**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

| | |
|---|---|
| STATE OF OREGON, et al.,<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants-Appellants. | No. 26-1804 |
| BURLAP AND BARREL, INC., et al.,<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants-Appellants. | No. 26-1805 |

**MOTION TO CONSOLIDATE APPEALS**

The government moves to consolidate these two appeals, which arise from two cases decided in a single opinion by the Court of International Trade, for briefing and argument in this Court.  We have contacted counsel for appellees in both cases for their positions on this motion but have not received a response.

These appeals arise from separate suits filed in the Court of International Trade (CIT).   Both suits challenge the imposition of tariffs by the President under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132(a), as reflected in Proclamation 11012, 91 Fed. Reg. 9339 (Feb. 20, 2026).  The cases were not consolidated in the CIT, but a three-judge panel of the CIT heard both cases and resolved both in a single opinion, holding that Section 122 does not authorize the challenged tariffs.  That opinion is attached for the Court's reference.  The government filed a notice of appeal in each case, and the appeals are pending before this Court as Nos. 26-1804 and 26-1805.

Because these appeals concern a single opinion issued by the CIT applying the same reasoning across both cases, they should be treated together to avoid duplicative briefing or unnecessary filings.  Accordingly, the government respectfully requests that the appeals be consolidated.

We have sought the position of counsel for appellees in both cases but have not received a response.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK

*/s/ Sophia Shams*

SOPHIA SHAMS
DOUGLAS C. DREIER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7213*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*
  *Sophia.Shams@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 231 words.  This motion was prepared using Microsoft Word 2013 in 14-point Book Antiqua, a proportionally-spaced typeface.

 /s/ *Sophia Shams* 
Sophia Shams

Slip Op. 26-47

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, ET AL., <br><br> Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges <br><br> Court No. 26-01472-3JP |
| BURLAP AND BARREL, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, ET AL., <br><br> Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges <br><br> Court No. 26-01606-3JP |

## OPINION AND ORDER

[Granting Plaintiffs' motions for summary judgment and entering a permanent injunction for The State of Washington, Burlap and Barrel, Inc., and Basic Fun, Inc.; dismissing the claims of The State of Oregon, The State of Arizona, The State of California, The State of New York, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, The State of Maine, The State of Maryland, The Commonwealth of Massachusetts, The State of Michigan, The State of New Jersey, The State of Minnesota, The State of Nevada, The State of New Mexico, The State of North Carolina, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, The State of Rhode Island, The State of Vermont, The Commonwealth of Virginia, and The State of Wisconsin, for lack of standing; denying as moot Plaintiffs' alternative motions for preliminary injunction.]

Dated: May 7, 2026

Brian S. Marshall, Senior Assistant Attorney General, Oregon Department of Justice, of Portland, Or., argued for Plaintiffs The State of Oregon, The State of Arizona, The State

of California, The State of New York, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, The State of Maine, The State of Maryland, The Commonwealth of Massachusetts, The State of Michigan, The State of Minnesota, The State of Nevada, The State of New Jersey, The State of New Mexico, The State of North Carolina, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, The State of Rhode Island, The State of Vermont, The Commonwealth of Virginia, The State of Washington, and The State of Wisconsin.  Also on the brief for The State of Oregon were: Dan Rayfield, Attorney General, Benjamin Gutman, Deputy Attorney General, Dustin Buehler, Special Counsel, and Leanne Hartmann, Samuel Kubernick, and Brian Collins, Senior Assistant Attorneys General; for The State of Arizona: Kristin K. Mayes, Attorney General, Joshua D. Bendor, Solicitor General, Syreeta A. Tyrell, Senior Litigation Counsel, and Timothy E.D. Horley and Jaylia Yan, Assistant Attorneys General; for The State of California: Rob Bonta, Attorney General, Lara Haddad, Supervising Deputy Attorney General, and Shiwon Choe, Carolyn Downs, and Samuel Sokolsky, Deputy Attorneys General; for The State of New York: Letitia James, Attorney General, Rabia Muqaddam, Chief Counsel for Federal Initiatives, and Stephen Thompson, Mark Ladov, Natasha Korgaonkar, Special Counsel; for The State of Colorado: Philip J. Weiser, Attorney General, and Sarah H. Weiss, Senior Assistant Attorney General; for The State of Connecticut: William Tong, Attorney General, and Michael Skold, Solicitor General; for The State of Delaware: Kathleen Jennings, Attorney General, Ian R. Liston, Director of Impact Litigation, Vanessa L. Kassab, Deputy Attorney General, and Rose Gibson, Assistant Attorney General; for The State of Illinois: Kwame Raoul, Attorney General, Cara Hendrickson, Executive Deputy Attorney General, and Gretchen Helfrich, Deputy Chief, Special Litigation Bureau; for the Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky: S. Travis Mayo, General Counsel, and Laura C. Tipton, Deputy General Counsel; for The State of Maine: Aaron M. Frey, Attorney General, and Katherine W. Thompson, Special Counsel; for The State of Maryland: Anthony G. Brown, Attorney General, and James C. Luh, Senior Assistant Attorney General; for The Commonwealth of Massachusetts: Andrea J. Campbell, Attorney General, and Katherine Dirks, Chief State Trial Counsel; for The State of Michigan: Dana Nessel, Attorney General, and Neil Giovanatti, Assistant Attorney General; for The State of Minnesota: Keith Ellison, Attorney General, Peter J. Farrell, Deputy Solicitor General, and Lindsey E. Middlecamp, Special Counsel; for The State of Nevada: Aaron D. Ford, Attorney General, and K. Brunetti Ireland, Chief of Special Litigation; for The State of New Jersey, Jennifer Davenport, Attorney General, and Lucy I. Sprague and David N. Birch, Deputy Attorneys General; for The State of New Mexico: Raúl Torrez, Attorney General, and Amy Senier, Senior Counsel; for The State of North Carolina: Jeff Jackson, Attorney General, Laura Howard, Chief Deputy Attorney General, and Daniel T. Wilkes, Assistant Deputy Attorney General; for Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania: Jennifer

Selber, General Counsel, and Jacob B. Boyer, Deputy General Counsel; for The State of Rhode Island: Peter F. Neronha, Attorney General, and Alex Carnevale, Special Assistant Attorney General; for The State of Vermont: Charity R. Clark, Attorney General, and Ryan P. Kane, Deputy Solicitor General; for The Commonwealth of Virginia: Jay Jones, Attorney General, and Tillman J. Breckenridge, Solicitor General; for The State of Washington: Nicholas W. Brown, Attorney General, and Freeman E. Halle and Todd Sipe, Assistant Attorneys General; for The State of Wisconsin: Joshua L. Kaul, Attorney General, and Brian P. Keenan, Assistant Attorney General.

Jeffrey M. Schwab, Liberty Justice Center, of Austin, TX, argued for Plaintiffs Burlap and Barrel, Inc., and Basic Fun, Inc.  Also on the brief were Reilly W. Stephens and James McQuaid.

Brett A. Shumate, Assistant Attorney General, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendants United States, Donald J. Trump, in his official capacity as President of the United States, Department of Homeland Security, Markwayne Mullin, in his official capacity as Secretary of the Department of Homeland Security, United States Customs and Border Protection, Rodney S. Scott, in his official capacity as Commissioner of United States Customs and Border Protection, the Executive Office of the President, Jamieson Greer, in his official capacity as United States Trade Representative, and the Office of the United States Trade Representative. Also on the brief were Eric J. Hamilton, Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Commercial Litigation Branch, Claudia Burke, Deputy Director, Commercial Litigation Branch, Justin R. Miller, Attorney-In-Charge, International Trade Field Office, Sosun Bae, Senior Trial Counsel, and Collin T. Mathias, Blake W. Cowman, Catherine M. Yang, and Mathias Rabinovitch, Trial Attorneys.

J. Marc Wheat, Advancing American Freedom, of Washington, DC, for Amici Curiae Advancing American Freedom, et al.

Ilya Somin, of Arlington, VA, and Joshua A. Claybourn, Jackson Kelly PLLC, of Evansville, IN, for Amici Curiae Cato Institute and Ilya Somin.

Adam G. Unikowsky, Aaron R. Cooper, Nikita Lalwani, and Debbie L. Berman, of Jenner & Block LLP, of New York, NY, and Chicago, IL, for Amici Curiae Economists.

      Barnett and Kelly, Judges: Plaintiffs[1] in these companion cases contest the imposition of duties pursuant to Proclamation No. 11012, Imposing a Temporary Import

---

[1] The plaintiffs in Court No. 26-01472, referred to as "State Plaintiffs," are The State of Oregon, The State of Arizona, The State of California, The State of New York, The

Court Nos. 26-01472 & 26-01606                                           Page 4

Surcharge to Address Fundamental International Payments Problems (Feb. 20, 2026),

91 Fed. Reg. 9339 (Feb. 25, 2026) ("Proclamation No. 11012") invoking Section 122 of

the Trade Act of 1974, 19 U.S.C. § 2312.  Compl. (Mar. 5, 2026) ("State Compl."), ECF

No. 2, Ct. No. 26-01472; Compl. (Mar. 9, 2026) ("Priv. Compl."), ECF No. 2, Ct. No. 26-

01606.[2]  Before the court are Plaintiffs' motions for summary judgment.  Pl. States' Mot.

for Summ. J., and, in the Alt., for a Prelim. Inj. (Mar. 13, 2026) ECF No. 25, and Pl.

States' Mem. of Law in Supp. of Mot. for Summ. J., and, in the Alt., for a Prelim. Inj.

(Mar. 13, 2026) ("State Pls.' Mem."), ECF No. 25; Pls.' Mot. for Prelim. Inj. and/or

Summ. J. for Permanent Inj. (Mar. 13, 2026), ECF No. 11, and Mem. in Supp. of Pls.'

Mot. for Prelim. Inj. and/or Summ. J. for Permanent Inj. (Mar. 13, 2026) ("Priv. Pls.'

Mem."), ECF No. 11.  Defendants[3] ("the Government") filed a single combined

---

State of Colorado, The State of Connecticut, The State of Delaware, The State of
Illinois, Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor
of the Commonwealth of Kentucky, The State of Maine, The State of Maryland, The
Commonwealth of Massachusetts, The State of Michigan, The State of Minnesota, The
State of Nevada, The State of New Jersey, The State of New Mexico, The State of
North Carolina, Josh Shapiro, in his official capacity as Governor of the Commonwealth
of Pennsylvania, The State of Rhode Island, The State of Vermont, The Commonwealth
of Virginia, The State of Washington, and The State of Wisconsin.  The plaintiffs in
Court No. 26-01606, referred to as "Private Plaintiffs," are Burlap and Barrel, Inc.
("Burlap and Barrel") and Basic Fun, Inc. ("Basic Fun").  The court refers to the State
Plaintiffs and the Private Plaintiffs collectively as "Plaintiffs."
[2] Citations to documents filed by State Plaintiffs identify the ECF No. in Ct. No. 26-
001472, and citations to documents filed by Private Plaintiffs identify the ECF No. in Ct.
No. 26-001606.  For documents filed on both case dockets, the court references the
ECF No. in Ct. No. 26-01472.
[3] Named Defendants are the United States, Donald J. Trump, in his official capacity as
President of the United States, United States Department of Homeland Security,
Markwayne Mullin, in his official capacity as Secretary of the Department of Homeland
Security, United States Customs and Border Protection, and Rodney S. Scott, in his
official capacity as Commissioner of United States Customs and Border Protection, see

Court Nos. 26-01472 & 26-01606                                    Page 5

opposition brief in response to both motions.  Defs.' Resp. in Opp'n to Mots. For Prelim.

Inj. and Summ. J. (Apr. 3, 2026) ("Defs.' Resp."), ECF No. 35.  Plaintiffs filed replies.  Pl.

States' Reply in Supp. of Mot. for Summ. J., and, in the Alt., for a Prelim. Inj. (Apr. 7,

2026) ("State Pls.' Reply"), ECF No. 37; Pls.' Reply Br. in Supp. of Their Mot. for Prelim.

Inj. and/or Summ. J. for Permanent Inj. (Apr. 7, 2026) ("Priv. Pls.' Reply"), ECF No. 22.

For the reasons discussed herein, the court grants summary judgment for Private

Plaintiffs and The State of Washington and enters a permanent injunction for those

importer Plaintiffs.  The court dismisses without prejudice the claims of the remaining

non-importer Plaintiffs.  The court denies as moot Plaintiffs' motions for a preliminary

injunction.

BACKGROUND

I.        **Section 122 of the Trade Act of 1974**

Article I, Section 8 of the U.S. Constitution vests Congress with the "Power To lay

and collect Taxes, Duties, Imposts and Excises."  U.S. Const. art. I, § 8, cl. 1.  Section

122 of the Trade Act of 1974 constitutes a congressional delegation of some of that

authority to the President.  Titled "Balance-of-Payments Authority," Section 122

empowers the President of the United States to impose temporary surcharges up to 15

percent <u>ad valorem</u> when fundamental international payment problems exist.  Section

122 of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 1987–89 (1974)

---

Summons (Mar. 5, 2026), ECF No. 1, Ct. No. 26-01472, as well as the Executive Office
of the President, Jamieson Greer, in his official capacity as United States Trade
Representative, and the Office of the United States Trade Representative, <u>see</u>
Summons (Mar. 9, 2026), ECF No. 1, Ct. No. 26-01606.

(codified at 19 U.S.C. § 2132)).[4]  The statute provides (with bold emphasis on the

provisions relevant to Proclamation No. 11012):

> (a) **Whenever fundamental international payments problems require special import measures to restrict imports**—
>> (1) **to deal with large and serious United States balance-of-payments deficits**[,]
>> (2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or
>> (3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,
>
> **the President shall proclaim, for a period not exceeding 150 days** (unless such period is extended by Act of Congress)—
>> (A) **a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States**;
>> (B) temporary limitations through the use of quotas on the importation of articles into the United States; or
>> (C) both a temporary import surcharge described in subparagraph (A) and temporary limitations described in subparagraph (B) . . . .
>
> (b) If the President determines that the imposition of import restrictions under subsection (a) will be contrary to the national interest of the United States, then he may refrain from proclaiming such restrictions and he shall—
>> (1) immediately inform Congress of his determination, and
>> (2) immediately convene the group of congressional official advisers designated under section 2211(a) of this title [section 161(a) in the Trade Act of 1974] and consult with them as to the reasons for such determination.
>
> (c) Whenever the President determines that fundamental international payments problems require special import measures to increase imports—

---

[4] Because Congress has not enacted Title 19 into positive law, the version of section 122 contained in the Statutes at Large governs to the extent there is a conflict between the public law and the U.S. Code.  For ease of reference, however, the court cites to 19 U.S.C. § 2132, showing, when necessary, any alterations to or differences from the Trade Act of 1974.  One such conflict, for example, is evident in Section 122(a)(1), which contains a comma at the end of that clause, while 19 U.S.C. § 2132(a)(1) contains a period.  Compare Trade Act of 1974, § 122, 88 Stat. at 1987 (comma), with 19 U.S.C. § 2132(a)(1) (1976) (period), and 19 U.S.C. § 2132(a)(1) (2018) (period).

> (1) to deal with large and persistent United States balance-of-trade surpluses, as determined on the basis of the cost-insurance-freight value of imports, as reported by the Bureau of the Census, or
> (2) to prevent significant appreciation of the dollar in foreign exchange markets,

the President is authorized to proclaim, for a period of 150 days (unless such period is extended by Act of Congress)—

> (A) a temporary reduction (of not more than 5 percent ad valorem) in the rate of duty on any article; and
> (B) a temporary increase in the value or quantity of articles which may be imported under any import restriction, or a temporary suspension of any import restriction . . . .

> (d)      (1) Import restricting actions proclaimed pursuant to subsection (a) **shall be applied consistently with the principle of nondiscriminatory treatment** . . . .
>          (2) Notwithstanding paragraph (1), if the President determines that the purposes of this section will best be served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action . . . .

> (e) Import restricting actions proclaimed pursuant to subsection (a) shall be of **broad and uniform application with respect to product coverage except where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy**.  Such exceptions shall be limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors . . . .

19 U.S.C. § 2132(a)–(e) (emphases added).

## II.      Historical Background Prior to Enactment of Section 122

Congress enacted Section 122 in response to a particular set of economic circumstances.  During the immediate aftermath of World War II, the United States and other nations undertook negotiations to develop the contours of a future international monetary and economic system.  See The Office of the Historian, Bretton Woods-

Court Nos. 26-01472 & 26-01606                                             Page 8

GATT, 1941-1947, U.S. Dep't of State, https://history.state.gov/milestones/1937-1945/bretton-woods (last visited May 6, 2026).  The negotiations resulted in the inauguration of the Bretton Woods international monetary system and, simultaneously, the creation of the International Monetary Fund and the World Bank.  See id.; Articles of Agreement of the Int'l Monetary Fund, Dec. 27, 1945, 60 Stat. 1401, 2 U.N.T.S. 39 ("Bretton Woods Agreements"); see also Bretton Woods Agreements Act, Pub. L. No. 79-171, 59 Stat. 512 (1945) (codified as amended at 22 U.S.C. §§ 286–286x) (implementing the Bretton Woods Agreements domestically).  Under the Bretton Woods system, the values of foreign currencies were fixed to the value of the U.S. dollar, the value of which was expressed in terms of gold at a rate of $35 per ounce, the so-called "gold standard."  Bretton Woods Agreements, Art. IV, Sec. 1(a); Proclamation No. 2072, 48 Stat. 1730 (Jan. 31, 1934); see also Gold Reserve Act of 1934, Pub. L. No. 73-87, 48 Stat. 337 (1934) (delegating authority to the President to fix the value of the U.S. dollar in relation to gold).

The Bretton Woods system was under increasing strain by the 1960s when the volume of U.S. dollars in worldwide circulation exceeded domestic gold reserves redeemable at fixed value, leading to periodic runs on the dollar in foreign exchange markets.  See The Office of the Historian, Nixon and the End of the Bretton Woods System, 1971-1973, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/nixon-shock (last visited May 6, 2026).  In August 1971, President Richard M. Nixon directed the suspension of the dollar's international convertibility into gold, imposed a series of domestic economic measures including wage and price controls,

and instituted a 10 percent "surcharge" on all imports into the United States in response

to the nation's deteriorating "balance of payments position."  Proclamation No. 4074,

Imposition of Suppl. Duty for Balance of Payments Purposes (Aug. 15, 1971), 36 Fed.

Reg. 15724 (Aug. 17, 1971).  In December 1971, the Group of Ten ("G-10") countries

agreed to a new set of fixed exchange rates that would devalue the dollar in the

Smithsonian Agreement.  See Nixon and the End of the Bretton Woods System, 1971-

1973.  But by early 1973, speculative pressures in global financial markets led to a

further devaluation of the dollar, and the G-10 economies reached a new agreement

whereby a group of European Community countries would jointly "float" their currencies

against the dollar.  See id.  This marked the end of the Bretton Woods system of fixed

exchange rates.  See id.  Later in 1973, after the outbreak of the Arab-Israeli War,

members of the Organization of Petroleum Exporting States ("OPEC") imposed an oil

embargo against the United States, further straining the U.S. economy and creating

external financial pressures with respect to foreign oil-producing countries.  See The

Office of the Historian, Oil Embargo, 1973-1974, U.S. Dep't of State,

https://history.state.gov/milestones/1969-1976/oil-embargo (last visited May 6, 2026).

The United States Customs Court, the predecessor to the United States Court of

International Trade ("CIT"), heard a challenge to the 10 percent Nixon surcharge in

1974.  See Yoshida Int'l, Inc. v. United States (Yoshida I), 73 Cust. Ct. 1, 378 F. Supp.

1155 (1974).  Despite not being cited in the underlying Proclamation imposing the

surcharge, the Government argued that the President's actions were lawful pursuant to

the Trading with the Enemy Act ("TWEA"), a 1917 wartime powers statute.  See id., 378

F. Supp. at 1157.  The Customs Court disagreed, holding that the surcharge exceeded the limited emergency authority delegated to the President by TWEA.  Id., 378 F. Supp. at 1172, 1175–76 ("The delegation of such an unrestrained and unbridled authority to lay duties, indeed, might well be deemed an abdication by the Congress of its constitutional power to regulate foreign commerce.").  The United States Court of Customs and Patent Appeals, the predecessor to the United States Court of Appeals for the Federal Circuit, reversed the Customs Court's decision, holding that the surcharge was "within the power constitutionally delegated" to the President by TWEA and reasoning that "[t]hough such a broad grant may be considered unwise, or even dangerous, should it come into the hands of an unscrupulous, rampant President, willing to declare an emergency when none exists, the wisdom of a congressional delegation is not for us to decide."  United States v. Yoshida Int'l. Inc. (Yoshida II), 63 CCPA 15, 36, 526 F. 2d 560, 583–84 (1975) (footnote omitted).

It was against this backdrop that Congress acted to explicitly delegate tariff authority to the President, to be used in response to particular and exceptional economic conditions, under Section 122 of the Trade Act of 1974.  After almost two years of debate, and while the appeal of Yoshida I was pending, Congress enacted Section 122 in January 1975.  See Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1979 (1975).  The Yoshida II court explicitly observed that "[a] surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action," i.e., Section 122, and expressed no view "regarding the existence of authority

for Proclamation 4074 in 1971, from the specific grant of the surcharge authority spelled out in the Trade Act of 1974."  63 C.C.P.A. at 34 n.33, 526 F.2d at 582 n.33.

### III.      Proclamation No. 11012

Pursuant to authority claimed under Section 122, on February 20, 2026, the President announced a 10 percent <u>ad valorem</u> duty on "all articles imported into the United States," with specified exceptions.  Proclamation No. 11012, cl. 1; ¶ 14 (exceptions).  The duty went into effect at 12:01 a.m. EST on February 24, 2026, and is set to remain in effect until 12:01 a.m. EST on July 24, 2026, unless "suspended, modified, or terminated on an earlier date" or "extended by an Act of Congress."  <u>Id.</u>, cl. 7.  To implement the increased duty rates, Proclamation No. 11012 modified subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States ("HTSUS") to add new subheadings under HTSUS heading 9903.  <u>Id.</u>, Annex I.

The Proclamation begins by explaining that, "[s]ometimes, the United States faces fundamental international payments problems, such as large and serious balance-of-payments deficits, an imminent and significant depreciation of its currency in foreign exchange markets, or an international balance-of-payments disequilibrium."  <u>Id.</u> ¶ 1. According to the President, "[t]hese problems can, among other things, endanger the ability of the United States to finance its spending, erode investor confidence in the economy, and distress the financial markets."  <u>Id.</u>  The President's "senior officials [informed him] that fundamental international payments problems within the meaning of section 122 exist and that special import measures to restrict imports are required to address these problems."  <u>Id.</u> ¶ 5.  That determination was made "under any reasonable

understanding of the term in the context of section 122." Id. ¶ 6. The President's "advisors have studied different methods of evaluating balance-of-payments deficits, including calculations based on current-account statistics" and in their view, "under any of these methods, the United States balance-of-payments position is a large and serious deficit." Id.

The President made several findings to support the invocation of section 122. First, "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country." Id. ¶ 7; see also id. ¶ 8 ("[T]he United States runs a substantial trade deficit" that "contributes to the fundamental international payments problems facing the United States.").[5] Second, "the annual balance on the United States primary income turned negative for the first time since at least 1960 in 2024" and "in 2024, the United States maintained a current account deficit of 4.0 percent of gross domestic product (GDP)." Id. ¶ 9. Third, "the net international-investment position of the United States is in an ongoing decline" and "at the end of 2024, the net international-investment position . . . , as a share of GDP, was negative 90 percent." Id. ¶ 10. According to the President, "[b]ecause the current account is one of the primary drivers of changes in the net international-investment position, the atypically large negative net international-investment position of the United States shows that the

---

[5] "The large, persistent, and serious annual United States goods trade deficit has grown by over 40 percent in the past 5 years alone, reaching $1.2 trillion in 2024. In 2025, the United States goods trade deficit remained at approximately $1.2 trillion." Proclamation No. 11012 ¶ 8.

Court Nos. 26-01472 & 26-01606                                        Page 13

United States balance-of-payments deficit is large and serious."  Id.  Lastly, "the balance

on secondary income of the United States has been persistently in a deficit since the

1960s."  Id. ¶ 11.  In sum, the President identified deficits in trade, primary income,

secondary income, and the current account, and a negative net international-investment

position, to support the tariff imposition.  See id. ¶¶ 7–11.

      The President thus concluded, on the advice of his advisors, that "an import

surcharge in the form of ad valorem duties is required to address these fundamental

international payments problems" and "deal with the large and serious United States

balance-of-payments deficit."  Id. ¶ 12.  That action notwithstanding, the President listed

multiple exceptions based on "the needs of the United States economy."  Id. ¶ 14; see

also id. ¶ 14(a)–(m) (the excepted articles).  The President based the exceptions on his

determinations regarding "(1) the unavailability of domestic supply at reasonable prices,

the necessary importation of raw materials, the avoidance of serious dislocations in the

supply of imported goods, or other similar factors; or (2) the fact that the surcharge

would be unnecessary or ineffective in carrying out the purposes of section 122."  Id.

¶ 15.[6]

---

[6] Proclamation No. 11012 does not apply to goods "that (i) were loaded onto a vessel at
the port of loading and in transit on the final mode of transit prior to entry into the United
States, before 12:01 a.m. eastern standard time on February 24, 2026; and (ii) are
entered for consumption, or withdrawn from warehouse for consumption, before 12:01
a.m. eastern standard time, February 28, 2026."  Proclamation No. 11012 ¶ 15(2).

Court Nos. 26-01472 & 26-01606 Page 14

## IV. U.S. Customs and Border Protection CSMS # 67844987

On February 23, 2026, U.S. Customs and Border Protection ("CBP") issued guidance to the trade community regarding the application of Section 122 duties pursuant to Proclamation No. 11012. See State Compl., Ex. 2, ECF No. 2-2 ("Cargo Systems Messaging Service (CSMS) # 64844987 – Imposing Temporary Section 122 Duties," or "CSMS # 64844987"). CSMS # 64844987 set forth the HTSUS classifications for imported articles subject to the additional duties and for the exemptions. Id. CSMS # 64844987 also provided guidance regarding articles classifiable under Chapter 98 of the HTSUS, articles admitted into a U.S. foreign trade zone, drawback, and classification sequencing in entry summaries. Id.

## V. Procedural History

Plaintiffs filed their respective complaints in March 2026. State Compl. (filed Mar. 5, 2026); Priv. Compl. (filed Mar. 9, 2026). State Plaintiffs consist of 24 sovereign states, represented by various state officials. State Compl. ¶¶ 25–48. Burlap and Barrel "is a New York-based spice company and ecommerce business," that "imports single origin spices from at least 22 countries." Priv. Compl. ¶ 10. Basic Fun is a Florida-based toy company that "imports components and finished toy products from China" and "designs, markets, and sells toys and games . . . to American consumers." Id. ¶ 11.

Following a status conference, see Docket Entry, ECF No. 23, Ct. No. 26-01472, and upon consultation with parties to both actions, the court granted in part and denied in part the State Plaintiffs' motion for expedited treatment of their case and entered a

scheduling order, see Scheduling Order (Mar. 12, 2026), ECF No. 24.  The parties filed

their respective briefs, and the Government filed an Answer to the complaints,

consistent with the deadlines in the scheduling order.[7]  See State Pls.' Mem.; Priv. Pls.'

Mem.; Defs.' Resp.; State Pls.' Reply; Priv. Pls.' Reply; Answer [State Compl.] (Apr. 3,

2026), ECF No. 34; Answer [Priv. Compl.] (Apr. 3, 2026), ECF No. 15.   The court held

oral argument on April 10, 2026.  Docket Entry, ECF No. 46; see also Oral Arg.,

https://www.cit.uscourts.gov/ audio-recordings-select-public-court-proceedings.

### JURISDICTION

The court has statutory subject matter jurisdiction pursuant to 28 U.S.C. § 1581(i)

(2018 & Supp. II 2022).  Section 1581(i) grants the court

> exclusive jurisdiction of any civil action commenced against the United
> States, its agencies, or its officers, that arises out of any law of the United
> States providing for—
> (A) revenue from imports or tonnage;
> (B) tariffs, duties, fees, or other taxes on the importation of
> merchandise for reasons other than the raising of revenue;
> (C) embargoes or other quantitative restrictions on the importation
> of merchandise for reasons other than the protection of the public
> health or safety; or

---

[7] Consistent with the agreement of all Parties, these cases proceeded on motions for summary judgment by Plaintiffs.  The dissent contends that Plaintiffs have failed to show the absence of a genuine dispute as to any material fact, and that granting of summary judgment is therefore not appropriate here.  Dissent Op. at 30–31.  To support this view, the dissent relies on Plaintiffs' argument "that in today's economic environment it is impossible for large and serious balance-of-payments deficits to exist," id. at 30.  But this argument hinges entirely on the definition of "balance-of-payments deficits," which is a legal issue for the court to resolve.  The Parties' assertions regarding certain contemporary Bureau of Economic Analysis ("BEA") measurements, see id. at 26 n.16, are, moreover, only relevant insofar as they might inform the court's interpretation of "balance-of-payments deficits."  Thus, the disputes between the Parties are properly characterized as questions of law, not of material fact.

Court Nos. 26-01472 & 26-01606                                                Page 16

> (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

Id. § 1581(i)(1).  These cases fall within section 1581(i)(1)(B), "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue."  Id. § 1581(i)(1)(b).  For purposes of 28 U.S.C. § 1581(i), a challenge to presidential action imposing tariffs, duties, or other import restrictions arises under a law providing for those measures.  See Luggage & Leather Goods Mfrs. of Am., Inc. v. United States, 588 F. Supp. 1413, 1419–21 (1984); U.S. Cane Sugar Refiners' Ass'n v. Block, 544 F. Supp. 883, 886 (1982), aff'd, 683 F.2d 399 (C.C.P.A. 1982).[8]

### STANDARD OF REVIEW

We necessarily interpret the statute in question to discern the extent of the delegated authority, which is a question of law.  See Marbury v. Madison, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); Loper Bright Enters. v. Raimondo, 603 U.S. 369, 386 (2024).  Beyond that, we are not empowered to review the factual determinations committed to the President's exercise of his discretion.  Silfab Solar, Inc. v. United States, 892 F.3d 1340,

---

[8] Although 28 U.S.C. § 1581(i) does not permit suit directly against the President, the court retains jurisdiction over suits against subordinate officials responsible for implementing the President's directives.  Corus Grp. PLC v. ITC, 352 F.3d 1351, 1359 (Fed. Cir. 2003) (explaining that, although the President is not an "officer" within the meaning of section 1581(i), claims challenging implementation of presidential action may proceed against the officials charged with administering that action); USP Holdings, Inc. v. United States, 36 F.4th 1359, 1366 (Fed. Cir. 2022) (reaffirming that section 1581(i) does not authorize suits against the President directly, but permits suits against subordinate officials responsible for carrying out the President's proclamation).

Court Nos. 26-01472 & 26-01606                                                 Page 17

1349 (Fed. Cir. 2018) ("In particular, courts have repeatedly confirmed that, where the statute authorizes a Presidential 'determination,' the courts have no authority to look behind that determination to see if it is supported by the record." (citing United States v. George S. Bush & Co., 310 U.S. 371, 379 (1940)); Motion Sys., Inc. v. United States, 437 F.3d 1356, 1360 (2006) (en banc) (citing George S. Bush & Co., 310 U.S. at 379). We determine what Congress has committed to the President's discretion. Loper Bright, 603 U.S. at 386. And we "determine whether the President "clear[ly] misconstru[ed]" his statutory authority. USP Holdings, Inc. v. United States, 36 F.4th 1359, 1365–66 (Fed. Cir. 2022) (citing Corus Grp., 352 F.3d at 1356); Motions Sys., 437 F.3d at 1361 (explaining that courts may consider whether "the President has violated an explicit statutory mandate"). We do not review claims that the President exceeded statutory authority according to a standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), the President not being an agency within the meaning of the APA. Franklin v. Mass., 505 U.S. 788, 796, 801 (1992). In considering Plaintiffs' summary judgment motions, we will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT Rule 56(a).

### DISCUSSION

I.    **Standing**

   A. **Legal Framework**

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" Already, LLC v. Nike, Inc., 568 U.S. 85, 90 (2013). "That

Court Nos. 26-01472 & 26-01606                                             Page 18

limitation requires those who invoke the power of a federal court to demonstrate

standing." Id. Thus, whether a plaintiff has Article III standing is a "threshold" inquiry.

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998). "[A]n 'actual

controversy,'" and, thus, standing, "must exist not only 'at the time the complaint is filed,'

but through 'all stages' of the litigation." Already, LLC, 568 U.S. at 90–91 (quoting

Alvarez v. Smith, 558 U.S. 87, 92 (2009)).

      "To establish Article III standing, an injury must be concrete, particularized, and

actual or imminent; fairly traceable to the challenged action; and redressable by a

favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (internal

quotation marks omitted); see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–561

(1992). For an injury to be imminent it must be "certainly impending," or there must be

"a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573

U.S. 149, 158 (2014) (internal quotation marks omitted); see also Mass. v. Mellon, 262

U.S. 447, 488 (1923) (a plaintiff must show, inter alia, "that he has sustained or is

immediately in danger of sustaining some direct injury"). Accordingly, "[a]llegations of

possible future injury are not sufficient." Clapper, 568 U.S. at 409 (internal quotation

marks omitted) (emphasis added) (alteration in original).

      When standing is based on "the government's allegedly unlawful regulation . . . of

someone else, . . . causation and redressability ordinarily hinge on the response of the

regulated (or regulable) third party to the government action or inaction—and perhaps

on the response of others as well." Defs. of Wildlife, 504 U.S. at 562. In that case, "it

becomes the burden of the plaintiff to adduce facts showing that those choices have

been or will be made in such manner as to produce causation and permit redressability of injury." Id. "Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the courts." Clapper, 568 U.S. at 415 (internal quotation marks and citation omitted).

## B. Parties' Contentions[9]

State Plaintiffs contend they have standing to sue as "direct importers of tariffed goods" or as non-importer plaintiffs suffering "pecuniary harms" traceable to the challenged tariffs under a theory of "economic logic." State Pls.' Mem. at 33–34 (quoting V.O.S. Selections, Inc. v. United States, 49 CIT __, __, 772 F. Supp. 3d 1350, 1367 (2025), aff'd in part, vacated in part, 149 F.4th 1312 (Fed. Cir. 2025), aff'd sub

---

[9] In light of the expedited briefing schedule, the court treats Defendants' response to State Plaintiffs' summary judgment motion as a "'suggestion'" of lack of standing with respect to non-importer plaintiff states and conducts an inquiry into that question. See Indium Corp. of America v. Semi–Alloys, Inc., 781 F.2d 879, 883–84 (Fed. Cir. 1985) (explaining that it is appropriate for a trial court to treat a "motion for summary judgment as a 'suggestion' of lack of subject matter jurisdiction and conduct[] an inquiry into the question of declaratory judgment jurisdiction"); Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 553 (2001) ("Regardless of how the Government designates its jurisdictional challenge, the [c]ourt is required to inquire sua sponte whenever a doubt arises as to the existence of federal jurisdiction." (quoting Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977))). Out of an abundance of caution, the court also considers the standing of importer plaintiffs. Consideration of evidence extrinsic to the complaint is permissible to establish "predicate jurisdictional facts." Cedars–Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993)). Plaintiffs submitted declarations supporting the allegations of standing in their complaints. For State Plaintiffs, see Decl. of Rabia Muqaddam, Exs. 5–28, ECF Nos. 27, 27-7 through 27-28 (individual declarations of State Plaintiffs). For Private Plaintiffs, see Decl. of Ethan Frisch, ECF No. 11 (on behalf of Burlap and Barrel) ("Frisch Decl."); Decl. of Jay Foreman, ECF No. 11 (on behalf of Basic Fun) ("Foreman Decl."). Defendants do not contest Plaintiffs' allegations or declarations of fact with respect to standing or seek discovery on standing pursuant to USCIT Rule 56(d) before the court reaches the merits of Plaintiffs' claims.

nom., Learning Res., Inc. v. Trump, 146 S. Ct. 628 (2026)); see also State Compl. ¶¶ 95–99; State Pls.' Reply at 17–18.[10]

Private Plaintiffs allege standing as importers. Priv. Compl. ¶¶ 10–11. Burlap and Barrel avers it "currently has three shipments scheduled to arrive in the next few weeks on which it will have to pay the tariffs imposed by the Section 122 Proclamation." Priv. Pls.' Mem. at 12 (citing Frisch Decl. ¶ 15). Basic Fun asserts it "has approximately 104 shipping containers of toys and components scheduled to arrive in the United States during the 150-day tariff period." Id. at 14 (citing Foreman Decl. ¶ 7).

The Government concedes standing with respect to the State of Washington and Private Plaintiffs based on information from CBP indicating that all three plaintiffs have imported goods subject to Section 122 duties. Defs.' Resp. at 69 n.23, 73 n.24. The Government contests the standing of the remaining State Plaintiffs "because they do not allege that they have been—or will soon be—required to pay duties under Section 122." Id. at 72. The Government contends that non-importer State Plaintiffs seek standing instead as "purchasers who allegedly paid increased costs to third-party importers based on IEEPA duties and . . . expect to do the same for Section 122 duties." Id. at 73. Such claims are "too attenuated," the Government argues, amounting to "no more

---

[10] In Learning Resources, the U.S. Supreme Court held the President's invocation of the International Emergency Economic Powers Act ("IEEPA") to issue a series of Executive Orders imposing tariffs to be unlawful. 148 S. Ct. at 635–36, 646. The Court issued its decision on February 20, 2026, the same day that President Trump signed Proclamation No. 11012.

than allegations of possible future injury" that fail to demonstrate causation.  Id. at 74–75.

### C. Analysis

#### 1. Importer Plaintiffs Have Standing

The standing inquiry for Private Plaintiffs and the State of Washington (collectively, "Importer Plaintiffs") is straightforward.  "[W]hen the plaintiff is himself an object of the [challenged government] action[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  Defs. of Wildlife, 504 U.S. at 561–62.  "[A]n importer's allegation that it pays unlawful U.S. duties typically would satisfy constitutional standing requirements."  V.O.S. Selections, 772 F. Supp. 3d at 1369 (internal quotation marks and citation omitted).  While standing must be assessed from the outset of the actions, it is enough for Importer Plaintiffs to show that, at the time of filing their respective complaints, payment of Section 122 duties was "certainly impending" or there was "a substantial risk" that such payment "will occur."  See Susan B. Anthony List, 573 U.S. at 158.

Importer Plaintiffs readily meet the imminent injury requirement.  The State of Washington submitted a declaration by the Executive Director of Procurement Services for the University of Washington ("UW"), a public research institution.[11]  Decl. of Ray

---

[11] Harm to a "public instrumentality" of a State harms the State.  Biden v. Nebraska, 600 U.S. 477, 490 (2023) ("The plan's harm to MOHELA is also a harm to Missouri.  MOHELA is a 'public instrumentality' of the State.").

Court Nos. 26-01472 & 26-01606                                          Page 22

Hsu, ECF No. 27-26 ("Hsu Decl."). Mr. Hsu declared that UW imports "products directly from overseas and pays the applicable duties directly to the United States government through its customs broker." Id. ¶ 5. Mr. Hsu averred that, in 2024, "UW accepted ninety-three shipments via its customs broker and paid a total of $18,199.37 in duties"; "[i]n 2025, the university accepted 130 shipments and paid a total of $1,019,104.44 in duties"; and "[a]s of the end of February 2026," UW has "accepted 23 shipments and paid a total of $34,107.83 in duties." Id. While these earlier duties "were based on the President's invocation of IEEPA,"[12] Mr. Hsu expects that UW "will purchase similar goods" subject to Section 122 duties before July 24, 2026. Id. ¶ 7. Mr. Hsu's declaration shows that UW accepts several shipments each month, which is sufficient to demonstrate that, in early March 2026, payment of Section 122 duties was "certainly impending."[13]

Private Plaintiffs import merchandise directly from overseas. Burlap and Barrel provided a declaration by its co-founder and co-CEO, Ethan Frisch. Frisch Decl. ¶ 2. Mr. Frisch declared that as of March 9, 2026, Burlap and Barrel had "three shipments scheduled to arrive in the next few weeks on which it will have to pay Section 122 tariffs." Id. ¶ 15; see also id. at 7 (noting the date). Those "imports are valued at

---

[12] The first IEEPA duties went into effect on February 4, 2025, and were issued pursuant to Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025). See V.O.S. Selections, 772 F. Supp. 3d at 1362–63.

[13] This finding is supported by, but does not turn on, Defendants' assertion that UW has made at least one Section 122 duty payment. Defs.' Resp. at 73 n.24. Additionally, the standing of the State of Washington does not depend on UW's allegations regarding indirect harm. See Hsu Decl. ¶ 6.

Court Nos. 26-01472 & 26-01606                                          Page 23

$172,732" with an "expected tariff" payment in the amount of "$17,273."  Id. ¶ 15.  Mr. Frisch further averred that for the 150-day duration of the Section 122 tariffs, Burlap and Barrel expects to "pay $60,000 in Section 122 tariffs."  Id. ¶ 17.  Basic Fun submitted a declaration by its CEO, Jay Foreman.  Foreman Decl. ¶ 2.  Mr. Foreman declared that Basic Fun "has approximately 104 shipping containers of toys and toy components scheduled to arrive in the United States during the upcoming 150-day period covered by the Section 122 tariffs," on which it expects to pay "approximately $690,000 in tariffs." Id. ¶¶ 7–8.  Like UW, Private Plaintiffs have demonstrated standing based on imminent, if not actual, liability for payment of Section 122 duties.

There being no question with respect to causation of the Importer Plaintiffs' respective injuries or the court's ability to redress those injuries, Importer Plaintiffs have standing to challenge the imposition of Section 122 duties pursuant to Proclamation No. 11012.  Because "at least one plaintiff has standing, the suit may proceed."  Nebraska, 600 U.S. at 489.

### 2.  Non-Importer State Plaintiffs Lack Standing

It is not necessary to address the standing of the remaining State Plaintiffs (collectively, "Non-Importer State Plaintiffs") to establish the existence of a case or controversy before the court.  See id.  It is, however, necessary to examine their standing to inform the scope of any relief the court may find appropriate: the Non-Importer State Plaintiffs seek a universal injunction to remedy indirect harm they claim to suffer.  State Pls.' Mem. at 34, 41–43; State Pls.' Reply at 20 ("[B]ecause only importers of record have a clear refund remedy, an injunction is necessary to stop the

Court Nos. 26-01472 & 26-01606                                    Page 24

States from paying hundreds of millions *indirectly* due to the Section 122 tariffs.") (emphasis added).[14]  Whether the court has authority to issue universal injunctive relief is, at present, an open question.  See V.O.S. Selections, 149 F.4th at 1339 (vacating the CIT's entry of a permanent injunction and remanding for reconsideration after the U.S. Supreme Court's intervening decision in Trump v. CASA, Inc., 606 U.S. 831 (2025)).[15]  In this case, however, the court does not need to reach this question because the Non-Importer State Plaintiffs fail to demonstrate an injury-in-fact, and therefore, lack Article III standing.

Non-Importer State Plaintiffs allege one or more of the following types of indirect economic harm: (1) passthrough tariff surcharges, (2) tariff-related increases in the cost of goods and services, and (3) burden and delay in the States' ability to carry out administrative duties.  See State Pls.' Mem. at 19–20, 34; see also, e.g., Decl. of Elizabeth Papadopoulos ¶¶ 5–8, ECF No. 27-24 (Oregon) ("Papadopoulos Decl."); Decl. of Jenifer Johnson ¶¶ 7–9, ECF No. 27-13 (Illinois); Decl. of Jeanette Moy ¶¶ 10–11, ECF No. 27-21 (New York); Decl. of Mark Raymond ¶¶ 5, 10–12, ECF No. 27-12 (Connecticut); Decl. of Jared Ambrosier ¶¶ 6, 11–13, ECF No. 27-17 (Michigan).[16]

---

[14] The States have not identified the importer/vendors from which they purchase goods subject to the Section 122 tariffs.  Nevertheless, given the number of State Plaintiffs, the breadth of their economic activity, and the wide scope of the Section 122 tariffs, any injunction on the collection of Section 122 tariffs would have to be universal to be practicable and to have practical effect for the Non-Importer State Plaintiffs.

[15] Learning Resources mooted any need for the CIT to reconsider the V.O.S. injunction.  See Learning Res., 146 S. Ct. 628 (2026).

[16] Non-Importer State Plaintiffs do not allege third party standing.  See, e.g., Powers v. Ohio, 499 U.S. 400, 410–11 (1991) (criteria for third party standing includes injury to the litigant, "a close relation to the third party," and "some hindrance to the third party's

"Monetary costs are of course an injury."  Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 111 (2025) (quoting United States v. Texas, 599 U.S. 670, 676 (2023)).  And Plaintiffs may "fairly employ economic logic" to establish injury-in-fact.  Canadian Lumber Trade All. v. United States, 517 F.3d 1319, 1333 (Fed. Cir. 2008); see also V.O.S. Selections, 772 F. Supp. 3d at 1368 ("To suffer an economic injury from a tariff it is not necessary to incur direct liability to Customs, or even to directly import an article of dutiable merchandise.").[17]  But "[w]hen . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." Defs. of Wildlife, 504 U.S. at 562.[18]

---

ability to protect his or her own interests") (citing Singleton v. Wulff, 428 U.S. 106, 112–16 (1976)).

[17] In Canadian Lumber, the U.S. Court of Appeals for the Federal Circuit affirmed the CIT's reliance on "the doctrine of 'competitor standing'" to find that certain Canadian producers had standing to challenge distributions of money to U.S. producers pursuant to the "Continued Dumping and Subsidy Offset Act," also known as the "Byrd Amendment."  517 F.3d at 1332–34.  That doctrine uses "economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors."  Id. at 1332.  While that case was "not a textbook candidate for 'competitor standing,'" the Federal Circuit found it "quite rational to infer that Customs, by distributing money to an entity that aims to take away market share from Canadian wheat and has already been somewhat successful in that effort, is likely to inflict further economic injury on the Canadian [producers]."  Id. at 1334.  Nevertheless, as the Federal Circuit later observed, the "findings of standing in Canadian Lumber and the other 'competitor standing' cases are applications of the standing requirement that the disputed action must pose a nonspeculative threat to a concrete interest of the challenger."  AVX Corp. v. Presidio Components, Inc., 923 F.3d 1357, 1364 (Fed. Cir. 2019).

[18] In the case of indirect injury, causation and redressability are typically more difficult to establish.  See, e.g., Murthy v. Mo., 603 U.S. 43 (2024).  In Murthy, the Supreme Court noted the "bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." 603 U.S. at 57 (internal

None of the Non-Importer State Plaintiffs identify actual indirect harm resulting from Section 122 duties.  Instead, Non-Importer State Plaintiffs urge the court to find imminent injury-in-fact based on their respective experiences with IEEPA duties.  See State Pls.' Reply at 17–18 ("As Plaintiffs' experience with IEEPA demonstrated, sometimes these tariff costs are passed through directly to purchasers, while in other instances the price increase is less direct."); see also, e.g., Papadopoulos Decl. ¶ 9 ("While the tariffs Fleet Services paid in the past were based on the President['s] invocation of IEEPA, I expect that Fleet Services will purchase similar goods before July 24, 2026, that would be subject to tariffs under the Section 122 Proclamation.").  The speculative nature of the Non-Importer State Plaintiffs' injury distinguishes this case from V.O.S. Selections.  See V.O.S. Selections, 772 F. Supp. 3d at 1367 ("The businesses that bring the V.O.S. action . . . allege and aver that they have suffered (and will continue to suffer) economic injuries as a result of the Worldwide and Retaliatory Tariffs.") (footnote omitted).[19]  While "'imminence' is concededly a somewhat elastic

_____

quotation marks and citation omitted) (emphasis added).  The relevant inquiry is whether third parties will "react in predictable ways."  Id.  Thus, the Supreme Court has "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  Id. (quoting Clapper, 568 U.S. at 413).

[19] State Plaintiffs assert that "[e]ven the dissenting opinion in the Federal Circuit 'agree[d] with the majority's decision on jurisdiction and standing.'"  State Pls.' Reply at 18 n.7 (quoting V.O.S. Selections, 149 F.4th at 1348–49) (Taranto, J., dissenting)) (second alteration in original).  State Plaintiffs appear to imply that the Federal Circuit majority affirmed the standing of non-importers in that case and agreement with that affirmance by the dissent.  The V.O.S. majority did not, however, directly address the standing of non-importers and as previously noted, vacated and remanded the CIT's sole remedy for those plaintiffs.  V.O.S. Selections, 149 F.4th at 1340.  The V.O.S. dissenters, moreover, also characterized their position somewhat differently, and

concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged

injury is not too speculative for Article III purposes—that the injury is certainly

impending." Defs. of Wildlife, 504 U.S. at 564 n.2 (internal quotation marks and citation

omitted). While the attenuation of their alleged harm varies, they are, nevertheless,

mere "[a]llegations of possible future injury." See Clapper, 568 U.S. at 409 (internal

quotation marks omitted) (alteration in original).[20] Accordingly, the Non-Importer State

Plaintiffs lack Article III standing. The court will dismiss without prejudice all claims by

Non-Importer State Plaintiffs.

## II.    Section 122: Balance-of-Payments Deficits

### A. Parties' Contentions

State Plaintiffs contend that the President lacked authority to invoke Section 122

because large and serious balance-of-payments deficits cannot occur in a floating

exchange rate monetary system. State Pls.' Mem. at 6–7, 15–16, 25. They argue that

the Proclamation unlawfully redefines the statutory term "balance-of-payments deficits"

to mean "current account deficits" and that the tariffs are not applied consistent with the

principle of nondiscrimination as required by Section 122. Id. at 25–32; State Pls.'

Reply at 5–11. State Plaintiffs further argue that CBP's enforcement exceeds statutory

---

perhaps more accurately, as agreeing with the majority "that enough plaintiffs had
constitutional standing in order for the lawfulness of the reciprocal and trafficking tariffs
to be adjudicated." Id. at 1357 (Taranto, J., dissenting). Accordingly, V.O.S. does not
help settle the question of non-importer standing in this case.

[20] Because the court concludes that Non-Importer State Plaintiffs have failed to
demonstrate any imminent, non-speculative injury, the court need not, and therefore
does not, address the Government's argument that those plaintiffs also lack prudential
standing. See Defs.' Resp. at 77–79.

Court Nos. 26-01472 & 26-01606                                           Page 28

authority.  State Pls.' Mem. at 32–33.  Private Plaintiffs similarly argue that balance-of-payments deficits cannot occur in a floating exchange rate system, that Section 122 does not authorize the challenged tariffs, that Congress did not clearly confer such sweeping authority, and that any contrary reading would raise a nondelegation problem.  Priv. Pls.' Mem. at 16–35.

Because the Bretton Woods system had already ended by the time of Section 122's enactment, Defendants argue, Plaintiffs' interpretation would mean that Congress passed a statute that was "already useless at the time of its enactment," in contravention of the presumption against ineffectiveness that courts must apply when interpreting statutes.  Defs.' Resp. at 32–33.  Defendants further argue that the tariffs imposed by the President's Proclamation are lawful because Section 122 provides the President with the discretion to determine when a large and serious balance-of-payments deficit exists, and that the President has correctly made such a finding based on the U.S. current account deficit, trade deficit, primary income, and net international-investment position.  Id. at 38–41.

**B. Analysis**

In Section 122 of the Trade Act of 1974, Congress authorizes, indeed requires, that the President proclaim temporary import restrictions[21] when certain conditions

---

[21] The restrictions available to the President include either a temporary import surcharge or temporary limitations through the use of quotas.  The only restriction at issue here is an import surcharge, i.e., tariff.  19 U.S.C. § 2132(a).

Court Nos. 26-01472 & 26-01606                                    Page 29

exist.[22]  19 U.S.C. § 2132(a).  This case turns on the meaning of Section 122 and

whether the President asserted the existence of the conditions required by the statute in

order to lawfully proclaim the import surcharges.[23]  As discussed further below, the

President's Proclamation fails to assert that those required conditions have been

satisfied.  See generally Proclamation No. 11012.

    "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and

Excises."  U.S. Const. art. I, § 8, cl. 1.  The power to tax includes the power to impose

tariffs.  Learning Res., 146 S. Ct. at 638 (citing Gibbons v. Ogden, 22 U.S. 1, 201

(1824)).  Congress may delegate and has delegated the power to impose tariffs to the

---

[22] Subsection (b) provides the President the discretion to forego import restrictions otherwise required under subsection (a) if he "determines that the imposition of import restrictions under subsection (a) will be contrary to the national interest of the United States." 19 U.S.C. § 2132(b).  In such a case, "he may refrain from proclaiming such restrictions and he shall—(1) immediately inform Congress of his determination, and (2) immediately convene the group of congressional official advisers designated under [19 U.S.C. § 2211(a)] and consult with them as to the reasons for such determination." Id.

[23] State Plaintiffs appended a statement of undisputed material facts to their motion. See Pls.' Statement of Undisputed Material Facts, ECF No. 26.  The statement contains various "facts" about Proclamation No. 11012, past nonuse of Section 122, and harm to State Plaintiffs. Id. ¶¶ 1–5, 17–24.  The statement also asserts as "facts" State Plaintiffs' views on the meaning of balance of payments, id. ¶¶ 6–15, and the claimed impossibility of a "large and serious" balance-of-payments deficit in a floating-rate system, id. ¶ 16.  But, as State Plaintiffs acknowledge, "[t]his is a statutory interpretation case." State Pls.' Reply at 2; see also id. (stating "the question is one of statutory interpretation, not of fact-finding," and "[t]hat is the role Plaintiffs ask the [c]ourt to play here").  The court need not parse State Plaintiffs' statement of facts to exclude irrelevant facts or legal conclusions.  The standard of review here is clear: we interpret the statute in question but do not make factual determinations committed to the President's discretion. Marbury, 5 U.S. at 177; Loper Bright, 603 U.S. at 386; Silfab Solar, 892 F.3d at 1348–49.  Put simply, we are empowered to decide what "balance-of-payments deficits" means for purposes of Section 122(a)(1) and whether the Proclamation asserts the existence of such deficits within the meaning of the statute.  This case may thus be resolved on summary judgment.  USCIT Rule 56(a).

President under several specifically conditioned statutes.  See, e.g., Trade Expansion Act of 1962, § 232, 19 U.S.C. § 1862 (providing for presidential action to adjust imports when the Secretary of Commerce finds that an article is being imported under such circumstances as to threaten to impair national security); Trade Act of 1974, § 301, 19 U.S.C. § 2411 (providing for trade action when the U.S. Trade Representative determines that a foreign country's conduct is unjustifiable, unreasonable, or discriminatory and burdens or restricts United States commerce).

"When Congress grants the power to impose tariffs, it does so clearly and with careful constraints."  Learning Res., 146 S. Ct. at 644.  Separation of powers concerns thus require the court to carefully parse those constraints and give them full effect, because "the President enjoys no inherent authority to impose tariffs during peacetime." Id. at 638; see also id. at 639 ("'[B]oth separation of powers principles and a practical understanding of legislative intent' suggested Congress would not have delegated 'highly consequential power' through ambiguous language." (plurality opinion) (alteration in original) (quoting West Virginia v. EPA, 597 U.S. 697, 723–24 (2022)));[24] see also

---

[24] While Chief Justice Roberts and Justices Gorsuch and Barrett relied on the major questions doctrine, Justice Kagan, joined by Justices Sotomayor and Jackson, found that the "ordinary tools of statutory interpretation" allowed them to arrive at the same result.  Learning Res., 146 S. Ct. at 674 (Kagan, J., concurring in part and concurring in the judgment).  While the court here utilizes those ordinary tools of statutory interpretation to establish the parameters of Section 122, the importance of the proper interpretation of that provision is informed by the separation of powers principles and a clear understanding of the legislative intent that informed the delegation of this tariff authority to the Executive Branch.

Little v. Barreme, 2 Cranch 170, 178–79 (1804) (Executive actions are subject to the

limitations set forth by Congress).

Section 122 provides, in pertinent part:

Whenever fundamental international payments problems require special
import measures to restrict imports—

(1) to deal with large and serious United States balance-of-payments
deficits[,]
(2) to prevent an imminent and significant depreciation of the dollar in
foreign exchange markets, or
(3) to cooperate with other countries in correcting an international balance-
of-payments disequilibrium,

the President shall proclaim, for a period not exceeding 150 days (unless
such period is extended by Act of Congress)—

(A) a temporary import surcharge, not to exceed 15 percent ad valorem, in
the form of duties (in addition to those already imposed, if any) on
articles imported into the United States . . . .

19 U.S.C. § 2132(a).

The court begins with the words of the statute.[25]  The parties do not dispute that

in order to proclaim import surcharges pursuant to Section 122, there must be large and

serious United States balance-of-payments deficits.  State Pls.' Mem. at 22; Priv. Pls.'

Mem. at 28; Defs.' Resp. at 16.  Similarly, assuming there are balance-of-payments

---

[25] The statute contains several phrases about which the parties do not agree, including
"fundamental international payments problems" and "balance-of-payments deficits."  Not
only do the parties disagree about the meaning of these phrases, but they also disagree
about whether they are independent phrases or if "balance-of-payments deficits" is
simply one of several enumerated "fundamental international payments problems."  See
State Pls.' Mem. at 23; Priv. Pls.' Mem. at 19; Defs.' Resp. at 42.  While the
grammatical structure of Section 122(a) suggests that "fundamental international
payments problems" are an independent requirement to proclaim import surcharges
pursuant to Section 122, the court need not reach this issue.

deficits, there is no serious dispute that whether such deficits are "large and serious" is a discretionary determination within the province of the Executive Branch, review of which by the judiciary is impermissible. See Dalton v. Specter, 511 U.S. 462, 477 (1994) ("Where a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."). However, the term "balance-of-payments deficits" is indicative of a term of art, susceptible to a defined meaning, and subject to objective measure within the traditional means of judicial review.[26]

It is clear that Congress was aware of the differences in the words it chose. Congress adopted "balance-of-payments deficits" as an issue to be addressed in Section 122(a) while it employed the phrase "balance-of-trade surpluses" in Section 122(c). 19 U.S.C. § 2312(a)(1), (c)(1) (emphases added). That distinction does not end the inquiry because neither the President in Proclamation No. 11012 nor Defendants before us conflate entirely those terms. See Proclamation No. 11012 ¶ 7; Defs.' Resp. at 37. The different terms indicate, however, that Congress intended a specific

---

[26] Indeed, the term "balance-of-payments deficit" causes some confusion. Balance of payments is an accounting term and as both parties point out, the balance of payments always balances by definition; it nets to zero. State Pls.' Mem. at 26–27 n.6; Defs.' Resp. at 5, 25. The phrase balance-of-payments deficits, thus, points to a negative component of that analysis. The Government argues that in today's world, the current account is the proper component for identifying a balance-of-payments deficit. Defs.' Resp. at 23–28. Problematically for the Government, and as discussed herein, Congress in 1974 identified the settlement, liquidity, and basic balance deficits as "balance-of-payments deficits." See, e.g., Staff of S. Fin. Comm., 93d Cong., Tables and Statistical Material on U.S. Balance of Trade and Balance of Payments ("Staff of S. Fin. Comm. Dec. 1974") Table 1 (Comm. Print Dec. 1974).

meaning through the words it chose when crafting Section 122(a) and, thus, conferred a specific authority on the President.  Having concluded that "balance-of-payments deficits" is capable of definition, it is incumbent on the court to discern that definition. See Marbury, 5 U.S. at 177.[27]

The legislative history of the Trade Act of 1974 reveals that Congress understood balance-of-payments deficits to refer, at the time, to deficits in (1) liquidity, (2) official settlements, or (3) basic balance.  For over two years, Congress carefully reviewed and revised legislative proposals in the context of dynamic international economic events. As discussed above, the statute was enacted at a time of great uncertainty for the future of the international monetary system.  As the bill was being debated in Congress, it was unknown whether the collapse of the Smithsonian Agreement and the end of fixed exchange rates in 1973 would mark a definitive end to the Bretton Woods system, or whether the U.S. and other countries would one day return to the gold standard.  See,

---

[27] Loper Bright confirms that courts have the responsibility of interpreting statutes even when the statutes are ambiguous:

> The Framers appreciated that the laws judges would necessarily apply in resolving those disputes would not always be clear.  Cognizant of the limits of human language and foresight, they anticipated that "[a]ll new laws, though penned with the greatest technical skill, and passed on the fullest and most mature deliberation," would be "more or less obscure and equivocal, until their meaning" was settled "by a series of particular discussions and adjudications."

603 U.S. at 384–85 (quoting The Federalist No. 37, p. 236 (J. Cooke ed. 1961) (J. Madison)) (alteration in original).  There is no dispute that Proclamation No. 11012 represents the first Presidential invocation of Section 122(a) since its enactment roughly 50 years ago.  See State Pls.' Mem. at 28; Defs.' Resp. at 40.  Thus, this case presents the first opportunity for the court to interpret the statute's relevant terms.  Accordingly, the legislative history surrounding congressional deliberation of Section 122 is instructive.

e.g., 119 Cong. Rec. 40,568 (1973) (statement of Rep. Henry S. Reuss) ("If the United States continues to let the dollar float in exchange markets, as we are wisely doing now, the exercise of [Section 122] authority would prevent the deterioration or appreciation of the external value of the dollar that would be necessary to eliminate a balance-of-payments deficit or surplus, as the case may be. On the other hand, if we should ever revert to a fixed exchange rate parity for the dollar, the time limit proposed of 150 days would be much too short to allow a reversal in basic economic conditions sufficient to restore a satisfactory balance-of-payments equilibrium."). Both the international economic challenges and questions about the limits of Presidential authority informed congressional consideration of this legislation.[28]

Early versions of the legislation contained standards for measuring the balance-of-payments deficit and applying the threshold for enabling Presidential authority to take action. Specifically, H.R. 6767 would have provided that a serious balance-of-payments deficit existed when the President determined that "the balance of payments (as measured either on the official reserve transactions basis or by the balance on current account and long-term-capital) has been in substantial deficit over a period of four consecutive calendar quarters." Trade Reform Act of 1973, H.R. 6767, 93d Cong.

---

[28] The Trade Act of 1974 was enacted on January 3, 1975, Pub. L. No. 93-618, 88 Stat. 1978, after the 10 percent Nixon surcharge had already been invalidated by the Customs Court, see Yoshida I, 378 F. Supp. at 1175–76, but before the reversal of that judgment on appeal, see Yoshida II, 526 F. 2d at 584. The 1973–1974 OPEC embargo only further complicated the United States's economic and monetary position. See Oil Embargo, 1973-1974. Both the international economic challenges and questions about the limits of Presidential authority informed congressional consideration of this legislation.

§ 401(b)(1)(A) (1973).[29]  Thus, in debating an earlier version of this legislation,

Congress specifically identified settlement deficits and basic balance deficits as two

possible balance-of-payments deficits.

Similarly, early analyses of balance-of-payments deficits focused on the liquidity,

official settlements, and basic balance concepts:

> The overall-balance-of-payments deficit (or surplus) can be shown
> in different ways.  The two most usual approaches, both of which are
> shown in the official figures of the U.S. Department of Commerce, are
> known as the "liquidity" concept and the "official settlements" concept.

> The balance, computed on the liquidity basis, is measured by
> changes in U.S. official reserve assets and in liquid liabilities to all
> foreigners.  It includes as liabilities, which are a potential drain on U.S.
> monetary reserves, all short-term liabilities to foreigners, private as well as
> those payable to foreign monetary authorities, it does not include U.S.
> private short-term holdings as an offsetting asset entry, however, on the
> theory that the U.S. Government exercises no direct control over them and
> therefore cannot mobilize them in support of the dollar in an emergency.

> The balance, computed on the official settlements basis, is
> measured by changes in U.S. official reserve assets, together with
> changes in liquid and certain nonliquid liabilities to foreign official
> agencies.  Under this concept foreign short-term capital inflows are
> included, as are U.S. short-term outward capital flows, as regular
> transactions.  According to this concept, the large inflows of foreign
> commercial bank funds in recent years have represented predominantly
> market-oriented business phenomena.

See Trends in Int'l Trade of the United States: Hr'gs Before the H. Comm. on Ways &

Means, 91st Cong. 2710 (1970) (statement of Dr. Howard S. Piquet); see also H.R.

Rep. No. 91-1435, at 12 (1970) (discussing liquidity and official settlements deficits).

---

[29] The balance on current account and long-term capital constitute what is also known
as the "basic balance."  See Council of Econ. Advisers, Exec. Office of the President,
Econ. Report of the President 194 (1974).

Court Nos. 26-01472 & 26-01606                                    Page 36

Later-in-time analyses are consistent with this approach.  See The Trade Reform Act of 1973, Hr'gs on H.R. 10710 Before the S. Comm. on Fin. ("H.R. 10710 Hr'gs"), 93d Cong., pt. 1, at 2, 221, 365–66; pt. 2, at 480, 661; pt. 4, at 1468–69; pt. 5, at 2080 (1974) (discussing or showing deficit in terms of "basic balance," "liquidity basis," or "official reserve transactions"); 120 Cong. Rec. 39,505, 39,521 (1974) (statements of Sen. Long and Sen. Hartke) ("In 1962, the Nation had . . . a balance of payments deficit of $2.9 billion—liquidity basis.  Ten years later . . . the payments deficit had grown from a bearable $2.9 billion to an intolerable $13.9 billion."); 120 Cong. Rec. 39,506 (1974) ("Table 7 U.S. Trade and Balance of Payments, 1960–74," showing "Balance of payments" identifying possible deficits in "liquidity," "official settlements," and "basic balance").[30]

Both the parenthetical definition of balance of payments and the measurement over four consecutive quarters proposed in H.R. 6767 were omitted from H.R. 10710. As the legislative history indicates, in lieu of the four quarters time period, Congress inserted the "large and serious" requirement to circumscribe the President's authority all while allowing for adequate flexibility to respond to a delimited set of particular

---

[30] A variety of options for analyzing the balance of payments were available to Congress at the time Section 122 was debated and enacted.  See H.R.10710 Hr'gs, Part 2 at 684–90 (App. C, Staff of S. Fin. Comm., 93d Cong., Staff Data and Materials on U.S. Trade and Balance of Payments Tables 22–23, 30 (Comm. Print Feb. 1974), showing tables displaying annual figures for "Current Account Balance" and "Basic Balance" under the header "U.S. Balance of Payments Trends," as well as "US Balance of Payments Summary by Area," including measures across various categories); H.R. 10710 Hr'gs, Part 6 at 2555 ("[Int'l Econ. Policy Assoc. (IEPA)] Balance-of-Payments Summary, 1969-73").

Court Nos. 26-01472 & 26-01606                                                    Page 37

economic and monetary challenges.  See H.R. Rep. No. 93-571, at 28–29 (1973) ("The

[House] [C]ommittee [on Ways and Means] considered various formulas for defining a

serious balance-of-payments deficit, including a specific formulation based on the

existence of a substantial deficit over a certain period of time, but the committee feels

that it is not possible to formulate a definition with mathematical exactness.

Nevertheless, the committee does not intend that a small or even a large balance-of-

payments deficit of short duration would warrant the exercise of the authority under this

section."); S. Rep. No. 93-1298, at 87–88 (1974) ("[C]ircumstances can change rapidly

and the [Senate] Committee [on Finance] deems it necessary that the President have

authority to impose surcharges and other import restrictions for balance of payments

reasons even though under present circumstances such authority is not likely to be

utilized.").  While Congress did not replace the parenthetical definition of balance of

payments, the legislative history indicates what Congress contemplated as the measure

of balance of payments.  Specifically, the Senate Report to the Trade Act of 1974

("Senate Report") refers to the three types of balance-of-payments deficits, namely (1)

liquidity, (2) official settlements, and (3) basic balance, discussed in other parts of the

legislative history.  S. Rep. 93-1298, at 8 (Table 3); see also Staff of S. Fin. Comm. Dec.

1974, Table 1.[31]

---

[31] The December 1974 Senate Finance Staff Report contains a wealth of statistical
information regarding trade and balance of payments, much of which appears to have
been summarized in Table 1.  Under the heading "U.S. Trade and Balance-of-Payments
Deficits," Table 1 lists "U.S. trade position," "Trade balance," and "Balance of
payments," with data from 1960 through 1973 and partial data for 1974.  See Staff of S.
Fin. Comm. Dec. 1974, Table 1.  As noted, the balance of payments data is categorized

The Government's own Declaration acknowledges some of these 1974

measures, stating:

> Multiple measures capture related aspects of a country's [balance-of-payments ("BOP")] deficit, and official statistics during the 1970s also reported broader measures than the current account. For example, the "official reserve transactions balance" tracked the net disposition of dollars by the federal government in order to manage the foreign exchange value of the dollar. Another common contemporaneous measure was the "basic balance" . . ., which combined the current account and long-term capital, and served as a gauge for the imbalance between "underlying" long-term demand and supply of foreign exchange. . . .

> According to the CEA's review of historical records, the basic balance was a common, broader measure of BOP deficits during the 1970s. The underlying intent of the basic balance, according to BEA, was to capture "[…] long term trends in the balance of payments by segregating volatile capital flows and placing them below the line."

---

based on liquidity, official settlements, and basic balance. Id. Those categories are mostly, but not always, in deficit. The report contains 31 total tables. See generally id. In addition to trade-related information (Tables 2 to 21 and 31), the report summarizes the U.S. current account balance (Table 22) and U.S. basic balance (Table 23); contains several U.S. basic balance trends regarding merchandise, services, military and foreign aid, and private capital (Tables 24 to 27); lists the U.S. basic balance by area (Tables 28 and 29); and summarizes the U.S. balance of payments by area (Table 30). Id., Tables 2–29. Table 30 contains balances for goods and services, current account, basic balance, net liquidity, and official settlements. Id., Table 30. But just as the balance on goods and services is contained in the current account balance, so too is the current account balance subsumed within the basic balance. Compare id., Table 22 (U.S. current account balance) and id., Table 28 (U.S. basic balance by area, 1973), with id. Table 30; see also Econ. Report of the President 194 (1974) (defining basic balance to include the current account). But the Senate included only "Liquidity," "Official settlements," and "Basic balance" in Table 1, titled "U.S. Trade and-Balance-of-Payments Deficits," and that is thus the clearest indication of the concerns Section 122 was intended to address. Staff of S. Fin. Comm. Dec. 1974, Table 1.

Court Nos. 26-01472 & 26-01606                                                    Page 39

Decl. of Pierre Yared (Council of Economic Advisors) ("Yared Decl.") ¶¶ 25, 27, ECF

No. 35-1 (third alteration in original).[32]

     Despite acknowledging differences in the 1974 measures of the balance of

payments as compared to modern measures, id. ¶¶ 27, 37–40, the Government seeks

to defend the Proclamation by arguing that "balance-of-payments deficits" is a malleable

phrase, see Defs.' Resp. at 32 n.12 ("[W]hat qualifies as a [balance-of-payments deficit]

may depend on the facts of the day." (quoting Wisconsin Cent. Ltd v. United States, 585

U.S. 274, 284 (2018) (alteration in original))). However, the Government's suggestion

that what constitutes "balance-of-payments deficits" may change proves too much. See

Yared Decl. ¶ 37 ("While the concept of current account has largely remained the same

since the 1970s, there is no single measure of the long-term capital account (the other

main component of basic balance), and BEA no longer reports all the components

needed to exactly replicate the basic balance."). As previously noted, the "balance of

payments" as an accounting principle always nets to zero. See State Pls.' Mem. at 26–

27 n.6; Defs.' Resp. at 5, 25; Yared Decl. ¶ 10. To the extent that is the case, if the

President has the ability to select among the sub-accounts to identify a balance-of-

payments deficit, unless every sub-account is balanced, the President would always be

able to identify a balance-of-payments deficit.

---

[32] The Yared Declaration later posits that the failings of the basic balance as a metric likely led BEA to discontinue its presentation of the basic balance in 1976. Yared Decl. ¶¶ 27, 35.

Such an expansive reading of the statute would raise a non-delegation issue, which in turn would prompt a constitutional question.[33] See Priv. Pls.' Mem at 28. "[T]he canon of constitutional avoidance" provides that, when one of two statutory interpretations would raise a constitutional question, "the other should prevail." Clark v. Martinez, 543 U.S. 371, 380–81 (2005); see also Mistretta v. United States, 488 U.S. 361, 373 n.7 (1989) (stating that the Court employs the nondelegation principle to interpret statutory text and give "narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional"); Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 646 (1980) (stating that "[a] construction of the statute that avoids [an] open-ended grant" of authority that would implicate the non-delegation doctrine "should certainly be favored"); Fisherman's Harvest, Inc. v. PBS & J, 490 F. 3d 1371, 1377 (Fed. Cir. 2007) ("The canon of constitutional avoidance in statutory interpretation implies that a plausible construction of [a statute] that does not raise . . . constitutional doubts gives better effect to congressional intent."). The Government's

---

[33] Defendants argue that "the balance-of-payment's current account [is] the only reasonable measure of a balance-of-payment deficit." Defs.' Resp. at 3; see also Yared Decl. ¶¶ 8, 13. This argument lacks support in either the statute's text or legislative history. Defendants' position is the President has discretion to identify any actionable deficit for purposes of Section 122(a)(1). See Defs.' Resp. at 20. But Section 122 would lack an intelligible principle if the President could simply identify any deficit account, or if the phrase "balance-of-payments deficits" could change with context. Further, Defendants reject the view that the phrase "fundamental international payments problems" constrains the President at all. See Defs.' Resp. at 41–44. While the court need not resolve the Parties' positions on this issue, the court cannot accept Defendants' interpretation that disclaims the existence of any meaningful intelligible principle in either "fundamental international payments problems" or "balance-of-payment deficits."

preferred interpretation of the statute must therefore be disfavored.  See N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30 (1937) ("[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act.  Even to avoid a serious doubt the rule is the same.") (emphasis added).

Further, the legislative history chronicles a series of efforts to carefully cabin Presidential discretion.  See Hr'g on H.R. 10710 Before the H. Rules Comm., 93d Cong. 84 (1973) (statement of Hon. Al Ullman) ("[I]n place of unlimited authority to modify import restraints in face of large and persistent balance of payments deficits or surpluses, the bill provides temporary and limited authority for the President to take action."); Staffs of the H. Comm. on Ways and Means and the S. Comm. on Fin., 93d Cong., Summary of Senate Amendments to H.R. 10710 Trade Act of 1974 6 (Comm. Print 1974) ("[Amendments 42–43] [m]ake[] the House bill authority to deal with deficit balance-of-payments situations mandatory, rather than discretionary, unless the President determines and informs the Congress that imposing import restrictions would be contrary to the national interest."); Staffs of the S. Comm. on Fin. and H. Comm. on Ways and Means, 93d Cong., Summary of the Provisions of H.R. 10710 4 (Comm. Print 1974) (stating that "[t]he Act directs the President to proclaim . . . import surcharges . . . as may be necessary to deal with large and serious U.S. balance of payments deficits" (emphasis added)).  Ultimately, the Senate Report, leading up to the enactment of Section 122, explicitly classifies three figures as measures of the "balance of payments" (liquidity, official settlements, and basic balance) while classifying two measures of the

"trade balance" as distinct.  S. Rep. 93-1298, at 8; see also Staff of S. Fin. Comm. Dec.

1974, Table 1.

Rather than identifying "balance-of-payments deficits" as that term was intended

in 1974, the Proclamation relies upon current account deficits, and a discussion of "a

large and serious trade deficit."  Proclamation No. 11012 ¶ 6; see also id. ¶ 7 (referring

to deficits concerning the balance of goods and services as well as the balances on

primary income and secondary income, all of which are part of the current account); id.

¶ 8 (noting the trade deficit).  Although the current account (and the balance of trade as

a component of the current account) are relevant to balance-of-payments deficits, they

are distinct, and the statute recognizes the distinction.  Compare 19 U.S.C. § 2132(a)(1)

("large and serious United States balance-of-payments deficits"), with 19 U.S.C.

§ 2132(c)(1) ("large and persistent United States balance-of-trade surpluses").  Indeed,

the Government's Declaration plainly acknowledges that the Proclamation does not rely

upon the metrics used to measure balance-of-payments deficits discussed at the time of

enactment:

> During the 1970s, economists leveraged multiple metrics to analyze
> different aspects of BOP deficits.  More expansive measures than the
> current account typically included other components of the BOP
> accounting framework involving relatively durable transactions—those that
> were long-term and illiquid—and excluded flows of payment and other
> liquid, money-like instruments that are recorded in the financial account.
> In developing candidate alternative BOP deficit measures to the current
> account, CEA accounted for the evolution of financial markets since the
> 1970s, which have substantially increased the liquidity of many assets
> (e.g., equities).
>
> Figure 5 shows CEA's most expansive candidate BOP deficit
> measure for the purposes of Section 122: the current account plus the

> capital account plus net FDI. This measure excludes most assets in the financial account, as in modern-day financial markets they can exhibit high degrees of liquidity and volatile flows, akin to broad financial flow. However, even this measure is likely too inclusive. As acknowledged by the BEA in 1976 "[…] even some components of direct investment, can be quite volatile." This suggests that a representation of the BOP deficit more aligned to Section 122 would reflect only the most durable components of FDI. As illustrated by Figure 5, CEA's most expansive candidate measure is more volatile than the current account balance, but presents the same qualitative story: a prolonged period in deficit.

Yared Decl. ¶¶ 43–44 (alteration in original) (citation omitted). The Declaration explains the Proclamation's reliance on the current account deficit as a function of the United States' shift from a fixed exchange rate to a floating exchange rate in great detail.[34] Id. ¶¶ 28–36. The narrative woven by the Declaration attempts to characterize the Senate's explicit references to (1) liquidity, (2) official settlements, and (3) the basic balance as concepts that must be reinterpreted today to take account of the fact that "BEA no longer reports all the components needed to exactly replicate the basic balance" as well as changes that have occurred in the long-term capital markets.[35] Id. ¶¶ 37–40. Thus, the Yared Declaration asserts that, given the "context of the modern economy and financial markets, . . . the balance of the current account within the BOP

---

[34] While the Yared Declaration is distinct from the President's Proclamation and not expressly relied upon therein, throughout the Proclamation, the President states that he was "informed" by senior officials and advisors in arriving at his factual findings. Proclamation No. 11012 ¶¶ 4–13. The court's references to the Yared Declaration are not dependent upon whether Mr. Yared was among the unnamed senior officials or advisors in the Proclamation.

[35] The Declaration explains its resort to measurements beyond those considered by Congress in 1974. See, e.g., Yared Decl. ¶ 38 (noting that "[w]hat can be construed as non-volatile, long-term capital has changed materially since the 1970s").

accounting framework is the most appropriate measure of BOP deficits for the purposes of Section 122." Id. ¶ 13.[36]

Both Plaintiffs and Defendants overstate the consequences of the United States' transition from a fixed exchange rate system to a floating exchange rate system. Plaintiffs argue that because the United States floats its currency, large and serious balance-of-payments deficits cannot occur. State Pls.' Mem. at 2–3; Priv. Pls.' Mem. at 21–22. Defendants argue that Plaintiffs' position means Section 122 was "a nullity since the day it was enacted." Defs.' Resp. at 40, see also id. at 35. Both Plaintiffs and Defendants miss the mark. Whether it is possible to measure balance-of-payments deficits by settlements, liquidity, or basic balance today is not our concern;[37] rather,

---

[36] Notably, in the next paragraph, the Yared Declaration acknowledges "trade deficits are conceptually distinct from balance-of-payments deficits." Id. ¶ 14.

[37] At Oral Argument, the Government conceded that the way in which a balance-of-payments deficit is measured today is different from how a balance-of-payments deficit was measured in 1974; namely, that basic balance and liquidity are no longer considered relevant or material measures. Oral Arg. at 1:35:00–1:38:00, 1:52:00–1:55:00 (approximate time stamps from the recording). Defendants' discussion of these alternatives during Oral Argument and in their brief makes clear they had notice of and understood the statutory interpretation grounds raised in Plaintiffs' motions for Summary Judgment. See Defs.' Resp. at 26 (arguing the Government's interpretation is supported by "statutory context and legislative history"); id. at 31 (arguing the President's "interpretation is not a clear misconstruction of Section 122" that requires judicial review of his actions); see also State Pls.' Mem. at 22–23, 25–27 (arguing the preconditions for Section 122 duties were not satisfied); Priv. Pls.' Mem. at 16–23 (similar). Thus, we disagree with the dissent that our resolution of this issue triggers the provisions of Rule 56(f) governing "Judgment Independent of the Motion," specifically, the requirement for "notice and a reasonable time to respond" before "grant[ing] the motion on grounds not raised by a party." USCIT Rule 56(f)(2); see also Dissent Op. at 24–30. Plainly, the grounds the Plaintiffs advanced and of which Defendants had notice necessarily require the court to interpret the meaning of "balance-of-payments deficits" for purposes of Section 122. See Loper Bright, 603 U.S. at 394 (stating that "courts

when interpreting the statute, we must determine the meaning of "balance-of-payments deficits" at the time Congress enacted the statute and whether the President identified balance-of-payments deficits within that meaning—regardless of how the BEA measures such deficits today. The meaning of this term is readily ascertainable when looking at how the Senate explicitly reported balance-of-payment deficits. S. Rep. 93-1298 at 8; Staff of S. Fin. Comm. Dec. 1974, Table 1.

Thus, what is relevant is what Congress meant by "balance-of-payments deficits" in 1974, and what Congress meant can be determined based on what it reported at the time of enactment, namely the balance-of-payments deficits as measured by liquidity, official settlements and the basic balance. Even if it is unlikely that "large and serious balance-of-payments deficits" within the meaning of Section 122 could occur today in light of the floating exchange rate system, the other provisions of Section 122 remain operative. See 19 U.S.C. § 2132(a)(2)–(h). Under those provisions, the President would be empowered to act "to prevent an imminent and significant depreciation of the dollar" or "to cooperate with other countries in correcting an international balance-of-payments disequilibrium." See id. § 2132(a)(2)–(3).

Accepting as true every factual statement in Proclamation No. 11012, the surcharge imposed by the Proclamation rests on the existence of a large trade deficit, a current account deficit, a negative net international investment position, and a deficit on the balance on primary and secondary income (which are part of the current account).

---

must exercise independent judgment in determining the meaning of statutory provisions").

Court Nos. 26-01472 & 26-01606          Page 46

Proclamation No. 11012 ¶¶ 7–11.  The Proclamation asserts that "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country."  Id. ¶ 7.  Nowhere does Proclamation No. 11012 identify balance-of-payments deficits within the meaning of Section 122 as it was enacted in 1974.  See generally Proclamation No. 11012.

Because the Proclamation's use of trade and current account deficits to stand in the place of balance-of-payment deficits within the meaning of the statute renders the Proclamation ultra vires, the court need not reach the arguments of whether Section 122 requires the identification of "fundamental international payments problems" or whether the exemptions provided in the Proclamation are lawful.  See Trump v. Hawaii, 585 U.S. 667, 703 (2018) (requiring a "facially legitimate and bona fide" reason for Executive action (citation omitted)).  Proclamation No. 11012 is invalid, and the tariffs imposed on Plaintiffs are unauthorized by law.[38]

---

[38] We have considered the arguments presented by the dissent and are not convinced by them.  The dissent finds the legislative history too limited to give meaning to the term "balance-of-payments deficits."  However, the dissent provides no affirmative alternative meaning to this critical statutory term that the President invokes as the basis of the Proclamation.  Indeed, the dissent concludes that one cannot or should not ascribe meaning to "balance-of-payments deficit" absent express statutory language defining the term.  To the contrary, as we have discussed, "[i]t is emphatically the province and duty of the judicial department to say what the law is.  Those who apply the rule to particular cases, must of necessity expound and interpret that rule."  Marbury, 5 U.S. at 177.  Thus, the court's role is to define statutory terms in order to determine whether the President acted within his congressional grant of authority.  See id.; USP Holdings, 36 F.4th at 1365–66.  Rather than define balance-of-payments deficits for purposes of Section 122, the dissent accepts the Defendants' claim that they may choose the economic statistics or sub-accounts of the balance-of-payments based on what is

### III.    CSMS # 67844987

### A. Parties' Contentions

State Plaintiffs seek judicial review of CBP's Cargo Systems Messaging Service # 67844987 as a final agency action pursuant to the APA.  State Pls.' Mem. at 32–33.  They suggest, however, that Proclamation No. 11012 and CSMS # 67844987 stand or fall together, contending that because CSMS # 67844987 "violates the requirement[s] of Section 122, it is "in excess of statutory jurisdiction, authority, or limitations."  Id. at 33 (quoting 5 U.S.C. § 706(2)(C)).  State Plaintiffs argue the court should "stay, vacate, and set aside CSMS # 67844987, which implements the Section 122 Proclamation."  Id.

The Government contends that CSMS # 64844987 is not an agency action for purposes of the APA, let alone a final agency action.  Defs.' Resp. at 66–67.  The Government relies on Maple Leaf Marketing, Inc. v. United States, 45 CIT __, __, 528 F. Supp. 3d 1365, 1378–79 (2021) (dismissing a claim for APA review of CSMS guidance).  Id. at 66–67.

In reply, State Plaintiffs argue that CSMS # 64844987 is a final agency action because it "creates requirements related to documentation and entering data and provides for 'drawback'—provisions not contained within the Proclamation."  State Pls.' Reply at 19.

---

available at present.  See Defs.' Resp. at 32 n.12.  As we discuss above, we cannot accept that view as a matter of statutory interpretation because doing so would require us to determine whether there is any intelligible principle behind such an open-ended delegation that would save it from constitutional scrutiny—a challenge the dissent dismisses as a "straw man."  Dissent Op. at 18.

Court Nos. 26-01472 & 26-01606                                    Page 48

**B. Analysis**

"[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review."  5 U.S.C. § 704.  An "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  Id. § 551(13).  For an agency action to be final, two requirements must be met.  Bennett v. Spear, 520 U.S. 154, 177–78 (1997).  First, the agency's action "must mark the 'consummation' of the agency's decisionmaking process."  Id. (citations omitted).  Second, the agency action "must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'"  Id. at 178 (citations omitted).

State Plaintiffs' moving brief provides no substantive rationale for treating CSMS # 67844987 as an agency action, final or otherwise, for purposes of the APA.  See State Pls.' Mem. at 32–33.  They seek to remedy this omission in their reply brief, arguing that CSMS # 67844987 is a _final_ agency action, State Pls.' Reply at 19, but their efforts are unavailing.  Arguments raised for the first time in a reply are forfeited.  See Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1375 n.4 (Fed. Cir. 2005).  Additionally, even in reply, State Plaintiffs do not address Defendants' argument that a CSMS message is not an "agency action" at all.  See Defs.' Resp. at 66 (citing Maple Leaf Mktg., 528 F. Supp. 3d at 1378–79).  Lastly, State Plaintiffs assert, in a conclusory fashion, that CBP's guidance regarding documentation, data entry, and drawback creates rights or obligations from which legal consequences flow.  State Pls.' Reply at 19.  The court will not "do counsel's work" of constructing the argument that may or may

Court Nos. 26-01472 & 26-01606                                    Page 49

not support the desired conclusion.  See Home Prods. Int'l, Inc. v. United States, 36 CIT

665, 673, 837 F. Supp. 2d 1294, 1301 (2012) (quoting United States v. Zannino, 895

F.2d 1, 17 (1st Cir. 1990)).

Accordingly, State Plaintiffs' arguments regarding CSMS # 67844987 do not

present independent grounds to set aside implementation of Proclamation No. 11012.

## IV.    Remedy

Plaintiffs seek a permanent injunction, State Pls.' Mem. at 35–41; Priv. Pls.'

Mem. at 35–40, while the Government argues that Plaintiffs are not entitled to one,

Defs.' Resp. at 68–72.  The State of Washington (through its instrumentalities) and

Private Plaintiffs, i.e., collectively, Importer Plaintiffs, have satisfied the requirements for

permanent injunctive relief.

A permanent injunction does not necessarily follow from success on the merits.

V.O.S. Selections, 149 F.4th at 1339.  A plaintiff seeking permanent injunctive relief

must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at
> law, such as monetary damages, are inadequate to compensate for that
> injury; (3) that, considering the balance of hardships between the plaintiff
> and defendant, a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).[39]   The court considers

whether Importer Plaintiffs have satisfied these eBay factors.

---

[39] The standard for a permanent injunction "is essentially the same as" the standard for
a preliminary injunction except that a plaintiff must establish "actual success" on the
merits rather than "a likelihood of success."  Amoco Prod. Co. v. Vill. of Gambell, AK,
480 U.S. 531, 546 n.12 (1987).  That being said, the Government's arguments against

Court Nos. 26-01472 & 26-01606                                                            Page 50

The court considers the first and second factors together.  Importer Plaintiffs have paid, and, absent injunctive relief, will continue to pay Section 122 duties that the court has held to be unlawful.  While Defendants "do not contest the [c]ourt's authority to order reliquidation" of entries subject to Section 122 duties made by prevailing plaintiffs following a final, unappealable decision on the merits, Defs.' Resp. at 69; see also id. at 71, Defendants do not explain why they should be permitted to continue the unlawful collection of Section 122 duties from Importer Plaintiffs for the duration of the imposition of such duties.  The Government, in effect, seeks the benefit of a stay of the court's judgment without showing its entitlement to one or otherwise responding to the substance of the Plaintiffs' arguments.  See USCIT Rule 62(c)–(d).[40]

Additionally, economic harm to Importer Plaintiffs takes several forms.  "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."  Celsis In Vitro, Inc. v. CellzDirect, Inc.,

---

injunctive relief appear to assume the court will decide the motion in a preliminary posture.  See Defs.' Resp. at 68 (arguing Plaintiffs have not shown they will incur harm "before the Court can decide the case on the merits") (emphasis added); id. at 69 (arguing Plaintiffs have not shown they will incur harm "while the Court considers their simultaneous motion for summary judgment") (emphasis added).  The Government's arguments regarding harm to Plaintiffs do not address the scenario in which the court considers injunctive relief concurrent with summary judgment.

[40] The court acknowledges the good faith efforts made by the Government to work towards the refund of unlawfully collected IEEPA duties.  See generally, Atmus Filtration, Inc. v. United States, Court No. 26-01259 (CIT Apr. 1, 2026), ECF No. 52 (court order summarizing CBP's progress on developing the functionality that will permit CBP to make the required refunds of duties imposed without legal basis under IEEPA); Euro-Notions Florida, Inc. V. United States, Court No. 25-0595 (CIT Apr. 14, 2026), ECF No. 19 (court order providing update on CBP's progress).  As that experience shows, however, there may be significant delays from the time the imposition of tariffs are first held unlawful before refunds are effectuated.

664 F.3d 922, 930 (Fed. Cir. 2012); see also Oman Fasteners, LLC v. United States,

125 F.4th 1068, 1089 (Fed. Cir. 2025) ("[L]ayoffs and damage to goodwill . . . are

independently sufficient to establish irreparable harm.").  Private Plaintiffs aver that they

have suffered or will suffer lost profits and damage to business relationships,

investments, and innovation on account of these tariffs.  Frisch Decl. ¶¶ 12–13, 18;

Foreman Decl. ¶¶ 20–21.  Granting a permanent injunction would also help to prevent

these harms.

Finally, considering the balance of hardships, a remedy in equity is warranted,

and the public interest would be served by a permanent injunction.  The third and fourth

elements "merge when the Government is the opposing party."  Nken v. Holder, 556

U.S. 418, 435 (2009).  "The public interest is served by ensuring that governmental

bodies comply with the law."  Am. Signature, Inc. v. United States, 598 F.3d 816, 830

(Fed. Cir. 2010).  The Government's arguments on these elements are grounded in the

reasons provided for the Section 122 duties.  See Defs.' Resp. at 71 ("The President

has identified that the balance-of-payments deficits significantly harm[] U.S. national

interests . . . ."); id. at 72 (arguing an injunction would "intru[de] on the President's

conduct of foreign affairs and efforts to . . . address the rapidly deteriorating balance-of-

payments position of the United States").  These reasons are unpersuasive.  Enjoining

unlawful conduct is in the public interest.

The balance of equities favors granting Importer Plaintiffs permanent injunctive

relief.  The court need not decide whether the CIT is authorized, post-CASA, 606 U.S.

at 831, to issue universal injunctive relief because such relief is not merited here.  The

Court Nos. 26-01472 & 26-01606                                                    Page 52

court finds standing in this case only with respect to Importer Plaintiffs, and those plaintiffs may be made whole by an injunction specific to them and refunds, with interest as provided by law, for any Section 122 duties paid before the injunction takes effect.[41] Private Plaintiffs make no specific arguments for a universal injunction.  See generally Priv. Pls.' Mem. at 35–40; Priv. Pls.' Reply at 25–28.[42]  While State Plaintiffs do, State Pls.' Mem. at 41–43, their arguments appear to assume the court will find standing for all State-parties, inclusive of the non-importing, purchaser States, which is not the case. And while the one State with standing, the State of Washington, avers harm from the indirect cost of tariffs passed on by resellers, Hsu Decl. ¶ 6, the potential for increased costs to one plaintiff is not an appropriate basis for the imposition of a universal injunction.  Accordingly, the court declines to enter a universal injunction.

**CONCLUSION AND ORDER**

In accordance with the foregoing, it is hereby

**ORDERED** that State Plaintiffs' motion for summary judgment (ECF No. 25, Ct. No. 26-01472) is **GRANTED** only with respect to Plaintiff The State of Washington; it is further

---

[41] While State Plaintiffs suggest that a non-universal injunction would violate the Uniformity Clause because it "would create disparate tax protocols based on geography," State Pls.' Mem. at 42, this argument overlooks that State Plaintiffs seek relief as importers (or purchasers) of goods making entry at potentially any port in the country.  Thus, the court is not imposing any geographic limitation on Section 122 tariff treatment for the Importer Plaintiffs entitled to relief.

[42] Private Plaintiffs do, however, assert that "the economic impact from these tariffs is widespread."  Priv. Pls.' Reply at 27.

Court Nos. 26-01472 & 26-01606                                    Page 53

ORDERED that all claims by State Plaintiffs other than Plaintiff The State of

Washington are **DISMISSED** for lack of standing; it is further

ORDERED that Private Plaintiffs' motion for summary judgment (ECF No. 11, Ct.

No. 26-01606) is **GRANTED**; and it is further

ORDERED that Plaintiffs' alternative motions for a preliminary injunction are

**DENIED AS MOOT**.

Judgment will be entered accordingly.

/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge

/s/      Claire R. Kelly
Claire R. Kelly, Judge

Dated: May 7, 2026
       New York, New York

Stanceu, Judge, dissenting: I respectfully dissent because I disagree with the majority's interpretation of Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132 ("Section 122").  Further, I believe it was error to grant summary judgments *sua sponte* in favor of the plaintiffs with standing without following the procedure USCIT Rule 56(f) requires.  I would have denied both summary judgment motions and provided the parties "notice and a reasonable time to respond" according to the Rule 56(f) procedure.

## I.

At various times in the nation's history, and in various ways, Congress has delegated to the President the power to alter the tariff treatment of goods imported into the United States.  Some statutes delegating this power expressly allow the President, subject to various conditions or procedures, to increase or decrease duties on imported foreign merchandise.[1]  Section 122 is such a statute.  In specific circumstances, it empowers the President to restrict imports by temporarily imposing or increasing duties or quotas or, alternatively, to increase imports by temporarily reducing duties or relaxing quotas.  In either case, the President is delegated authority to make a

---

[1] In contrast, in at least one statute, Congress delegated to the President the constitutional power to regulate importation without delegating the power to impose duties on imported goods.  *See Learning Resources, Inc. v. Trump*, 607 U.S. --, 146 S. Ct. 628 (2026).

determination based on his own findings as to specified economic conditions in the United States.

Our review in cases such as this one, which challenge a President's exercise of delegated legislative authority, is limited and deferential. In deciding whether the President acted within such authority, we are not empowered to review the factual findings by which he concluded the action was necessary or appropriate. *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) ("It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review." (citations omitted)); *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984) ("The President's findings of fact and the motivations for his action are not subject to review.") (citing *George S. Bush & Co.*, 310 U.S. at 379–80; *United States Cane Sugar Refiners' Ass'n v. Block*, 683 F.2d 399, 404 (CCPA 1982); *Aimcee Wholesale Corp. v. United States*, 468 F.2d 202, 206 (CCPA 1972)).

## II.

In delegating to the President the authority to restrict imports, Section 122(a)(1) does not limit the term "balance-of-payments deficits" to measurements of our

country's balance of payments that are computed according to "liquidity," "official settlements," or "basic balance." No reference to those methods of measurement, nor any other definition of the term "balance-of-payments," appears in Section 122 or related provisions of the Trade Act of 1974, and the legislative history does not support the majority's interpretation of the statutory term.

I begin my consideration of the majority's statutory interpretation by deciding what Congress could *not* have meant when it referred to our country's balance of payments in Section 122(a)(1). First, it was not adopting the Black's Law Dictionary definition of the term, which defined balance of payments as synonymous with the balance of trade.[2] We know this because Section 122 refers to our country's payments balance in subsection (a) and its trade balance in subsection (c), indicating that it intended to distinguish between these two concepts.

Second, we can say confidently that Congress did not mean for the balance of payments to be something that was to be measured only according to "official settlements" or "basic balance." As the majority notes, an early version of what was to become Section 122 was contained in H.R. 6767, which provided that "a serious balance-of-payments deficit existed when the President determined that 'the balance of payments (as measured either on the official reserve transactions basis or by the balance

---

[2] "Balance of payments (1844) The difference between what a country spends buying goods and services from abroad and what it earns selling goods and services abroad." Black's Law Dictionary (11th Ed. 2019).

on current account and long-term-capital) has been in substantial deficit over a period

of four consecutive calendar quarters.'" *Opinion of the Majority* ("*Majority Op.*") at 34

(quoting Trade Reform Act of 1973, H.R. 6767, 93d Cong. § 401(b)(1)(A) (1973)).  By the

terms it used, that version defined a "balance of payments" as one measured on an

official settlements basis ("official reserve transactions") or according to what was

known as basic balance ("balance on current account and long-term-capital").  As the

majority notes, the House version that was considered in the Senate, H.R. 10710, deleted

the parenthetical definition of balance of payments and the four-quarters measurement

and added the "large and serious" qualification.  *Majority Op.* at 36-37.

It is at this point that the majority and I part company.  We disagree specifically

as to the significance of the deletion of the language that had appeared in the

parenthetical in H.R. 6767.  The majority's interpretation is, in effect, that in drafting

what would become Section 122(a)(1) in the House and Senate and adopting a final

version, Congress first deleted the parenthetical but then reverted to the previous

concept of confining the meaning of "balance-of-payments deficits" to deficits measured

according to official settlements or basic balance, but with the change of adding a third

measure, which was the liquidity basis.  This raises the question of why, if that was the

intent, neither chamber restored the parenthetical or added another reference to specific

measurement methods.  The reasonable conclusion I can draw from the change from

H.R. 6767 to H.R. 10710 is that neither the House Ways and Means Committee nor the

Senate Finance Committee, in formulating what was enacted as Section 122(a)(1), had such an intent.

The majority quotes an explanatory sentence from the House Report on the Trade Act of 1974 ("House Report"), as follows: "The [House] [C]ommittee [on Ways and Means] considered various formulas for defining a serious balance-of-payments deficit, including a specific formulation based on the existence of a substantial deficit over a certain period of time, but the committee feels that it is not possible to formulate a definition with mathematical exactness." *Id*. at 37 (quoting H.R. Rep. No. 93-571, at 28-29 (1973)).  Following the approach taken in the final House bill, the Senate did not include in its version a definition of "balance of payments" or a temporal reference such as the four-quarters reference, and no such definition or reference was included in Section 122 as ultimately enacted.[3]

The majority acknowledges that "Congress did not replace the parenthetical definition of balance of payments" but nevertheless proceeds to conclude that the "legislative history indicates what Congress contemplated as the measure of balance of payments," which the majority views as being confined to the liquidity, official settlements, or basic balance measures. *Majority Op.* at 37.  I see no convincing

---

[3] In contrast, Congress included in Section 122(c) a required measurement of balance-of-trade surpluses, which are to be "determined on the basis of the cost-insurance-freight value of imports, as reported by the Bureau of the Census."  19 U.S.C. § 2132(c)(1).

Court Nos. 26-01472 & 26-01606                                                                Page 6

indication in the legislative history that Congress intended to define "balance of payments" as something that was to be measured in only those three ways for purposes of Section 122(a)(1).

The House Report conveys the opposite intent in explaining why the references to two measurement methods (i.e., official settlements and basic balance) were omitted from the bill. In the sentence the majority quotes, the House Ways and Means Committee reported that it decided against a specific "formulation" or "definition." *See id*. at 37 (quoting H.R. Rep. No. 93-571, at 28-29). In the preceding sentence, the House Report also demonstrated the intent to afford some degree of discretion to the President as to the method of measurement. H.R. Rep. No. 93-571, at 28 ("The committee recognizes that there will be an element of judgment on the part of the President in determining the existence of a serious deficit that justifies use of this authority."). The majority apparently would interpret both sentences from the House Report to mean only that Congress intended to leave to the President's discretion what would constitute the size or seriousness of balance-of-payments deficits but not the choice of measurement method. Were that the case, it would be reasonable to expect that the change from H.R. 6767 to H.R. 10710 would have omitted only the four-quarters measurement from the text and retained, in some form, a definition of the means of measurement. But the change omitted both the four-quarters reference and the defined means of measurement, and the Senate did not restore either of them.

The majority's opinion concludes that "[w]hile Congress did not replace the parenthetical definition of balance of payments, the legislative history indicates what Congress contemplated as the measure of the balance of payments." *Majority Op.* at 37. In my view, what Congress signaled by deciding not to replace the parenthetical definition in H.R. 6767 speaks directly to the statutory interpretation issue before us. It signaled that the drafters in the House and Senate decided against specifying a particular measurement method or methods for balance-of-payments deficits. What the majority instead identifies as indicative legislative history consists of a statistical table in a report of the Senate Finance Committee and certain other statistical tables in Finance Committee staff reports. The majority concludes from these tables that Congress intended that liquidity, official settlements, and basic balance would be the exclusive measures of the payments balance for purposes of Section 122(a)(1). *Id.* The majority reasons that "[s]pecifically, the Senate Report to the Trade Act of 1974 ("Senate Report") refers to the three types of balance-of-payments deficits, namely (1) liquidity, (2) official settlements, and (3) basic balance, discussed in other parts of the legislative history." *Id.* (citing S. Rep. No. 93-1298, at 8 (Table 3)).

The Senate Report "refers to the three types of balance of payments deficits" in the sense that all three measures the majority identifies are headings in "Table 3" in that report, which presents statistics, in billions of dollars, on merchandise trade ("U.S. trade position"), "Trade balance," and "Balance of payments." S. Rep. No. 93-1298, at 8-9

(Table 3).  The accompanying text, which does not refer to Section 122, discloses the actual purpose for which the Senate Finance Committee included Table 3 in the Report: "The performance of the United States in the world economy throughout much of the postwar period has been marked by persistent trade and payments deficits.  The performance since 1960 is shown in Table 3 below."  *Id*. at 7.

The Senate Report presents "Table 5" several pages after Table 3.  *See id*. at 12 (Table 5).  Table 5 compares the trade balance (apparently, the merchandise trade balance) with the balance of payments for the years 1966 through the first nine months of 1974, but it presents payments balance statistics only on the liquidity basis, not official settlements or basic balance.  The accompanying text shows the purpose for the inclusion of Table 5 was the Committee's concern about the effect trade deficits were having on the balance of payments as well as the importance of measuring the merchandise trade balance on a c.i.f. (cost, insurance and freight) rather than an f.o.b. (free on board) basis.  Noting that "our trade account has been in deficit since 1966," the Committee stated that "[t]hese recent trade deficits have accounted for over one-half of our overall payments deficits, as shown in Table 5."  *Id*. at 7.

It logically can be presumed from the placement of Tables 3 and 5 within the Senate Report, and in particular from the text accompanying each, that Tables 3 and 5 were included in the report to illustrate the points being made in the accompanying text on pages 7 to 12 of the report.  But it is a leap of logic to presume that these tables were

placed in the text of the report to address an issue not discussed in the text, which is

how payments balances were to be measured for purposes of Section 122.  The

discussion of Section 122 occurs much later in the Senate Report, at pages 87-89.  That

discussion, like the discussion earlier in the Senate Report, does not address the

question of how a balance-of-payments deficit is to be measured for purposes of the

Section 122(a)(1) authority.

In addition to relying on Table 3 of the Senate Report, the majority also cites a

December 1974 staff report prepared for the Senate Finance Committee that contains a

table presenting balance-of-payments statistics according to liquidity, settlements, and

basic balance.  *Majority Op.* at 37 & 37 n.31 (citing Staff Report of S. Fin. Comm., 93d

Cong., Tables and Statistical Material on U.S. Balance of Trade and Balance of Payments

Table 1 (Comm. Print Dec. 1974)) ("December 1974 staff report").  Table 1 in the

December 1974 staff report is essentially identical to Table 3 in the Senate Report (with a

slight change to the title).  It is one thing to say that the Senate Finance Committee

understood that the payments balance could be measured for Section 122(a)(1) purposes

according to liquidity, official settlements, and basic balance.  It is quite another to say,

based on the headings in Table 3 and in the same table in the December 1974 staff

report, that the Committee intended that it would be impermissible for deficits in the

country's payments balance to be measured in any other way for the application of

Section 122(a)(1), particularly in light of the absence of any text in the report so

indicating and the deletion from H.R. 10710 of the parenthetical definition that appeared in H.R. 6767.

The majority concludes that the presenting of statistics on the payments balance according to liquidity, official settlements, and basic balance in Table 1 of the December 1974 staff report (which is a nearly identical version of Table 3 in the Senate Report) "is thus the clearest indication of the concerns Section 122 was intended to address." *Majority Op.* at 38 n.31.  I find this conclusion unconvincing, for two reasons.  First, Table 1 makes no reference to Section 122.  Second, Table 30 in the December 1974 staff report, which the majority also cites, *id.*, in presenting data on the U.S. balance of payments by area, presents global and area data in the last two superior headings, the first of which is labeled "Balance on current account" and the second of which is labeled "Basic balance."  December 1974 staff report at 36-37.  This placement could suggest that both the current account balance and the basic balance were considered to be measures of the payments balance.  Table 30 also presents data (globally only, not by area) on "Net liquidity balance" and "Official settlements balance."  *Id.*

The staff report prepared for the Senate Finance Committee dated February 26, 1974, which the majority cites, *Majority Op.* at 36 n.30, also indicates that the country's current account balance could have been considered to be a measure of the balance of payments in 1974.  *See* Staff Data and Materials on U.S. Trade and Balance of Payments, Staff Report of S. Fin. Comm., 93d Cong. (Comm. Print Feb. 26, 1974) ("February 26,

1974 staff report").[4] This staff report sets forth as Table 1 a table that is essentially identical to Table 1 in the December staff report and Table 3 in the Senate Report.[5] But notably, the February 26, 1974 staff report also includes a table ("Table 22"), titled "U.S. Current Account Balance," that it places directly under the heading "U.S. Balance of Payment Trends.*"[6] February 26, 1974 staff report at 24. Table 22 presents current

---

[4] The information presented in the February 26, 1974 staff report appears to have been statistically updated and condensed to formulate the December 1974 staff report. Both versions are official Committee Prints. The February staff report contains 39 tables, and the December staff report contains 31, with many tables in common (including Table 30), and is further condensed for the December staff report by the deletion of 9 charts.

[5] There are some variations in some of the reported data, apparently due to statistical updates.

[6] In footnote 1, Table 22 describes what "U.S. Current Account Balance" includes in terms essentially consistent with common definitions of the current account today: "Includes merchandise, services, [together, the trade balance] private remittances [primary income], and government transfers [included in secondary income]." It is not clear to what the asterisk in the heading refers.

Defendants define the "current account" balance as "the net position of (i) goods trade, (ii) services trade, (iii) primary income, and (iv) secondary income." Decl. of Pierre Yared (Acting Chairman, Council of Economic Advisors) ¶ 24, Court No. 26-01472, ECF No. 35-1 ("Yared Decl.").

A Glossary maintained by the Bureau of Economic Analysis, U.S. Department of Commerce ("BEA") defines "Current account (international)" as: "Record of transactions in goods, services, income, and unilateral current transfers between residents and nonresidents." *See Current Account (International)*, BEA Glossary (last accessed May 6, 2026) https://bea.gov/help/glossary/current-account-international. It is apparent from the terms used that the references to transactions in goods and services constitute the trade balance, "income" refers to primary income, and "unilateral transfers" refer to secondary income.

*Footnote Continued*

account balances for the years 1960 through 1973 (preliminary).  The next table, Table

23, is titled "U.S. basic balance" and lists the basic balance for those same years.  *Id.*  The

placement of these two tables immediately beneath a heading referring to U.S. balance

of payments trends is an indication that these two measurements—current account

balance and basic balance—may both have been considered to be measurements of the

balance of payments.  Following are tables on the merchandise trade balance (Table 24),

the services trade balance (Table 25), military and foreign aid (Table 25), and the private

capital account (Table 26).

The February 26, 1974 staff report contains another indication that the current

account balance could have been considered to be a measure of the balance of payments

in 1974.  The report presents, on one page (page 45), four charts, in the form of line

graphs, all of which pertain to the general subject of the balance of payments: "U.S. net

liquidity and official settlements balance" (shown on the same graph, Figure 13), "U.S.

current account balance" (Figure 14), and "U.S. basic balance" (included under heading

for Figure 14 and shown in the table of contents as Figure 15).  February 26, 1974 staff

report at 45.  Thus, page 45 and the table of contents, *id*. at IV, place the chart on current

account balance after the chart for liquidity and official settlements and immediately

---

Defendants define primary and secondary income in this way: "Primary income consists of international investment income and labor compensation, while secondary income reflects unilateral transfers (e.g. insurance payments, foreign aid, remittances)." Yared Decl. ¶ 24.

before the chart on basic balance. Figures 14 and 15 have as the horizontal axis the years 1950 through 1973 (the last year shown as "est." [estimated]). *Id*. at 45. Current account balance is described on the chart as "Including merchandise, investment income, services, military, and transfers." *Id*. A notation on the U.S. current account chart reads "Best measure of U.S. international competitive position." *Id*. It shows deficits and surpluses for 1950-69 and a sharp drop beginning in 1970-71 to below negative $8 billion in 1972, followed by a rapid increase to a surplus for estimated 1973. *Id*. A notation on the following chart, "U.S. basic balance," reads "Best measure of persistent features in U.S. payments position" and shows deficits for all years from 1950 to 1972 except for the 1973 estimate, which shows a rapid rise to a surplus, after a sharp drop in 1970 to a low below negative $9 billion in 1972. *Id*. This chart states, "Adds long-term capital movements to current account balance." *Id*. The "Source" for all four charts on page 45 is given as "Council on International Economic Policy Annual Report, February 1974." *Id*.

In summary, the mere references to the three methods of measuring payments balances in Table 3 of the Senate Report, a table also presented in the Senate Finance Committee staff reports, are far too slender a reed to support the weight of a conclusion by this Court that Congress intended for "balance-of-payments deficits" to be measured for Section 122(a)(1) purposes only according to liquidity, official settlements, and basic balance. The other tables and charts discussed above cast further doubt on that

Court Nos. 26-01472 & 26-01606                                                                Page 14

conclusion. Had Congress intended to limit measurement to liquidity, official

settlements, and basic balance for purposes of Section 122(a)(1), one would expect to see

a definition to that effect in Section 122, as there was in H.R. 6767, or at least discussion

in the text of the Senate or House Report signifying that these were the only permissible

methods of measurement. The deletion of the parenthetical from H.R. 6767 and the

accompanying explanation in the House Report, which rejected the idea of specifying

what measures would be permissible, are contrary to any supposition that the President

was required to adhere to those three measurement methods in restricting imports

according to Section 122(a)(1). The specific issue of whether Congress intended the

balance of payments to have been measurable according to the balance on current

account likewise is not addressed in the text of the House and Senate reports. But the

February 26, 1974 staff report and the December 1974 staff report indicate that it could

have been a possibility, and I see no indication that Congress intended for it *not* to be

used. We should not draw conclusions about legislative intent from what we do not

know.

From the reference in subsection (a) of Section 122 to the payments balance and

the reference in subsection (c) to the trade balance, the majority opinion reasons that

"[a]lthough the current account (and the balance of trade as a component of the current

account) are relevant to balance-of-payments deficits, they are distinct, and the statute

recognizes the distinction." *Majority Op.* at 42. This statement draws an unwarranted

conclusion from the statutory text.  The statute distinguishes the payments balance from the trade balance by using both terms, but it does not distinguish the payments balance from the current account balance, an entity the statute does not mention.  We safely can conclude, nevertheless, that Congress, in mentioning the payments balance in subsection (a), intended to refer to a broader measure than the one to which it referred in subsection (c).[7]

Nothing in the statute or the legislative history of Section 122 suggests that Congress adopted a "frozen in time" approach to statistical measurement such that the President's authority under Section 122 would expire should the Commerce Department's Bureau of Economic Analysis ("BEA"), the agency charged with maintaining our country's economic statistics, change the way it measures and calculates them.  The House and Senate Reports reveal that in enacting Section 122 Congress was motivated by genuine concerns over the economic condition of the country and wanted the President to have for the future some specified, limited authority to restrict (or, in a situation described in subsection (c), increase) imports into the United States.[8]  The legislative history does not support the plaintiffs' view that this

---

[7] The majority, who describe the trade balance as a component of the current account balance, *Majority Op.* at 42, agrees with defendants that the current account balance is a broader measure than the trade balance.

[8] The majority opines in *dicta* that "the grammatical structure of Section 122(a) suggests that 'fundamental international payments problems' are an independent

*Footnote Continued*

authority was not intended to be used after the transition from the Bretton Woods system to floating exchange rates and was included in the statute only to allow for the possibility that the United States and its trading partners would return to a fixed-rate international arrangement.[9]

Congress understood in 1974, and long before 1974, that our country's payments balance could be measured in different ways that produce different results. *See* Subcomm. on Econ. Stats., Joint Econ. Comm., 89th Cong., 1st Sess., *The Balance of Payments Statistics of the United States*, at 2 (Comm. Print 1965) (Reporting conclusions of the "Review Committee for Balance-of-Payment Statistics" and stating that ". . . we agree with the Review Committee that 'no simple number can adequately describe the international payments position of this country at any time.'"). The three methods

---

requirement" for Presidential action under Section 122(a)(1), i.e., a requirement that is in addition to large and serious balance-of-payments deficits. *Majority Op*. at 31 n.25. The Senate Report refutes a view that large and serious balance-of-payments deficits, standing alone, are insufficient to support an import restriction. *See* S. Rep. No. 93-1298, at 87 ("Under the Committee bill, the President would be required to impose import restrictions whenever the U.S. faces large and serious balance-of-payments deficits.").

[9] The statement of Rep. Henry Reuss the majority quotes makes this point. *Majority Op*. at 34 (quoting 119 Cong. Rec. 40,568 (1973)) (concluding that under floating exchange rates the Section 122 authority would achieve limited adjustments of the exchange rate of the dollar). The possible measurement of the payments balance by the basic balance method is another indication, as this is a broad measurement which, like the current account balance, is based on the economy as a whole and is not confined to the balance on government-held monetary reserves, as is the official settlements measurement.

identified in Table 3 of the Senate Report illustrate that there is more than one method,

while the text of that report does not say that these are the only acceptable methods.

The three statistical methods for measuring the payments balance the majority

cites are obsolete.  The BEA today measures the balance of payments according to a

method that, as the BEA instructs, is intended to result in a sum of zero.[10]  That method

calculates the payments balance by summing the current account balance with the

balances on the capital and financial accounts.[11]  By definition, a payments balance

measured according to a method that in principle produces a zero balance cannot

---

[10] *See* Amanda Geiger, *What is the Balance of Payments?*, Fed. Rsrv. Bank of St. Louis (last accessed May 6, 2026) https://www.stlouisfed.org/publications/page-one-economics/2025/oct/what-is-the-balance-of-payments.

[11] The majority opinion recognizes that the BEA's measurement of the balance of payments "as an accounting principle always nets to zero." *Majority Op.* at 39.  The BEA Glossary defines "Balance of payments" as "Record of transactions between U.S. residents and foreign residents during a given time period.  Includes transactions in goods, services, income, assets, and liabilities.  It is broken down into the current accounts (international), capital accounts (international), and financial accounts (international)." *Balance of Payments*, BEA Glossary (last accessed May 6, 2026) https://bea.gov/help/glossary/balance-payments.  It defines "Capital account (international)" as "Record of capital transfers between U.S. residents and foreign residents, such as debt forgiveness and migrants' transfers, and acquisitions and disposals of nonproduced nonfinancial assets between residents and nonresidents." *Capital Account (international)*, BEA Glossary (last accessed May 6, 2026) https://bea.gov/help/glossary/capital-account-international.  It defines "Financial account (international)" as "Record of transactions between U.S. residents and foreign residents resulting in changes in the level of international claims or liabilities, such as in deposits, ownership of portfolio investment securities, and direct investments." *Financial Account (international)*, BEA Glossary (last accessed May 6, 2026) www.bea.gov/help/glossary/financial-account-international.

amount to a "fundamental international payments problem" within the meaning of

Section 122. Congress, therefore, meant something else in referring to the balance of

payments in Section 122(a)(1).

The majority reasons that the obsolescence of methods of measuring the

payments deficit is of no concern, *Majority Op.* at 44, while also concluding that "to

lawfully proclaim the import surcharges" authorized by Section 122(a)(1) the President

must use those obsolete methods to assert "the existence of the conditions required by

the statute," *id*. at 29. According to this reasoning, the BEA in effect can repeal Section

122(a)(1) by changing how it measures the balance of payments. That could not have

been the legislative intent.

Characterizing defendants' position as one in which "the President has discretion

to identify any actionable deficit for purposes of Section 122(a)(1)," the majority reasons

that "Section 122 would lack an intelligible principle if the President could simply

identify any deficit account," *id.* at 40 n.33, and that "[s]uch an expansive reading of the

statute would raise a non-delegation issue," *id*. at 40. This reasoning sets up a straw

man. Recognizing the need to measure a balance-of-payments deficit by a "*reasonable*

understanding of the term in the context of section 122," Proclamation 11012 ("the

Proclamation") does not "simply identify any deficit account." *Proclamation 11012*, (Feb.

20, 2026), 91 Fed. Reg. 9,339 (Exec. Office of the President Feb. 25, 2026) ("*Proclamation*")

¶ 6 (emphasis added). The Proclamation addresses, in considerable detail based on

official BEA statistics, various metrics pertaining to the payments balance that involve

statistical measures of developments over the last several years.[12]  Among them is a

"staggering" current account deficit that reached four percent of gross domestic

product ("GDP") in 2024, was two percent of GDP during 2013-2019, and was larger in

2024 than in 2019-2023, *id*. ¶ 9, and an historically unprecedented U.S. net international

investment position at the end of 2024 that was negative 90 percent of GDP and that the

_____

[12] Stated in summary form, the Proclamation makes the following factual findings:

> Fundamental international payments problems exist that significantly harm U.S. national interests, including economic and national security interests. *Proclamation* ¶ 13.  "The large, persistent, and serious" goods trade deficit of $1.2 trillion in 2024 and approximately $1.2 trillion in 2025 "has grown by 40 percent in the past 5 years alone" and "contributes to the fundamental international payments problems facing the United States." *Id*. ¶ 8.  Beginning in 2024, the "primary income" balance turned negative for the first time since at least 1960 and therefore no longer served as a counterweight to the trade deficit in the current account and no longer served as a "stabilizing force for the United States balance-of-payments position even in the face of large and persistent trade deficits." *Id*. ¶ 9.  The balance on secondary income has long been in deficit. *Id*. ¶ 11.  The balance-of-payments position is now a "large and serious balance-of-payments deficit." *Id*. ¶ 13.  The "ongoing decline" in the U.S. net international-investment position shows that the U.S. balance-of-payments deficit is large and serious, in that the current account is a "primary driver" of changes in the net U.S. international-investment position, which reached 90 percent of gross domestic product ("GDP") in 2024. *Id*. ¶ 10.  The "staggering" current account deficit, which reached 4 percent of GDP in 2024, was almost double that of 2019-2023 and the largest since 2008. *Id*. ¶ 9.

President found to be affected significantly by the current account and indicative of the large and serious balance of payments deficit, *id*. ¶ 10.

For the reasons I have discussed, I conclude that the majority errs, first, in its interpretation of the legislative history in holding that the President cannot invoke subsection (a)(1) unless he identifies a payments deficit measured according to liquidity, official settlements, or basic balance and, second, in holding that Congress expressly foreclosed the possibility of the President's using current account deficits as the basis for action under subsection (a)(1) by referring to the payments balance in subsection (a) and the trade balance in subsection (c).

### III.

The basic balance measurement of the payments balance, in use in 1974, was calculated directly from the current account balance: it summed the current account balance, positive or negative, with the balance on long-term capital, positive or negative. *See Majority Op.* at 32 n.26, 35 n.29. Under the majority's approach, this Court would sustain the Proclamation had it identified a large and serious balance-of-payments deficit calculated according to a basic balance measurement. At the same time, the majority regard the issue of whether a balance-of-payments deficit according to basic balance (or liquidity or official settlements) exists or could be measured to exist today as one that is beyond the concern of this Court. *Majority Op.* at 44 ("Whether it is

possible to measure balance-of-payments deficits by settlements, liquidity, or basic

balance today is not our concern."). But on that issue, I have a concern.

The basic balance and the BEA's contemporary measurement of the balance of

payments have a feature in common: both include the current account balance. The

basic balance sums the current account balance with only a long-term capital balance

while the contemporary BEA measurement endeavors to sum the current account

balance with the entire capital account and financial account balances.[13] The State

plaintiffs, citing BEA and World Bank Group data, acknowledge that under the

contemporary BEA measurement of the payments balance the current account is

"balanced" principally by the surplus on the financial account, the capital account being

much smaller.[14] The Proclamation cites the enormity of the current account deficit in

---

[13] The BEA uses this measurement of the payments balance with the objective that the balance will be zero (but apparently difficulties in measuring the capital account and financial account balances are the reason why the calculated balance of payments typically results in "discrepancy" deficits). *See* Geiger, *supra* note 10.

[14] The State plaintiffs acknowledge that the capital account "tends to be rather small" and that "the two-way financial flows" measured by the financial account are "enormous." Pl. States' Mot. for Summary J., and, in the Alternative, for Permanent Inj. 6 (Mar. 13, 2026) Ct. No. 26-04172, ECF No. 25 (citing Decl. of Douglas A. Irwin (Prof. of Economics, Dartmouth College) ¶ 9, ECF No. 27-6; BEA, *International Trade and Investment*). They cite World Bank Group data estimating the 2024 U.S. financial account position as a surplus of approximately $1.13 trillion, *id.* at 17 (footnote omitted), which would balance the entire 2024 current account deficit ($1.13 trillion as reported by the BEA). The basic balance measurement of the payments balance was defined to sum the current account balance with a balance on certain capital flows (long-term capital) but does not include the balance on the financial account.

2024 (i.e., four percent of GDP). *Proclamation* ¶ 9. It would be questionable as a factual matter, and indeed presumptuous, to speculate that a long-term capital account balance—even if it could be measured accurately today, and defendants offer an expert opinion that it cannot[15]—when not combined with the financial account balance, could be positive at so enormous a magnitude as to offset the enormously negative current account balance such that the balance of payments as it would be measured by basic balance is not a large and serious deficit.

Defendants offer the expert opinion that the current account balance, even if combined with the capital account balance, still would be a large and serious balance-of-payments deficit. Decl. of Pierre Yared (Acting Chairman, Council of Economic Advisors) ¶ 15, Ct. No. 26-01472, ECF No. 35-1 ("Yared Decl."). My point is not that we necessarily must accept this expert opinion as an established fact for purposes of ruling on the pending summary judgment motions. But the statistics maintained by the BEA, and the World Bank Group measurement of the financial account as provided to us by the State plaintiffs, show the enormous effect that the 2024 deficit on current account would have had on the balance of payments that year, whether measured by the contemporary BEA method or as measured by basic balance. It also demonstrates to me

---

[15] As the majority mentions, defendants offer expert opinion that today "there is no single measure of the long-term capital account (the other main component of the basic balance)." *Majority Op.* at 39 (quoting Yared Decl. ¶ 37).

Court Nos. 26-01472 & 26-01606                                                                Page 23

another reason why this Court should not invalidate the Proclamation for failure to include, for example, an actual numerical calculation of the balance-of-payments deficit according to a basic balance measurement. There being no official BEA statistic of the payments balance as measured by basic balance, or, specifically, as measured by a sum of the current account balance and a long-term capital balance, any such numerical calculation would not be an official government statistic.

We are not experts in international macroeconomics matters and should hesitate to question whether it was reasonable for the President to rely on official BEA government statistics rather than a calculation of his own that may have been acceptable to the majority but would have had no official status. The Proclamation instead relies on advice the President's advisors provided after studying "different methods of evaluating balance-of-payments deficits." *Proclamation* ¶ 6. That advice was that the balance-of-payments deficit is large and serious "under any of these methods." *Id*. The Proclamation states that the advisors considered different methods of measuring our country's "balance-of-payments position[] under any reasonable understanding of the term in the context of section 122," which Congress enacted more than a half century ago. *Id*. The current account is mentioned as only one of the methods considered. Given the limitations on our judicial role, we are not in a position to presume that the advisors did not also consider whether the balance-of-payments deficit would be large and serious according to the basic balance method.

In summary, we should not conclude that the absence from the Proclamation of a basic balance measurement of the payments balance, in particular, is a ground upon which to invalidate the Proclamation. Instead, the Proclamation relies on BEA statistics to support the President's finding that the balance-of-payments deficit is, by any reasonable measure within the meaning of Section 122, large and serious. *See id*. ¶¶ 6, 7, 9, 10, 13. We do not have the expertise to reach the conclusion the majority reaches, and the limits of our judicial role strongly caution against it. *See George S. Bush & Co.,* 310 U.S. at 379-80. For this reason as well, I disagree with the majority's position, *Majority Op.* at 45-46, that the President acted *ultra vires* because he did not identify a balance-of-payments deficit determined according to basic balance or one of the other two measurements listed in Table 3 of the Senate Report.

IV.

I turn now to the two summary judgment motions pending before us. As I explain below, I would have denied both summary judgment motions and held in abeyance any ruling on whether the Proclamation should or should not be invalidated, pending our conducting the procedure required by USCIT Rule 56(f). We have before us no cross-motion for summary judgment by defendants, *see* Rule 56(f)(1), and Rule 56(f) requires us to refrain from *sua sponte* granting summary judgment either on grounds not raised by a party (Rule 56(f)(2)), or after identifying for the parties material

facts that may not be in dispute (Rule 56(f)(3)), without first providing notice and a reasonable time to respond.

USCIT Rule 56(f)(1) sets forth a procedure that applies where, as here, a party opposing a summary judgment motion does not make a cross-motion for summary judgment. In that situation, the rule protects the procedural rights of a movant. Rule 56(f)(2) safeguards the rights of a nonmovant, providing as follows: "*Judgment Independent of the Motion*. After giving notice and a reasonable time to respond, the court may: . . . (2) grant the motion on grounds not raised by a party." Rule 56(f)(3) also serves the objective of affording procedural fairness to the parties.

The majority grants summary judgments to the State of Washington and the importer plaintiffs without following the "notice and reasonable time to respond" procedure of Rule 56(f)(2) or (f)(3). The majority's opinion grants summary judgments based on two grounds. First, it holds that there are no material facts in dispute. *Majority Op.* at 29 n.23. Then, it holds that plaintiffs with standing are entitled to summary judgment as a matter of law on the ground that the Proclamation is *ultra vires* because it does not identify "balance-of-payments deficits" measured according to liquidity, official settlements, or basic balance. *Id*. at 45-46. As to both holdings, the parties were not given notice that the court was contemplating grants of summary judgments on these grounds, which no party raised in seeking summary judgment, and

on which the court did not allow the parties "notice and a reasonable time to respond" as Rule 56(f) required in the procedural posture of these two cases.

With respect to the first ground, we can discern from the summary judgment motions that both groups of plaintiffs would have us reach a general, factual conclusion that they would have us consider to be beyond genuine dispute. That conclusion is, in summary, that balance-of-payments deficits of concern to Congress in late 1974 may have been large and serious when measured according to the contemporary BEA definition, but any balance-of-payments deficits existing amidst today's system of floating exchange rates are zero or negligible when measured according to that same definition. Defendants dispute this general conclusion.[16] In granting summary judgments based on the majority's implicit conclusion that this factual dispute is not on a material issue, *see id*. at 29 n.23, the majority opinion grants summary judgments on a ground no plaintiff raised in a brief on which summary judgment was sought.

---

[16] Disagreeing with plaintiffs' factual allegations, and pointing to the country's current account deficits, defendants argue that, as the President found, "the United States faces a large and serious balance-of-payments deficit." Defs.' Resp. in Opp'n to Mots. for Prelim. Inj. and Summary J. 14 (Apr. 3, 2026) Ct. No. 26-01472, ECF No. 35, Ct. No. 26-01606, ECF. No. 16 ("Defs.' Resp."). Defendants dispute plaintiffs' allegation that the balance-of-payments deficit is nonexistent or statistically insignificant. Defendants disagree that the contemporary BEA measurement is applicable to the issue these cases present. *Id*. at 30 (arguing that the BEA measurement always balances to zero regardless of whether the country has a fixed or floating currency and citing Yared Decl. ¶ 21).

With regard to the second ground on which the majority grants summary judgment motions, i.e., the majority's interpretation of the term "balance-of-payments deficits" as used in Section 122(a)(1), the majority held that the President, in order to restrict imports under Section 122(a)(1), would have had to identify a balance-of-payments deficit that was measured on a basic balance, liquidity, or official settlements basis. This also was a ground no plaintiff raised in its brief seeking summary judgment. Both groups of plaintiffs claimed that the Proclamation must be invalidated, but they supported this claim essentially on the ground that no balance-of-payments deficits within the meaning of Section 122(a)(1) exist, or can exist, because of the nation's economic condition and, specifically, because of the absence of a system of fixed exchange rates. In this way, plaintiffs' summary judgment motions raised the issue of whether, due to today's economic environment, the President has any authority to restrict imports under Section 122(a)(1) and answered that question in the negative. Deciding that there are no material facts in dispute and that plaintiffs are entitled to judgment on an issue of law, i.e., the majority's view on an issue of statutory interpretation, the majority's opinion never reached that factual issue.

Because a movant seeking summary judgment must meet the two-part burden of showing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law, the requirement for notice and a reasonable time to respond imposed by Rule 56(f) is intended to ensure procedural fairness for a

nonmovant with respect to both parts of that burden. The objective of fairness is plainly implicated where, as here, a court is granting summary judgments based not only on the issue of whether the parties' factual disagreement pertains to a material fact but also on the issue of what Congress meant when referring in Section 122(a)(1) to our country's balance-of-payments deficits. As to the latter, plaintiffs and defendants disagree on the statutory interpretation of that term, but the majority adopts a definition no party advocated. Plaintiffs argued for the contemporary definition of the term as applied by the BEA, while defendants argued that the most reasonable measure of the payments balance is the current account balance. Rejecting both positions, the majority holds that only measurements of the payments balance by basic balance, liquidity, or official settlements conform to the definition it applies to the adjective "balance-of-payments" as used to modify the term "deficits" in Section 122(a)(1).

The procedure of Rule 56(f) is particularly important for our decisions on the summary judgment motions before us. Had the parties been given notice and a reasonable time to respond to the grounds upon which the majority ultimately decided these cases, the court might have had the benefit of their arguments as to whether confining the President's discretion to the use of liquidity, official settlements, or basic balance as measures of the payments balance is the correct interpretation of Section 122(a)(1). As discussed above, the majority reaches its conclusion based on Table 3 as presented in the Senate Report and in the staff reports. No party had notice that the

court would rely solely on those sources of legislative history in reaching its conclusion, and specifically, defendants were not provided "a reasonable time to respond," USCIT R. 56(f), with arguments as to why the majority's statutory interpretation might not be correct.

While it might be argued that the parties had the opportunity at oral argument to address the grounds on which the majority grants summary judgments, the oral argument did not provide "notice and a reasonable time to respond" as required by Rule 56(f). Satisfying that procedural requirement is not optional on the part of this Court, and in this case it would have ensured procedural fairness. *See, e.g., Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150-51 (10th Cir. 2017) (Fed. R. Civ. P. 56(f)(2) required notice and a "reasonable time to consider the court's *sua sponte* theory and to develop the legal and factual arguments to dispute it."); 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2720.1 (4th ed.) (". . . if the court determines to enter summary judgment on a ground not presented or argued by the parties, the failure to give the losing party an opportunity to defend against that ground provides a ground for reversal.").

Therefore, even if I were to agree on the merits of the majority's decision to grant summary judgments in favor of the plaintiffs with standing (and I do not agree), I still would not have granted summary judgments at this time. Instead, I would have given the parties notice of possible grounds that the parties have not raised and upon which

the court was considering granting summary judgment, affording them the opportunity to submit additional briefing, as I believe Rule 56(f) requires.[17]

Also, I do not agree that any plaintiff, as of yet, has met its two-part burden of showing the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. In my view, no plaintiff has shown that the fact they would have us accept, and upon which they base their summary judgment motions, i.e., that in today's economic environment it is impossible for large and serious balance-of-payments deficits to exist, is an indisputable fact. We cannot presume to know whether changes in the long-term trends of the payments balance may be attributed as much to the change in the BEA measurement methodology as to the early-1970s transition to a floating-rate currency. Plaintiffs' failure to show the absence of a genuine dispute as to any material fact by itself requires that we deny both summary judgment motions.[18] In

---

[17] If the majority had considered the procedure of USCIT Rule 56(f) too time consuming in light of plaintiffs' motions for a preliminary injunction and concluded, *inter alia*, that some plaintiffs had shown irreparable harm and a likelihood of success on the merits, an alternative would have been the majority's ordering, without my concurrence, a preliminary injunction against the collection of duties.

[18] I recognize that defendants did not follow the procedure specified in USCIT Rule 56.3 (and that the importer plaintiffs, in moving for summary judgment, did not do so either). In view of the court's discretion in applying that rule, I do not see these procedural irregularities as grounds for our ruling on the summary judgment motions, one way or the other. Regardless, we would not be in a position to deem plaintiffs' alleged fact to be admitted on the basis of Rule 56.3 if we were to decide that this fact is contrary to a fact upon which the President based his decision to restrict imports, which we are not empowered to review.

addition, I conclude that no plaintiff has demonstrated, as of yet, that it is entitled to judgment as a matter of law. Under the procedure by which I would have decided these cases, I would have allowed the parties the opportunity to address the issue of whether plaintiffs, after being denied summary judgment on the grounds they asserted in their motions, nevertheless are entitled to summary judgment on some other ground, and the issue of whether, instead, defendants should be awarded summary judgment as nonmovants.

V.

I now address the views expressed in the majority's opinion at 46 n.38 by clarifying the reasons why I am dissenting. I dissent because the majority: (1) enters summary judgments for plaintiffs according to a definition of "balance-of-payments" that lacks any convincing support in the legislative history and according to the majority's concluding, without support in the statutory language, that Section 122 expressly distinguishes the current account balance, which Section 122 does not mention, from the payments balance; (2) prejudices the defendants by failing to follow the procedure required by USCIT Rule 56(f); and (3) overlooks that plaintiffs, as of yet, have failed to meet a burden of showing that there is no genuine dispute as to any material fact or a burden of showing that they are entitled to judgments as a matter of law.

Defining "balance-of-payments" as used in Section 122(a)(1) to mean our country's payments balance as measured only on the bases of liquidity, settlements, or basic balance, the majority characterizes my dissent as finding "the legislative history too limited to give meaning to the term "balance-of-payments deficits" and providing "no affirmative alternative meaning to this critical statutory term that the President invokes as the basis of the Proclamation." *Majority Op.* at 46 n.38. What I find "too limited" is not the legislative history but the majority's analysis of it. For example, I regard the deletion of the parenthetical from H.R. 6767 as indicative legislative history. I disagree with the majority's statement that "the dissent concludes that one cannot or should not ascribe meaning to 'balance-of-payments deficit' absent express statutory language defining the term." *Id.* I reach no such conclusion, and I do not disagree with the majority's view that the meaning of a term not defined in a statute can be ascertained from legislative history.

The majority is correct that at this point in the litigation I do not offer my own interpretation of the term "balance-of-payments" as used in Section 122(a)(1). Doing so is not necessary to expressing my opinion that the majority misinterprets the text of the statute and the legislative history and, for this reason and others, errs in entering summary judgment for some of the plaintiffs.[19]

_____

[19] While I am not prepared to define the term "balance of payments" at this point in the litigation, I conclude that were we to attempt to invalidate the Proclamation solely

*Footnote Continued*

A court could interpret "balance-of-payments" to have a definite meaning while also deciding that Congress did not intend to confine the President's discretion to any particular means of measurement. This would not necessarily mean that the President would be free to restrict imports under Section 122(a)(1) according to any definition of the balance of payments he might contemplate. A court might conclude as an "intelligible principle," for example, that the President's use of measurement methods necessarily would be limited to those that can be shown to have gained acceptance in the relevant fields of economics. I do not offer this as a definition of the term, for I would have wanted informed briefing from the parties before venturing to decide the statutory interpretation issue the majority raises. Because the majority decided this issue without following the USCIT Rule 56(f) procedure, we did not have the benefit of such informed briefing. As acknowledged in *Learning Resources, Inc. v. Trump*, 607 U.S. at --, 146 S. Ct. at 646, as justices "we claim no special competence in matters of economics or foreign affairs." As judges of this Court, we shouldn't either.

---

on the ground that the Proclamation does not define that term or the statutory term "large and serious balance-of-payments deficits" beyond what it states, we would lack the authority to do so. The Proclamation is not a treatise or a judicial opinion. No principle of which I am aware required it to engage in a discussion of statutory interpretation. And because the President is not a government agency for purposes of the Administrative Procedure Act ("APA"), we lack the authority to review the Proclamation according to the "arbitrary, capricious" standard of review set forth in the APA, 5 U.S.C. § 706. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

Court Nos. 26-01472 & 26-01606                                                    Page 34

The majority asserts, further, that "[r]ather than define balance-of-payments deficits for purposes of Section 122, the dissent accepts Defendants' claim that they may choose the economic statistics or sub-accounts of the balance-of-payments based on what is available at present." *Majority Op.* at 46 n.38. I do not reach the question of whether what the majority describes as a claim by defendants is correct. I take no position on it other than to conclude that, as characterized by the majority, it is not a correct interpretation either of the Proclamation or what is before us in these cases.

The Proclamation is not based on the argument the majority attributes to the defendants.[20] As discussed previously, it instead rests upon multiple findings of fact by the President that our country's balance of payments is in serious deficit by any reasonable measure of that term as used in Section 122. *See, e.g., Proclamation* ¶¶ 6, 7, 9, 10, 13. The immediate issue before us is whether or not to grant the summary judgment motions seeking to invalidate the Proclamation, not whether every argument defendants advance in support of the Proclamation is correct.

---

[20] As to "sub-accounts," the majority might be referring to the three sub-accounts of the payments balance as defined today by the BEA, a measurement that the majority and I apparently agree is not what could have been meant by the term "balance-of-payments" as used in Section 122(a)(1). As discussed previously, I do not conclude, as the majority does, that Congress necessarily believed that the current account balance was not usable as a measurement or indication of the payments balance. This, too, is an issue that informed briefing may have elucidated.

The majority also appears to presume that I would sustain the Proclamation based on my supposed acceptance of what they characterize as defendants' position. I consider it premature to decide whether we should sustain or invalidate the Proclamation. Instead, for the reasons I offer, I would have denied both summary judgment motions and, to ensure procedural fairness, followed the procedure USCIT Rule 56(f) requires in this situation.

VI.

In summary, the cases before us require us to proceed cautiously, with the requisite degree of judicial restraint and with the objective of ensuring procedural fairness to all parties.

For the reasons I present in the foregoing, I would not exercise the judicial power to enter summary judgments that invalidate the Proclamation and enjoin its operation. Instead, I would deny both summary judgment motions and proceed according to USCIT Rule 56(f).

/s/   Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated: May 7, 2026
   New York, New York