**Nos. 2026-1804, -1805**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF CALIFORNIA, THE STATE OF NEW YORK, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, THE STATE OF MAINE, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NORTH CAROLINA, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, THE STATE OF RHODE ISLAND, THE STATE OF VERMONT, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, THE STATE OF WISCONSIN,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, THE UNITED STATES, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner for U.S. Customs and Border Protection,

Defendants-Appellants.

BURLAP AND BARREL, INC., BASIC FUN, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner for U.S. Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

Defendants-Appellants.

On Appeal from the United States Court of International Trade
Nos. 26-1472, -1606, Judges Barnett, Kelly, and Stanceu

## EMERGENCY MOTION FOR A STAY PENDING APPEAL
## AND AN IMMEDIATE ADMINISTRATIVE STAY

BRETT A. SHUMATE

*Signature block continued on inside cover*        *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
DOUGLAS C. DREIER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4452*

# TABLE OF CONTENTS

**<u>Page</u>**

STATEMENT ................................................................................................ 4

      A.    Statutory Background ........................................................................4

      B.    Factual Background ...........................................................................8

      C.    This Litigation .................................................................................10

ARGUMENT.............................................................................................. 12

I.     The Government Is Likely To Prevail On The Merits .......................... 12

II.    The Equitable Factors Favor A Stay ......................................................... 22

CONCLUSION ........................................................................................... 26

CERTIFICATE OF COMPLIANCE

ADDENDUM

Last Thursday, a divided panel of the Court of International Trade (CIT) invalidated time-limited tariffs imposed by the President under Section 122 of the Trade Act of 1974 to deal with a large and serious balance-of-payments deficit.  The CIT did so even though the Supreme Court contemplated that the President might proceed on this path after his tariffs under the International Emergency Economic Powers Act (IEEPA) were invalidated, even though the CIT itself determined in the IEEPA cases that Section 122 would apply in this circumstance, and even though the plaintiffs there — including some of the plaintiffs here — repeatedly argued as much.

The CIT's ruling rests not on the text Congress actually enacted, but on (1) a definition of the balance of payments included in a prior unenacted version of the bill and (2) the headings in a table in a Senate committee report on the enacted version of the Act:

TABLE 3.—U.S. TRADE AND BALANCE OF PAYMENTS, 1960–74

[In billions of dollars]

| U.S. trade position | | | | Trade balance | | Balance of payments | | |
|---|---|---|---|---|---|---|---|---|
| Exports (X) | | Imports (M) | | | C.i.f. (M) excluding foreign aid (X) | | Official settle- | Basic |
| Total | Minus foreign aid | F.o.b. | C.i.f.¹ | F.o.b. | | Liquidity² | ments³ | balance |

From the fact that the table includes "[l]iquidity," "[o]fficial settlements," and "[b]asic balance" as subcategories under "[b]alance of payments," S.

Rep. No. 93-1298, at 8 (1974)—and the fact that the latter two were included in the definition of "balance of payments" in the prior unenacted bill—the majority inferred that when Congress authorized tariffs "to deal with large and serious United States balance-of-payments deficits," 19 U.S.C. § 2132(a)(1), it must have been referring only "to deficits in (1) liquidity, (2) official settlements, or (3) basic balance." A41; *see* A43-45.

That sort of reasoning has not been recognizable as sound statutory interpretation for decades. It virtually ignores the statutory text and the backdrop against which Congress was acting, both of which make clear that whatever else a "balance-of-payments deficit[]" might include, it certainly includes the problem the President identified here. And even on its own terms, the majority's interpretation of the legislative history is unpersuasive. As the CIT dissent explains, the history actually shows that "Congress understood … our country's payments balance could be measured in different ways that produce different results," A77, and the natural inference from Congress's choice not to define "balance of payments" in Section 122—after a prior version of the legislation had defined it—is that Congress meant to allow the President to choose among reasonable economic methodologies.

This Court should stay the CIT's judgment pending appeal. An injunction against "an Executive Branch policy," particularly one "with foreign affairs implications," irreparably harms the government. *Trump v. Orr*, 146 S. Ct. 44, 46 (2025). That harm is manifest here. As the Secretary of Commerce explains, these tariffs are meant to protect the Nation during a "transition in … trade policy following" the invalidation of the IEEPA tariffs. A174. If these tariffs are lifted, importers and foreign producers "will have a strong incentive to accelerate shipments into the United States" before these tariffs could be restored, if the government were to prevail on appeal, and "before other tariff measures are finalized or implemented." A177. Moreover, the government has been ordered to pay refunds to the importer plaintiffs here—and others who sue in the coming days—that it may well be unable to recoup if it ultimately prevails. Plaintiffs, conversely, can be made whole through refunds, including interest, if the tariffs are ultimately held unlawful and refundable.

The CIT's injunction takes effect tomorrow. The Court should accordingly grant an immediate administrative stay. If the Court does so, and ultimately denies a stay pending appeal, it should extend its administrative stay for an additional week to allow the government to seek relief from the

Supreme Court. If this Court does not grant an administrative stay, the government respectfully requests a ruling on this motion by Friday, May 15; absent relief by that date, the government will seek relief from the Supreme Court. Plaintiffs have not responded to a request for their position on this motion.[1]

## STATEMENT

### A.   Statutory Background

**1.**     As relevant, Section 122 of the Trade Act authorizes the President to impose tariffs "to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a).

The balance of payments is an accounting system that summarizes a country's financial transactions with other countries. *See* A124-125. Transactions are tracked in three accounts: current, capital, and financial. A128. The current account tracks (i) revenue from exports, less expenditures on imports; (ii) primary income, comprising investment income and labor compensation from abroad; and (iii) secondary income, comprising unilateral transfers such as insurance payments, foreign aid, and remittances. A130.

---

[1] The government filed a stay motion in the CIT earlier today. The CIT has not yet ruled, but the government could not delay this exigent filing. We will apprise the Court of the CIT's ruling.

In other words, it tracks the *current* flow of money into and out of the United States. If the United States sends more money overseas for imports than it receives as revenue for exports, and if that deficit is not counterbalanced by other forms of current income from abroad, like salaries, dividends, and interest paid overseas to U.S. workers and nationals, then the balance of the current account will be negative.

The capital and financial accounts record assets and liabilities as opposed to current monetary flows. The capital account, universally acknowledged to be small relative to the current account, records capital transfers between the United States and foreign countries, such as debt forgiveness, migrants' transfers, and acquisitions and disposals of nonproduced nonfinancial assets. A78 n.11. The financial account records financial transactions between the United States and foreign countries, including deposits and direct investment. *Id.*

It is well established in economics, and undisputed here, that the overall balance of payments is necessarily zero. A124. If there is a negative balance in the current account (*i.e.*, if the United States is sending more money overseas than it is receiving from overseas), there must be a correspondingly positive balance in the capital and financial accounts (*i.e.*, foreign countries

must be investing more in U.S. assets than the United States is investing in foreign assets).  If the balance of payments does not appear to be zero in figures reported by the government, that is because accounts are constructed "from separate and imperfect data sources."  A128.

**2.**    Before the 1970s, under the "Bretton Woods" system, Congress set the value of the U.S. dollar at one-35th of the value of an ounce of gold. A101.  Other countries pegged the value of their currencies to the U.S. dollar. *Id.*  And, as a corollary to the fixed value of the U.S. dollar, the U.S. government guaranteed that it would buy or sell gold at $35 per ounce.  *Id.*

In 1971, the United States recorded a trade deficit for the first time since 1888.  Dale, *U.S. Trade Deficit First Since 1888*, N.Y. Times, Jan. 26, 1972, at 45. Traders in foreign exchange markets began fearing that the dollar was overvalued and that the United States lacked enough gold on hand to exchange for dollars, triggering a run for gold that exacerbated the crisis.  A102.

Confronted with this impending disaster, President Nixon suspended the convertibility of the dollar into gold in 1971.  *Address to the Nation Outlining a New Economic Policy: "The Challenge of Peace"* (Aug. 15, 1971), https://perma.cc/22T2-F645.  He observed that America's "trade balance has eroded over the past 15 years" and imposed a 10% tariff on imports to

remove "the unfair edge … of … foreign competition" and make "the product of American labor … more competitive." *Id.* A series of agreements followed, culminating in a March 16, 1973 agreement that ended the Bretton Woods system. The United States has since used a floating exchange rate.

Although the immediate crisis had passed, President Nixon—in response to litigation challenging his tariffs—sought explicit statutory authorization for such tariffs in the future. *Special Message to the Congress Proposing Trade Reform Litigation* (Apr. 10, 1973), https://perma.cc/F9MQ-487F. Specifically, he "request[ed] more flexible authority to raise or lower import restrictions on a temporary basis to help correct deficits or surpluses in [the Nation's] payments position." *Id.* The need for explicit statutory authority became even clearer after the CIT's predecessor held that President Nixon had lacked authority for the tariffs. *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974), *rev'd*, 526 F.2d 560 (C.C.P.A. 1975).

**3.** Congress responded with the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975), which contained Section 122. As relevant, Section 122 provides that, "[w]henever fundamental international payments problems require special import measures to restrict imports … to deal with large and serious United States balance-of-payments deficits … , the President

shall proclaim, for a period not exceeding 150 days" unless extended by Congress, "a temporary import surcharge, not to exceed 15 percent ad valorem," added onto any existing duties on imported articles.  19 U.S.C. § 2132(a).  At Section 122's enactment, as now, the United States had a floating rather than fixed exchange system.

### B.  Factual Background

**1.**  In April 2025, President Trump found that "large and persistent annual U.S. goods trade deficits" threatened the Nation.  Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,041 (Apr. 7, 2025).  Invoking IEEPA, the President acted to, among other things, "rebalance global trade flows" by imposing tariffs on certain "imports from all trading partners."  *Id.* at 15,045.

The CIT invalidated those tariffs on the ground that because they "respond[ed] to an imbalance in trade," which the CIT described as "a type of balance-of-payments deficit," they needed to be justified "under the narrower, non-emergency authorities in Section 122" rather than IEEPA's broader emergency powers.  *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1375 (Ct. Int'l Trade 2025) (per curiam).  The CIT emphasized that "[t]rade deficits are one of the key balance-of-payment deficits" that Section 122 was meant to address.  *Id.*  This Court and the Supreme Court

affirmed. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (en banc) (per curiam); *Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026).

2. Immediately after the Supreme Court's decision, President Trump issued Proclamation 11012, 91 Fed. Reg. 9339 (Feb. 25, 2026), invoking Section 122. He determined that "fundamental international payments problems within the meaning of section 122 exist and that special import measures to restrict imports are required to address these problems." *Id.* He explained that the "United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country," and thus that "the United States balance-of-payments position, under any reasonable understanding of the term in the context of section 122, is currently a large and serious deficit." *Id.* at 9340. In other words, the President found that all three components of the current account—the balance of trade (revenue from exports less expenditures on imports), primary income (revenue from U.S. capital or labor deployed overseas), and secondary income (transfer payments into the country minus those out of the country)—were negative.

To deal with the large and serious balance-of-payments deficit he had identified, the President imposed a temporary 10% import surcharge on all articles imported into the United States, with certain exemptions not relevant here. 91 Fed. Reg. at 9340-9341.  That surcharge ends July 24, 2026.

## C.    This Litigation

States and private companies challenged the Section 122 tariffs in two cases.  The CIT issued a single opinion in both, with a majority holding that the circumstances described in the President's proclamation do not constitute "balance-of-payments deficits" within the meaning of Section 122.

The CIT began by recognizing, correctly, that only the three plaintiffs shown to be importers have standing to challenge the tariffs, and that the remaining plaintiffs lack standing based on their asserted "indirect economic harm[s]."  A32.

As to the merits, the CIT majority reasoned that "balance-of-payments deficits" is a "term of art" that encompasses only deficits in liquidity, official settlements, or the basic balance.  A40.  The majority based this conclusion wholly on legislative history.  The majority recognized that, while Congress had defined "balance of payments" in an earlier version of the legislation, the enacted version of Section 122 includes no such definition.  And it

- 10 -

recognized that "[a] variety of options for analyzing the balance of payments," not just the measures specified in the original parenthetical definition, "were available to Congress at the time Section 122 was debated and enacted." A44 n.30. But the majority nonetheless held that Congress required the President to look only to the measures listed in the headings of a single table in the Senate Report on the Trade Act of 1974, which included "[l]iquidity," "[o]fficial settlements," and "[b]asic balance" as subheadings under a "[b]alance of payments" heading. S. Rep. No. 93-1298, at 8. The majority regarded this table as "indicat[ing]" "what Congress contemplated as the measure of balance of payments." A45. The majority placed further reliance on a December 1974 report from the Staff of the Senate Finance Committee—a report prepared wholly by congressional staff—which the majority described as reflecting the views of "the Senate." A45 & n.31. The majority described this report as "the clearest indication of the concerns Section 122 was intended to address." A46 n.31.

Because the balance-of-payments deficits identified in the challenged presidential proclamation were not assessed based on liquidity, official settlements, or basic balance, the CIT held that they do not constitute balance-of-payments deficits within the meaning of Section 122 and that the

- 11 -

proclamation is invalid.  A54.  The court enjoined the enforcement of the tariffs as to the three plaintiffs with standing.  A7.

## ARGUMENT

A stay pending appeal depends on "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"  *Nken v. Holder*, 556 U.S. 418, 426 (2009).  Here, those factors strongly favor the government.  The Court should grant a stay pending appeal and an immediate administrative stay, as in the IEEPA litigation.  *V.O.S. Selections, Inc. v. Trump*, 2025 WL 1527040 (Fed. Cir. May 29, 2025) (en banc); *V.O.S. Selections, Inc. v. Trump*, 2025 WL 1649290 (Fed. Cir. June 10, 2025) (en banc).

## I.    The Government Is Likely To Prevail On The Merits

**1.**    The question here is whether the circumstances identified in the President's proclamation constitute a "balance-of-payments deficit[]," 19 U.S.C. § 2132(a)(1).  As the proclamation recognizes, and as economists have long understood, there are multiple ways of calculating a balance-of-payments deficit.  Whatever other methods might be viable, the statute allows

the approach taken here—treating a deficit in the current account, stemming from the combination of a trade imbalance and a heavily negative international-investment position, as a balance-of-payments deficit. That is clear from the text, context, and enactment history of Section 122, which the CIT majority essentially ignored, and even the legislative history, which the majority misread.

At the outset, Congress did not define the term "balance-of-payments deficits"; indeed, it declined to enact definitional language included in a prior version of the bill. The term is a technical one, the interpretation of which must be driven by how it is understood in the relevant field of expertise. *Van Buren v. United States*, 593 U.S. 374, 388 (2021) ("When interpreting statutes, courts take note of terms that carry 'technical meaning[s].'"). And all members of the CIT recognized—correctly—that plaintiffs' proposed interpretation, under which Section 122 could be invoked only when there is a negative value of the overall balance of payments, is untenable because (as discussed above) the overall balance is necessarily zero. Plaintiffs' reading would thus render the statute ineffectual, and courts do not interpret statutes in that way. *Garland v. Cargill*, 602 U.S. 406, 427 (2024).

- 13 -

Because a "balance-of-payments deficit[]" cannot mean a negative value of the overall balance of payments, it must refer to a deficit of some subset of the overall balance. And given the background against which Section 122 was proposed and enacted, there is no doubt that an imbalance in the current account arising from a substantial trade deficit, when combined with a deterioration of the balance on primary income, is one form of a "balance-of-payments deficit[]." When declaring the 1971 national emergency and imposing a temporary 10% duty in response to it, the Nixon Administration recognized that the trade deficit (the first since 1888) was "a primary element in the unsatisfactory U.S. balance of payments" and that correcting the balance-of-payments deficit required correcting the trade deficit. Office of the Historian, U.S. Dep't of State, *Paper Prepared in the Department of Treasury* (Sept. 10, 1971), https://perma.cc/JTZ8-2KTU. That crisis was the genesis of Section 122, as discussed above. Indeed, the committee reports on Section 122 repeatedly cite the trade deficit as a key reason it was needed. *See, e.g.*, H.R. Rep. No. 93-571, at 13, 29 (1973); S. Rep. No. 93-1298, at 7.

Of course, courts do not "restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy," *Brogan v. United States*, 522 U.S. 398, 403 (1998), but where the text readily applies to that

- 14 -

"particular evil," a statute should not be construed as failing to address it. The enactment history thus shows that, whatever else the phrase "balance-of-payments deficits" covers, it certainly covers the kinds of problems the President identified here.

This understanding of "balance-of-payments deficits" is consistent with how economists have understood the phrase, both in 1974 and today. As the Acting Chairman of the Council of Economic Advisers explained in a declaration, there are "various credible methodologies for calculating balance-of-payments deficits." A124. That has long been recognized in the economics literature. Just a few years before Congress used the phrase in Section 122, for example, a journal of the International Monetary Fund published an article to explain "economists' shorthand" about the meaning of the phrase "'a deficit in the balance of payments.'" Poul Høst-Madsen, *What Does It Really Mean?: A Deficit in the Balance of Payments*, 3 Fin. & Dev. 171, 171 (1966). The article explained that the phrase is not "a contradiction in terms"—even though the overall balance "is necessarily zero when the entry for net errors and omissions is included"—because, as "used in public discussion," the phrase refers only to "the balance of a certain selection of transactions." *Id.* (emphasis omitted). "The other transactions," the article

explains, are "regarded as 'financing'" a surplus or deficit. *Id.* And there is no single understanding among economists about where to draw "'the line'" between items that "make up the surplus or deficit" and those that "represent the financing of" the surplus or deficit. *Id.* at 171-172.

However else one might permissibly determine the existence of a "balance-of-payments deficit[]," there should be no serious question that the President's proclamation rests on *an* economically reasonable methodology. *See* Brief of Trade Scholars in Economics, Politics, and Law as Amicus Curiae at 7-10, *Learning Res.*, 146 S. Ct. 628 (No. 24-1287), 2025 WL 3035872, at *7-10 (explaining that "the 'current account' dictates the [balance of payments] in the United States").

2.      Given all this, it is unsurprising that the CIT—and some of these plaintiffs—previously agreed that Section 122 encompasses situations like this. In the IEEPA case, the CIT recognized that "[t]rade deficits are one of the key balance-of-payment deficits" that Section 122 was meant to address. 772 F. Supp. 3d at 1375. And the plaintiffs there, including many of the plaintiffs here, urged that position. They informed this Court, for example, that Section 122 afforded "specific … authority … to impose tariffs to address" "'trade deficits.'" States Plaintiffs-Appellees' Brief at 10, *V.O.S. Selections*,

149 F.4th 1312 (No. 2025-1812), 2025 WL 4670735, at *10.  They told the Supreme Court the same.  *See* Brief for State Respondents at 14, *Learning Res.*, 146 S. Ct. 628 (No. 24-1287), 2025 WL 2993816, at *14; Brief for Private Respondents at 30-31, *Learning Res.*, 146 S. Ct. 628 (No. 24-1287), 2025 WL 2986594, at *30-31.

**3.**     The CIT's contrary conclusion is unpersuasive for many reasons.

*First*, and most obviously, "'legislative history is not the law.'"  *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019).  Worse, the majority here relied on some of the weakest forms of legislative history imaginable, including language in a committee staff report lacking the imprimatur of even a single Member of Congress.

*Second*, as the dissent explains, the majority's reasoning is not even a correct account of the legislative history, read as a whole.  As the dissent notes, the table on which the majority relied so heavily appears in the Senate report on the Trade Act of 1974 many pages before the report's "discussion of Section 122" of the Act, and the report's text does "not discuss[] … how payments balances were to be measured for purposes of Section 122."  A69-70.  Nor does the table the majority identified in the committee staff report, which the majority described as "'the clearest indication of the concerns

Section 122 was intended to address,'" "make[] [any] reference to Section 122." A71. And the dissent identifies other evidence in the staff report "that the country's current account balance," on which the challenged proclamation relies, "could have been considered to be a measure of the balance of payments in 1974," A71, such as a table "titled 'U.S. Current Account Balance'" placed "directly under the heading 'U.S. Balance of Payments Trends,'" A72.

Moreover, the dissent explains, the better inference from Congress's omission of the definition of "balance of payments" included in prior legislation is that Congress meant "to afford some degree of discretion to the President as to the method of measurement." A67. That is clear, the dissent noted, A66, from the House committee report on Section 122, which recognized that the committee "considered various formulas for defining a serious balance-of-payments deficit" but felt it was "not possible to formulate a definition with mathematical exactness." H.R. Rep. No. 93-571, at 28-29; *see id.* at 31 (similar). It is also the most natural inference from the fact that Congress, having previously considered a version of the bill that included a definition, ultimately omitted the definition. *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-580 (2006); *Doe v. Chao*, 540 U.S. 614, 622 (2004). The

significance of the omission is even clearer given that Congress maintained definitions of other terms in Section 122, notably specifying that "balance-of-trade surpluses," the counterpart to deficits, must be "determined on the basis of the cost-insurance-freight value of imports, as reported by the Bureau of the Census." 19 U.S.C. § 2132(c)(1).

*Third*, accepting *arguendo* that Congress was thinking of deficits in one of the three measures included in the table when it referred to "balance-of-payments deficits," that does not mean the phrase is limited in that fashion. As the Supreme Court has repeatedly emphasized, "the provisions of our laws" control, not "the principal concerns of our legislators." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *see Bostock v. Clayton County*, 590 U.S. 644, 674 (2020). For that reason, "[t]he fact that [a statute] has been applied in situations not expressly anticipated by Congress does not demonstrate" the kind of "ambiguity" that calls for resort to indications of congressional intent; "it simply demonstrates [the] breadth of" the text Congress enacted. *Bostock*, 590 U.S. at 674 (quotation marks omitted).

*Finally*, and most fundamentally, the majority incorrectly believed that Section 122 must specify a single economic methodology for determining a "balance-of-payments deficit[]." As discussed above, the phrase "balance-

- 19 -

of-payments deficit" is a term of art with a range of accepted meanings in economics. The best reading of the statute is that it allows the President to act in response to circumstances that constitute a "balance-of-payments deficit" within an economically reasonable understanding of that phrase. That reading does not, as the CIT majority suggested, abnegate the judicial responsibility "'to say what the law is,'" A54 n.38. It simply recognizes that the *legal* meaning of "balance-of-payments deficit" is "balance-of-payments deficit as determined using an economically reasonable methodology." Congress did not need to specify, and courts do not need to determine, a particular economic methodology the President must use.

As the CIT dissent explained, that is a perfectly sensible understanding of how Congress would have expected this statute to work. "Congress understood in 1974, and long before 1974, that our country's payments balance could be measured in different ways that produce different results." A77. And Congress wanted to give the President flexibility to address "genuine concerns over the economic condition of the country," A76, recognizing that those concerns might take different forms in the future than they did in 1974.

The CIT majority mistakenly suggested that this understanding of the statute would raise nondelegation concerns. A48. As an initial matter, "in

- 20 -

the national security and foreign policy realms, the nondelegation doctrine" plays a "more limited role," *FCC v. Consumers' Rsch.*, 606 U.S. 656, 706 (2025) (Kavanaugh, J., concurring), and Congress therefore may "invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations," *Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892), as it frequently has, *see, e.g., Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 558-560 (1976); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409 (1928); *Marshall Field*, 143 U.S. at 680; *Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 387-388 (1813). No Member of the Court in *Learning Resources* suggested that the construction of statutory authority asserted in that case violated the nondelegation doctrine.

Even if the domestic version of the nondelegation doctrine were applicable, moreover, Section 122 would easily pass muster. Congress set forth both "'the general policy'" and "'the boundaries of [the] delegated authority'"—so that "both 'the courts and the public'" can "'ascertain whether the [executive]' has followed the law," *Consumers' Rsch.*, 606 U.S. at 673—by allowing the President to determine the existence of a balance-of-payments deficit using an economically reasonable methodology.

- 21 -

## II.    The Equitable Factors Favor A Stay

The remaining stay factors overwhelmingly favor the government.

The CIT's order would irreparably harm the United States for three reasons. *First*, an injunction against "an Executive Branch policy," particularly one "with foreign affairs implications," irreparably harms the government. *Trump v. Orr*, 146 S. Ct. 44, 46 (2025). That harm is particularly concrete here. As the Commerce Secretary's declaration explains, "[t]he Section 122 surcharge is a temporary import restriction designed to help deal with … fundamental international payments problems" during a "transition in United States trade policy following" the invalidation of the IEEPA tariffs. A174. It "is, by design, temporary," lasting only 150 days unless extended by Congress. *Id.* If the invalidation of the surcharge is not stayed, "the harm" to the Nation's trade policy "cannot be repaired later." *Id.* Moreover, importers and foreign producers are likely to take actions exacerbating the problems that led the President to impose the challenged tariffs. "They will have a strong incentive to accelerate shipments into the United States" during this transitional period, before the Section 122 tariffs could be restored (if the government were to prevail on appeal) and "before other tariff measure are finalized or implemented." A177. That "would invite additional

imports during the very period in which the United States is attempting to stabilize its trade position and transition to more targeted measures." A178.

As the U.S. Trade Representative's declaration explains, moreover, the current crisis "endangers our ability to finance our spending, erodes investor confidence in our economy, and distresses financial markets." A170. Section 122 tariffs have "incentivized trading partners to continue implementation by underscoring President Trump's determination to address fundamental imbalances in the global trading system." A169. Absent a stay, the CIT's ruling would undermine that progress.

These risks to our economy and foreign policy are not averted by the fact that this injunction extends to only three plaintiffs. Other plaintiffs are nearly certain to seek similar relief, and (assuming the CIT assigns their cases to the same panel, as it did for the IEEPA cases) they are likely to receive it. *Cf. Hanson v. District of Columbia*, 120 F.4th 223, 247-248 (D.C. Cir. 2024) (per curiam) (explaining, in affirming denial of preliminary injunction, that the court could not simply "limit[] injunctive relief to the four appellants in this case" given that "a follow-on class-action suit seeking the same relief would inevitably follow" in which the same relief would "almost inevitably have to be granted"), *cert. denied*, 145 S. Ct. 2778 (2025).

*Second*, the CIT's order requires that tariffs paid by the importer plaintiffs under the challenged proclamation must "be refunded with interest." A8. This could cause the government to suffer unrecoverable financial losses. Even if the government prevails on appeal, U.S. Customs & Border Protection (CBP) "may not be able to retroactively collect the outstanding Section 122 duties," because CBP's continuous bonding formula for importers' unpaid bills is "not likely [to] cover the full amount of Section 122 duties subsequently assessed." A184-185. "Ordinarily, 'economic loss does not, in and of itself, constitute irreparable harm,'" but it can be "irreparable where no adequate compensatory or other corrective relief will be available at a later date." *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (quotation marks omitted). That is true here.

Indeed, as Judge Taranto noted in dissent from an unpublished order denying a stay in *Transpacific Steel LLC v. United States*, 840 F. App'x 517 (Fed. Cir. 2020), there is a strong argument that an order requiring the government to pay refunds should *automatically* be stayed under CIT Rule 62(e), which provides that monetary judgments against the government are exempt from the usual bond requirement for an automatic stay pending appeal, *see* CIT R. 62(a); *accord* Fed. R. Civ. P. 62(a). The Court can obviate the question

whether an automatic stay applies by granting one under the equitable standard.

*Finally*, another declaration explains that the injunction would impose severe burdens on CBP, which is already facing the daunting task of dealing with the aftereffects of the invalidation of the IEEPA tariffs.  A185-186.  Indeed, CBP may be unable to comply with the injunction on the timeframe the CIT specified because it cannot complete the work of reprogramming its system without confirmation of plaintiffs' unique importer of record numbers, which the State of Washington has yet to provide.  A183-184.

**2.**    Conversely, a stay would not cognizably harm plaintiffs, because—unlike the government's financial losses from refunds—plaintiffs' financial losses from tariffs paid during the appeal *could* be repaired if plaintiffs ultimately prevail after the full course of appellate proceedings, assuming those tariffs are otherwise refundable.

The equities and public interest thus heavily favor a stay.  On one side of the balance, the government (and thus the public) would suffer significant policy consequences, and likely lose funds irrevocably, absent a stay.  On the other side, plaintiffs face no comparable irreparable harm.

## CONCLUSION

This Court should stay the CIT's judgment pending appeal and grant

an immediate administrative stay.

Respectfully submitted,

BRETT A. SHUMATE
 *Assistant Attorney General*

ERIC D. MCARTHUR
 *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS

 */s/ Douglas C. Dreier*
DOUGLAS C. DREIER
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7264*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-4452*
 *Douglas.C.Dreier@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,180 words.  This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Douglas C. Dreier*
Douglas C. Dreier

**ADDENDUM**

# TABLE OF CONTENTS

Notice of Appeal, *Oregon* (Dkt. 51).................................................................. A1

Notice of Appeal, *Burlap & Barrel* (Dkt. 40)...................................................... A4

Judgment of the Court of International Trade (*Oregon*, Dkt. 50).................. A7

Opinion & Order of the Court of International Trade (*Oregon*, Dkt. 49).... A9

Declaration of Acting Chairman of the Council of Economic Advisers,
　　Pierre Yared (*Oregon*, Dkt. 35-1) ......................................................... A122

Declaration of Ambassador Jamieson Lee Greer, United States Trade
　　Representative (*Oregon*, Dkt. 35-2)....................................................... A147

Declaration of Howard W. Lutnick, United States Secretary of
　　Commerce (*Oregon*, Dkt. 35-3) .............................................................. A158

Declaration of Ambassador Jamieson Lee Greer, United States Trade
　　Representative (*Oregon*, Dkt. 53-1)....................................................... A167

Declaration of Howard W. Lutnick, United States Secretary of
　　Commerce (*Oregon*, Dkt. 53-2) .............................................................. A172

Declaration of Executive Director, Trade Programs Directorate, Office
　　of Trade, U.S. Customs and Border Protection (*Oregon*, Dkt.
　　53-3)................................................................................................................ A182

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
              THE HONORABLE CLAIRE R. KELLY, JUDGE
              THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

|  |  |
|---|---|
| THE STATE OF OREGON, *et al.*,   ) <br><br> Plaintiffs,   ) <br><br> v.   ) <br><br> DONALD J. TRUMP, in his official capacity as ) <br> President of the United States, *et al.*,   ) <br><br> Defendants.   ) | Court No. 26-01472 |

**DEFENDANTS' NOTICE OF APPEAL**

Notice is hereby given that defendants appeal to the United States Court of Appeals for the Federal Circuit from the Court's opinion and final judgment of May 7, 2026. *See The State of Oregon, et al. v. United States*, Court No. 26-01472, ECF No. 49, 50.

                           Respectfully submitted,

                           BRETT A. SHUMATE
                           Assistant Attorney General

                           ERIC J. HAMILTON
                           Deputy Assistant Attorney General

                           PATRICIA M. McCARTHY
                           Director

                           CLAUDIA BURKE
                           Deputy Director

                           /s/Justin R. Miller
                           JUSTIN R. MILLER
                           Attorney-In-Charge
                           International Trade Field Office

- A1 -

SOSUN BAE
Senior Trial Counsel

COLLIN T. MATHIAS
BLAKE W. COWMAN
CATHERINE M. YANG
MATHIAS RABINOVITCH
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 353-9063
Claudia.Burke@usdoj.gov

Dated: May 8, 2026                    *Attorneys for Defendants*

- A2 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 8, 2026, I caused the foregoing "DEFENDANT'S NOTICE

OF APPEAL" to be filed and served electronically via the Court's CM/ECF system.


<u>/s/Justin R. Miller</u>

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
            THE HONORABLE CLAIRE R. KELLY, JUDGE
            THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE


|  |  |  |
|---|---|---|
| BURLAP AND BARREL, INC.; BASIC FUN, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Court No. 26-01606 |
| DONALD J. TRUMP in his official capacity as President of the United States, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' NOTICE OF APPEAL

Notice is hereby given that defendants appeal to the United States Court of Appeals for the Federal Circuit from the Court's opinion and final judgment of May 7, 2026. *See Burlap and Barrel, Inc. et al. v. United States*, Court No. 26-01606, ECF No. 38, 39.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

/s/Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

- A4 -

- A5 -

SOSUN BAE
Senior Trial Counsel

COLLIN T. MATHIAS
BLAKE W. COWMAN
CATHERINE M. YANG
MATHIAS RABINOVITCH
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 353-9063
Claudia.Burke@usdoj.gov

Dated: May 8, 2026                    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 8, 2026, I caused the foregoing "DEFENDANT'S NOTICE

OF APPEAL" to be filed and served electronically via the Court's CM/ECF system.


s/Justin R. Miller

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr>
<td>

THE STATE OF OREGON, ET AL.,

Plaintiffs,

v.

UNITED STATES, ET AL.,

Defendants.

</td>
<td>

Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges

Court No. 26-01472-3JP

</td>
</tr>
<tr>
<td>

BURLAP AND BARREL, INC., ET AL.,

Plaintiffs,

v.

UNITED STATES, ET AL.,

Defendants.

</td>
<td>

Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges

Court No. 26-01606-3JP

</td>
</tr>
</table>

## <u>JUDGMENT</u>

This case having been duly submitted for decision, and the court, after due deliberation, having rendered an opinion; now, in conformity with that opinion it is hereby

**ORDERED** that Proclamation No. 11012 (Feb. 20, 2026), <u>Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems</u>, 91 Fed. Reg. 9,339 (Feb. 25, 2026), is declared to be invalid as contrary to law; it is further

**ORDERED** that Proclamation No. 11012 is permanently enjoined with respect to The State of Washington (and its Instrumentalities), Burlap and Barrel, Inc., and Basic Fun, Inc. (the Importer Plaintiffs as defined in the court's accompanying opinion); it is further

- A7 -

Court Nos. 26-01472 & 26-01606                                        Page 2

ORDERED that Defendants shall implement the above-described permanent injunction within 5 days; it is further

ORDERED that Section 122 duties paid by Importer Plaintiffs before this injunction is fully implemented shall be refunded with interest as provided by law; and it is further

ORDERED that each party shall bear its own costs.

/s/     Mark A. Barnett
Mark A. Barnett, Chief Judge

/s/     Claire R. Kelly
Claire R. Kelly, Judge

Dated: May 7, 2026
     New York, New York

- A8 -

Slip Op. 26-47

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, ET AL.,<br><br>Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges<br><br>Court No. 26-01472-3JP |
| BURLAP AND BARREL, INC., ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, ET AL.,<br><br>Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges<br><br>Court No. 26-01606-3JP |

## OPINION AND ORDER

[Granting Plaintiffs' motions for summary judgment and entering a permanent injunction for The State of Washington, Burlap and Barrel, Inc., and Basic Fun, Inc.; dismissing the claims of The State of Oregon, The State of Arizona, The State of California, The State of New York, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, The State of Maine, The State of Maryland, The Commonwealth of Massachusetts, The State of Michigan, The State of New Jersey, The State of Minnesota, The State of Nevada, The State of New Mexico, The State of North Carolina, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, The State of Rhode Island, The State of Vermont, The Commonwealth of Virginia, and The State of Wisconsin, for lack of standing; denying as moot Plaintiffs' alternative motions for preliminary injunction.]

Dated: May 7, 2026

Brian S. Marshall, Senior Assistant Attorney General, Oregon Department of Justice, of Portland, Or., argued for Plaintiffs The State of Oregon, The State of Arizona, The State

of California, The State of New York, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, The State of Maine, The State of Maryland, The Commonwealth of Massachusetts, The State of Michigan, The State of Minnesota, The State of Nevada, The State of New Jersey, The State of New Mexico, The State of North Carolina, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, The State of Rhode Island, The State of Vermont, The Commonwealth of Virginia, The State of Washington, and The State of Wisconsin. Also on the brief for The State of Oregon were: Dan Rayfield, Attorney General, Benjamin Gutman, Deputy Attorney General, Dustin Buehler, Special Counsel, and Leanne Hartmann, Samuel Kubernick, and Brian Collins, Senior Assistant Attorneys General; for The State of Arizona: Kristin K. Mayes, Attorney General, Joshua D. Bendor, Solicitor General, Syreeta A. Tyrell, Senior Litigation Counsel, and Timothy E.D. Horley and Jaylia Yan, Assistant Attorneys General; for The State of California: Rob Bonta, Attorney General, Lara Haddad, Supervising Deputy Attorney General, and Shiwon Choe, Carolyn Downs, and Samuel Sokolsky, Deputy Attorneys General; for The State of New York: Letitia James, Attorney General, Rabia Muqaddam, Chief Counsel for Federal Initiatives, and Stephen Thompson, Mark Ladov, Natasha Korgaonkar, Special Counsel; for The State of Colorado: Philip J. Weiser, Attorney General, and Sarah H. Weiss, Senior Assistant Attorney General; for The State of Connecticut: William Tong, Attorney General, and Michael Skold, Solicitor General; for The State of Delaware: Kathleen Jennings, Attorney General, Ian R. Liston, Director of Impact Litigation, Vanessa L. Kassab, Deputy Attorney General, and Rose Gibson, Assistant Attorney General; for The State of Illinois: Kwame Raoul, Attorney General, Cara Hendrickson, Executive Deputy Attorney General, and Gretchen Helfrich, Deputy Chief, Special Litigation Bureau; for the Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky: S. Travis Mayo, General Counsel, and Laura C. Tipton, Deputy General Counsel; for The State of Maine: Aaron M. Frey, Attorney General, and Katherine W. Thompson, Special Counsel; for The State of Maryland: Anthony G. Brown, Attorney General, and James C. Luh, Senior Assistant Attorney General; for The Commonwealth of Massachusetts: Andrea J. Campbell, Attorney General, and Katherine Dirks, Chief State Trial Counsel; for The State of Michigan: Dana Nessel, Attorney General, and Neil Giovanatti, Assistant Attorney General; for The State of Minnesota: Keith Ellison, Attorney General, Peter J. Farrell, Deputy Solicitor General, and Lindsey E. Middlecamp, Special Counsel; for The State of Nevada: Aaron D. Ford, Attorney General, and K. Brunetti Ireland, Chief of Special Litigation; for The State of New Jersey, Jennifer Davenport, Attorney General, and Lucy I. Sprague and David N. Birch, Deputy Attorneys General; for The State of New Mexico: Raúl Torrez, Attorney General, and Amy Senier, Senior Counsel; for The State of North Carolina: Jeff Jackson, Attorney General, Laura Howard, Chief Deputy Attorney General, and Daniel T. Wilkes, Assistant Deputy Attorney General; for Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania: Jennifer

Selber, General Counsel, and Jacob B. Boyer, Deputy General Counsel; for The State of Rhode Island: Peter F. Neronha, Attorney General, and Alex Carnevale, Special Assistant Attorney General; for The State of Vermont: Charity R. Clark, Attorney General, and Ryan P. Kane, Deputy Solicitor General; for The Commonwealth of Virginia: Jay Jones, Attorney General, and Tillman J. Breckenridge, Solicitor General; for The State of Washington: Nicholas W. Brown, Attorney General, and Freeman E. Halle and Todd Sipe, Assistant Attorneys General; for The State of Wisconsin: Joshua L. Kaul, Attorney General, and Brian P. Keenan, Assistant Attorney General.

Jeffrey M. Schwab, Liberty Justice Center, of Austin, TX, argued for Plaintiffs Burlap and Barrel, Inc., and Basic Fun, Inc.  Also on the brief were Reilly W. Stephens and James McQuaid.

Brett A. Shumate, Assistant Attorney General, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendants United States, Donald J. Trump, in his official capacity as President of the United States, Department of Homeland Security, Markwayne Mullin, in his official capacity as Secretary of the Department of Homeland Security, United States Customs and Border Protection, Rodney S. Scott, in his official capacity as Commissioner of United States Customs and Border Protection, the Executive Office of the President, Jamieson Greer, in his official capacity as United States Trade Representative, and the Office of the United States Trade Representative. Also on the brief were Eric J. Hamilton, Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Commercial Litigation Branch, Claudia Burke, Deputy Director, Commercial Litigation Branch, Justin R. Miller, Attorney-In-Charge, International Trade Field Office, Sosun Bae, Senior Trial Counsel, and Collin T. Mathias, Blake W. Cowman, Catherine M. Yang, and Mathias Rabinovitch, Trial Attorneys.

J. Marc Wheat, Advancing American Freedom, of Washington, DC, for Amici Curiae Advancing American Freedom, et al.

Ilya Somin, of Arlington, VA, and Joshua A. Claybourn, Jackson Kelly PLLC, of Evansville, IN, for Amici Curiae Cato Institute and Ilya Somin.

Adam G. Unikowsky, Aaron R. Cooper, Nikita Lalwani, and Debbie L. Berman, of Jenner & Block LLP, of New York, NY, and Chicago, IL, for Amici Curiae Economists.

        Barnett and Kelly, Judges: Plaintiffs[1] in these companion cases contest the

imposition of duties pursuant to Proclamation No. 11012, Imposing a Temporary Import

---

[1] The plaintiffs in Court No. 26-01472, referred to as "State Plaintiffs," are The State of Oregon, The State of Arizona, The State of California, The State of New York, The

Court Nos. 26-01472 & 26-01606                                    Page 4

<u>Surcharge to Address Fundamental International Payments Problems</u> (Feb. 20, 2026),

91 Fed. Reg. 9339 (Feb. 25, 2026) ("Proclamation No. 11012") invoking Section 122 of

the Trade Act of 1974, 19 U.S.C. § 2312.  Compl. (Mar. 5, 2026) ("State Compl."), ECF

No. 2, Ct. No. 26-01472; Compl. (Mar. 9, 2026) ("Priv. Compl."), ECF No. 2, Ct. No. 26-

01606.[2]  Before the court are Plaintiffs' motions for summary judgment.  Pl. States' Mot.

for Summ. J., and, in the Alt., for a Prelim. Inj. (Mar. 13, 2026) ECF No. 25, and Pl.

States' Mem. of Law in Supp. of Mot. for Summ. J., and, in the Alt., for a Prelim. Inj.

(Mar. 13, 2026) ("State Pls.' Mem."), ECF No. 25; Pls.' Mot. for Prelim. Inj. and/or

Summ. J. for Permanent Inj. (Mar. 13, 2026), ECF No. 11, and Mem. in Supp. of Pls.'

Mot. for Prelim. Inj. and/or Summ. J. for Permanent Inj. (Mar. 13, 2026) ("Priv. Pls.'

Mem."), ECF No. 11.  Defendants[3] ("the Government") filed a single combined

---

State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, Office of the Governor <u>ex rel.</u> Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, The State of Maine, The State of Maryland, The Commonwealth of Massachusetts, The State of Michigan, The State of Minnesota, The State of Nevada, The State of New Jersey, The State of New Mexico, The State of North Carolina, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, The State of Rhode Island, The State of Vermont, The Commonwealth of Virginia, The State of Washington, and The State of Wisconsin.  The plaintiffs in Court No. 26-01606, referred to as "Private Plaintiffs," are Burlap and Barrel, Inc. ("Burlap and Barrel") and Basic Fun, Inc. ("Basic Fun").  The court refers to the State Plaintiffs and the Private Plaintiffs collectively as "Plaintiffs."

[2] Citations to documents filed by State Plaintiffs identify the ECF No. in Ct. No. 26-001472, and citations to documents filed by Private Plaintiffs identify the ECF No. in Ct. No. 26-001606.  For documents filed on both case dockets, the court references the ECF No. in Ct. No. 26-01472.

[3] Named Defendants are the United States, Donald J. Trump, in his official capacity as President of the United States, United States Department of Homeland Security, Markwayne Mullin, in his official capacity as Secretary of the Department of Homeland Security, United States Customs and Border Protection, and Rodney S. Scott, in his official capacity as Commissioner of United States Customs and Border Protection, <u>see</u>

opposition brief in response to both motions.  Defs.' Resp. in Opp'n to Mots. For Prelim.

Inj. and Summ. J. (Apr. 3, 2026) ("Defs.' Resp."), ECF No. 35.  Plaintiffs filed replies.  Pl.

States' Reply in Supp. of Mot. for Summ. J., and, in the Alt., for a Prelim. Inj. (Apr. 7,

2026) ("State Pls.' Reply"), ECF No. 37; Pls.' Reply Br. in Supp. of Their Mot. for Prelim.

Inj. and/or Summ. J. for Permanent Inj. (Apr. 7, 2026) ("Priv. Pls.' Reply"), ECF No. 22.

     For the reasons discussed herein, the court grants summary judgment for Private

Plaintiffs and The State of Washington and enters a permanent injunction for those

importer Plaintiffs.  The court dismisses without prejudice the claims of the remaining

non-importer Plaintiffs.  The court denies as moot Plaintiffs' motions for a preliminary

injunction.

**BACKGROUND**

**I.        Section 122 of the Trade Act of 1974**

     Article I, Section 8 of the U.S. Constitution vests Congress with the "Power To lay

and collect Taxes, Duties, Imposts and Excises."  U.S. Const. art. I, § 8, cl. 1.  Section

122 of the Trade Act of 1974 constitutes a congressional delegation of some of that

authority to the President.  Titled "Balance-of-Payments Authority," Section 122

empowers the President of the United States to impose temporary surcharges up to 15

percent <u>ad valorem</u> when fundamental international payment problems exist.  Section

122 of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 1987–89 (1974)

---

Summons (Mar. 5, 2026), ECF No. 1, Ct. No. 26-01472, as well as the Executive Office of the President, Jamieson Greer, in his official capacity as United States Trade Representative, and the Office of the United States Trade Representative, <u>see</u> Summons (Mar. 9, 2026), ECF No. 1, Ct. No. 26-01606.

- A13 -

Court Nos. 26-01472 & 26-01606                                              Page 6

(codified at 19 U.S.C. § 2132)).[4]  The statute provides (with bold emphasis on the

provisions relevant to Proclamation No. 11012):

> (a) **Whenever fundamental international payments problems require special import measures to restrict imports**—
>> (1) **to deal with large and serious United States balance-of-payments deficits**[,]
>> (2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or
>> (3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,
>
> **the President shall proclaim, for a period not exceeding 150 days** (unless such period is extended by Act of Congress)—
>> (A) **a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States**;
>> (B) temporary limitations through the use of quotas on the importation of articles into the United States; or
>> (C) both a temporary import surcharge described in subparagraph (A) and temporary limitations described in subparagraph (B) . . . .
>
> (b) If the President determines that the imposition of import restrictions under subsection (a) will be contrary to the national interest of the United States, then he may refrain from proclaiming such restrictions and he shall—
>> (1) immediately inform Congress of his determination, and
>> (2) immediately convene the group of congressional official advisers designated under section 2211(a) of this title [section 161(a) in the Trade Act of 1974] and consult with them as to the reasons for such determination.
>
> (c) Whenever the President determines that fundamental international payments problems require special import measures to increase imports—

---

[4] Because Congress has not enacted Title 19 into positive law, the version of section 122 contained in the Statutes at Large governs to the extent there is a conflict between the public law and the U.S. Code.  For ease of reference, however, the court cites to 19 U.S.C. § 2132, showing, when necessary, any alterations to or differences from the Trade Act of 1974.  One such conflict, for example, is evident in Section 122(a)(1), which contains a comma at the end of that clause, while 19 U.S.C. § 2132(a)(1) contains a period.  Compare Trade Act of 1974, § 122, 88 Stat. at 1987 (comma), with 19 U.S.C. § 2132(a)(1) (1976) (period), and 19 U.S.C. § 2132(a)(1) (2018) (period).

> (1) to deal with large and persistent United States balance-of-trade surpluses, as determined on the basis of the cost-insurance-freight value of imports, as reported by the Bureau of the Census, or
> (2) to prevent significant appreciation of the dollar in foreign exchange markets,
>
> the President is authorized to proclaim, for a period of 150 days (unless such period is extended by Act of Congress)—
>
> (A) a temporary reduction (of not more than 5 percent ad valorem) in the rate of duty on any article; and
> (B) a temporary increase in the value or quantity of articles which may be imported under any import restriction, or a temporary suspension of any import restriction . . . .
>
> (d)     (1) Import restricting actions proclaimed pursuant to subsection (a) **shall be applied consistently with the principle of nondiscriminatory treatment** . . . .
> (2) Notwithstanding paragraph (1), if the President determines that the purposes of this section will best be served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action . . . .
>
> (e) Import restricting actions proclaimed pursuant to subsection (a) shall be of **broad and uniform application with respect to product coverage except where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy**. Such exceptions shall be limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors . . . .

19 U.S.C. § 2132(a)–(e) (emphases added).

## II.     Historical Background Prior to Enactment of Section 122

Congress enacted Section 122 in response to a particular set of economic circumstances. During the immediate aftermath of World War II, the United States and other nations undertook negotiations to develop the contours of a future international monetary and economic system. See The Office of the Historian, Bretton Woods-

- A15 -

GATT, 1941-1947, U.S. Dep't of State, https://history.state.gov/milestones/1937-1945/bretton-woods (last visited May 6, 2026).  The negotiations resulted in the inauguration of the Bretton Woods international monetary system and, simultaneously, the creation of the International Monetary Fund and the World Bank.  See id.; Articles of Agreement of the Int'l Monetary Fund, Dec. 27, 1945, 60 Stat. 1401, 2 U.N.T.S. 39 ("Bretton Woods Agreements"); see also Bretton Woods Agreements Act, Pub. L. No. 79-171, 59 Stat. 512 (1945) (codified as amended at 22 U.S.C. §§ 286–286x) (implementing the Bretton Woods Agreements domestically).  Under the Bretton Woods system, the values of foreign currencies were fixed to the value of the U.S. dollar, the value of which was expressed in terms of gold at a rate of $35 per ounce, the so-called "gold standard."  Bretton Woods Agreements, Art. IV, Sec. 1(a); Proclamation No. 2072, 48 Stat. 1730 (Jan. 31, 1934); see also Gold Reserve Act of 1934, Pub. L. No. 73-87, 48 Stat. 337 (1934) (delegating authority to the President to fix the value of the U.S. dollar in relation to gold).

The Bretton Woods system was under increasing strain by the 1960s when the volume of U.S. dollars in worldwide circulation exceeded domestic gold reserves redeemable at fixed value, leading to periodic runs on the dollar in foreign exchange markets.  See The Office of the Historian, Nixon and the End of the Bretton Woods System, 1971-1973, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/nixon-shock (last visited May 6, 2026).  In August 1971, President Richard M. Nixon directed the suspension of the dollar's international convertibility into gold, imposed a series of domestic economic measures including wage and price controls,

- A16 -

and instituted a 10 percent "surcharge" on all imports into the United States in response to the nation's deteriorating "balance of payments position."  Proclamation No. 4074, Imposition of Suppl. Duty for Balance of Payments Purposes (Aug. 15, 1971), 36 Fed. Reg. 15724 (Aug. 17, 1971).  In December 1971, the Group of Ten ("G-10") countries agreed to a new set of fixed exchange rates that would devalue the dollar in the Smithsonian Agreement.  See Nixon and the End of the Bretton Woods System, 1971-1973.  But by early 1973, speculative pressures in global financial markets led to a further devaluation of the dollar, and the G-10 economies reached a new agreement whereby a group of European Community countries would jointly "float" their currencies against the dollar.  See id.  This marked the end of the Bretton Woods system of fixed exchange rates.  See id.  Later in 1973, after the outbreak of the Arab-Israeli War, members of the Organization of Petroleum Exporting States ("OPEC") imposed an oil embargo against the United States, further straining the U.S. economy and creating external financial pressures with respect to foreign oil-producing countries.  See The Office of the Historian, Oil Embargo, 1973-1974, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/oil-embargo (last visited May 6, 2026).

The United States Customs Court, the predecessor to the United States Court of International Trade ("CIT"), heard a challenge to the 10 percent Nixon surcharge in 1974.  See Yoshida Int'l, Inc. v. United States (Yoshida I), 73 Cust. Ct. 1, 378 F. Supp. 1155 (1974).  Despite not being cited in the underlying Proclamation imposing the surcharge, the Government argued that the President's actions were lawful pursuant to the Trading with the Enemy Act ("TWEA"), a 1917 wartime powers statute.  See id., 378

Court Nos. 26-01472 & 26-01606                                    Page 10

F. Supp. at 1157.  The Customs Court disagreed, holding that the surcharge exceeded the limited emergency authority delegated to the President by TWEA.  Id., 378 F. Supp. at 1172, 1175–76 ("The delegation of such an unrestrained and unbridled authority to lay duties, indeed, might well be deemed an abdication by the Congress of its constitutional power to regulate foreign commerce.").  The United States Court of Customs and Patent Appeals, the predecessor to the United States Court of Appeals for the Federal Circuit, reversed the Customs Court's decision, holding that the surcharge was "within the power constitutionally delegated" to the President by TWEA and reasoning that "[t]hough such a broad grant may be considered unwise, or even dangerous, should it come into the hands of an unscrupulous, rampant President, willing to declare an emergency when none exists, the wisdom of a congressional delegation is not for us to decide."  United States v. Yoshida Int'l. Inc. (Yoshida II), 63 CCPA 15, 36, 526 F. 2d 560, 583–84 (1975) (footnote omitted).

It was against this backdrop that Congress acted to explicitly delegate tariff authority to the President, to be used in response to particular and exceptional economic conditions, under Section 122 of the Trade Act of 1974.  After almost two years of debate, and while the appeal of Yoshida I was pending, Congress enacted Section 122 in January 1975.  See Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1979 (1975).  The Yoshida II court explicitly observed that "[a] surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action," i.e., Section 122, and expressed no view "regarding the existence of authority

- A18 -

for Proclamation 4074 in 1971, from the specific grant of the surcharge authority spelled out in the Trade Act of 1974."  63 C.C.P.A. at 34 n.33, 526 F.2d at 582 n.33.

### III.     Proclamation No. 11012

Pursuant to authority claimed under Section 122, on February 20, 2026, the President announced a 10 percent <u>ad valorem</u> duty on "all articles imported into the United States," with specified exceptions.  Proclamation No. 11012, cl. 1; ¶ 14 (exceptions).  The duty went into effect at 12:01 a.m. EST on February 24, 2026, and is set to remain in effect until 12:01 a.m. EST on July 24, 2026, unless "suspended, modified, or terminated on an earlier date" or "extended by an Act of Congress."  <u>Id.</u>, cl. 7.  To implement the increased duty rates, Proclamation No. 11012 modified subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States ("HTSUS") to add new subheadings under HTSUS heading 9903.  <u>Id.</u>, Annex I.

The Proclamation begins by explaining that, "[s]ometimes, the United States faces fundamental international payments problems, such as large and serious balance-of-payments deficits, an imminent and significant depreciation of its currency in foreign exchange markets, or an international balance-of-payments disequilibrium."  <u>Id.</u> ¶ 1.  According to the President, "[t]hese problems can, among other things, endanger the ability of the United States to finance its spending, erode investor confidence in the economy, and distress the financial markets."  <u>Id.</u>  The President's "senior officials [informed him] that fundamental international payments problems within the meaning of section 122 exist and that special import measures to restrict imports are required to address these problems."  <u>Id.</u> ¶ 5.  That determination was made "under any reasonable

- A19 -

understanding of the term in the context of section 122." Id. ¶ 6. The President's "advisors have studied different methods of evaluating balance-of-payments deficits, including calculations based on current-account statistics" and in their view, "under any of these methods, the United States balance-of-payments position is a large and serious deficit." Id.

The President made several findings to support the invocation of section 122. First, "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country." Id. ¶ 7; see also id. ¶ 8 ("[T]he United States runs a substantial trade deficit" that "contributes to the fundamental international payments problems facing the United States.").[5] Second, "the annual balance on the United States primary income turned negative for the first time since at least 1960 in 2024" and "in 2024, the United States maintained a current account deficit of 4.0 percent of gross domestic product (GDP)." Id. ¶ 9. Third, "the net international-investment position of the United States is in an ongoing decline" and "at the end of 2024, the net international-investment position . . . , as a share of GDP, was negative 90 percent." Id. ¶ 10. According to the President, "[b]ecause the current account is one of the primary drivers of changes in the net international-investment position, the atypically large negative net international-investment position of the United States shows that the

---

[5] "The large, persistent, and serious annual United States goods trade deficit has grown by over 40 percent in the past 5 years alone, reaching $1.2 trillion in 2024. In 2025, the United States goods trade deficit remained at approximately $1.2 trillion." Proclamation No. 11012 ¶ 8.

- A20 -

United States balance-of-payments deficit is large and serious." Id. Lastly, "the balance on secondary income of the United States has been persistently in a deficit since the 1960s." Id. ¶ 11. In sum, the President identified deficits in trade, primary income, secondary income, and the current account, and a negative net international-investment position, to support the tariff imposition. See id. ¶¶ 7–11.

The President thus concluded, on the advice of his advisors, that "an import surcharge in the form of ad valorem duties is required to address these fundamental international payments problems" and "deal with the large and serious United States balance-of-payments deficit." Id. ¶ 12. That action notwithstanding, the President listed multiple exceptions based on "the needs of the United States economy." Id. ¶ 14; see also id. ¶ 14(a)–(m) (the excepted articles). The President based the exceptions on his determinations regarding "(1) the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, the avoidance of serious dislocations in the supply of imported goods, or other similar factors; or (2) the fact that the surcharge would be unnecessary or ineffective in carrying out the purposes of section 122." Id. ¶ 15.[6]

---

[6] Proclamation No. 11012 does not apply to goods "that (i) were loaded onto a vessel at the port of loading and in transit on the final mode of transit prior to entry into the United States, before 12:01 a.m. eastern standard time on February 24, 2026; and (ii) are entered for consumption, or withdrawn from warehouse for consumption, before 12:01 a.m. eastern standard time, February 28, 2026." Proclamation No. 11012 ¶ 15(2).

## IV.     U.S. Customs and Border Protection CSMS # 67844987

On February 23, 2026, U.S. Customs and Border Protection ("CBP") issued guidance to the trade community regarding the application of Section 122 duties pursuant to Proclamation No. 11012.  See State Compl., Ex. 2, ECF No. 2-2 ("Cargo Systems Messaging Service (CSMS) # 64844987 – Imposing Temporary Section 122 Duties," or "CSMS # 64844987").  CSMS # 64844987 set forth the HTSUS classifications for imported articles subject to the additional duties and for the exemptions.  Id.  CSMS # 64844987 also provided guidance regarding articles classifiable under Chapter 98 of the HTSUS, articles admitted into a U.S. foreign trade zone, drawback, and classification sequencing in entry summaries.  Id.

## V.      Procedural History

Plaintiffs filed their respective complaints in March 2026.  State Compl. (filed Mar. 5, 2026); Priv. Compl. (filed Mar. 9, 2026).  State Plaintiffs consist of 24 sovereign states, represented by various state officials.  State Compl. ¶¶ 25–48.  Burlap and Barrel "is a New York-based spice company and ecommerce business," that "imports single origin spices from at least 22 countries."  Priv. Compl. ¶ 10.  Basic Fun is a Florida-based toy company that "imports components and finished toy products from China" and "designs, markets, and sells toys and games . . . to American consumers."  Id. ¶ 11.

Following a status conference, see Docket Entry, ECF No. 23, Ct. No. 26-01472, and upon consultation with parties to both actions, the court granted in part and denied in part the State Plaintiffs' motion for expedited treatment of their case and entered a

Court Nos. 26-01472 & 26-01606                                              Page 15

scheduling order, see Scheduling Order (Mar. 12, 2026), ECF No. 24.  The parties filed

their respective briefs, and the Government filed an Answer to the complaints,

consistent with the deadlines in the scheduling order.[7]  See State Pls.' Mem.; Priv. Pls.'

Mem.; Defs.' Resp.; State Pls.' Reply; Priv. Pls.' Reply; Answer [State Compl.] (Apr. 3,

2026), ECF No. 34; Answer [Priv. Compl.] (Apr. 3, 2026), ECF No. 15.   The court held

oral argument on April 10, 2026.  Docket Entry, ECF No. 46; see also Oral Arg.,

https://www.cit.uscourts.gov/ audio-recordings-select-public-court-proceedings.

## JURISDICTION

The court has statutory subject matter jurisdiction pursuant to 28 U.S.C. § 1581(i)

(2018 & Supp. II 2022).  Section 1581(i) grants the court

> exclusive jurisdiction of any civil action commenced against the United
> States, its agencies, or its officers, that arises out of any law of the United
> States providing for—
> (A) revenue from imports or tonnage;
> (B) tariffs, duties, fees, or other taxes on the importation of
> merchandise for reasons other than the raising of revenue;
> (C) embargoes or other quantitative restrictions on the importation
> of merchandise for reasons other than the protection of the public
> health or safety; or

---

[7] Consistent with the agreement of all Parties, these cases proceeded on motions for summary judgment by Plaintiffs.  The dissent contends that Plaintiffs have failed to show the absence of a genuine dispute as to any material fact, and that granting of summary judgment is therefore not appropriate here.  Dissent Op. at 30–31.  To support this view, the dissent relies on Plaintiffs' argument "that in today's economic environment it is impossible for large and serious balance-of-payments deficits to exist," id. at 30.  But this argument hinges entirely on the definition of "balance-of-payments deficits," which is a legal issue for the court to resolve.  The Parties' assertions regarding certain contemporary Bureau of Economic Analysis ("BEA") measurements, see id. at 26 n.16, are, moreover, only relevant insofar as they might inform the court's interpretation of "balance-of-payments deficits."  Thus, the disputes between the Parties are properly characterized as questions of law, not of material fact.

- A23 -

(D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

Id. § 1581(i)(1).  These cases fall within section 1581(i)(1)(B), "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue."  Id. § 1581(i)(1)(b).  For purposes of 28 U.S.C. § 1581(i), a challenge to presidential action imposing tariffs, duties, or other import restrictions arises under a law providing for those measures.  See Luggage & Leather Goods Mfrs. of Am., Inc. v. United States, 588 F. Supp. 1413, 1419–21 (1984); U.S. Cane Sugar Refiners' Ass'n v. Block, 544 F. Supp. 883, 886 (1982), aff'd, 683 F.2d 399 (C.C.P.A. 1982).[8]

### STANDARD OF REVIEW

We necessarily interpret the statute in question to discern the extent of the delegated authority, which is a question of law.  See Marbury v. Madison, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); Loper Bright Enters. v. Raimondo, 603 U.S. 369, 386 (2024).  Beyond that, we are not empowered to review the factual determinations committed to the President's exercise of his discretion.  Silfab Solar, Inc. v. United States, 892 F.3d 1340,

---

[8] Although 28 U.S.C. § 1581(i) does not permit suit directly against the President, the court retains jurisdiction over suits against subordinate officials responsible for implementing the President's directives.  Corus Grp. PLC v. ITC, 352 F.3d 1351, 1359 (Fed. Cir. 2003) (explaining that, although the President is not an "officer" within the meaning of section 1581(i), claims challenging implementation of presidential action may proceed against the officials charged with administering that action); USP Holdings, Inc. v. United States, 36 F.4th 1359, 1366 (Fed. Cir. 2022) (reaffirming that section 1581(i) does not authorize suits against the President directly, but permits suits against subordinate officials responsible for carrying out the President's proclamation).

1349 (Fed. Cir. 2018) ("In particular, courts have repeatedly confirmed that, where the

statute authorizes a Presidential 'determination,' the courts have no authority to look

behind that determination to see if it is supported by the record." (citing United States v.

George S. Bush & Co., 310 U.S. 371, 379 (1940)); Motion Sys., Inc. v. United States,

437 F.3d 1356, 1360 (2006) (en banc) (citing George S. Bush & Co., 310 U.S. at

379).  We determine what Congress has committed to the President's discretion.  Loper

Bright, 603 U.S. at 386.  And we "determine whether the President "clear[ly]

misconstru[ed]" his statutory authority.  USP Holdings, Inc. v. United States, 36 F.4th

1359, 1365–66 (Fed. Cir. 2022) (citing Corus Grp., 352 F.3d at 1356); Motions Sys.,

437 F.3d at 1361 (explaining that courts may consider whether "the President has

violated an explicit statutory mandate").  We do not review claims that the President

exceeded statutory authority according to a standard of review set forth in the

Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), the President not being an

agency within the meaning of the APA.  Franklin v. Mass., 505 U.S. 788, 796, 801

(1992).  In considering Plaintiffs' summary judgment motions, we will "grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  USCIT Rule 56(a).

## DISCUSSION

### I.      Standing

#### A.  Legal Framework

"Article III of the Constitution grants the Judicial Branch authority to adjudicate

'Cases' and 'Controversies.'"  Already, LLC v. Nike, Inc., 568 U.S. 85, 90 (2013).  "That

Court Nos. 26-01472 & 26-01606                                          Page 18

limitation requires those who invoke the power of a federal court to demonstrate

standing."  Id.  Thus, whether a plaintiff has Article III standing is a "threshold" inquiry.

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).  "[A]n 'actual

controversy,'" and, thus, standing, "must exist not only 'at the time the complaint is filed,'

but through 'all stages' of the litigation."  Already, LLC, 568 U.S. at 90–91 (quoting

Alvarez v. Smith, 558 U.S. 87, 92 (2009)).

　　　"To establish Article III standing, an injury must be concrete, particularized, and

actual or imminent; fairly traceable to the challenged action; and redressable by a

favorable ruling."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (internal

quotation marks omitted); see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–561

(1992).  For an injury to be imminent it must be "certainly impending," or there must be

"a substantial risk that the harm will occur."  Susan B. Anthony List v. Driehaus, 573

U.S. 149, 158 (2014) (internal quotation marks omitted); see also Mass. v. Mellon, 262

U.S. 447, 488 (1923) (a plaintiff must show, inter alia, "that he has sustained or is

immediately in danger of sustaining some direct injury").  Accordingly, "[a]llegations of

possible future injury are not sufficient."  Clapper, 568 U.S. at 409 (internal quotation

marks omitted) (emphasis added) (alteration in original).

　　　When standing is based on "the government's allegedly unlawful regulation . . . of

someone else, . . . causation and redressability ordinarily hinge on the response of the

regulated (or regulable) third party to the government action or inaction—and perhaps

on the response of others as well."  Defs. of Wildlife, 504 U.S. at 562.  In that case, "it

becomes the burden of the plaintiff to adduce facts showing that those choices have

- A26 -

been or will be made in such manner as to produce causation and permit redressability

of injury."  Id.  "Plaintiffs cannot rely on speculation about the unfettered choices made

by independent actors not before the courts."  Clapper, 568 U.S. at 415 (internal

quotation marks and citation omitted).

### B. Parties' Contentions[9]

State Plaintiffs contend they have standing to sue as "direct importers of tariffed

goods" or as non-importer plaintiffs suffering "pecuniary harms" traceable to the

challenged tariffs under a theory of "economic logic."  State Pls.' Mem. at 33–34

(quoting V.O.S. Selections, Inc. v. United States, 49 CIT __, __, 772 F. Supp. 3d 1350,

1367 (2025), aff'd in part, vacated in part, 149 F.4th 1312 (Fed. Cir. 2025), aff'd sub

---

[9] In light of the expedited briefing schedule, the court treats Defendants' response to State Plaintiffs' summary judgment motion as a "'suggestion'" of lack of standing with respect to non-importer plaintiff states and conducts an inquiry into that question.  See Indium Corp. of America v. Semi–Alloys, Inc., 781 F.2d 879, 883–84 (Fed. Cir. 1985) (explaining that it is appropriate for a trial court to treat a "motion for summary judgment as a 'suggestion' of lack of subject matter jurisdiction and conduct[] an inquiry into the question of declaratory judgment jurisdiction"); Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 553 (2001) ("Regardless of how the Government designates its jurisdictional challenge, the [c]ourt is required to inquire sua sponte whenever a doubt arises as to the existence of federal jurisdiction." (quoting Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977))).  Out of an abundance of caution, the court also considers the standing of importer plaintiffs.  Consideration of evidence extrinsic to the complaint is permissible to establish "predicate jurisdictional facts." Cedars–Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993)).  Plaintiffs submitted declarations supporting the allegations of standing in their complaints.  For State Plaintiffs, see Decl. of Rabia Muqaddam, Exs. 5–28, ECF Nos. 27, 27-7 through 27-28 (individual declarations of State Plaintiffs).  For Private Plaintiffs, see Decl. of Ethan Frisch, ECF No. 11 (on behalf of Burlap and Barrel) ("Frisch Decl."); Decl. of Jay Foreman, ECF No. 11 (on behalf of Basic Fun) ("Foreman Decl.").  Defendants do not contest Plaintiffs' allegations or declarations of fact with respect to standing or seek discovery on standing pursuant to USCIT Rule 56(d) before the court reaches the merits of Plaintiffs' claims.

nom., <u>Learning Res., Inc. v. Trump</u>, 146 S. Ct. 628 (2026)); <u>see also</u> State Compl.

¶¶ 95–99; State Pls.' Reply at 17–18.[10]

Private Plaintiffs allege standing as importers.  Priv. Compl. ¶¶ 10–11.  Burlap

and Barrel avers it "currently has three shipments scheduled to arrive in the next few

weeks on which it will have to pay the tariffs imposed by the Section 122 Proclamation."

Priv. Pls.' Mem. at 12 (citing Frisch Decl. ¶ 15).  Basic Fun asserts it "has approximately

104 shipping containers of toys and components scheduled to arrive in the United

States during the 150-day tariff period."  <u>Id.</u> at 14 (citing Foreman Decl. ¶ 7).

The Government concedes standing with respect to the State of Washington and

Private Plaintiffs based on information from CBP indicating that all three plaintiffs have

imported goods subject to Section 122 duties.  Defs.' Resp. at 69 n.23, 73 n.24.  The

Government contests the standing of the remaining State Plaintiffs "because they do not

allege that they have been—or will soon be—required to pay duties under Section 122."

<u>Id.</u> at 72.  The Government contends that non-importer State Plaintiffs seek standing

instead as "purchasers who allegedly paid increased costs to third-party importers

based on IEEPA duties and . . . expect to do the same for Section 122 duties."  <u>Id.</u> at

73.  Such claims are "too attenuated," the Government argues, amounting to "no more

---

[10] In <u>Learning Resources</u>, the U.S. Supreme Court held the President's invocation of the International Emergency Economic Powers Act ("IEEPA") to issue a series of Executive Orders imposing tariffs to be unlawful.  148 S. Ct. at 635–36, 646.  The Court issued its decision on February 20, 2026, the same day that President Trump signed Proclamation No. 11012.

than allegations of possible future injury" that fail to demonstrate causation.  Id. at 74–75.

## C. Analysis

### 1. Importer Plaintiffs Have Standing

The standing inquiry for Private Plaintiffs and the State of Washington (collectively, "Importer Plaintiffs") is straightforward.  "[W]hen the plaintiff is himself an object of the [challenged government] action[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  Defs. of Wildlife, 504 U.S. at 561–62.  "[A]n importer's allegation that it pays unlawful U.S. duties typically would satisfy constitutional standing requirements."  V.O.S. Selections, 772 F. Supp. 3d at 1369 (internal quotation marks and citation omitted).  While standing must be assessed from the outset of the actions, it is enough for Importer Plaintiffs to show that, at the time of filing their respective complaints, payment of Section 122 duties was "certainly impending" or there was "a substantial risk" that such payment "will occur."  See Susan B. Anthony List, 573 U.S. at 158.

Importer Plaintiffs readily meet the imminent injury requirement.  The State of Washington submitted a declaration by the Executive Director of Procurement Services for the University of Washington ("UW"), a public research institution.[11]  Decl. of Ray

---

[11] Harm to a "public instrumentality" of a State harms the State.  Biden v. Nebraska, 600 U.S. 477, 490 (2023) ("The plan's harm to MOHELA is also a harm to Missouri.  MOHELA is a 'public instrumentality' of the State.").

Hsu, ECF No. 27-26 ("Hsu Decl.").  Mr. Hsu declared that UW imports "products directly from overseas and pays the applicable duties directly to the United States government through its customs broker."  Id. ¶ 5.  Mr. Hsu averred that, in 2024, "UW accepted ninety-three shipments via its customs broker and paid a total of $18,199.37 in duties"; "[i]n 2025, the university accepted 130 shipments and paid a total of $1,019,104.44 in duties"; and "[a]s of the end of February 2026," UW has "accepted 23 shipments and paid a total of $34,107.83 in duties."  Id.  While these earlier duties "were based on the President's invocation of IEEPA,"[12] Mr. Hsu expects that UW "will purchase similar goods" subject to Section 122 duties before July 24, 2026.  Id. ¶ 7.  Mr. Hsu's declaration shows that UW accepts several shipments each month, which is sufficient to demonstrate that, in early March 2026, payment of Section 122 duties was "certainly impending."[13]

Private Plaintiffs import merchandise directly from overseas.  Burlap and Barrel provided a declaration by its co-founder and co-CEO, Ethan Frisch.  Frisch Decl. ¶ 2.  Mr. Frisch declared that as of March 9, 2026, Burlap and Barrel had "three shipments scheduled to arrive in the next few weeks on which it will have to pay Section 122 tariffs."  Id. ¶ 15; see also id. at 7 (noting the date).  Those "imports are valued at

---

[12] The first IEEPA duties went into effect on February 4, 2025, and were issued pursuant to Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025).  See V.O.S. Selections, 772 F. Supp. 3d at 1362–63.

[13] This finding is supported by, but does not turn on, Defendants' assertion that UW has made at least one Section 122 duty payment.  Defs.' Resp. at 73 n.24.  Additionally, the standing of the State of Washington does not depend on UW's allegations regarding indirect harm.  See Hsu Decl. ¶ 6.

$172,732" with an "expected tariff" payment in the amount of "$17,273." Id. ¶ 15. Mr. Frisch further averred that for the 150-day duration of the Section 122 tariffs, Burlap and Barrel expects to "pay $60,000 in Section 122 tariffs." Id. ¶ 17. Basic Fun submitted a declaration by its CEO, Jay Foreman. Foreman Decl. ¶ 2. Mr. Foreman declared that Basic Fun "has approximately 104 shipping containers of toys and toy components scheduled to arrive in the United States during the upcoming 150-day period covered by the Section 122 tariffs," on which it expects to pay "approximately $690,000 in tariffs." Id. ¶¶ 7–8. Like UW, Private Plaintiffs have demonstrated standing based on imminent, if not actual, liability for payment of Section 122 duties.

There being no question with respect to causation of the Importer Plaintiffs' respective injuries or the court's ability to redress those injuries, Importer Plaintiffs have standing to challenge the imposition of Section 122 duties pursuant to Proclamation No. 11012. Because "at least one plaintiff has standing, the suit may proceed." Nebraska, 600 U.S. at 489.

### 2. Non-Importer State Plaintiffs Lack Standing

It is not necessary to address the standing of the remaining State Plaintiffs (collectively, "Non-Importer State Plaintiffs") to establish the existence of a case or controversy before the court. See id. It is, however, necessary to examine their standing to inform the scope of any relief the court may find appropriate: the Non-Importer State Plaintiffs seek a universal injunction to remedy indirect harm they claim to suffer. State Pls.' Mem. at 34, 41–43; State Pls.' Reply at 20 ("[B]ecause only importers of record have a clear refund remedy, an injunction is necessary to stop the

Court Nos. 26-01472 & 26-01606                                    Page 24

States from paying hundreds of millions *indirectly* due to the Section 122 tariffs.") (emphasis added).[14]  Whether the court has authority to issue universal injunctive relief is, at present, an open question.  See V.O.S. Selections, 149 F.4th at 1339 (vacating the CIT's entry of a permanent injunction and remanding for reconsideration after the U.S. Supreme Court's intervening decision in Trump v. CASA, Inc., 606 U.S. 831 (2025)).[15]  In this case, however, the court does not need to reach this question because the Non-Importer State Plaintiffs fail to demonstrate an injury-in-fact, and therefore, lack Article III standing.

Non-Importer State Plaintiffs allege one or more of the following types of indirect economic harm: (1) passthrough tariff surcharges, (2) tariff-related increases in the cost of goods and services, and (3) burden and delay in the States' ability to carry out administrative duties.  See State Pls.' Mem. at 19–20, 34; see also, e.g., Decl. of Elizabeth Papadopoulos ¶¶ 5–8, ECF No. 27-24 (Oregon) ("Papadopoulos Decl."); Decl. of Jenifer Johnson ¶¶ 7–9, ECF No. 27-13 (Illinois); Decl. of Jeanette Moy ¶¶ 10–11, ECF No. 27-21 (New York); Decl. of Mark Raymond ¶¶ 5, 10–12, ECF No. 27-12 (Connecticut); Decl. of Jared Ambrosier ¶¶ 6, 11–13, ECF No. 27-17 (Michigan).[16]

---

[14] The States have not identified the importer/vendors from which they purchase goods subject to the Section 122 tariffs.  Nevertheless, given the number of State Plaintiffs, the breadth of their economic activity, and the wide scope of the Section 122 tariffs, any injunction on the collection of Section 122 tariffs would have to be universal to be practicable and to have practical effect for the Non-Importer State Plaintiffs.

[15] Learning Resources mooted any need for the CIT to reconsider the V.O.S. injunction. See Learning Res., 146 S. Ct. 628 (2026).

[16] Non-Importer State Plaintiffs do not allege third party standing.  See, e.g., Powers v. Ohio, 499 U.S. 400, 410–11 (1991) (criteria for third party standing includes injury to the litigant, "a close relation to the third party," and "some hindrance to the third party's

"Monetary costs are of course an injury." Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 111 (2025) (quoting United States v. Texas, 599 U.S. 670, 676 (2023)). And Plaintiffs may "fairly employ economic logic" to establish injury-in-fact. Canadian Lumber Trade All. v. United States, 517 F.3d 1319, 1333 (Fed. Cir. 2008); see also V.O.S. Selections, 772 F. Supp. 3d at 1368 ("To suffer an economic injury from a tariff it is not necessary to incur direct liability to Customs, or even to directly import an article of dutiable merchandise.").[17] But "[w]hen . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." Defs. of Wildlife, 504 U.S. at 562.[18]

---

ability to protect his or her own interests") (citing Singleton v. Wulff, 428 U.S. 106, 112–16 (1976)).

[17] In Canadian Lumber, the U.S. Court of Appeals for the Federal Circuit affirmed the CIT's reliance on "the doctrine of 'competitor standing'" to find that certain Canadian producers had standing to challenge distributions of money to U.S. producers pursuant to the "Continued Dumping and Subsidy Offset Act," also known as the "Byrd Amendment." 517 F.3d at 1332–34. That doctrine uses "economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors." Id. at 1332. While that case was "not a textbook candidate for 'competitor standing,'" the Federal Circuit found it "quite rational to infer that Customs, by distributing money to an entity that aims to take away market share from Canadian wheat and has already been somewhat successful in that effort, is likely to inflict further economic injury on the Canadian [producers]." Id. at 1334. Nevertheless, as the Federal Circuit later observed, the "findings of standing in Canadian Lumber and the other 'competitor standing' cases are applications of the standing requirement that the disputed action must pose a nonspeculative threat to a concrete interest of the challenger." AVX Corp. v. Presidio Components, Inc., 923 F.3d 1357, 1364 (Fed. Cir. 2019).

[18] In the case of indirect injury, causation and redressability are typically more difficult to establish. See, e.g., Murthy v. Mo., 603 U.S. 43 (2024). In Murthy, the Supreme Court noted the "bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." 603 U.S. at 57 (internal

None of the Non-Importer State Plaintiffs identify actual indirect harm resulting from Section 122 duties. Instead, Non-Importer State Plaintiffs urge the court to find imminent injury-in-fact based on their respective experiences with IEEPA duties. See State Pls.' Reply at 17–18 ("As Plaintiffs' experience with IEEPA demonstrated, sometimes these tariff costs are passed through directly to purchasers, while in other instances the price increase is less direct."); see also, e.g., Papadopoulos Decl. ¶ 9 ("While the tariffs Fleet Services paid in the past were based on the President['s] invocation of IEEPA, I expect that Fleet Services will purchase similar goods before July 24, 2026, that would be subject to tariffs under the Section 122 Proclamation."). The speculative nature of the Non-Importer State Plaintiffs' injury distinguishes this case from V.O.S. Selections. See V.O.S. Selections, 772 F. Supp. 3d at 1367 ("The businesses that bring the V.O.S. action . . . allege and aver that they have suffered (and will continue to suffer) economic injuries as a result of the Worldwide and Retaliatory Tariffs.") (footnote omitted).[19] While "'imminence' is concededly a somewhat elastic

---

quotation marks and citation omitted) (emphasis added). The relevant inquiry is whether third parties will "react in predictable ways." Id. Thus, the Supreme Court has "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." Id. (quoting Clapper, 568 U.S. at 413).

[19] State Plaintiffs assert that "[e]ven the dissenting opinion in the Federal Circuit 'agree[d] with the majority's decision on jurisdiction and standing.'" State Pls.' Reply at 18 n.7 (quoting V.O.S. Selections, 149 F.4th at 1348–49) (Taranto, J., dissenting)) (second alteration in original). State Plaintiffs appear to imply that the Federal Circuit majority affirmed the standing of non-importers in that case and agreement with that affirmance by the dissent. The V.O.S. majority did not, however, directly address the standing of non-importers and as previously noted, vacated and remanded the CIT's sole remedy for those plaintiffs. V.O.S. Selections, 149 F.4th at 1340. The V.O.S. dissenters, moreover, also characterized their position somewhat differently, and

concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged

injury is not too speculative for Article III purposes—that the injury is certainly

impending." Defs. of Wildlife, 504 U.S. at 564 n.2 (internal quotation marks and citation

omitted). While the attenuation of their alleged harm varies, they are, nevertheless,

mere "[a]llegations of possible future injury." See Clapper, 568 U.S. at 409 (internal

quotation marks omitted) (alteration in original).[20] Accordingly, the Non-Importer State

Plaintiffs lack Article III standing. The court will dismiss without prejudice all claims by

Non-Importer State Plaintiffs.

## II.      Section 122: Balance-of-Payments Deficits

### A. Parties' Contentions

State Plaintiffs contend that the President lacked authority to invoke Section 122

because large and serious balance-of-payments deficits cannot occur in a floating

exchange rate monetary system. State Pls.' Mem. at 6–7, 15–16, 25. They argue that

the Proclamation unlawfully redefines the statutory term "balance-of-payments deficits"

to mean "current account deficits" and that the tariffs are not applied consistent with the

principle of nondiscrimination as required by Section 122. Id. at 25–32; State Pls.'

Reply at 5–11. State Plaintiffs further argue that CBP's enforcement exceeds statutory

---

perhaps more accurately, as agreeing with the majority "that enough plaintiffs had constitutional standing in order for the lawfulness of the reciprocal and trafficking tariffs to be adjudicated." Id. at 1357 (Taranto, J., dissenting). Accordingly, V.O.S. does not help settle the question of non-importer standing in this case.

[20] Because the court concludes that Non-Importer State Plaintiffs have failed to demonstrate any imminent, non-speculative injury, the court need not, and therefore does not, address the Government's argument that those plaintiffs also lack prudential standing. See Defs.' Resp. at 77–79.

authority.  State Pls.' Mem. at 32–33.  Private Plaintiffs similarly argue that balance-of-payments deficits cannot occur in a floating exchange rate system, that Section 122 does not authorize the challenged tariffs, that Congress did not clearly confer such sweeping authority, and that any contrary reading would raise a nondelegation problem.  Priv. Pls.' Mem. at 16–35.

Because the Bretton Woods system had already ended by the time of Section 122's enactment, Defendants argue, Plaintiffs' interpretation would mean that Congress passed a statute that was "already useless at the time of its enactment," in contravention of the presumption against ineffectiveness that courts must apply when interpreting statutes.  Defs.' Resp. at 32–33.  Defendants further argue that the tariffs imposed by the President's Proclamation are lawful because Section 122 provides the President with the discretion to determine when a large and serious balance-of-payments deficit exists, and that the President has correctly made such a finding based on the U.S. current account deficit, trade deficit, primary income, and net international-investment position.  Id. at 38–41.

**B. Analysis**

In Section 122 of the Trade Act of 1974, Congress authorizes, indeed requires, that the President proclaim temporary import restrictions[21] when certain conditions

---

[21] The restrictions available to the President include either a temporary import surcharge or temporary limitations through the use of quotas.  The only restriction at issue here is an import surcharge, i.e., tariff.  19 U.S.C. § 2132(a).

- A36 -

exist.[22]  19 U.S.C. § 2132(a).  This case turns on the meaning of Section 122 and whether the President asserted the existence of the conditions required by the statute in order to lawfully proclaim the import surcharges.[23]  As discussed further below, the President's Proclamation fails to assert that those required conditions have been satisfied.  See generally Proclamation No. 11012.

"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises."  U.S. Const. art. I, § 8, cl. 1.  The power to tax includes the power to impose tariffs.  Learning Res., 146 S. Ct. at 638 (citing Gibbons v. Ogden, 22 U.S. 1, 201 (1824)).  Congress may delegate and has delegated the power to impose tariffs to the

---

[22] Subsection (b) provides the President the discretion to forego import restrictions otherwise required under subsection (a) if he "determines that the imposition of import restrictions under subsection (a) will be contrary to the national interest of the United States." 19 U.S.C. § 2132(b).  In such a case, "he may refrain from proclaiming such restrictions and he shall—(1) immediately inform Congress of his determination, and (2) immediately convene the group of congressional official advisers designated under [19 U.S.C. § 2211(a)] and consult with them as to the reasons for such determination." Id.
[23] State Plaintiffs appended a statement of undisputed material facts to their motion. See Pls.' Statement of Undisputed Material Facts, ECF No. 26.  The statement contains various "facts" about Proclamation No. 11012, past nonuse of Section 122, and harm to State Plaintiffs. Id. ¶¶ 1–5, 17–24.  The statement also asserts as "facts" State Plaintiffs' views on the meaning of balance of payments, id. ¶¶ 6–15, and the claimed impossibility of a "large and serious" balance-of-payments deficit in a floating-rate system, id. ¶ 16.  But, as State Plaintiffs acknowledge, "[t]his is a statutory interpretation case." State Pls.' Reply at 2; see also id. (stating "the question is one of statutory interpretation, not of fact-finding," and "[t]hat is the role Plaintiffs ask the [c]ourt to play here").  The court need not parse State Plaintiffs' statement of facts to exclude irrelevant facts or legal conclusions.  The standard of review here is clear: we interpret the statute in question but do not make factual determinations committed to the President's discretion. Marbury, 5 U.S. at 177; Loper Bright, 603 U.S. at 386; Silfab Solar, 892 F.3d at 1348–49.  Put simply, we are empowered to decide what "balance-of-payments deficits" means for purposes of Section 122(a)(1) and whether the Proclamation asserts the existence of such deficits within the meaning of the statute.  This case may thus be resolved on summary judgment. USCIT Rule 56(a).

President under several specifically conditioned statutes. See, e.g., Trade Expansion Act of 1962, § 232, 19 U.S.C. § 1862 (providing for presidential action to adjust imports when the Secretary of Commerce finds that an article is being imported under such circumstances as to threaten to impair national security); Trade Act of 1974, § 301, 19 U.S.C. § 2411 (providing for trade action when the U.S. Trade Representative determines that a foreign country's conduct is unjustifiable, unreasonable, or discriminatory and burdens or restricts United States commerce).

"When Congress grants the power to impose tariffs, it does so clearly and with careful constraints." Learning Res., 146 S. Ct. at 644. Separation of powers concerns thus require the court to carefully parse those constraints and give them full effect, because "the President enjoys no inherent authority to impose tariffs during peacetime." Id. at 638; see also id. at 639 ("'[B]oth separation of powers principles and a practical understanding of legislative intent' suggested Congress would not have delegated 'highly consequential power' through ambiguous language." (plurality opinion) (alteration in original) (quoting West Virginia v. EPA, 597 U.S. 697, 723–24 (2022)));[24] see also

---

[24] While Chief Justice Roberts and Justices Gorsuch and Barrett relied on the major questions doctrine, Justice Kagan, joined by Justices Sotomayor and Jackson, found that the "ordinary tools of statutory interpretation" allowed them to arrive at the same result. Learning Res., 146 S. Ct. at 674 (Kagan, J., concurring in part and concurring in the judgment). While the court here utilizes those ordinary tools of statutory interpretation to establish the parameters of Section 122, the importance of the proper interpretation of that provision is informed by the separation of powers principles and a clear understanding of the legislative intent that informed the delegation of this tariff authority to the Executive Branch.

Court Nos. 26-01472 & 26-01606                                    Page 31

<u>Little v. Barreme</u>, 2 Cranch 170, 178–79 (1804) (Executive actions are subject to the

limitations set forth by Congress).

Section 122 provides, in pertinent part:

Whenever fundamental international payments problems require special import measures to restrict imports—

(1) to deal with large and serious United States balance-of-payments deficits[,]
(2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or
(3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,

the President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)—

(A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States . . . .

19 U.S.C. § 2132(a).

The court begins with the words of the statute.[25]  The parties do not dispute that

in order to proclaim import surcharges pursuant to Section 122, there must be large and

serious United States balance-of-payments deficits.  State Pls.' Mem. at 22; Priv. Pls.'

Mem. at 28; Defs.' Resp. at 16.  Similarly, assuming there are balance-of-payments

---

[25] The statute contains several phrases about which the parties do not agree, including "fundamental international payments problems" and "balance-of-payments deficits."  Not only do the parties disagree about the meaning of these phrases, but they also disagree about whether they are independent phrases or if "balance-of-payments deficits" is simply one of several enumerated "fundamental international payments problems."  <u>See</u> State Pls.' Mem. at 23; Priv. Pls.' Mem. at 19; Defs.' Resp. at 42.  While the grammatical structure of Section 122(a) suggests that "fundamental international payments problems" are an independent requirement to proclaim import surcharges pursuant to Section 122, the court need not reach this issue.

- A39 -

deficits, there is no serious dispute that whether such deficits are "large and serious" is a discretionary determination within the province of the Executive Branch, review of which by the judiciary is impermissible. See Dalton v. Specter, 511 U.S. 462, 477 (1994) ("Where a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."). However, the term "balance-of-payments deficits" is indicative of a term of art, susceptible to a defined meaning, and subject to objective measure within the traditional means of judicial review.[26]

It is clear that Congress was aware of the differences in the words it chose. Congress adopted "balance-of-payments deficits" as an issue to be addressed in Section 122(a) while it employed the phrase "balance-of-trade surpluses" in Section 122(c). 19 U.S.C. § 2312(a)(1), (c)(1) (emphases added). That distinction does not end the inquiry because neither the President in Proclamation No. 11012 nor Defendants before us conflate entirely those terms. See Proclamation No. 11012 ¶ 7; Defs.' Resp. at 37. The different terms indicate, however, that Congress intended a specific

---

[26] Indeed, the term "balance-of-payments deficit" causes some confusion. Balance of payments is an accounting term and as both parties point out, the balance of payments always balances by definition; it nets to zero. State Pls.' Mem. at 26–27 n.6; Defs.' Resp. at 5, 25. The phrase balance-of-payments deficits, thus, points to a negative component of that analysis. The Government argues that in today's world, the current account is the proper component for identifying a balance-of-payments deficit. Defs.' Resp. at 23–28. Problematically for the Government, and as discussed herein, Congress in 1974 identified the settlement, liquidity, and basic balance deficits as "balance-of-payments deficits." See, e.g., Staff of S. Fin. Comm., 93d Cong., Tables and Statistical Material on U.S. Balance of Trade and Balance of Payments ("Staff of S. Fin. Comm. Dec. 1974") Table 1 (Comm. Print Dec. 1974).

meaning through the words it chose when crafting Section 122(a) and, thus, conferred a specific authority on the President.  Having concluded that "balance-of-payments deficits" is capable of definition, it is incumbent on the court to discern that definition. See Marbury, 5 U.S. at 177.[27]

The legislative history of the Trade Act of 1974 reveals that Congress understood balance-of-payments deficits to refer, at the time, to deficits in (1) liquidity, (2) official settlements, or (3) basic balance.  For over two years, Congress carefully reviewed and revised legislative proposals in the context of dynamic international economic events. As discussed above, the statute was enacted at a time of great uncertainty for the future of the international monetary system.  As the bill was being debated in Congress, it was unknown whether the collapse of the Smithsonian Agreement and the end of fixed exchange rates in 1973 would mark a definitive end to the Bretton Woods system, or whether the U.S. and other countries would one day return to the gold standard.  See,

---

[27] Loper Bright confirms that courts have the responsibility of interpreting statutes even when the statutes are ambiguous:

> The Framers appreciated that the laws judges would necessarily apply in resolving those disputes would not always be clear.  Cognizant of the limits of human language and foresight, they anticipated that "[a]ll new laws, though penned with the greatest technical skill, and passed on the fullest and most mature deliberation," would be "more or less obscure and equivocal, until their meaning" was settled "by a series of particular discussions and adjudications."

603 U.S. at 384–85 (quoting The Federalist No. 37, p. 236 (J. Cooke ed. 1961) (J. Madison)) (alteration in original).  There is no dispute that Proclamation No. 11012 represents the first Presidential invocation of Section 122(a) since its enactment roughly 50 years ago.  See State Pls.' Mem. at 28; Defs.' Resp. at 40.  Thus, this case presents the first opportunity for the court to interpret the statute's relevant terms.  Accordingly, the legislative history surrounding congressional deliberation of Section 122 is instructive.

e.g., 119 Cong. Rec. 40,568 (1973) (statement of Rep. Henry S. Reuss) ("If the United States continues to let the dollar float in exchange markets, as we are wisely doing now, the exercise of [Section 122] authority would prevent the deterioration or appreciation of the external value of the dollar that would be necessary to eliminate a balance-of-payments deficit or surplus, as the case may be.  On the other hand, if we should ever revert to a fixed exchange rate parity for the dollar, the time limit proposed of 150 days would be much too short to allow a reversal in basic economic conditions sufficient to restore a satisfactory balance-of-payments equilibrium.").  Both the international economic challenges and questions about the limits of Presidential authority informed congressional consideration of this legislation.[28]

Early versions of the legislation contained standards for measuring the balance-of-payments deficit and applying the threshold for enabling Presidential authority to take action.  Specifically, H.R. 6767 would have provided that a serious balance-of-payments deficit existed when the President determined that "the balance of payments (as measured either on the official reserve transactions basis or by the balance on current account and long-term-capital) has been in substantial deficit over a period of four consecutive calendar quarters."  Trade Reform Act of 1973, H.R. 6767, 93d Cong.

---

[28] The Trade Act of 1974 was enacted on January 3, 1975, Pub. L. No. 93-618, 88 Stat. 1978, after the 10 percent Nixon surcharge had already been invalidated by the Customs Court, see Yoshida I, 378 F. Supp. at 1175–76, but before the reversal of that judgment on appeal, see Yoshida II, 526 F. 2d at 584.  The 1973–1974 OPEC embargo only further complicated the United States's economic and monetary position.  See Oil Embargo, 1973-1974.  Both the international economic challenges and questions about the limits of Presidential authority informed congressional consideration of this legislation.

Court Nos. 26-01472 & 26-01606                                    Page 35

§ 401(b)(1)(A) (1973).[29]  Thus, in debating an earlier version of this legislation,

Congress specifically identified settlement deficits and basic balance deficits as two

possible balance-of-payments deficits.

     Similarly, early analyses of balance-of-payments deficits focused on the liquidity,

official settlements, and basic balance concepts:

> The overall-balance-of-payments deficit (or surplus) can be shown in different ways.  The two most usual approaches, both of which are shown in the official figures of the U.S. Department of Commerce, are known as the "liquidity" concept and the "official settlements" concept.
>
> The balance, computed on the liquidity basis, is measured by changes in U.S. official reserve assets and in liquid liabilities to all foreigners.  It includes as liabilities, which are a potential drain on U.S. monetary reserves, all short-term liabilities to foreigners, private as well as those payable to foreign monetary authorities, it does not include U.S. private short-term holdings as an offsetting asset entry, however, on the theory that the U.S. Government exercises no direct control over them and therefore cannot mobilize them in support of the dollar in an emergency.
>
> The balance, computed on the official settlements basis, is measured by changes in U.S. official reserve assets, together with changes in liquid and certain nonliquid liabilities to foreign official agencies.  Under this concept foreign short-term capital inflows are included, as are U.S. short-term outward capital flows, as regular transactions.  According to this concept, the large inflows of foreign commercial bank funds in recent years have represented predominantly market-oriented business phenomena.

See Trends in Int'l Trade of the United States: Hr'gs Before the H. Comm. on Ways &

Means, 91st Cong. 2710 (1970) (statement of Dr. Howard S. Piquet); see also H.R.

Rep. No. 91-1435, at 12 (1970) (discussing liquidity and official settlements deficits).

---

[29] The balance on current account and long-term capital constitute what is also known as the "basic balance."  See Council of Econ. Advisers, Exec. Office of the President, Econ. Report of the President 194 (1974).

- A43 -

Later-in-time analyses are consistent with this approach.  See The Trade Reform Act of 1973, Hr'gs on H.R. 10710 Before the S. Comm. on Fin. ("H.R. 10710 Hr'gs"), 93d Cong., pt. 1, at 2, 221, 365–66; pt. 2, at 480, 661; pt. 4, at 1468–69; pt. 5, at 2080 (1974) (discussing or showing deficit in terms of "basic balance," "liquidity basis," or "official reserve transactions"); 120 Cong. Rec. 39,505, 39,521 (1974) (statements of Sen. Long and Sen. Hartke) ("In 1962, the Nation had . . . a balance of payments deficit of $2.9 billion—liquidity basis.  Ten years later . . . the payments deficit had grown from a bearable $2.9 billion to an intolerable $13.9 billion."); 120 Cong. Rec. 39,506 (1974) ("Table 7 U.S. Trade and Balance of Payments, 1960–74," showing "Balance of payments" identifying possible deficits in "liquidity," "official settlements," and "basic balance").[30]

Both the parenthetical definition of balance of payments and the measurement over four consecutive quarters proposed in H.R. 6767 were omitted from H.R. 10710. As the legislative history indicates, in lieu of the four quarters time period, Congress inserted the "large and serious" requirement to circumscribe the President's authority all while allowing for adequate flexibility to respond to a delimited set of particular

---

[30] A variety of options for analyzing the balance of payments were available to Congress at the time Section 122 was debated and enacted.  See H.R.10710 Hr'gs, Part 2 at 684–90 (App. C, Staff of S. Fin. Comm., 93d Cong., Staff Data and Materials on U.S. Trade and Balance of Payments Tables 22–23, 30 (Comm. Print Feb. 1974), showing tables displaying annual figures for "Current Account Balance" and "Basic Balance" under the header "U.S. Balance of Payments Trends," as well as "US Balance of Payments Summary by Area," including measures across various categories); H.R. 10710 Hr'gs, Part 6 at 2555 ("[Int'l Econ. Policy Assoc. (IEPA)] Balance-of-Payments Summary, 1969-73").

economic and monetary challenges.  See H.R. Rep. No. 93-571, at 28–29 (1973) ("The

[House] [C]ommittee [on Ways and Means] considered various formulas for defining a

serious balance-of-payments deficit, including a specific formulation based on the

existence of a substantial deficit over a certain period of time, but the committee feels

that it is not possible to formulate a definition with mathematical exactness.

Nevertheless, the committee does not intend that a small or even a large balance-of-

payments deficit of short duration would warrant the exercise of the authority under this

section."); S. Rep. No. 93-1298, at 87–88 (1974) ("[C]ircumstances can change rapidly

and the [Senate] Committee [on Finance] deems it necessary that the President have

authority to impose surcharges and other import restrictions for balance of payments

reasons even though under present circumstances such authority is not likely to be

utilized.").  While Congress did not replace the parenthetical definition of balance of

payments, the legislative history indicates what Congress contemplated as the measure

of balance of payments.  Specifically, the Senate Report to the Trade Act of 1974

("Senate Report") refers to the three types of balance-of-payments deficits, namely (1)

liquidity, (2) official settlements, and (3) basic balance, discussed in other parts of the

legislative history.  S. Rep. 93-1298, at 8 (Table 3); see also Staff of S. Fin. Comm. Dec.

1974, Table 1.[31]

---

[31] The December 1974 Senate Finance Staff Report contains a wealth of statistical
information regarding trade and balance of payments, much of which appears to have
been summarized in Table 1.  Under the heading "U.S. Trade and Balance-of-Payments
Deficits," Table 1 lists "U.S. trade position," "Trade balance," and "Balance of
payments," with data from 1960 through 1973 and partial data for 1974. See Staff of S.
Fin. Comm. Dec. 1974, Table 1.  As noted, the balance of payments data is categorized

The Government's own Declaration acknowledges some of these 1974

measures, stating:

> Multiple measures capture related aspects of a country's [balance-of-payments ("BOP")] deficit, and official statistics during the 1970s also reported broader measures than the current account.  For example, the "official reserve transactions balance" tracked the net disposition of dollars by the federal government in order to manage the foreign exchange value of the dollar.  Another common contemporaneous measure was the "basic balance" . . ., which combined the current account and long-term capital, and served as a gauge for the imbalance between "underlying" long-term demand and supply of foreign exchange. . . .

> According to the CEA's review of historical records, the basic balance was a common, broader measure of BOP deficits during the 1970s.  The underlying intent of the basic balance, according to BEA, was to capture "[…] long term trends in the balance of payments by segregating volatile capital flows and placing them below the line."

---

based on liquidity, official settlements, and basic balance.  Id. Those categories are mostly, but not always, in deficit.  The report contains 31 total tables. See generally id. In addition to trade-related information (Tables 2 to 21 and 31), the report summarizes the U.S. current account balance (Table 22) and U.S. basic balance (Table 23); contains several U.S. basic balance trends regarding merchandise, services, military and foreign aid, and private capital (Tables 24 to 27); lists the U.S. basic balance by area (Tables 28 and 29); and summarizes the U.S. balance of payments by area (Table 30). Id., Tables 2–29.  Table 30 contains balances for goods and services, current account, basic balance, net liquidity, and official settlements. Id., Table 30.  But just as the balance on goods and services is contained in the current account balance, so too is the current account balance subsumed within the basic balance.  Compare id., Table 22 (U.S. current account balance) and id., Table 28 (U.S. basic balance by area, 1973), with id. Table 30; see also Econ. Report of the President 194 (1974) (defining basic balance to include the current account).  But the Senate included only "Liquidity," "Official settlements," and "Basic balance" in Table 1, titled "U.S. Trade and-Balance-of-Payments Deficits," and that is thus the clearest indication of the concerns Section 122 was intended to address.  Staff of S. Fin. Comm. Dec. 1974, Table 1.

- A46 -

Decl. of Pierre Yared (Council of Economic Advisors) ("Yared Decl.") ¶¶ 25, 27, ECF

No. 35-1 (third alteration in original).[32]

Despite acknowledging differences in the 1974 measures of the balance of

payments as compared to modern measures, id. ¶¶ 27, 37–40, the Government seeks

to defend the Proclamation by arguing that "balance-of-payments deficits" is a malleable

phrase, see Defs.' Resp. at 32 n.12 ("[W]hat qualifies as a [balance-of-payments deficit]

may depend on the facts of the day." (quoting Wisconsin Cent. Ltd v. United States, 585

U.S. 274, 284 (2018) (alteration in original))).  However, the Government's suggestion

that what constitutes "balance-of-payments deficits" may change proves too much.  See

Yared Decl. ¶ 37 ("While the concept of current account has largely remained the same

since the 1970s, there is no single measure of the long-term capital account (the other

main component of basic balance), and BEA no longer reports all the components

needed to exactly replicate the basic balance.").  As previously noted, the "balance of

payments" as an accounting principle always nets to zero.  See State Pls.' Mem. at 26–

27 n.6; Defs.' Resp. at 5, 25; Yared Decl. ¶ 10.  To the extent that is the case, if the

President has the ability to select among the sub-accounts to identify a balance-of-

payments deficit, unless every sub-account is balanced, the President would always be

able to identify a balance-of-payments deficit.

---

[32] The Yared Declaration later posits that the failings of the basic balance as a metric likely led BEA to discontinue its presentation of the basic balance in 1976.  Yared Decl. ¶¶ 27, 35.

Such an expansive reading of the statute would raise a non-delegation issue, which in turn would prompt a constitutional question.[33]  See Priv. Pls.' Mem at 28. "[T]he canon of constitutional avoidance" provides that, when one of two statutory interpretations would raise a constitutional question, "the other should prevail."  Clark v. Martinez, 543 U.S. 371, 380–81 (2005); see also Mistretta v. United States, 488 U.S. 361, 373 n.7 (1989) (stating that the Court employs the nondelegation principle to interpret statutory text and give "narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional"); Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 646 (1980) (stating that "[a] construction of the statute that avoids [an] open-ended grant" of authority that would implicate the non-delegation doctrine "should certainly be favored"); Fisherman's Harvest, Inc. v. PBS & J, 490 F. 3d 1371, 1377 (Fed. Cir. 2007) ("The canon of constitutional avoidance in statutory interpretation implies that a plausible construction of [a statute] that does not raise . . . constitutional doubts gives better effect to congressional intent.").  The Government's

---

[33] Defendants argue that "the balance-of-payment's current account [is] the only reasonable measure of a balance-of-payment deficit."  Defs.' Resp. at 3; see also Yared Decl. ¶¶ 8, 13.  This argument lacks support in either the statute's text or legislative history.  Defendants' position is the President has discretion to identify any actionable deficit for purposes of Section 122(a)(1).  See Defs.' Resp. at 20.  But Section 122 would lack an intelligible principle if the President could simply identify any deficit account, or if the phrase "balance-of-payments deficits" could change with context. Further, Defendants reject the view that the phrase "fundamental international payments problems" constrains the President at all.  See Defs.' Resp. at 41–44.  While the court need not resolve the Parties' positions on this issue, the court cannot accept Defendants' interpretation that disclaims the existence of any meaningful intelligible principle in either "fundamental international payments problems" or "balance-of-payment deficits."

preferred interpretation of the statute must therefore be disfavored.  See N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30 (1937) ("[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act.  Even to avoid a serious doubt the rule is the same.") (emphasis added).

Further, the legislative history chronicles a series of efforts to carefully cabin Presidential discretion.  See Hr'g on H.R. 10710 Before the H. Rules Comm., 93d Cong. 84 (1973) (statement of Hon. Al Ullman) ("[I]n place of unlimited authority to modify import restraints in face of large and persistent balance of payments deficits or surpluses, the bill provides temporary and limited authority for the President to take action."); Staffs of the H. Comm. on Ways and Means and the S. Comm. on Fin., 93d Cong., Summary of Senate Amendments to H.R. 10710 Trade Act of 1974 6 (Comm. Print 1974) ("[Amendments 42–43] [m]ake[] the House bill authority to deal with deficit balance-of-payments situations mandatory, rather than discretionary, unless the President determines and informs the Congress that imposing import restrictions would be contrary to the national interest."); Staffs of the S. Comm. on Fin. and H. Comm. on Ways and Means, 93d Cong., Summary of the Provisions of H.R. 10710 4 (Comm. Print 1974) (stating that "[t]he Act directs the President to proclaim . . . import surcharges . . . as may be necessary to deal with large and serious U.S. balance of payments deficits" (emphasis added)).  Ultimately, the Senate Report, leading up to the enactment of Section 122, explicitly classifies three figures as measures of the "balance of payments" (liquidity, official settlements, and basic balance) while classifying two measures of the

"trade balance" as distinct.  S. Rep. 93-1298, at 8; see also Staff of S. Fin. Comm. Dec.

1974, Table 1.

Rather than identifying "balance-of-payments deficits" as that term was intended

in 1974, the Proclamation relies upon current account deficits, and a discussion of "a

large and serious trade deficit."  Proclamation No. 11012 ¶ 6; see also id. ¶ 7 (referring

to deficits concerning the balance of goods and services as well as the balances on

primary income and secondary income, all of which are part of the current account); id.

¶ 8 (noting the trade deficit).  Although the current account (and the balance of trade as

a component of the current account) are relevant to balance-of-payments deficits, they

are distinct, and the statute recognizes the distinction.  Compare 19 U.S.C. § 2132(a)(1)

("large and serious United States balance-of-payments deficits"), with 19 U.S.C.

§ 2132(c)(1) ("large and persistent United States balance-of-trade surpluses").  Indeed,

the Government's Declaration plainly acknowledges that the Proclamation does not rely

upon the metrics used to measure balance-of-payments deficits discussed at the time of

enactment:

> During the 1970s, economists leveraged multiple metrics to analyze different aspects of BOP deficits.  More expansive measures than the current account typically included other components of the BOP accounting framework involving relatively durable transactions—those that were long-term and illiquid—and excluded flows of payment and other liquid, money-like instruments that are recorded in the financial account. In developing candidate alternative BOP deficit measures to the current account, CEA accounted for the evolution of financial markets since the 1970s, which have substantially increased the liquidity of many assets (e.g., equities).
>
> Figure 5 shows CEA's most expansive candidate BOP deficit measure for the purposes of Section 122: the current account plus the

capital account plus net FDI.  This measure excludes most assets in the financial account, as in modern-day financial markets they can exhibit high degrees of liquidity and volatile flows, akin to broad financial flow.  However, even this measure is likely too inclusive.  As acknowledged by the BEA in 1976 "[…] even some components of direct investment, can be quite volatile."  This suggests that a representation of the BOP deficit more aligned to Section 122 would reflect only the most durable components of FDI.  As illustrated by Figure 5, CEA's most expansive candidate measure is more volatile than the current account balance, but presents the same qualitative story: a prolonged period in deficit.

Yared Decl. ¶¶ 43–44 (alteration in original) (citation omitted).  The Declaration explains the Proclamation's reliance on the current account deficit as a function of the United States' shift from a fixed exchange rate to a floating exchange rate in great detail.[34]  Id. ¶¶ 28–36.  The narrative woven by the Declaration attempts to characterize the Senate's explicit references to (1) liquidity, (2) official settlements, and (3) the basic balance as concepts that must be reinterpreted today to take account of the fact that "BEA no longer reports all the components needed to exactly replicate the basic balance" as well as changes that have occurred in the long-term capital markets.[35]  Id. ¶¶ 37–40.  Thus, the Yared Declaration asserts that, given the "context of the modern economy and financial markets, . . . the balance of the current account within the BOP

---

[34] While the Yared Declaration is distinct from the President's Proclamation and not expressly relied upon therein, throughout the Proclamation, the President states that he was "informed" by senior officials and advisors in arriving at his factual findings.  Proclamation No. 11012 ¶¶ 4–13.  The court's references to the Yared Declaration are not dependent upon whether Mr. Yared was among the unnamed senior officials or advisors in the Proclamation.

[35] The Declaration explains its resort to measurements beyond those considered by Congress in 1974.  See, e.g., Yared Decl. ¶ 38 (noting that "[w]hat can be construed as non-volatile, long-term capital has changed materially since the 1970s").

accounting framework is the most appropriate measure of BOP deficits for the purposes of Section 122." Id. ¶ 13.[36]

Both Plaintiffs and Defendants overstate the consequences of the United States' transition from a fixed exchange rate system to a floating exchange rate system. Plaintiffs argue that because the United States floats its currency, large and serious balance-of-payments deficits cannot occur. State Pls.' Mem. at 2–3; Priv. Pls.' Mem. at 21–22. Defendants argue that Plaintiffs' position means Section 122 was "a nullity since the day it was enacted." Defs.' Resp. at 40, see also id. at 35. Both Plaintiffs and Defendants miss the mark. Whether it is possible to measure balance-of-payments deficits by settlements, liquidity, or basic balance today is not our concern;[37] rather,

---

[36] Notably, in the next paragraph, the Yared Declaration acknowledges "trade deficits are conceptually distinct from balance-of-payments deficits." Id. ¶ 14.

[37] At Oral Argument, the Government conceded that the way in which a balance-of-payments deficit is measured today is different from how a balance-of-payments deficit was measured in 1974; namely, that basic balance and liquidity are no longer considered relevant or material measures. Oral Arg. at 1:35:00–1:38:00, 1:52:00–1:55:00 (approximate time stamps from the recording). Defendants' discussion of these alternatives during Oral Argument and in their brief makes clear they had notice of and understood the statutory interpretation grounds raised in Plaintiffs' motions for Summary Judgment. See Defs.' Resp. at 26 (arguing the Government's interpretation is supported by "statutory context and legislative history"); id. at 31 (arguing the President's "interpretation is not a clear misconstruction of Section 122" that requires judicial review of his actions); see also State Pls.' Mem. at 22–23, 25–27 (arguing the preconditions for Section 122 duties were not satisfied); Priv. Pls.' Mem. at 16–23 (similar). Thus, we disagree with the dissent that our resolution of this issue triggers the provisions of Rule 56(f) governing "Judgment Independent of the Motion," specifically, the requirement for "notice and a reasonable time to respond" before "grant[ing] the motion on grounds not raised by a party." USCIT Rule 56(f)(2); see also Dissent Op. at 24–30. Plainly, the grounds the Plaintiffs advanced and of which Defendants had notice necessarily require the court to interpret the meaning of "balance-of-payments deficits" for purposes of Section 122. See Loper Bright, 603 U.S. at 394 (stating that "courts

when interpreting the statute, we must determine the meaning of "balance-of-payments deficits" at the time Congress enacted the statute and whether the President identified balance-of-payments deficits within that meaning—regardless of how the BEA measures such deficits today. The meaning of this term is readily ascertainable when looking at how the Senate explicitly reported balance-of-payment deficits. S. Rep. 93-1298 at 8; Staff of S. Fin. Comm. Dec. 1974, Table 1.

Thus, what is relevant is what Congress meant by "balance-of-payments deficits" in 1974, and what Congress meant can be determined based on what it reported at the time of enactment, namely the balance-of-payments deficits as measured by liquidity, official settlements and the basic balance. Even if it is unlikely that "large and serious balance-of-payments deficits" within the meaning of Section 122 could occur today in light of the floating exchange rate system, the other provisions of Section 122 remain operative. See 19 U.S.C. § 2132(a)(2)–(h). Under those provisions, the President would be empowered to act "to prevent an imminent and significant depreciation of the dollar" or "to cooperate with other countries in correcting an international balance-of-payments disequilibrium." See id. § 2132(a)(2)–(3).

Accepting as true every factual statement in Proclamation No. 11012, the surcharge imposed by the Proclamation rests on the existence of a large trade deficit, a current account deficit, a negative net international investment position, and a deficit on the balance on primary and secondary income (which are part of the current account).

---

must exercise independent judgment in determining the meaning of statutory provisions").

Proclamation No. 11012 ¶¶ 7–11.  The Proclamation asserts that "the United States

runs a trade deficit, does not currently make a net income from the capital and labor that

it deploys abroad, and experiences more transfer payments, on net, flowing out of the

country than into the country."  Id. ¶ 7.  Nowhere does Proclamation No. 11012 identify

balance-of-payments deficits within the meaning of Section 122 as it was enacted in

1974.  See generally Proclamation No. 11012.

Because the Proclamation's use of trade and current account deficits to stand in

the place of balance-of-payment deficits within the meaning of the statute renders the

Proclamation ultra vires, the court need not reach the arguments of whether Section

122 requires the identification of "fundamental international payments problems" or

whether the exemptions provided in the Proclamation are lawful.  See Trump v. Hawaii,

585 U.S. 667, 703 (2018) (requiring a "facially legitimate and bona fide" reason for

Executive action (citation omitted)).  Proclamation No. 11012 is invalid, and the tariffs

imposed on Plaintiffs are unauthorized by law.[38]

---

[38] We have considered the arguments presented by the dissent and are not convinced
by them.  The dissent finds the legislative history too limited to give meaning to the term
"balance-of-payments deficits."  However, the dissent provides no affirmative alternative
meaning to this critical statutory term that the President invokes as the basis of the
Proclamation.  Indeed, the dissent concludes that one cannot or should not ascribe
meaning to "balance-of-payments deficit" absent express statutory language defining
the term.  To the contrary, as we have discussed, "[i]t is emphatically the province and
duty of the judicial department to say what the law is.  Those who apply the rule to
particular cases, must of necessity expound and interpret that rule."  Marbury, 5 U.S. at
177.  Thus, the court's role is to define statutory terms in order to determine whether the
President acted within his congressional grant of authority.  See id.; USP Holdings, 36
F.4th at 1365–66.  Rather than define balance-of-payments deficits for purposes of
Section 122, the dissent accepts the Defendants' claim that they may choose the
economic statistics or sub-accounts of the balance-of-payments based on what is

Court Nos. 26-01472 & 26-01606                                    Page 47

### III.    CSMS # 67844987

### A. Parties' Contentions

State Plaintiffs seek judicial review of CBP's Cargo Systems Messaging Service # 67844987 as a final agency action pursuant to the APA.  State Pls.' Mem. at 32–33. They suggest, however, that Proclamation No. 11012 and CSMS # 67844987 stand or fall together, contending that because CSMS # 67844987 "violates the requirement[s] of Section 122, it is "in excess of statutory jurisdiction, authority, or limitations."  Id. at 33 (quoting 5 U.S.C. § 706(2)(C)).  State Plaintiffs argue the court should "stay, vacate, and set aside CSMS # 67844987, which implements the Section 122 Proclamation."  Id.

The Government contends that CSMS # 64844987 is not an agency action for purposes of the APA, let alone a final agency action.  Defs.' Resp. at 66–67.  The Government relies on Maple Leaf Marketing, Inc. v. United States, 45 CIT __, __, 528 F. Supp. 3d 1365, 1378–79 (2021) (dismissing a claim for APA review of CSMS guidance). Id. at 66–67.

In reply, State Plaintiffs argue that CSMS # 64844987 is a final agency action because it "creates requirements related to documentation and entering data and provides for 'drawback'—provisions not contained within the Proclamation."  State Pls.' Reply at 19.

---

available at present.  See Defs.' Resp. at 32 n.12.  As we discuss above, we cannot accept that view as a matter of statutory interpretation because doing so would require us to determine whether there is any intelligible principle behind such an open-ended delegation that would save it from constitutional scrutiny—a challenge the dissent dismisses as a "straw man."  Dissent Op. at 18.

- A55 -

### B. Analysis

"[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. An "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Id. § 551(13). For an agency action to be final, two requirements must be met. Bennett v. Spear, 520 U.S. 154, 177–78 (1997). First, the agency's action "must mark the 'consummation' of the agency's decisionmaking process." Id. (citations omitted). Second, the agency action "must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" Id. at 178 (citations omitted).

State Plaintiffs' moving brief provides no substantive rationale for treating CSMS # 67844987 as an agency action, final or otherwise, for purposes of the APA. See State Pls.' Mem. at 32–33. They seek to remedy this omission in their reply brief, arguing that CSMS # 67844987 is a final agency action, State Pls.' Reply at 19, but their efforts are unavailing. Arguments raised for the first time in a reply are forfeited. See Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1375 n.4 (Fed. Cir. 2005). Additionally, even in reply, State Plaintiffs do not address Defendants' argument that a CSMS message is not an "agency action" at all. See Defs.' Resp. at 66 (citing Maple Leaf Mktg., 528 F. Supp. 3d at 1378–79). Lastly, State Plaintiffs assert, in a conclusory fashion, that CBP's guidance regarding documentation, data entry, and drawback creates rights or obligations from which legal consequences flow. State Pls.' Reply at 19. The court will not "do counsel's work" of constructing the argument that may or may

Court Nos. 26-01472 & 26-01606                                    Page 49

not support the desired conclusion.  See Home Prods. Int'l, Inc. v. United States, 36 CIT

665, 673, 837 F. Supp. 2d 1294, 1301 (2012) (quoting United States v. Zannino, 895

F.2d 1, 17 (1st Cir. 1990)).

Accordingly, State Plaintiffs' arguments regarding CSMS # 67844987 do not

present independent grounds to set aside implementation of Proclamation No. 11012.

**IV.    Remedy**

Plaintiffs seek a permanent injunction, State Pls.' Mem. at 35–41; Priv. Pls.'

Mem. at 35–40, while the Government argues that Plaintiffs are not entitled to one,

Defs.' Resp. at 68–72.  The State of Washington (through its instrumentalities) and

Private Plaintiffs, i.e., collectively, Importer Plaintiffs, have satisfied the requirements for

permanent injunctive relief.

A permanent injunction does not necessarily follow from success on the merits.

V.O.S. Selections, 149 F.4th at 1339.  A plaintiff seeking permanent injunctive relief

must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at
> law, such as monetary damages, are inadequate to compensate for that
> injury; (3) that, considering the balance of hardships between the plaintiff
> and defendant, a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).[39]   The court considers

whether Importer Plaintiffs have satisfied these eBay factors.

---

[39] The standard for a permanent injunction "is essentially the same as" the standard for
a preliminary injunction except that a plaintiff must establish "actual success" on the
merits rather than "a likelihood of success."  Amoco Prod. Co. v. Vill. of Gambell, AK,
480 U.S. 531, 546 n.12 (1987).  That being said, the Government's arguments against

The court considers the first and second factors together.  Importer Plaintiffs have paid, and, absent injunctive relief, will continue to pay Section 122 duties that the court has held to be unlawful.  While Defendants "do not contest the [c]ourt's authority to order reliquidation" of entries subject to Section 122 duties made by prevailing plaintiffs following a final, unappealable decision on the merits, Defs.' Resp. at 69; see also id. at 71, Defendants do not explain why they should be permitted to continue the unlawful collection of Section 122 duties from Importer Plaintiffs for the duration of the imposition of such duties.  The Government, in effect, seeks the benefit of a stay of the court's judgment without showing its entitlement to one or otherwise responding to the substance of the Plaintiffs' arguments.  See USCIT Rule 62(c)–(d).[40]

Additionally, economic harm to Importer Plaintiffs takes several forms.  "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."  Celsis In Vitro, Inc. v. CellzDirect, Inc.,

---

injunctive relief appear to assume the court will decide the motion in a preliminary posture.  See Defs.' Resp. at 68 (arguing Plaintiffs have not shown they will incur harm "before the Court can decide the case on the merits") (emphasis added); id. at 69 (arguing Plaintiffs have not shown they will incur harm "while the Court considers their simultaneous motion for summary judgment") (emphasis added).  The Government's arguments regarding harm to Plaintiffs do not address the scenario in which the court considers injunctive relief concurrent with summary judgment.

[40] The court acknowledges the good faith efforts made by the Government to work towards the refund of unlawfully collected IEEPA duties.  See generally, Atmus Filtration, Inc. v. United States, Court No. 26-01259 (CIT Apr. 1, 2026), ECF No. 52 (court order summarizing CBP's progress on developing the functionality that will permit CBP to make the required refunds of duties imposed without legal basis under IEEPA); Euro-Notions Florida, Inc. V. United States, Court No. 25-0595 (CIT Apr. 14, 2026), ECF No. 19 (court order providing update on CBP's progress).  As that experience shows, however, there may be significant delays from the time the imposition of tariffs are first held unlawful before refunds are effectuated.

664 F.3d 922, 930 (Fed. Cir. 2012); see also Oman Fasteners, LLC v. United States,

125 F.4th 1068, 1089 (Fed. Cir. 2025) ("[L]ayoffs and damage to goodwill . . . are

independently sufficient to establish irreparable harm.").  Private Plaintiffs aver that they

have suffered or will suffer lost profits and damage to business relationships,

investments, and innovation on account of these tariffs.  Frisch Decl. ¶¶ 12–13, 18;

Foreman Decl. ¶¶ 20–21.  Granting a permanent injunction would also help to prevent

these harms.

Finally, considering the balance of hardships, a remedy in equity is warranted,

and the public interest would be served by a permanent injunction.  The third and fourth

elements "merge when the Government is the opposing party."  Nken v. Holder, 556

U.S. 418, 435 (2009).  "The public interest is served by ensuring that governmental

bodies comply with the law."  Am. Signature, Inc. v. United States, 598 F.3d 816, 830

(Fed. Cir. 2010).  The Government's arguments on these elements are grounded in the

reasons provided for the Section 122 duties.  See Defs.' Resp. at 71 ("The President

has identified that the balance-of-payments deficits significantly harm[] U.S. national

interests . . . ."); id. at 72 (arguing an injunction would "intru[de] on the President's

conduct of foreign affairs and efforts to . . . address the rapidly deteriorating balance-of-

payments position of the United States").  These reasons are unpersuasive.  Enjoining

unlawful conduct is in the public interest.

The balance of equities favors granting Importer Plaintiffs permanent injunctive

relief.  The court need not decide whether the CIT is authorized, post-CASA, 606 U.S.

at 831, to issue universal injunctive relief because such relief is not merited here.  The

court finds standing in this case only with respect to Importer Plaintiffs, and those plaintiffs may be made whole by an injunction specific to them and refunds, with interest as provided by law, for any Section 122 duties paid before the injunction takes effect.[41] Private Plaintiffs make no specific arguments for a universal injunction. See generally Priv. Pls.' Mem. at 35–40; Priv. Pls.' Reply at 25–28.[42] While State Plaintiffs do, State Pls.' Mem. at 41–43, their arguments appear to assume the court will find standing for all State-parties, inclusive of the non-importing, purchaser States, which is not the case. And while the one State with standing, the State of Washington, avers harm from the indirect cost of tariffs passed on by resellers, Hsu Decl. ¶ 6, the potential for increased costs to one plaintiff is not an appropriate basis for the imposition of a universal injunction. Accordingly, the court declines to enter a universal injunction.

## CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that State Plaintiffs' motion for summary judgment (ECF No. 25, Ct. No. 26-01472) is **GRANTED** only with respect to Plaintiff The State of Washington; it is further

---

[41] While State Plaintiffs suggest that a non-universal injunction would violate the Uniformity Clause because it "would create disparate tax protocols based on geography," State Pls.' Mem. at 42, this argument overlooks that State Plaintiffs seek relief as importers (or purchasers) of goods making entry at potentially any port in the country. Thus, the court is not imposing any geographic limitation on Section 122 tariff treatment for the Importer Plaintiffs entitled to relief.

[42] Private Plaintiffs do, however, assert that "the economic impact from these tariffs is widespread." Priv. Pls.' Reply at 27.

Court Nos. 26-01472 & 26-01606                                        Page 53

     **ORDERED** that all claims by State Plaintiffs other than Plaintiff The State of

Washington are **DISMISSED** for lack of standing; it is further

     **ORDERED** that Private Plaintiffs' motion for summary judgment (ECF No. 11, Ct.

No. 26-01606) is **GRANTED**; and it is further

     **ORDERED** that Plaintiffs' alternative motions for a preliminary injunction are

**DENIED AS MOOT**.

     Judgment will be entered accordingly.

/s/     Mark A. Barnett
Mark A. Barnett, Chief Judge

/s/     Claire R. Kelly
Claire R. Kelly, Judge

Dated: May 7, 2026
      New York, New York

Stanceu, Judge, dissenting: I respectfully dissent because I disagree with the majority's interpretation of Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132 ("Section 122"). Further, I believe it was error to grant summary judgments *sua sponte* in favor of the plaintiffs with standing without following the procedure USCIT Rule 56(f) requires. I would have denied both summary judgment motions and provided the parties "notice and a reasonable time to respond" according to the Rule 56(f) procedure.

## I.

At various times in the nation's history, and in various ways, Congress has delegated to the President the power to alter the tariff treatment of goods imported into the United States. Some statutes delegating this power expressly allow the President, subject to various conditions or procedures, to increase or decrease duties on imported foreign merchandise.[1] Section 122 is such a statute. In specific circumstances, it empowers the President to restrict imports by temporarily imposing or increasing duties or quotas or, alternatively, to increase imports by temporarily reducing duties or relaxing quotas. In either case, the President is delegated authority to make a

---

[1] In contrast, in at least one statute, Congress delegated to the President the constitutional power to regulate importation without delegating the power to impose duties on imported goods. *See Learning Resources, Inc. v. Trump*, 607 U.S. --, 146 S. Ct. 628 (2026).

determination based on his own findings as to specified economic conditions in the United States.

Our review in cases such as this one, which challenge a President's exercise of delegated legislative authority, is limited and deferential. In deciding whether the President acted within such authority, we are not empowered to review the factual findings by which he concluded the action was necessary or appropriate. *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) ("It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review." (citations omitted)); *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984) ("The President's findings of fact and the motivations for his action are not subject to review.") (citing *George S. Bush & Co.*, 310 U.S. at 379–80; *United States Cane Sugar Refiners' Ass'n v. Block*, 683 F.2d 399, 404 (CCPA 1982); *Aimcee Wholesale Corp. v. United States*, 468 F.2d 202, 206 (CCPA 1972)).

II.

In delegating to the President the authority to restrict imports, Section 122(a)(1) does not limit the term "balance-of-payments deficits" to measurements of our

country's balance of payments that are computed according to "liquidity," "official settlements," or "basic balance." No reference to those methods of measurement, nor any other definition of the term "balance-of-payments," appears in Section 122 or related provisions of the Trade Act of 1974, and the legislative history does not support the majority's interpretation of the statutory term.

I begin my consideration of the majority's statutory interpretation by deciding what Congress could *not* have meant when it referred to our country's balance of payments in Section 122(a)(1). First, it was not adopting the Black's Law Dictionary definition of the term, which defined balance of payments as synonymous with the balance of trade.[2] We know this because Section 122 refers to our country's payments balance in subsection (a) and its trade balance in subsection (c), indicating that it intended to distinguish between these two concepts.

Second, we can say confidently that Congress did not mean for the balance of payments to be something that was to be measured only according to "official settlements" or "basic balance." As the majority notes, an early version of what was to become Section 122 was contained in H.R. 6767, which provided that "a serious balance-of-payments deficit existed when the President determined that 'the balance of payments (as measured either on the official reserve transactions basis or by the balance

---

[2] "Balance of payments (1844) The difference between what a country spends buying goods and services from abroad and what it earns selling goods and services abroad." Black's Law Dictionary (11th Ed. 2019).

Court Nos. 26-01472 & 26-01606                                                    Page 4

on current account and long-term-capital) has been in substantial deficit over a period

of four consecutive calendar quarters.'" *Opinion of the Majority* ("*Majority Op.*") at 34

(quoting Trade Reform Act of 1973, H.R. 6767, 93d Cong. § 401(b)(1)(A) (1973)). By the

terms it used, that version defined a "balance of payments" as one measured on an

official settlements basis ("official reserve transactions") or according to what was

known as basic balance ("balance on current account and long-term-capital"). As the

majority notes, the House version that was considered in the Senate, H.R. 10710, deleted

the parenthetical definition of balance of payments and the four-quarters measurement

and added the "large and serious" qualification. *Majority Op.* at 36-37.

It is at this point that the majority and I part company. We disagree specifically

as to the significance of the deletion of the language that had appeared in the

parenthetical in H.R. 6767. The majority's interpretation is, in effect, that in drafting

what would become Section 122(a)(1) in the House and Senate and adopting a final

version, Congress first deleted the parenthetical but then reverted to the previous

concept of confining the meaning of "balance-of-payments deficits" to deficits measured

according to official settlements or basic balance, but with the change of adding a third

measure, which was the liquidity basis. This raises the question of why, if that was the

intent, neither chamber restored the parenthetical or added another reference to specific

measurement methods. The reasonable conclusion I can draw from the change from

H.R. 6767 to H.R. 10710 is that neither the House Ways and Means Committee nor the

Senate Finance Committee, in formulating what was enacted as Section 122(a)(1), had such an intent.

The majority quotes an explanatory sentence from the House Report on the Trade Act of 1974 ("House Report"), as follows: "The [House] [C]ommittee [on Ways and Means] considered various formulas for defining a serious balance-of-payments deficit, including a specific formulation based on the existence of a substantial deficit over a certain period of time, but the committee feels that it is not possible to formulate a definition with mathematical exactness." *Id*. at 37 (quoting H.R. Rep. No. 93-571, at 28-29 (1973)). Following the approach taken in the final House bill, the Senate did not include in its version a definition of "balance of payments" or a temporal reference such as the four-quarters reference, and no such definition or reference was included in Section 122 as ultimately enacted.[3]

The majority acknowledges that "Congress did not replace the parenthetical definition of balance of payments" but nevertheless proceeds to conclude that the "legislative history indicates what Congress contemplated as the measure of balance of payments," which the majority views as being confined to the liquidity, official settlements, or basic balance measures. *Majority Op.* at 37. I see no convincing

---

[3] In contrast, Congress included in Section 122(c) a required measurement of balance-of-trade surpluses, which are to be "determined on the basis of the cost-insurance-freight value of imports, as reported by the Bureau of the Census." 19 U.S.C. § 2132(c)(1).

indication in the legislative history that Congress intended to define "balance of payments" as something that was to be measured in only those three ways for purposes of Section 122(a)(1).

The House Report conveys the opposite intent in explaining why the references to two measurement methods (i.e., official settlements and basic balance) were omitted from the bill. In the sentence the majority quotes, the House Ways and Means Committee reported that it decided against a specific "formulation" or "definition." *See id.* at 37 (quoting H.R. Rep. No. 93-571, at 28-29). In the preceding sentence, the House Report also demonstrated the intent to afford some degree of discretion to the President as to the method of measurement. H.R. Rep. No. 93-571, at 28 ("The committee recognizes that there will be an element of judgment on the part of the President in determining the existence of a serious deficit that justifies use of this authority."). The majority apparently would interpret both sentences from the House Report to mean only that Congress intended to leave to the President's discretion what would constitute the size or seriousness of balance-of-payments deficits but not the choice of measurement method. Were that the case, it would be reasonable to expect that the change from H.R. 6767 to H.R. 10710 would have omitted only the four-quarters measurement from the text and retained, in some form, a definition of the means of measurement. But the change omitted both the four-quarters reference and the defined means of measurement, and the Senate did not restore either of them.

The majority's opinion concludes that "[w]hile Congress did not replace the parenthetical definition of balance of payments, the legislative history indicates what Congress contemplated as the measure of the balance of payments." *Majority Op.* at 37. In my view, what Congress signaled by deciding not to replace the parenthetical definition in H.R. 6767 speaks directly to the statutory interpretation issue before us. It signaled that the drafters in the House and Senate decided against specifying a particular measurement method or methods for balance-of-payments deficits. What the majority instead identifies as indicative legislative history consists of a statistical table in a report of the Senate Finance Committee and certain other statistical tables in Finance Committee staff reports. The majority concludes from these tables that Congress intended that liquidity, official settlements, and basic balance would be the exclusive measures of the payments balance for purposes of Section 122(a)(1). *Id.* The majority reasons that "[s]pecifically, the Senate Report to the Trade Act of 1974 ("Senate Report") refers to the three types of balance-of-payments deficits, namely (1) liquidity, (2) official settlements, and (3) basic balance, discussed in other parts of the legislative history." *Id.* (citing S. Rep. No. 93-1298, at 8 (Table 3)).

The Senate Report "refers to the three types of balance of payments deficits" in the sense that all three measures the majority identifies are headings in "Table 3" in that report, which presents statistics, in billions of dollars, on merchandise trade ("U.S. trade position"), "Trade balance," and "Balance of payments." S. Rep. No. 93-1298, at 8-9

(Table 3).  The accompanying text, which does not refer to Section 122, discloses the actual purpose for which the Senate Finance Committee included Table 3 in the Report: "The performance of the United States in the world economy throughout much of the postwar period has been marked by persistent trade and payments deficits.  The performance since 1960 is shown in Table 3 below." *Id*. at 7.

The Senate Report presents "Table 5" several pages after Table 3.  *See id*. at 12 (Table 5).  Table 5 compares the trade balance (apparently, the merchandise trade balance) with the balance of payments for the years 1966 through the first nine months of 1974, but it presents payments balance statistics only on the liquidity basis, not official settlements or basic balance.  The accompanying text shows the purpose for the inclusion of Table 5 was the Committee's concern about the effect trade deficits were having on the balance of payments as well as the importance of measuring the merchandise trade balance on a c.i.f. (cost, insurance and freight) rather than an f.o.b. (free on board) basis.  Noting that "our trade account has been in deficit since 1966," the Committee stated that "[t]hese recent trade deficits have accounted for over one-half of our overall payments deficits, as shown in Table 5." *Id*. at 7.

It logically can be presumed from the placement of Tables 3 and 5 within the Senate Report, and in particular from the text accompanying each, that Tables 3 and 5 were included in the report to illustrate the points being made in the accompanying text on pages 7 to 12 of the report.  But it is a leap of logic to presume that these tables were

placed in the text of the report to address an issue not discussed in the text, which is

how payments balances were to be measured for purposes of Section 122.  The

discussion of Section 122 occurs much later in the Senate Report, at pages 87-89.  That

discussion, like the discussion earlier in the Senate Report, does not address the

question of how a balance-of-payments deficit is to be measured for purposes of the

Section 122(a)(1) authority.

In addition to relying on Table 3 of the Senate Report, the majority also cites a

December 1974 staff report prepared for the Senate Finance Committee that contains a

table presenting balance-of-payments statistics according to liquidity, settlements, and

basic balance.  *Majority Op.* at 37 & 37 n.31 (citing Staff Report of S. Fin. Comm., 93d

Cong., Tables and Statistical Material on U.S. Balance of Trade and Balance of Payments

Table 1 (Comm. Print Dec. 1974)) ("December 1974 staff report").  Table 1 in the

December 1974 staff report is essentially identical to Table 3 in the Senate Report (with a

slight change to the title).  It is one thing to say that the Senate Finance Committee

understood that the payments balance could be measured for Section 122(a)(1) purposes

according to liquidity, official settlements, and basic balance.  It is quite another to say,

based on the headings in Table 3 and in the same table in the December 1974 staff

report, that the Committee intended that it would be impermissible for deficits in the

country's payments balance to be measured in any other way for the application of

Section 122(a)(1), particularly in light of the absence of any text in the report so

indicating and the deletion from H.R. 10710 of the parenthetical definition that

appeared in H.R. 6767.

The majority concludes that the presenting of statistics on the payments balance

according to liquidity, official settlements, and basic balance in Table 1 of the December

1974 staff report (which is a nearly identical version of Table 3 in the Senate Report) "is

thus the clearest indication of the concerns Section 122 was intended to address."

*Majority Op.* at 38 n.31. I find this conclusion unconvincing, for two reasons. First,

Table 1 makes no reference to Section 122. Second, Table 30 in the December 1974 staff

report, which the majority also cites, *id.*, in presenting data on the U.S. balance of

payments by area, presents global and area data in the last two superior headings, the

first of which is labeled "Balance on current account" and the second of which is labeled

"Basic balance." December 1974 staff report at 36-37. This placement could suggest that

both the current account balance and the basic balance were considered to be measures

of the payments balance. Table 30 also presents data (globally only, not by area) on

"Net liquidity balance" and "Official settlements balance." *Id.*

The staff report prepared for the Senate Finance Committee dated February 26,

1974, which the majority cites, *Majority Op.* at 36 n.30, also indicates that the country's

current account balance could have been considered to be a measure of the balance of

payments in 1974. *See* Staff Data and Materials on U.S. Trade and Balance of Payments,

Staff Report of S. Fin. Comm., 93d Cong. (Comm. Print Feb. 26, 1974) ("February 26,

1974 staff report").[4]  This staff report sets forth as Table 1 a table that is essentially

identical to Table 1 in the December staff report and Table 3 in the Senate Report.[5]  But

notably, the February 26, 1974 staff report also includes a table ("Table 22"), titled "U.S.

Current Account Balance," that it places directly under the heading "U.S. Balance of

Payment Trends.*"[6]  February 26, 1974 staff report at 24.  Table 22 presents current

---

[4] The information presented in the February 26, 1974 staff report appears to have been statistically updated and condensed to formulate the December 1974 staff report. Both versions are official Committee Prints.  The February staff report contains 39 tables, and the December staff report contains 31, with many tables in common (including Table 30), and is further condensed for the December staff report by the deletion of 9 charts.

[5] There are some variations in some of the reported data, apparently due to statistical updates.

[6] In footnote 1, Table 22 describes what "U.S. Current Account Balance" includes in terms essentially consistent with common definitions of the current account today: "Includes merchandise, services, [together, the trade balance] private remittances [primary income], and government transfers [included in secondary income]."  It is not clear to what the asterisk in the heading refers.
　　　Defendants define the "current account" balance as "the net position of (i) goods trade, (ii) services trade, (iii) primary income, and (iv) secondary income."  Decl. of Pierre Yared (Acting Chairman, Council of Economic Advisors) ¶ 24, Court No. 26-01472, ECF No. 35-1 ("Yared Decl.").
　　　A Glossary maintained by the Bureau of Economic Analysis, U.S. Department of Commerce ("BEA") defines "Current account (international)" as: "Record of transactions in goods, services, income, and unilateral current transfers between residents and nonresidents."  *See Current Account (International)*, BEA Glossary (last accessed May 6, 2026) https://bea.gov/help/glossary/current-account-international.  It is apparent from the terms used that the references to transactions in goods and services constitute the trade balance, "income" refers to primary income, and "unilateral transfers" refer to secondary income.

<em>Footnote Continued</em>

account balances for the years 1960 through 1973 (preliminary).  The next table, Table

23, is titled "U.S. basic balance" and lists the basic balance for those same years.  *Id*.  The

placement of these two tables immediately beneath a heading referring to U.S. balance

of payments trends is an indication that these two measurements—current account

balance and basic balance—may both have been considered to be measurements of the

balance of payments.  Following are tables on the merchandise trade balance (Table 24),

the services trade balance (Table 25), military and foreign aid (Table 25), and the private

capital account (Table 26).

The February 26, 1974 staff report contains another indication that the current

account balance could have been considered to be a measure of the balance of payments

in 1974.  The report presents, on one page (page 45), four charts, in the form of line

graphs, all of which pertain to the general subject of the balance of payments: "U.S. net

liquidity and official settlements balance" (shown on the same graph, Figure 13), "U.S.

current account balance" (Figure 14), and "U.S. basic balance" (included under heading

for Figure 14 and shown in the table of contents as Figure 15).  February 26, 1974 staff

report at 45.  Thus, page 45 and the table of contents, *id*. at IV, place the chart on current

account balance after the chart for liquidity and official settlements and immediately

---

Defendants define primary and secondary income in this way: "Primary income consists of international investment income and labor compensation, while secondary income reflects unilateral transfers (e.g. insurance payments, foreign aid, remittances)." Yared Decl. ¶ 24.

before the chart on basic balance. Figures 14 and 15 have as the horizontal axis the years 1950 through 1973 (the last year shown as "est." [estimated]). *Id*. at 45. Current account balance is described on the chart as "Including merchandise, investment income, services, military, and transfers." *Id*. A notation on the U.S. current account chart reads "Best measure of U.S. international competitive position." *Id*. It shows deficits and surpluses for 1950-69 and a sharp drop beginning in 1970-71 to below negative $8 billion in 1972, followed by a rapid increase to a surplus for estimated 1973. *Id*. A notation on the following chart, "U.S. basic balance," reads "Best measure of persistent features in U.S. payments position" and shows deficits for all years from 1950 to 1972 except for the 1973 estimate, which shows a rapid rise to a surplus, after a sharp drop in 1970 to a low below negative $9 billion in 1972. *Id*. This chart states, "Adds long-term capital movements to current account balance." *Id*. The "Source" for all four charts on page 45 is given as "Council on International Economic Policy Annual Report, February 1974." *Id*.

In summary, the mere references to the three methods of measuring payments balances in Table 3 of the Senate Report, a table also presented in the Senate Finance Committee staff reports, are far too slender a reed to support the weight of a conclusion by this Court that Congress intended for "balance-of-payments deficits" to be measured for Section 122(a)(1) purposes only according to liquidity, official settlements, and basic balance. The other tables and charts discussed above cast further doubt on that

conclusion.  Had Congress intended to limit measurement to liquidity, official settlements, and basic balance for purposes of Section 122(a)(1), one would expect to see a definition to that effect in Section 122, as there was in H.R. 6767, or at least discussion in the text of the Senate or House Report signifying that these were the only permissible methods of measurement.  The deletion of the parenthetical from H.R. 6767 and the accompanying explanation in the House Report, which rejected the idea of specifying what measures would be permissible, are contrary to any supposition that the President was required to adhere to those three measurement methods in restricting imports according to Section 122(a)(1).  The specific issue of whether Congress intended the balance of payments to have been measurable according to the balance on current account likewise is not addressed in the text of the House and Senate reports.  But the February 26, 1974 staff report and the December 1974 staff report indicate that it could have been a possibility, and I see no indication that Congress intended for it *not* to be used.  We should not draw conclusions about legislative intent from what we do not know.

From the reference in subsection (a) of Section 122 to the payments balance and the reference in subsection (c) to the trade balance, the majority opinion reasons that "[a]lthough the current account (and the balance of trade as a component of the current account) are relevant to balance-of-payments deficits, they are distinct, and the statute recognizes the distinction." *Majority Op.* at 42.  This statement draws an unwarranted

conclusion from the statutory text. The statute distinguishes the payments balance from the trade balance by using both terms, but it does not distinguish the payments balance from the current account balance, an entity the statute does not mention. We safely can conclude, nevertheless, that Congress, in mentioning the payments balance in subsection (a), intended to refer to a broader measure than the one to which it referred in subsection (c).[7]

Nothing in the statute or the legislative history of Section 122 suggests that Congress adopted a "frozen in time" approach to statistical measurement such that the President's authority under Section 122 would expire should the Commerce Department's Bureau of Economic Analysis ("BEA"), the agency charged with maintaining our country's economic statistics, change the way it measures and calculates them. The House and Senate Reports reveal that in enacting Section 122 Congress was motivated by genuine concerns over the economic condition of the country and wanted the President to have for the future some specified, limited authority to restrict (or, in a situation described in subsection (c), increase) imports into the United States.[8] The legislative history does not support the plaintiffs' view that this

---

[7] The majority, who describe the trade balance as a component of the current account balance, *Majority Op.* at 42, agrees with defendants that the current account balance is a broader measure than the trade balance.

[8] The majority opines in *dicta* that "the grammatical structure of Section 122(a) suggests that 'fundamental international payments problems' are an independent

*Footnote Continued*

authority was not intended to be used after the transition from the Bretton Woods system to floating exchange rates and was included in the statute only to allow for the possibility that the United States and its trading partners would return to a fixed-rate international arrangement.[9]

Congress understood in 1974, and long before 1974, that our country's payments balance could be measured in different ways that produce different results. *See* Subcomm. on Econ. Stats., Joint Econ. Comm., 89th Cong., 1st Sess., *The Balance of Payments Statistics of the United States*, at 2 (Comm. Print 1965) (Reporting conclusions of the "Review Committee for Balance-of-Payment Statistics" and stating that ". . . we agree with the Review Committee that 'no simple number can adequately describe the international payments position of this country at any time.'"). The three methods

_____

requirement" for Presidential action under Section 122(a)(1), i.e., a requirement that is in addition to large and serious balance-of-payments deficits. *Majority Op*. at 31 n.25. The Senate Report refutes a view that large and serious balance-of-payments deficits, standing alone, are insufficient to support an import restriction. *See* S. Rep. No. 93-1298, at 87 ("Under the Committee bill, the President would be required to impose import restrictions whenever the U.S. faces large and serious balance-of-payments deficits.").

[9] The statement of Rep. Henry Reuss the majority quotes makes this point. *Majority Op*. at 34 (quoting 119 Cong. Rec. 40,568 (1973)) (concluding that under floating exchange rates the Section 122 authority would achieve limited adjustments of the exchange rate of the dollar). The possible measurement of the payments balance by the basic balance method is another indication, as this is a broad measurement which, like the current account balance, is based on the economy as a whole and is not confined to the balance on government-held monetary reserves, as is the official settlements measurement.

identified in Table 3 of the Senate Report illustrate that there is more than one method,

while the text of that report does not say that these are the only acceptable methods.

The three statistical methods for measuring the payments balance the majority

cites are obsolete. The BEA today measures the balance of payments according to a

method that, as the BEA instructs, is intended to result in a sum of zero.[10] That method

calculates the payments balance by summing the current account balance with the

balances on the capital and financial accounts.[11] By definition, a payments balance

measured according to a method that in principle produces a zero balance cannot

———————————————

[10] *See* Amanda Geiger, *What is the Balance of Payments?*, Fed. Rsrv. Bank of St. Louis (last accessed May 6, 2026) https://www.stlouisfed.org/publications/page-one-economics/2025/oct/what-is-the-balance-of-payments.

[11] The majority opinion recognizes that the BEA's measurement of the balance of payments "as an accounting principle always nets to zero." *Majority Op.* at 39. The BEA Glossary defines "Balance of payments" as "Record of transactions between U.S. residents and foreign residents during a given time period. Includes transactions in goods, services, income, assets, and liabilities. It is broken down into the current accounts (international), capital accounts (international), and financial accounts (international)." *Balance of Payments*, BEA Glossary (last accessed May 6, 2026) https://bea.gov/help/glossary/balance-payments. It defines "Capital account (international)" as "Record of capital transfers between U.S. residents and foreign residents, such as debt forgiveness and migrants' transfers, and acquisitions and disposals of nonproduced nonfinancial assets between residents and nonresidents." *Capital Account (international)*, BEA Glossary (last accessed May 6, 2026) https://bea.gov/help/glossary/capital-account-international. It defines "Financial account (international)" as "Record of transactions between U.S. residents and foreign residents resulting in changes in the level of international claims or liabilities, such as in deposits, ownership of portfolio investment securities, and direct investments." *Financial Account (international)*, BEA Glossary (last accessed May 6, 2026) www.bea.gov/help/glossary/financial-account-international.

amount to a "fundamental international payments problem" within the meaning of Section 122. Congress, therefore, meant something else in referring to the balance of payments in Section 122(a)(1).

The majority reasons that the obsolescence of methods of measuring the payments deficit is of no concern, *Majority Op.* at 44, while also concluding that "to lawfully proclaim the import surcharges" authorized by Section 122(a)(1) the President must use those obsolete methods to assert "the existence of the conditions required by the statute," *id*. at 29. According to this reasoning, the BEA in effect can repeal Section 122(a)(1) by changing how it measures the balance of payments. That could not have been the legislative intent.

Characterizing defendants' position as one in which "the President has discretion to identify any actionable deficit for purposes of Section 122(a)(1)," the majority reasons that "Section 122 would lack an intelligible principle if the President could simply identify any deficit account," *id.* at 40 n.33, and that "[s]uch an expansive reading of the statute would raise a non-delegation issue," *id*. at 40. This reasoning sets up a straw man. Recognizing the need to measure a balance-of-payments deficit by a "*reasonable understanding of the term in the context of section 122*," Proclamation 11012 ("the Proclamation") does not "simply identify any deficit account." *Proclamation 11012*, (Feb. 20, 2026), 91 Fed. Reg. 9,339 (Exec. Office of the President Feb. 25, 2026) ("*Proclamation*") ¶ 6 (emphasis added). The Proclamation addresses, in considerable detail based on

official BEA statistics, various metrics pertaining to the payments balance that involve statistical measures of developments over the last several years.[12] Among them is a "staggering" current account deficit that reached four percent of gross domestic product ("GDP") in 2024, was two percent of GDP during 2013-2019, and was larger in 2024 than in 2019-2023, *id.* ¶ 9, and an historically unprecedented U.S. net international investment position at the end of 2024 that was negative 90 percent of GDP and that the

—————————

[12] Stated in summary form, the Proclamation makes the following factual findings:

> Fundamental international payments problems exist that significantly harm U.S. national interests, including economic and national security interests. *Proclamation* ¶ 13. "The large, persistent, and serious" goods trade deficit of $1.2 trillion in 2024 and approximately $1.2 trillion in 2025 "has grown by 40 percent in the past 5 years alone" and "contributes to the fundamental international payments problems facing the United States." *Id.* ¶ 8. Beginning in 2024, the "primary income" balance turned negative for the first time since at least 1960 and therefore no longer served as a counterweight to the trade deficit in the current account and no longer served as a "stabilizing force for the United States balance-of-payments position even in the face of large and persistent trade deficits." *Id.* ¶ 9. The balance on secondary income has long been in deficit. *Id.* ¶ 11. The balance-of-payments position is now a "large and serious balance-of-payments deficit." *Id.* ¶ 13. The "ongoing decline" in the U.S. net international-investment position shows that the U.S. balance-of-payments deficit is large and serious, in that the current account is a "primary driver" of changes in the net U.S. international-investment position, which reached 90 percent of gross domestic product ("GDP") in 2024. *Id.* ¶ 10. The "staggering" current account deficit, which reached 4 percent of GDP in 2024, was almost double that of 2019-2023 and the largest since 2008. *Id.* ¶ 9.

President found to be affected significantly by the current account and indicative of the large and serious balance of payments deficit, *id.* ¶ 10.

For the reasons I have discussed, I conclude that the majority errs, first, in its interpretation of the legislative history in holding that the President cannot invoke subsection (a)(1) unless he identifies a payments deficit measured according to liquidity, official settlements, or basic balance and, second, in holding that Congress expressly foreclosed the possibility of the President's using current account deficits as the basis for action under subsection (a)(1) by referring to the payments balance in subsection (a) and the trade balance in subsection (c).

III.

The basic balance measurement of the payments balance, in use in 1974, was calculated directly from the current account balance: it summed the current account balance, positive or negative, with the balance on long-term capital, positive or negative. *See Majority Op.* at 32 n.26, 35 n.29. Under the majority's approach, this Court would sustain the Proclamation had it identified a large and serious balance-of-payments deficit calculated according to a basic balance measurement. At the same time, the majority regard the issue of whether a balance-of-payments deficit according to basic balance (or liquidity or official settlements) exists or could be measured to exist today as one that is beyond the concern of this Court. *Majority Op.* at 44 ("Whether it is

possible to measure balance-of-payments deficits by settlements, liquidity, or basic balance today is not our concern."). But on that issue, I have a concern.

The basic balance and the BEA's contemporary measurement of the balance of payments have a feature in common: both include the current account balance. The basic balance sums the current account balance with only a long-term capital balance while the contemporary BEA measurement endeavors to sum the current account balance with the entire capital account and financial account balances.[13] The State plaintiffs, citing BEA and World Bank Group data, acknowledge that under the contemporary BEA measurement of the payments balance the current account is "balanced" principally by the surplus on the financial account, the capital account being much smaller.[14] The Proclamation cites the enormity of the current account deficit in

---

[13] The BEA uses this measurement of the payments balance with the objective that the balance will be zero (but apparently difficulties in measuring the capital account and financial account balances are the reason why the calculated balance of payments typically results in "discrepancy" deficits). *See* Geiger, *supra* note 10.

[14] The State plaintiffs acknowledge that the capital account "tends to be rather small" and that "the two-way financial flows" measured by the financial account are "enormous." Pl. States' Mot. for Summary J., and, in the Alternative, for Permanent Inj. 6 (Mar. 13, 2026) Ct. No. 26-04172, ECF No. 25 (citing Decl. of Douglas A. Irwin (Prof. of Economics, Dartmouth College) ¶ 9, ECF No. 27-6; BEA, *International Trade and Investment*). They cite World Bank Group data estimating the 2024 U.S. financial account position as a surplus of approximately $1.13 trillion, *id.* at 17 (footnote omitted), which would balance the entire 2024 current account deficit ($1.13 trillion as reported by the BEA). The basic balance measurement of the payments balance was defined to sum the current account balance with a balance on certain capital flows (long-term capital) but does not include the balance on the financial account.

2024 (i.e., four percent of GDP).  *Proclamation* ¶ 9.  It would be questionable as a factual matter, and indeed presumptuous, to speculate that a long-term capital account balance—even if it could be measured accurately today, and defendants offer an expert opinion that it cannot[15]—when not combined with the financial account balance, could be positive at so enormous a magnitude as to offset the enormously negative current account balance such that the balance of payments as it would be measured by basic balance is not a large and serious deficit.

Defendants offer the expert opinion that the current account balance, even if combined with the capital account balance, still would be a large and serious balance-of-payments deficit.  Decl. of Pierre Yared (Acting Chairman, Council of Economic Advisors) ¶ 15, Ct. No. 26-01472, ECF No. 35-1 ("Yared Decl.").  My point is not that we necessarily must accept this expert opinion as an established fact for purposes of ruling on the pending summary judgment motions.  But the statistics maintained by the BEA, and the World Bank Group measurement of the financial account as provided to us by the State plaintiffs, show the enormous effect that the 2024 deficit on current account would have had on the balance of payments that year, whether measured by the contemporary BEA method or as measured by basic balance.  It also demonstrates to me

---

[15] As the majority mentions, defendants offer expert opinion that today "there is no single measure of the long-term capital account (the other main component of the basic balance)."  *Majority Op.* at 39 (quoting Yared Decl. ¶ 37).

another reason why this Court should not invalidate the Proclamation for failure to include, for example, an actual numerical calculation of the balance-of-payments deficit according to a basic balance measurement. There being no official BEA statistic of the payments balance as measured by basic balance, or, specifically, as measured by a sum of the current account balance and a long-term capital balance, any such numerical calculation would not be an official government statistic.

We are not experts in international macroeconomics matters and should hesitate to question whether it was reasonable for the President to rely on official BEA government statistics rather than a calculation of his own that may have been acceptable to the majority but would have had no official status. The Proclamation instead relies on advice the President's advisors provided after studying "different methods of evaluating balance-of-payments deficits." *Proclamation* ¶ 6. That advice was that the balance-of-payments deficit is large and serious "under any of these methods." *Id*. The Proclamation states that the advisors considered different methods of measuring our country's "balance-of-payments position[] under any reasonable understanding of the term in the context of section 122," which Congress enacted more than a half century ago. *Id*. The current account is mentioned as only one of the methods considered. Given the limitations on our judicial role, we are not in a position to presume that the advisors did not also consider whether the balance-of-payments deficit would be large and serious according to the basic balance method.

In summary, we should not conclude that the absence from the Proclamation of a basic balance measurement of the payments balance, in particular, is a ground upon which to invalidate the Proclamation. Instead, the Proclamation relies on BEA statistics to support the President's finding that the balance-of-payments deficit is, by any reasonable measure within the meaning of Section 122, large and serious. *See id.* ¶¶ 6, 7, 9, 10, 13. We do not have the expertise to reach the conclusion the majority reaches, and the limits of our judicial role strongly caution against it. *See George S. Bush & Co.,* 310 U.S. at 379-80. For this reason as well, I disagree with the majority's position, *Majority Op.* at 45-46, that the President acted *ultra vires* because he did not identify a balance-of-payments deficit determined according to basic balance or one of the other two measurements listed in Table 3 of the Senate Report.

IV.

I turn now to the two summary judgment motions pending before us. As I explain below, I would have denied both summary judgment motions and held in abeyance any ruling on whether the Proclamation should or should not be invalidated, pending our conducting the procedure required by USCIT Rule 56(f). We have before us no cross-motion for summary judgment by defendants, *see* Rule 56(f)(1), and Rule 56(f) requires us to refrain from *sua sponte* granting summary judgment either on grounds not raised by a party (Rule 56(f)(2)), or after identifying for the parties material

facts that may not be in dispute (Rule 56(f)(3)), without first providing notice and a reasonable time to respond.

USCIT Rule 56(f)(1) sets forth a procedure that applies where, as here, a party opposing a summary judgment motion does not make a cross-motion for summary judgment. In that situation, the rule protects the procedural rights of a movant. Rule 56(f)(2) safeguards the rights of a nonmovant, providing as follows: "*Judgment Independent of the Motion.* After giving notice and a reasonable time to respond, the court may: . . . (2) grant the motion on grounds not raised by a party." Rule 56(f)(3) also serves the objective of affording procedural fairness to the parties.

The majority grants summary judgments to the State of Washington and the importer plaintiffs without following the "notice and reasonable time to respond" procedure of Rule 56(f)(2) or (f)(3). The majority's opinion grants summary judgments based on two grounds. First, it holds that there are no material facts in dispute. *Majority Op.* at 29 n.23. Then, it holds that plaintiffs with standing are entitled to summary judgment as a matter of law on the ground that the Proclamation is *ultra vires* because it does not identify "balance-of-payments deficits" measured according to liquidity, official settlements, or basic balance. *Id*. at 45-46. As to both holdings, the parties were not given notice that the court was contemplating grants of summary judgments on these grounds, which no party raised in seeking summary judgment, and

on which the court did not allow the parties "notice and a reasonable time to respond" as Rule 56(f) required in the procedural posture of these two cases.

With respect to the first ground, we can discern from the summary judgment motions that both groups of plaintiffs would have us reach a general, factual conclusion that they would have us consider to be beyond genuine dispute. That conclusion is, in summary, that balance-of-payments deficits of concern to Congress in late 1974 may have been large and serious when measured according to the contemporary BEA definition, but any balance-of-payments deficits existing amidst today's system of floating exchange rates are zero or negligible when measured according to that same definition. Defendants dispute this general conclusion.[16] In granting summary judgments based on the majority's implicit conclusion that this factual dispute is not on a material issue, *see id*. at 29 n.23, the majority opinion grants summary judgments on a ground no plaintiff raised in a brief on which summary judgment was sought.

_____

[16] Disagreeing with plaintiffs' factual allegations, and pointing to the country's current account deficits, defendants argue that, as the President found, "the United States faces a large and serious balance-of-payments deficit." Defs.' Resp. in Opp'n to Mots. for Prelim. Inj. and Summary J. 14 (Apr. 3, 2026) Ct. No. 26-01472, ECF No. 35, Ct. No. 26-01606, ECF. No. 16 ("Defs.' Resp."). Defendants dispute plaintiffs' allegation that the balance-of-payments deficit is nonexistent or statistically insignificant. Defendants disagree that the contemporary BEA measurement is applicable to the issue these cases present. *Id*. at 30 (arguing that the BEA measurement always balances to zero regardless of whether the country has a fixed or floating currency and citing Yared Decl. ¶ 21).

With regard to the second ground on which the majority grants summary judgment motions, i.e., the majority's interpretation of the term "balance-of-payments deficits" as used in Section 122(a)(1), the majority held that the President, in order to restrict imports under Section 122(a)(1), would have had to identify a balance-of-payments deficit that was measured on a basic balance, liquidity, or official settlements basis. This also was a ground no plaintiff raised in its brief seeking summary judgment. Both groups of plaintiffs claimed that the Proclamation must be invalidated, but they supported this claim essentially on the ground that no balance-of-payments deficits within the meaning of Section 122(a)(1) exist, or can exist, because of the nation's economic condition and, specifically, because of the absence of a system of fixed exchange rates. In this way, plaintiffs' summary judgment motions raised the issue of whether, due to today's economic environment, the President has any authority to restrict imports under Section 122(a)(1) and answered that question in the negative. Deciding that there are no material facts in dispute and that plaintiffs are entitled to judgment on an issue of law, i.e., the majority's view on an issue of statutory interpretation, the majority's opinion never reached that factual issue.

Because a movant seeking summary judgment must meet the two-part burden of showing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law, the requirement for notice and a reasonable time to respond imposed by Rule 56(f) is intended to ensure procedural fairness for a

nonmovant with respect to both parts of that burden. The objective of fairness is plainly

implicated where, as here, a court is granting summary judgments based not only on

the issue of whether the parties' factual disagreement pertains to a material fact but also

on the issue of what Congress meant when referring in Section 122(a)(1) to our

country's balance-of-payments deficits. As to the latter, plaintiffs and defendants

disagree on the statutory interpretation of that term, but the majority adopts a definition

no party advocated. Plaintiffs argued for the contemporary definition of the term as

applied by the BEA, while defendants argued that the most reasonable measure of the

payments balance is the current account balance. Rejecting both positions, the majority

holds that only measurements of the payments balance by basic balance, liquidity, or

official settlements conform to the definition it applies to the adjective "balance-of-

payments" as used to modify the term "deficits" in Section 122(a)(1).

     The procedure of Rule 56(f) is particularly important for our decisions on the

summary judgment motions before us. Had the parties been given notice and a

reasonable time to respond to the grounds upon which the majority ultimately decided

these cases, the court might have had the benefit of their arguments as to whether

confining the President's discretion to the use of liquidity, official settlements, or basic

balance as measures of the payments balance is the correct interpretation of Section

122(a)(1). As discussed above, the majority reaches its conclusion based on Table 3 as

presented in the Senate Report and in the staff reports. No party had notice that the

court would rely solely on those sources of legislative history in reaching its conclusion, and specifically, defendants were not provided "a reasonable time to respond," USCIT R. 56(f), with arguments as to why the majority's statutory interpretation might not be correct.

While it might be argued that the parties had the opportunity at oral argument to address the grounds on which the majority grants summary judgments, the oral argument did not provide "notice and a reasonable time to respond" as required by Rule 56(f). Satisfying that procedural requirement is not optional on the part of this Court, and in this case it would have ensured procedural fairness. *See, e.g.*, *Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150-51 (10th Cir. 2017) (Fed. R. Civ. P. 56(f)(2) required notice and a "reasonable time to consider the court's *sua sponte* theory and to develop the legal and factual arguments to dispute it."); 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2720.1 (4th ed.) (". . . if the court determines to enter summary judgment on a ground not presented or argued by the parties, the failure to give the losing party an opportunity to defend against that ground provides a ground for reversal.").

Therefore, even if I were to agree on the merits of the majority's decision to grant summary judgments in favor of the plaintiffs with standing (and I do not agree), I still would not have granted summary judgments at this time. Instead, I would have given the parties notice of possible grounds that the parties have not raised and upon which

the court was considering granting summary judgment, affording them the opportunity

to submit additional briefing, as I believe Rule 56(f) requires.[17]

Also, I do not agree that any plaintiff, as of yet, has met its two-part burden of

showing the absence of a genuine issue of material fact and its entitlement to judgment

as a matter of law.  In my view, no plaintiff has shown that the fact they would have us

accept, and upon which they base their summary judgment motions, i.e., that in today's

economic environment it is impossible for large and serious balance-of-payments

deficits to exist, is an indisputable fact.  We cannot presume to know whether changes

in the long-term trends of the payments balance may be attributed as much to the

change in the BEA measurement methodology as to the early-1970s transition to a

floating-rate currency.  Plaintiffs' failure to show the absence of a genuine dispute as to

any material fact by itself requires that we deny both summary judgment motions.[18]  In

---

[17] If the majority had considered the procedure of USCIT Rule 56(f) too time consuming in light of plaintiffs' motions for a preliminary injunction and concluded, *inter alia*, that some plaintiffs had shown irreparable harm and a likelihood of success on the merits, an alternative would have been the majority's ordering, without my concurrence, a preliminary injunction against the collection of duties.

[18] I recognize that defendants did not follow the procedure specified in USCIT Rule 56.3 (and that the importer plaintiffs, in moving for summary judgment, did not do so either).  In view of the court's discretion in applying that rule, I do not see these procedural irregularities as grounds for our ruling on the summary judgment motions, one way or the other.  Regardless, we would not be in a position to deem plaintiffs' alleged fact to be admitted on the basis of Rule 56.3 if we were to decide that this fact is contrary to a fact upon which the President based his decision to restrict imports, which we are not empowered to review.

addition, I conclude that no plaintiff has demonstrated, as of yet, that it is entitled to judgment as a matter of law. Under the procedure by which I would have decided these cases, I would have allowed the parties the opportunity to address the issue of whether plaintiffs, after being denied summary judgment on the grounds they asserted in their motions, nevertheless are entitled to summary judgment on some other ground, and the issue of whether, instead, defendants should be awarded summary judgment as nonmovants.

V.

I now address the views expressed in the majority's opinion at 46 n.38 by clarifying the reasons why I am dissenting. I dissent because the majority: (1) enters summary judgments for plaintiffs according to a definition of "balance-of-payments" that lacks any convincing support in the legislative history and according to the majority's concluding, without support in the statutory language, that Section 122 expressly distinguishes the current account balance, which Section 122 does not mention, from the payments balance; (2) prejudices the defendants by failing to follow the procedure required by USCIT Rule 56(f); and (3) overlooks that plaintiffs, as of yet, have failed to meet a burden of showing that there is no genuine dispute as to any material fact or a burden of showing that they are entitled to judgments as a matter of law.

Defining "balance-of-payments" as used in Section 122(a)(1) to mean our country's payments balance as measured only on the bases of liquidity, settlements, or basic balance, the majority characterizes my dissent as finding "the legislative history too limited to give meaning to the term "balance-of-payments deficits" and providing "no affirmative alternative meaning to this critical statutory term that the President invokes as the basis of the Proclamation." *Majority Op.* at 46 n.38. What I find "too limited" is not the legislative history but the majority's analysis of it. For example, I regard the deletion of the parenthetical from H.R. 6767 as indicative legislative history. I disagree with the majority's statement that "the dissent concludes that one cannot or should not ascribe meaning to 'balance-of-payments deficit' absent express statutory language defining the term." *Id.* I reach no such conclusion, and I do not disagree with the majority's view that the meaning of a term not defined in a statute can be ascertained from legislative history.

The majority is correct that at this point in the litigation I do not offer my own interpretation of the term "balance-of-payments" as used in Section 122(a)(1). Doing so is not necessary to expressing my opinion that the majority misinterprets the text of the statute and the legislative history and, for this reason and others, errs in entering summary judgment for some of the plaintiffs.[19]

---

[19] While I am not prepared to define the term "balance of payments" at this point in the litigation, I conclude that were we to attempt to invalidate the Proclamation solely

*Footnote Continued*

A court could interpret "balance-of-payments" to have a definite meaning while also deciding that Congress did not intend to confine the President's discretion to any particular means of measurement. This would not necessarily mean that the President would be free to restrict imports under Section 122(a)(1) according to any definition of the balance of payments he might contemplate. A court might conclude as an "intelligible principle," for example, that the President's use of measurement methods necessarily would be limited to those that can be shown to have gained acceptance in the relevant fields of economics. I do not offer this as a definition of the term, for I would have wanted informed briefing from the parties before venturing to decide the statutory interpretation issue the majority raises. Because the majority decided this issue without following the USCIT Rule 56(f) procedure, we did not have the benefit of such informed briefing. As acknowledged in *Learning Resources, Inc. v. Trump*, 607 U.S. at --, 146 S. Ct. at 646, as justices "we claim no special competence in matters of economics or foreign affairs." As judges of this Court, we shouldn't either.

---

on the ground that the Proclamation does not define that term or the statutory term "large and serious balance-of-payments deficits" beyond what it states, we would lack the authority to do so. The Proclamation is not a treatise or a judicial opinion. No principle of which I am aware required it to engage in a discussion of statutory interpretation. And because the President is not a government agency for purposes of the Administrative Procedure Act ("APA"), we lack the authority to review the Proclamation according to the "arbitrary, capricious" standard of review set forth in the APA, 5 U.S.C. § 706. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

The majority asserts, further, that "[r]ather than define balance-of-payments deficits for purposes of Section 122, the dissent accepts Defendants' claim that they may choose the economic statistics or sub-accounts of the balance-of-payments based on what is available at present." *Majority Op.* at 46 n.38. I do not reach the question of whether what the majority describes as a claim by defendants is correct. I take no position on it other than to conclude that, as characterized by the majority, it is not a correct interpretation either of the Proclamation or what is before us in these cases.

The Proclamation is not based on the argument the majority attributes to the defendants.[20] As discussed previously, it instead rests upon multiple findings of fact by the President that our country's balance of payments is in serious deficit by any reasonable measure of that term as used in Section 122. *See, e.g., Proclamation* ¶¶ 6, 7, 9, 10, 13. The immediate issue before us is whether or not to grant the summary judgment motions seeking to invalidate the Proclamation, not whether every argument defendants advance in support of the Proclamation is correct.

---

[20] As to "sub-accounts," the majority might be referring to the three sub-accounts of the payments balance as defined today by the BEA, a measurement that the majority and I apparently agree is not what could have been meant by the term "balance-of-payments" as used in Section 122(a)(1). As discussed previously, I do not conclude, as the majority does, that Congress necessarily believed that the current account balance was not usable as a measurement or indication of the payments balance. This, too, is an issue that informed briefing may have elucidated.

The majority also appears to presume that I would sustain the Proclamation based on my supposed acceptance of what they characterize as defendants' position. I consider it premature to decide whether we should sustain or invalidate the Proclamation. Instead, for the reasons I offer, I would have denied both summary judgment motions and, to ensure procedural fairness, followed the procedure USCIT Rule 56(f) requires in this situation.

VI.

In summary, the cases before us require us to proceed cautiously, with the requisite degree of judicial restraint and with the objective of ensuring procedural fairness to all parties.

For the reasons I present in the foregoing, I would not exercise the judicial power to enter summary judgments that invalidate the Proclamation and enjoin its operation. Instead, I would deny both summary judgment motions and proceed according to USCIT Rule 56(f).

/s/   Timothy C. Stanceu<br>Timothy C. Stanceu, Judge

Dated: May 7, 2026
    New York, New York

**<u>Web Pages Cited in the Opinion</u>**

Case Case:26-1802-3JP Document:ment 4 Page: 129d Filed:05/11/2026 1 of 8

Case Case: 26-1805-3, Document 41, Page: 130, Filed: 05/11/2026 2 of 8



**MILESTONES: 1937–1945**

> **NOTE TO READERS**
> "Milestones in the History of U.S. Foreign Relations" has been retired and is no longer maintained. For more information, please see <u>the full notice</u>.

# Bretton Woods-GATT, 1941–1947

During and immediately after the Second World War, the United States, the United Kingdom, and other allied nations engaged in a series of negotiations to establish the rules for the postwar international economy. The result was the creation of the International Monetary Fund and the World Bank at the July 1944 Bretton Woods Conference and the signing of the General Agreement on Tariffs and Trade at an international conference in Geneva in October 1947.



*Harry Dexter White and John Maynard Keynes at the inaugural meeting of the International Monetary Fund's Board of Governors, March 8, 1946. (International Monetary Fund)*

The lessons drawn by U.S. policymakers from the interwar period informed their approach to the postwar global economy. President Franklin D. Roosevelt and officials such as Secretary of State Cordell Hull were adherents of the Wilsonian belief that free trade promoted not just prosperity, but also peace. The experience of the 1930s certainly suggested as much. The policies adopted by governments to combat the Great Depression—high tariffs, competitive currency devaluations, discriminatory trading blocs—helped destabilize the international environment without improving the economic situation. This experience led leaders throughout the anti-Axis United Nations alliance to conclude that economic cooperation was the only way to achieve both peace and prosperity, at home and abroad.

- A98 -

This vision was articulated in the Atlantic Charter, issued by Roosevelt and British Prime Minister Winston Churchill at the conclusion of the August 1941 Atlantic Conference. The Charter's fourth point committed the United States and the United Kingdom "to further the enjoyment by all States, great or small, victor or vanquished, of access, on equal terms, to the trade and to the raw materials of the world which are needed for their economic prosperity," while its fifth point expressed their commitment to "the fullest collaboration between all nations in the economic field with the object of securing, for all, improved labor standards, economic advancement and social security." The two countries elaborated upon these principles in Article VII of their February 1942 agreement on lend-lease aid. In that article, the United Kingdom agreed that in return for U.S. lend-lease assistance, it would cooperate with the United States in devising measures to expand "production, employment, and the exchange and consumption of goods," to eliminate "all forms of discriminatory treatment in international commerce," to reduce barriers to trade, and generally to achieve the goals laid out in the Atlantic Charter.

By early 1942, U.S. and British officials began preparing proposals that would foster economic stability and prosperity in the postwar world. Harry Dexter White, Special Assistant to the U.S. Secretary of the Treasury, and John Maynard Keynes, an advisor to the British Treasury, each drafted plans creating organizations that would provide financial assistance to countries experiencing short-term balance of payments deficits; this assistance was meant to ensure that such countries did not adopt protectionist or predatory economic policies to improve their balance of payments position. While both plans envisioned a world of fixed exchange rates, believed to be more conducive to the expansion of international trade than floating exchange rates, they differed in several significant respects. As a result, from 1942 until 1944, bilateral and multilateral meetings of allied financial experts were held in order to settle upon a common approach. Agreement was finally reached at the July 1944 United Nations Monetary and Financial Conference, a gathering of delegates from 44 nations that met in Bretton Woods, New Hampshire. The two major accomplishments of the Bretton Woods conference were the creation of the International Monetary Fund (IMF) and the International Bank for Reconstruction and Development (IBRD), commonly known as the World Bank. The IMF was charged with overseeing a system of fixed exchange rates centered on the U.S. dollar and gold, serving as a forum for consultation and cooperation and a provider of short-term financial assistance to countries experiencing temporary deficits in their balance of payments. The IBRD was responsible for providing financial assistance for the reconstruction of war-ravaged nations and the economic development of less developed countries. In July 1945, Congress passed the Bretton Woods Agreements Act, authorizing U.S. entry into the IMF and World Bank, and the two organizations officially came into existence five months later. The fixed exchange rate system established at Bretton Woods endured for the better part of three decades; only after the exchange crises of August 1971, when President Richard M. Nixon suspended the dollar's convertibility into gold, and February/March 1973 did floating exchange rates become the norm for the major industrialized democracies.

Agreement on international trade proved more difficult to achieve. One of the most contentious issues was the system of preferential tariffs established among the members of the British Commonwealth in 1932, whereby trade within the Commonwealth was subject to lower tariffs than trade between the Commonwealth nations and the rest of the world. U.S. officials such as Cordell Hull opposed imperial preferences on both ideological and practical grounds—the United Kingdom and Canada, both members of the system, were the United States' two largest trading partners—and called for their abolition; however, many U.K. and other Commonwealth officials favored keeping the preferences, at least until the United States agreed to reduce the high Smoot–Hawley tariffs set in 1930. After more than four years of negotiations on this and other issues—such as the rules that would govern tariff negotiations and the structure of a proposed new organization to oversee international trade—agreement was finally reached in 1947. Twenty-three nations meeting in

- A99 -

Geneva from April to October 1947 concluded the first postwar round of tariff negotiations, leading to reductions in tariffs and imperial preferences, as well as a draft charter for a new institution, the International Trade Organization (ITO). Participants also signed the General Agreement on Tariffs and Trade (GATT), designed not only to implement the agreed tariff cuts but to serve as an interim codification of the rules governing commercial relations among its signatories until the ITO was created. In November 1947, the United Nations Conference on Trade and Employment convened in Havana to consider the draft ITO charter; four months of negotiations later, the representatives of 53 countries signed the finished charter in March 1948. However, strong opposition in the U.S. Congress meant that the ITO never came into existence. Instead, it was the GATT that governed postwar international trade relations for almost fifty years. Under the GATT's aegis, eight rounds of trade negotiations resulted in significant tariff reductions among its members before it was superseded by the World Trade Organization in 1995.

- A100 -



**MILESTONES: 1969–1976**

> **NOTE TO READERS**
>
> "Milestones in the History of U.S. Foreign Relations" has been retired and is no longer maintained. For more information, please see the full notice.

# Nixon and the End of the Bretton Woods System, 1971–1973

On August 15, 1971, President Richard M. Nixon announced his New Economic Policy, a program "to create a new prosperity without war." Known colloquially as the "Nixon shock," the initiative marked the beginning of the end for the Bretton Woods system of fixed exchange rates established at the end of World War II.



*Secretary of the Treasury John Connally on the day that President Richard Nixon announced his New Economic Policy, August 15, 1971. (Nixon Presidential Library)*

Under the Bretton Woods system, the external values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in turn expressed in gold at the congressionally-set price of $35 per ounce. By the 1960s, a surplus of U.S. dollars caused by foreign aid, military spending, and foreign investment threatened this system, as the United States did not have enough gold to cover the volume of dollars in worldwide circulation at the rate of $35 per ounce; as a result, the dollar was overvalued. Presidents John F. Kennedy and Lyndon B. Johnson adopted a series of measures to support the dollar and sustain Bretton Woods: foreign investment disincentives; restrictions on foreign lending; efforts to stem the

- A101 -

official outflow of dollars; international monetary reform; and cooperation with other countries. Nothing worked. Meanwhile, traders in foreign exchange markets, believing that the dollar's overvaluation would one day compel the U.S. government to devalue it, proved increasingly inclined to sell dollars. This resulted in periodic runs on the dollar.

It was just such a run on the dollar, along with mounting evidence that the overvalued dollar was undermining the nation's foreign trading position, which prompted President Richard M. Nixon to act. On August 13, 1971, Nixon convened a meeting of his top economic advisers, including Secretary of the Treasury John Connally and Office of Management and Budget Director George Shultz, at the Camp David presidential retreat to consider a program of action. Notably absent from the meeting were Secretary of State William Rogers and President's Assistant for National Security Affairs Henry Kissinger. After two days of talks, on the evening of August 15, Nixon announced his New Economic Policy in an address to the nation on "The Challenge of Peace." Asserting that progress in bringing an end to U.S. involvement in the war in Vietnam meant that it was time for Americans to turn their minds to the challenges of a post-Vietnam world, Nixon identified a three-fold task: "We must create more and better jobs; we must stop the rise in the cost of living; we must protect the dollar from the attacks of international money speculators." To achieve the first two goals, he proposed tax cuts and a 90-day freeze on prices and wages; to achieve the third, Nixon directed the suspension of the dollar's convertibility into gold. He also ordered that an extra 10 percent tariff be levied on all dutiable imports; like the suspension of the dollar's gold convertibility, this measure was intended to induce the United States' major trading partners to adjust the value of their currencies upward and the level of their trade barriers downward so as to allow for more imports from the United States.

A success at home, Nixon's speech shocked many abroad, who saw it as an act of worrisome unilateralism; the assertive manner in which Connally conducted the ensuing exchange rate negotiations with his foreign counterparts did little to allay such concerns. Nevertheless, after months of negotiations, the Group of Ten (G–10) industrialized democracies agreed to a new set of fixed exchange rates centered on a devalued dollar in the December 1971 Smithsonian Agreement. Although characterized by Nixon as "the most significant monetary agreement in the history of the world," the exchange rates established in the Smithsonian Agreement did not last long. Fifteen months later, in February 1973, speculative market pressure led to a further devaluation of the dollar and another set of exchange parities. Several weeks later, the dollar was yet again subjected to heavy pressure in financial markets; however, this time there would be no attempt to shore up Bretton Woods. In March 1973, the G–10 approved an arrangement wherein six members of the European Community tied their currencies together and jointly floated against the U.S. dollar, a decision that effectively signaled the abandonment of the Bretton Woods fixed exchange rate system in favor of the current system of floating exchange rates.

- A102 -

Case Case: 26-1805-3 JP Document 4 Page: 135 L C File: 07/05/11 2026 7 of 8



**MILESTONES: 1969–1976**

> **NOTE TO READERS**
> "Milestones in the History of U.S. Foreign Relations" has been retired and is no longer maintained. For more information, please see <u>the full notice</u>.

# Oil Embargo, 1973–1974

During the 1973 Arab-Israeli War, Arab members of the Organization of Petroleum Exporting Countries (OPEC) imposed an embargo against the United States in retaliation for the U.S. decision to re-supply the Israeli military and to gain leverage in the post-war peace negotiations. Arab OPEC members also extended the embargo to other countries that supported Israel including the Netherlands, Portugal, and South Africa. The embargo both banned petroleum exports to the targeted nations and introduced cuts in oil production. Several years of negotiations between oil-producing nations and oil companies had already destabilized a decades-old pricing system, which exacerbated the embargo's effects.



*Cars wait in long lines during the gas shortage. (Library of Congress Prints and Photographs Division, U.S. News & World Report Magazine Photograph Collection, Warren K. Leffler)*

The 1973 Oil Embargo acutely strained a U.S. economy that had grown increasingly dependent on foreign oil. The efforts of President Richard M. Nixon's administration to end the embargo signaled a complex shift in the global financial balance of power to oil-producing states and triggered a slew of U.S. attempts to address the foreign policy challenges emanating from long-term dependence on foreign oil.

By 1973, OPEC had demanded that foreign oil corporations increase prices and cede greater shares of revenue to their local subsidiaries. In April, the Nixon administration announced a new energy strategy to boost domestic production to reduce U.S. vulnerability to oil imports and ease the strain of nationwide fuel shortages. That vulnerability would become overtly clear in the fall of that year.

- A103 -

The onset of the embargo contributed to an upward spiral in oil prices with global implications. The price of oil per barrel first doubled, then quadrupled, imposing skyrocketing costs on consumers and structural challenges to the stability of whole national economies. Since the embargo coincided with a devaluation of the dollar, a global recession seemed imminent. U.S. allies in Europe and Japan had stockpiled oil supplies, and thereby secured for themselves a short-term cushion, but the long-term possibility of high oil prices and recession precipitated a rift within the Atlantic Alliance. European nations and Japan found themselves in the uncomfortable position of needing U.S. assistance to secure energy sources, even as they sought to disassociate themselves from U.S. Middle East policy. The United States, which faced a growing dependence on oil consumption and dwindling domestic reserves, found itself more reliant on imported oil than ever before, having to negotiate an end to the embargo under harsh domestic economic circumstances that served to diminish its international leverage. To complicate matters, the embargo's organizers linked its end to successful U.S. efforts to bring about peace between Israel and its Arab neighbors.

Partly in response to these developments, on November 7 the Nixon administration announced Project Independence to promote domestic energy independence. It also engaged in intensive diplomatic efforts among its allies, promoting a consumers' union that would provide strategic depth and a consumers' cartel to control oil pricing. Both of these efforts were only partially successful.

President Nixon and Secretary of State Henry Kissinger recognized the constraints inherent in peace talks to end the war that were coupled with negotiations with Arab OPEC members to end the embargo and increase production. But they also recognized the linkage between the issues in the minds of Arab leaders. The Nixon administration began parallel negotiations with key oil producers to end the embargo, and with Egypt, Syria, and Israel to arrange an Israeli pullout from the Sinai and the Golan Heights. Initial discussions between Kissinger and Arab leaders began in November 1973 and culminated with the First Egyptian-Israeli Disengagement Agreement on January 18, 1974. Though a finalized peace deal failed to materialize, the prospect of a negotiated end to hostilities between Israel and Syria proved sufficient to convince the relevant parties to lift the embargo in March 1974.

The embargo laid bare one of the foremost challenges confronting U.S. policy in the Middle East, that of balancing the contradictory demands of unflinching support for Israel and the preservation of close ties to the Arab oil-producing monarchies. The strains on U.S. bilateral relations with Saudi Arabia revealed the difficulty of reconciling those demands. The U.S. response to the events of 1973–1974 also clarified the need to reconcile U.S. support for Israel to counterbalance Soviet influence in the Arab world with both foreign and domestic economic policies.

The full impact of the embargo, including high inflation and stagnation in oil importers, resulted from a complex set of factors beyond the proximate actions taken by the Arab members of OPEC. The declining leverage of the U.S. and European oil corporations (the "Seven Sisters") that had hitherto stabilized the global oil market, the erosion of excess capacity of East Texas oil fields, and the recent decision to allow the U.S. dollar to float freely in the international exchange all played a role in exacerbating the crisis. Once the broader impact of these factors set in throughout the United States, it triggered new measures beyond the April and November 1973 efforts that focused on energy conservation and development of domestic energy sources. These measures included the creation of the Strategic Petroleum Reserve, a national 55-mile-per-hour speed limit on U.S. highways, and later, President Gerald R. Ford's administration's imposition of fuel economy standards. It also prompted the creation of the International Energy Agency proposed by Kissinger.

- A104 -

- A105 -

**Web Pages Cited in the Opinion**

Case 1:26-cv-26148053-JP Document 49 Page: 138 Filed 05/06/205/11/2026 of 17



# What Is the Balance of Payments?

October 01, 2025
By **Amanda Geiger**

SHARE THIS PAGE: f X in ✉ 🖨 ∞

A lot of attention is paid to the importing and exporting of goods and services, but there are other types of economic transactions between countries that trade with each other. Countries need a way to record not just the movement of goods and services between trading partners, but also the debit and credit of other financial transactions and investments.

## Enter the Balance of Payments

The **balance of payments** is an accounting system; it is a summary of all the transactions involving goods, services, and investment between one country and all other countries over a given time. Any transaction that causes money to flow into a country is a credit to balance payments accounts, and any transaction that causes money to flow out is a debit.

Trade involves the movement of goods and services, but there are also many other transactions recorded in balance of payments accounts. Transactions between countries can be divided into three general categories: exports and imports, capital transfer receipts and payments, and financial assets and liabilities, as shown in the graphic below.

- A106 -

Case 1:26-cv-01483-JP Document 49 Page: 139 Filed 05/11/2026

Case 1:26-cv-01483-JP Document 4 Page: 139 Filed 05/11/2026 3 of 17



When money is received by the U.S. it is recorded as a credit in the balance of payments. When money leaves the U.S. as payment it is recorded as a debit in the balance of payments.

Capital transfer receipts and payments are capital (money or assets) that are transferred from one country to another. For example, a capital transfer can be the interest you receive on a savings account balance at a foreign bank or the money sent to someone in another country as a gift. Financial assets and liabilities refer to borrowing and lending in foreign markets. For example, you purchase stock on a foreign stock exchange or take out a loan from a foreign bank.

## Examples of Transactions Recorded in the Balance of Payments

| Exports | Capital transfer receipts | Financial assets |
|---|---|---|
| Resources, goods, and services produced domestically but sold abroad | • Interest received<br>• Remittances received | • Buying stock<br>• Buying bonds<br>• Making a deposit in a bank account |
| Imports | Capital transfer payments | Financial liabilities |

NOTE: Income earned on foreign assets (such as interest and dividends) is recorded in the current account, while the purchase or sale of the assets themselves is recorded in the financial account.

- A107 -

Case 1:26-cv-26148053JPDocumentent 49 Page: F140 05/06/205/1 1/20264 of 17

| Resources, goods, and services produced abroad but sold domestically | • Interest paid<br>• Remittances paid | • Taking out a loan<br>• Issuing bonds |
|---|---|---|

NOTE: Income earned on foreign assets (such as interest and dividends) is recorded in the current account, while the purchase or sale of the assets themselves is recorded in the financial account.

## Is Balance of Trade Different from Balance of Payments?

While the balance of payments is a record of the flow of money used to make all international sales and purchases, the **balance of trade** refers to "net exports," or the amount of goods and services sold abroad minus the purchases of goods and services from other countries. The balance of trade is just one part of the balance of payments. In the table above, the balance of trade would be the total of only the first column, while the balance of payments would include all three columns.

The transaction categories in the table are divided into two broad accounts: the current account and the capital and financial account. The current account is the section of a country's balance of payments that records its exports and imports of goods and services, its net investment income, and its net transfers. (Note that the table is a sample of the types of transactions recorded in the balance of payments and is not a complete list.) The capital and financial account is the section of a country's balance of payments that records movements of capital into and out of a country. Balance of payments is a form of double-entry accounting, meaning every credit has a corresponding debit. In other words, current account + capital and financial account = 0.

To learn more about the balance of trade and how it is recorded in balance of payments accounts, read this *Page One Economics* article on international trade.

## Why Does the Balance of Payments Equal Zero?

As an accounting principle, a buy (debit) for one country is a sell (credit) for another. In a closed system, as shown in the above graphic, the money must be accounted for as either a credit or a debit. There is no money "leakage" between trading partners. This is an extension of the **circular flow model** in which an expenditure for one person becomes income for the other person.

Let's look at an example. Country A purchases a good from Country B. Country B must now decide what to do with the currency it receives for the sale of the good to Country A. Country B could do one of the following:

1. Hold the currency as a cash reserve.

2. Use the currency to purchase something from Country A or invest in a financial asset in

- A108 -

Country A.

3. Exchange the currency on the foreign exchange market for a different currency.

Most of the time, a country will choose the above option 2 and use the foreign currency it receives to make investments or other purchases from the original country. In our example, this would mean Country B receives funds for a good it sells to Country A but then uses the same currency to purchase a financial asset, such as a bond, from Country A. When this is done, there is an inflow in financial capital to Country A. So, while you might have a trade deficit in goods and services (current account), it is often offset by a surplus in financial transactions (capital and financial account). In our example, this would mean Country A has a debit for the purchase of a good from Country B, but then has a credit when Country B invests in a financial asset in Country A.

We can see this play out when we look at the U.S. balance of payments in the FRED graph below. You'll notice that the total financial inflows—everything above the zero line—is mirrored in the financial outflows—everything below the zero line. While not all catagories of transactions are perfectly mirrored, the totals are generally symmetrical.



**U.S. Balance of Payments**

Source: U.S. Bureau of Economic Analysis via FRED®
Shaded areas indicate U.S. recessions.
Customize | Download Data

- A109 -

SOURCE: U.S. Balance of Payments, U.S. Bureau of Economic Analysis via FRED, Federal Reserve Bank of St. Louis, accessed August 26, 2025.

To learn more about the U.S. balance of payments, read this FRED Blog from July 2025.

## Conclusion

Balance of payments is a valuable tool used to assess how a country interacts in world markets. By exploring the different categories of transactions, we can learn a lot about a country's economy and its relationships with trading partners. The balance of payments may be a challenging concept at first, but if we keep in mind that an expenditure for one person becomes income for someone else, it is much easier to understand how this accounting system attempts to track a country's global transactions as a series of credits and debits.

- A110 -

Case 1:26-cv-2611-8053JP Document 49-2 Page: 143 05/0ed 05/11/2026 7 of 17

## Glossary

## References



## Teacher Resources

Preview the *Reading Q&A* version of this essay on the Federal Reserve Education website (FRE.org). Then, log in or create an account to download the content for your online classroom.

**Preview the Reading Q&A**

## ABOUT THE AUTHOR



**Amanda Geiger**

Amanda is a St. Louis Fed senior economic education specialist with an M.A. in economics and entrepreneurship. She previously served as an AP Macroeconomics exam reader and table leader.

**Related Topics**

**Trade**

- A111 -

**Cite This Article**

# Subscribe to Page One Economics

These essays from our education specialists cover economic and personal finance basics. Special versions are available for classroom use. Views expressed are not necessarily those of the St. Louis Fed or Federal Reserve System.

Email Us

-Media Inquiries

-Economic Education

**FOLLOW US**

**SIGN UP FOR EMAIL ALERTS**

Receive updates in your inbox as soon as new content is published.

Sign Up

**QUICK LINKS**

About Us

Legal Information

Contact Us

- A112 -

Case 1:26-cv-26148253JP Document 49 Page: 145 Filed 05/06/2026 Page 9 of 17

Privacy Policy

Careers

Doing Business with the Fed

Events

FRB Services & FedNow

Visiting the St. Louis Fed

Economy Museum

- A113 -

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Financial account (international)

# Financial account (international)

## Glossary

### A-Z:

| - Any - ⌄ |
| --- |

### Search Glossary term:

|  |
| --- |

[ Apply ]

Record of transactions between U.S. residents (/help/glossary/us-residents) and foreign residents (/help/glossary/foreign-residents) resulting in changes in the level of international claims or liabilities, such as in deposits, ownership of portfolio investment securities, and direct investment (/help/glossary/direct-investment).

Related Terms
Balance of payments (/help/glossary/balance-payments)
Capital account (international) (/help/glossary/capital-account-international)
Current account (international) (/help/glossary/current-account-international)

Download Acrobat Reader (http://get.adobe.com/reader/)
Page last modified on 4/13/18

**Bureau of Economic Analysis**  4600 Silver Hill Road • Suitland, MD 20746

Contact Us **(/contact-us)**

Working at BEA **(/about/working-at-bea)**

Frequently Asked Questions **(/help/faq)**

- A114 -

## Our Policies (/about/policies-and-information)

## Privacy (/privacy)

Commitment to Scientific Integrity (/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (/about/policies-and-information/data-dissemination)

Open Data (/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov)

No FEAR Act (https://www.commerce.gov/cr/reports-and-resources/no-fear-act)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://
www.linkedin.com/
company/
bureau(https://
(https:// www.youtube.com/
x.com/economic-w-www.facebook.com/
bea_news)GCP9DDbea.gov)UivA6Yb5w)

- A115 -

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Current account (international)

# Current account (international)

## Glossary

**A-Z:**

| - Any - ⌄ |
| --- |

**Search Glossary term:**

|  |
| --- |

Apply

Record of transactions in goods, services (/help/glossary/services), income, and unilateral current transfers (/help/glossary/unilateral-current-transfers) between residents and nonresidents.

Related Terms
Balance of payments (/index.php/help/glossary/balance-payments)
Capital account (international) (/index.php/help/glossary/capital-account-international)
Financial account (international) (/index.php/help/glossary/financial-account-international)

Download Acrobat Reader (http://get.adobe.com/reader/)
Page last modified on 4/13/18

## Bureau of Economic Analysis   4600 Silver Hill Road • Suitland, MD 20746

Contact Us (/contact-us)

Working at BEA (/about/working-at-bea)

Frequently Asked Questions (/help/faq)

Our Policies (/about/policies-and-information)

Privacy (/privacy)

- A116 -

Commitment to Scientific Integrity (/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (/about/policies-and-information/data-dissemination)

Open Data (/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov)

No FEAR Act (https://www.commerce.gov/cr/reports-and-resources/no-fear-act)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://www.linkedin.com/company/bureau-
of-
economic-
(https://x.com/(https://www.facebook.com/(https://www.youtube.com/channel/UCGB9QD1x_z__duUivA6Yb5w)

- A117 -

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Balance of payments

# Balance of payments

## Glossary

**A-Z:**

- Any -

**Search Glossary term:**

Apply

Record of transactions between U.S. residents (/help/glossary/us-residents) and foreign residents (/help/glossary/foreign-residents) during a given time period. Includes transactions in goods, services (/help/glossary/services), income, assets, and liabilities. It is broken down into the current accounts (international), capital accounts (international) (/help/glossary/capital-account-international), and financial accounts (international) (/help/glossary/financial-account-international).

Download Acrobat Reader (http://get.adobe.com/reader/)

Page last modified on 4/11/18

**Bureau of Economic Analysis**  4600 Silver Hill Road • Suitland, MD 20746

Contact Us (/contact-us)

Working at BEA (/about/working-at-bea)

Frequently Asked Questions (/help/faq)

Our Policies (/about/policies-and-information)

- A118 -

# Privacy (/privacy)

Commitment to Scientific Integrity (/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (/about/policies-and-information/data-dissemination)

Open Data (/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov)

No FEAR Act (https://www.commerce.gov/cr/reports-and-resources/no-fear-act)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Capital account (international)

# Capital account (international)

## Glossary

**A-Z:**

- Any - ▾

**Search Glossary term:**

Apply

Record of capital transfers between U.S. residents (/help/glossary/us-residents) and foreign residents (/help/glossary/foreign-residents), such as debt forgiveness and migrants' transfers, and acquisitions and disposals of nonproduced nonfinancial assets between residents and nonresidents.

Related Terms
Balance of payments (/help/glossary/balance-payments)
Current account (international) (/help/glossary/current-account-international)
Financial account (international) (/help/glossary/financial-account-international)

Download Acrobat Reader (http://get.adobe.com/reader/)

Page last modified on 4/13/18

**Bureau of Economic Analysis**  4600 Silver Hill Road • Suitland, MD 20746

Contact Us (/contact-us)

Working at BEA (/about/working-at-bea)

Frequently Asked Questions (/help/faq)

Case 1:26-cv-21-4825-JP Document 49 Page: 153 05/06/2605/11/2026 7 of 17

## Our Policies (/about/policies-and-information)

## Privacy (/privacy)

Commitment to Scientific Integrity (/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (/about/policies-and-information/data-dissemination)

Open Data (/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov)

No FEAR Act (https://www.commerce.gov/cr/reports-and-resources/no-fear-act)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://www.linkedin.com/company/bureau (https://
(https:// www.youtube.com/
x.com/ economic www.instagram.com/
bea_news) analysis) UCPSDDqbea.gov) UivA6Yb5w)

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:   THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
          THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE
          THE HONORABLE CLAIRE R. KELLY, JUDGE

|  |  |
|---|---|
| THE STATE OF OREGON, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Court No. 26-01472 |
| ) | |
| DONALD J. TRUMP, in his official capacity as ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Defendants. ) | |

|  |  |
|---|---|
| BURLAP AND BARREL, INC.; BASIC FUN, ) | |
| INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Court No. 26-01606 |
| ) | |
| DONALD J. TRUMP in his official capacity as ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF PIERRE YARED (COUNCIL OF ECONOMIC ADVISERS)

## I.   Qualifications

1.   I am the Acting Chairman of the Council of Economic Advisers (CEA). I lead a team of over 40 economists who are responsible for monitoring the performance of the U.S. economy, interfacing with the business, finance, and diplomatic community, and advising the White House on all economic policy issues, including tax legislation, trade, energy markets, financial markets, housing markets, and immigration.

1

- A122 -

2.      I have been on the faculty of Columbia Business School since 2007, and I currently hold the title of MUTB Professor of International Business. I previously served as the Senior Vice Dean for Faculty Affairs and Vice Dean for Executive Education at Columbia Business School. My research is on the political economy of macroeconomic policy and has been published in the top general interest journals in economics. I am the co-author of the first fully digital interactive textbook in Intermediate Macroeconomics.

3.      I teach Global Economic Environment, a Core MBA course in macroeconomics for which I received the Dean's Award for Teaching Excellence. I am a research associate of the National Bureau of Economic Research, a member of the Council on Foreign Relations, and a member of the Economic Club of New York. I received my AB in Economics from Harvard University and my PhD in Economics from Massachusetts Institute of Technology.

4.      I offer this declaration in response to plaintiffs' filings. This declaration is intended simply as background, to aid the Court in understanding key economic concepts discussed in filings and in the statute.

## II.      Summary of Opinions

5.      On February 20, 2026, the President issued Proclamation 11012, invoking Section 122 of the Trade Act of 1974 (19 U.S.C. § 2132) (Section 122).[1]  In that proclamation, the President found, among other things, that the United States faces fundamental international payments problems and that the United States has large and serious balance-of-payments (BOP)

---

[1] Proclamation 11012, *Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems*, 91 Fed. Reg. 9339 (Feb. 25, 2026).

2

- A123 -

deficits.[2]  To deal with the large and serious United States balance-of-payments deficit, the

President imposed a 10% surcharge on certain imports for a period of 150 days.[3]

6.	On February 20, 2026, the United States had a large and serious balance-of-payments deficit.

7.	This declaration details various credible methodologies for calculating the balance-of-payments deficit and provides data using each of these methods.  Importantly, each of the varying methodologies produces the same result: the United States has a large and serious BOP deficit.

8.	Out of the various credible methodologies for calculating balance-of-payments deficits, the CEA staff assess that the balance of the current account is the most appropriate measure here.

9.	The overarching balance-of-payments accounting framework—consisting of the current, capital, and financial accounts—nets to zero by construction (under all circumstances). Therefore, balance-of-payments deficits invoke a narrower economic principle—focused on specific components of the balance-of-payments accounting framework to measure a balance-of-payments deficit in order to determine whether it is large and serious—not the accounting identity itself.

10.	Under the balance-of-payments accounting framework, the balance of payments (as an accounting identity) must balance. Net lending or borrowing measured from the current and capital accounts must exactly equal net lending or borrowing measured from the financial account. Even at the time of President Nixon's 1971 action to deal with the United States'

---

[2] *Id.*

[3] *Id.*

balance-of-payments crisis, the accounting identity results in a net balance-of-payments position of zero. This is always true regardless of the currency regime under which a country operates.

11.     The International Monetary Fund (IMF) has recognized that countries with fully-flexible exchange rates and open capital accounts are vulnerable to balance-of-payments crises marked by capital-flow shocks and sudden stops; a floating currency regime can mitigate those episodes relative to a fixed exchange rate regime, but it does not eliminate external-crisis risk.[4] All countries <u>under any currency and policy regime</u> may experience a BOP deficit and international payments problems. Therefore, the conditions, triggers, and importance of measuring balance-of-payments flows for the purposes of Section 122 remain relevant today.

12.     A review of the historical record and contemporaneous official statistics by the CEA finds that various official measures that focus on components of the BOP accounting framework have been constructed to measure BOP deficits. These measures were relevant in the years preceding and following the passage of the Trade Act of 1974 (and remain relevant today).

13.     After reviewing these measures and within the context of the modern economy and financial markets, the CEA finds that the balance of the current account within the BOP accounting framework is the most appropriate measure of BOP deficits for the purposes of Section 122.

14.     While trade deficits are conceptually distinct from balance-of-payments deficits, trade deficits are a key input into any credible or reasonable method to assess balance-of-payments deficits.

---

[4] *See, e.g.*, Antonio David, and Carlos Goncalves, *In Search of Lost Time: Examining the Duration of Sudden Stops in Capital Flows*, IMF Working Papers 2019, 230 (2019), https://doi.org/10.5089/9781513516080.001.

- A125 -

15. But, as historical measures have focused on capturing the net amount of liquid, short-term, or money-like flows entering or exiting a country, one could reasonably add other components of the BOP accounting framework by summing the balance on the capital account and, at most, net Foreign Direct Investment (FDI) with the balance of the current account.[5] The range of values, from the balance of the current account to the expanded measures described in the preceding sentence constitute the full range of measures that could reasonably and credibly be used to estimate the BOP deficit. Each of these measures indicate that the United States is currently experiencing a large and serious BOP deficit.

16. As measured by the current account balance, the annual BOP deficit of $1.2 trillion (-4.1% of GDP) in 2024 was larger, relative to the overall economy, than it was prior to the passage of the Trade Act of 1974, using both data estimates available in 1974 (-0.7% of GNP in 1972), and the most recent available estimates (-0.5% of GDP).[67]

17. The CEA also considers alternative measures of the BOP deficit, taking into account historical precedent. These measures are constructed by adding other components of the BOP accounting framework to the current account balance. Each of these alternative measures also demonstrate a large and persistent BOP deficit.

---

[5] Because of the BOP identity, adding all components of the BOP accounting framework necessarily sums to zero. Therefore, any measure of a BOP deficit must exclude the components of the BOP accounting framework that are liquid, short-term, or money-like flows.

[6] In the 1970s, the overall economy was measured using gross national product (GNP), rather than gross domestic product (GDP); the measure of GDP was not introduced into the national accounts until the 1990s. As much of the components of GDP are also in GNP, these measures are similar in magnitude. The principal difference between them is that GDP measures domestic activity, including economic activity from non-U.S. citizens, whereas GNP measures activity of U.S. citizens, including economic activity abroad.

[7] The CEA believes that the end of 2024 offers the cleanest assessment of the current BOP for the purposes of Section 122 because it precedes dynamics associated with International Emergency Economic Powers Act (IEEPA) tariffs announced and implemented in 2025.

18.     The CEA also considers whether the BOP deficit is serious. The United States'
net international investment position (the difference between foreign-owned U.S. assets and U.S.
owned foreign assets, which reflects the accumulation of past current account deficits) as a share
of GDP reached -90% in 2024 (the U.S. is a large net debtor). In dollar terms, this net negative
international investment position is the largest in the world, and one of the most negative of any
developed country as a share of GDP. The IMF has argued that a deterioration in the net
international investment position of a country can increase the susceptibility of the economy to
fluctuations in exchange rates, market conditions, and foreign demand for domestic assets. The
accrual of large foreign liabilities can also lead to a higher share of domestic cash flows accruing
to foreigners, which can come at the expense of consumption loss for domestic households in
such an economy.[8] The primary income balance of the U.S., which is a component of the current
account balance capturing such net payments to foreigners, marked its sharpest deterioration on
record (in nominal terms) in 2024, marking the only negative annual reading recorded by BEA
going back to at least 1960.

19.     As each considered measurement of the BOP deficit described in this declaration
is currently in a much larger deficit than the corresponding deficits observed in the years
immediately preceding and following the passage of the Trade Act of 1974; the BOP deficits are
historically large; and these BOP deficits have resulted in meaningful deterioration in the net
international investment position and in the primary income balance, it is in the CEA's opinion
that the United States' BOP deficit is both large and serious. Importantly, this conclusion is true
using any credible and reasonable method used for calculating BOP deficit.

---

[8] *See, infra*, Section III.

6

## III.    Opinions

### A.    What Is <u>Not</u> a Balance of Payments Deficit?

20.    The overarching BOP accounting framework—consisting of the current, capital, and financial accounts—nets to zero by construction (under all circumstances). Therefore, BOP deficits invoke a narrower economic principle—not the accounting identity itself—which must focus on specific components of the BOP accounting framework to measure a BOP deficit in order to determine whether it is large and serious.

21.    Under the BOP accounting framework, the balance of payments (as an accounting identity) must balance. Net lending or borrowing measured from the current and capital accounts must exactly equal net lending or borrowing measured from the financial account. Even at the time of President Nixon's 1971 action to deal with the United States' balance-of-payments crisis, the accounting identity results in a net balance-of-payments position of zero. This is always true regardless of the currency regime under which a country operates.

22.    Although the BOP accounting identity must always sum to zero, the measured accounts reported by the Bureau of Economic Analysis (BEA) never sum exactly to zero because of measurement error. BEA defines the statistical discrepancy as the residual needed to balance its recorded credits and debits.  This discrepancy exists because the accounts are constructed from separate and imperfect data sources, with net balance of these accounts in aggregate reflecting the sum of net errors and omissions in the underlying sources. Despite the claims of plaintiffs, this statistical discrepancy is not and cannot constitute a meaningful flow in its own right as it is an accounting residual generated by incomplete source data, timing mismatches, gaps in coverage, estimation error, and other measurement problems. This statistical discrepancy has always existed as long as the balance of payments have been measured as there does not currently exist a means to perfectly (and immediately) measure all transactions, especially in a

7

large economy like the United States. Therefore, a negative or positive statistical discrepancy cannot reasonably or credibly be understood as a BOP deficit as it simply reflects statistical noise, as evidenced by Figure 1.

## Figure 1: Measuring the BOP Statistical Discrepancy Over Time

Source: Bureau of Economic Analysis, CEA Calculations

### B. What Is a Balance of Payments Deficit?

23.     Section 122 authorizes the President to impose temporary import surcharges to address fundamental international payments problems, including "to deal with large and serious United States balance-of-payments deficits." Yet the Trade Act does not provide an explicit definition for either the measurement of BOP deficit or what would constitute a "large and serious" deficit. Regarding BOP deficit measurement, CEA staff assess (Section III) that the current account is the most appropriate measure for the purposes of Section 122 and concludes that there is a BOP deficit using that measure. However, for the avoidance of any doubt as to whether there is a BOP deficit for the purposes of Section 122, CEA staff also detail alternative

8

- A129 -

measures for calculating BOP using the BOP accounting identity flowing from: (1) the balance on the current account to: (2) the current account plus the capital account plus net foreign direct investment (FDI). As with the current account measure, CEA concludes that there is a BOP deficit using each of these alternative measures.

24. The current account balance is the net position of (i) goods trade, (ii) services trade, (iii) primary income, and (iv) secondary income. Primary income consists of international investment income and labor compensation, while secondary income reflects unilateral transfers (e.g., insurance payments, foreign aid, remittances). The current account is one of the three primary components of the BOP accounting framework, alongside the capital and financial accounts. [9] Much as double-entry bookkeeping helps businesses manage their accounts, the BOP accounting framework organizes international transactions. For example, if a U.S. company sells a $50,000 car abroad, the car's movement abroad enters as $50,000 of goods exports in the current account while the compensating movement of dollars to the United States enters as a $50,000 currency acquisition in the financial account. Alternative BOP deficit measures use the current account as a starting point, and include elements of the capital and financial accounts.

25. Multiple measures capture related aspects of a country's BOP deficit, and official statistics during the 1970s also reported broader measures than the current account. For example, the "official reserve transactions balance" tracked the net disposition of dollars by the federal government in order to manage the foreign exchange value of the dollar. Another common contemporaneous measure was the "basic balance" (Figure 2), which combined the current account and long-term capital, and served as a gauge for the imbalance between "underlying"

---

[9] Throughout, each of these components of the BOP accounting framework are referred to as they are defined by the Bureau of Economic Analysis in the U.S. International Economic Accounts: Concepts and Methods https://www.bea.gov/resources/methodologies/international/pdf/iea-concepts-methods.pdf

9

long-term demand and supply of foreign exchange. Notably, even though the U.S. dollar started to float in 1973, Section 122 was passed by Congress in 1974 and signed into law by President Ford in 1975, suggesting that Congress's reference to BOP deficits was not simply centered around currency exchange management.

26.     Figure 2 charts the current account balance and the basic balance as shares of gross national product (GNP), [10] given data estimates contemporaneous with Section 122's passage. While the basic balance had been in deficit for over a decade before Section 122 was introduced to Congress, between 1964 and 1972 the current account swung from a surplus of 0.9% of GNP to a deficit of -0.7% of GNP. Administration documents suggest that the reversal of the current account surplus was viewed as a primary indication of deterioration in the BOP deficit and an impetus for President Nixon's suspension of the gold standard in 1971.

---

[10] GNP is closely related to gross domestic product (GDP); the primarily distinction is that GNP focuses on the production of a country's residents, regardless of where the production takes place, while GDP focuses on production that occurs within a country, regardless of the citizenship of who is producing. GNP was the standard measure of the economy in the 1970s; GDP statistics were not introduced until the 1990s.

10

## Figure 2: Basic Balance & Current Account, % of GNP

*Given data estimates as of 1974*



### C.    What Did Broader Historical BOP Deficit Measures Capture?

27.    According to the CEA's review of historical records, the basic balance was a common, broader measure of BOP deficits during the 1970s.  The underlying intent of the basic balance, according to BEA, was to capture "[…] long term trends in the balance of payments by segregating volatile capital flows and placing them below the line." [11] These segregated volatile capital flows consisted of payment and other liquid, money-like instruments. Because the BOP accounts follow double-entry bookkeeping, every durable transaction recorded in the basic balance has a corresponding, equal transaction consisting of a payment or money-like transfer. In other words, if the basic balance is in surplus or deficit, there must also be a net inflow or

---

[11] See the Report of the BEA's Advisory Committee on the Presentation of Balance of Payments Statistics in the June 1976 Survey of Current Business https://apps.bea.gov/scb/issues/1976/scb-1976-june.pdf

11

outflow, respectively, of payment instruments. In order to capture only durable trends in the BOP deficit and exclude short-term and volatile capital flows, the basic balance omitted all short-term capital flows (with maturities less than 1 year) and all liquid private capital flows. However, this measure was still imperfect because some of the long-term securities it included can be highly volatile. Moreover, the statistical distinction between short- and long-term capital is based on original maturities, which can diverge from investors' actual holding horizons. As noted by the BEA's Advisory Committee on the Presentation of Balance of Payments Statistics in the June 1976 Survey of Current Business, the basic balance cannot capture the true long-term pattern of the BOP deficit. This determination likely motivated BEA to discontinue its presentation of the basic balance. To CEA's knowledge, none of BEA's current statistical aggregates seek to replicate or capture the spirit of the basic balance.

### D. Can Balance of Payments Deficits Exist in a Floating Rate Currency Regime?

28. In general, there are two types of currency exchange systems: fixed (or pegged) and floating (also called free or flexible).

29. A pegged (fixed) exchange rate is an exchange rate regime under which an economy maintains a set rate of exchange between its currency and another currency or a basket of currencies. Often the exchange rate is allowed to move within a narrow predetermined (although not always announced) band. Pegs are maintained through a variety of measures, including capital controls and intervention.

30. A floating (flexible) exchange rate is an exchange rate regime under which the foreign exchange rate of a currency is fully determined by the market, with intervention from the government or central bank used sparingly.

31.     Most major currencies (*e.g.*, U.S. dollar, euro) are floating, with intervention being rare since 2000. Other floating currencies are more managed. This can range from intervention being occasionally used to signal the government's concern with the level or pace of movement of the exchange rate, to more frequent intervention to manage the movement of the currency. The IMF distinguishes between a *de jure* exchange rate regime of a country and the *de facto* regime. Floating exchange rates exhibit greater volatility than managed floating exchange rates.

32.     Under a floating system, interventions by the government and central bank are generally reserved for cases of excessive volatility and disorderly movements in exchange rates.

33.     In March 1973, the United States moved to a de facto floating currency.[12] Thus, before Section 122's enactment, at the time of Section 122's enactment, and since Section 122's enactment, the United States has had a floating currency—not a fixed currency.

34.     Measuring trends in the balance of payments remains relevant even following the formal abandonment of the Bretton Woods system of fixed exchange rates and the adoption of floating rate currencies. As the Federal Reserve Bank of New York argued in 1975, under the subsequent floating regime, "Balance-of-payments measures are still used to identify disequilibria which may occur when official intervention is large enough to influence market exchange rates." More broadly, the New York Fed noted that "a more important current concern is to anticipate sources of future exchange rate change and the potential impact of international developments on domestic economies." Indeed, the New York Fed emphasized that the analytical frameworks developed under Bretton Woods remained applicable, arguing that "the

---

[12] Office of the Historian, U.S. Department of State. "Nixon and the End of the Bretton Woods System, 1971-1973." Milestones in the History of U.S. Foreign Relations https://history.state.gov/milestones/1969-1976/nixon-shock

same characteristics—short-run sensitivity to interest rates and exchange rate expectations—are as important in the case of floating exchange rates as in the Bretton Woods framework." It maintained that "it is still desirable to separate payments according to how stable or volatile they are, and how responsive to short-run changes in monetary policy," and that "the basic balance, as well as other variants of this concept, is just as natural a basis for analysis in the world of floating exchange rates as it was under fixed exchange rates."[13]

35.     However, like the BEA recognized a year later when it chose to discontinue reporting of the basic balance, the New York Fed also recognized the limitations of existing measures in separating "stable" long term flows from short term "volatile" flows acknowledging that while the concept of the basic balance "represents the ideal", it remains flawed by measurement problems. Instead, the New York Fed posited that balance of payments flows might best be measured by the sum of the current account and capital account, as these are "the only measured flow categories that can be regarded as largely interest insensitive."

36.     As the IMF has recognized, even countries with fully-flexible exchange rates and open capital accounts remain vulnerable to BOP crises marked by capital-flow shocks and sudden stops; a floating currency regime can mitigate those episodes, but it does not eliminate external-crisis risk.[14] Countries *under any currency and policy regime* may experience BOP deficits and international payments problems. Therefore, the conditions, triggers, and importance of measuring balance of payments flows for the purposes of Section 122 remain relevant today.

---

[13] See Patricia Hagan Kuwayama, "Measuring the United States Balance of Payments," Monthly Review (Federal Reserve Bank of New York) 57, no. 8 (August 1975): 183–190 https://www.newyorkfed.org/medialibrary/media/research/monthly_review/1975_pdf/08_3_75.pdf

[14] *See, e.g.*, Antonio David, and Carlos Goncalves, *In Search of Lost Time: Examining the Duration of Sudden Stops in Capital Flows*, IMF Working Papers 2019, 230 (2019), https://doi.org/10.5089/9781513516080.001.

### E.  What Alternate Measures Are Currently Available to Capture the Balance of Payments Deficit?

37.     While the concept of the current account has largely remained the same since the 1970s, there is no single measure of the long-term capital account (the other main component of the basic balance), and BEA no longer reports all the components needed to exactly replicate the basic balance. CEA staff considered multiple interpretations of what, in the modern context, should be included to measure the BOP deficit, following the accounting concept of the BOP that was broadly understood at the time of the passage of Section 122.

38.     What can be construed as non-volatile, long-term capital has changed materially since the 1970s. In the years following the passage of Section 122, financial market deepening liquefied many balance-sheet claims, expanding the class of payment and money-like instruments. The CEA staff believe that any measure for the purposes of Section 122 should capture only the most durable, illiquid, and long-term claims under current market conditions, in order to isolate instruments that can currently be used as or quickly converted into (i.e., liquidated) money-like claims. At present, the capital account certainly consists of long-term capital, though the BEA did not begin publishing a separate measure for the capital account (removing a small portion of the unilateral transfers measure from the current account) until July 1999 and the associated flow is small relative to the current account, so in practice a measure including the current and capital account balance would not be materially different than reporting only the current account. Additionally, the CEA staff assess that some segments of FDI could also still be viewed as long-term capital.

39.     The CEA staff assess that the most reasonable approach for determining BOP deficits using modern BOP reporting is the balance of the current account, and that any attempt

15

to recreate the intent of broader historical BOP measures should not extend past including net FDI in addition to the balance on the capital account.

40.     While CEA staff view some components of FDI as long-term capital, not all FDI is illiquid. As BEA noted in 1976, when it chose to discontinue reporting of the basic balance, "[…] even some components of direct investment, can be quite volatile." The CEA staff have no way of isolating the non-volatile components of FDI, nor a sense of what portion of FDI is volatile. This is why CEA staff view the combination of the current account, capital account, and FDI as the most expansive candidate BOP deficit measure for the purposes Section 122.

### F.     Is There a Large Balance of Payments Deficit?

41.     Figure 3 below shows the current account balance as a share of GDP since 1960. The current account has been in a persistent deficit since the 1990s. Moreover, relative to the overall economy, the current account deficit was larger at the end of 2024 (-4.1% of GDP; also -4.1% of GNP) than at its trough in the early 1970s (-0.7% of GNP in 1972, see Figure 2), according to data estimates available when Congress passed The Trade Act. [15,16,17]

---

[15] CEA staff believe that the end of 2024 offers the cleanest assessment of the current BOP for the purposes of Section 122 because it precedes dynamics associated with IEEPA tariffs announced and implemented in 2025.

[16] Figure 3 uses GDP to measure overall economic activity, rather than GNP, as it is the more conventional metric now.  However, GDP is a relatively modern measure, and in 1974 only GNP estimates were available.

[17] Based on the latest-available estimates, the current account balance was -0.5% of GDP in 1972.

16



**Figure 3: Current Account, % of GDP**

Source: Bureau of Economic Analysis; CEA calculations

42.      Figure 4 shows the U.S. trade balance (goods and services). The trade balance is by far the largest component of the current account, and tends to be the primary driver of fluctuations in the current balance. As a result, the time series behavior of the current account is dominated by the trade balance. The trade balance has been in persistent deficit since the 1970s. The large, persistent, and serious annual United States goods trade deficit has grown by over 40 percent in the past 5 years alone, reaching $1.2 trillion in 2024 and remaining at approximately $1.2 trillion in 2025.

17

## Figure 4: Trade Balance as Share (%) of GDP



Source: Bureau of Economic Analysis; CEA calculations

43.     During the 1970s, economists leveraged multiple metrics to analyze different aspects of BOP deficits.  More expansive measures than the current account typically included other components of the BOP accounting framework involving relatively durable transactions—those that were long-term and illiquid—and excluded flows of payment and other liquid, money-like instruments that are recorded in the financial account.  In developing candidate alternative BOP deficit measures to the current account, CEA accounted for the evolution of financial markets since the 1970s, which have substantially increased the liquidity of many assets (e.g., equities).

44.     Figure 5 shows CEA's most expansive candidate BOP deficit measure for the purposes of Section 122: the current account plus the capital account plus net FDI. This measure excludes most assets in the financial account, as in modern-day financial markets they can exhibit high degrees of liquidity and volatile flows, akin to broad financial flow. However, even this measure is likely too inclusive. As acknowledged by the BEA in 1976 "[…] even some

18

components of direct investment, can be quite volatile." [18] This suggests that a representation of the BOP deficit more aligned to Section 122 would reflect only the most durable components of FDI. As illustrated by Figure 5, CEA's most expansive candidate measure is more volatile than the current account balance, but presents the same qualitative story: a prolonged period in deficit.

**Figure 5: Current Account + Capital Account\* + Net FDI, Share (%) of GDP**



Source: Bureau of Economic Analysis; CEA calculations
\*In July 1999, BEA restructured international transactions to separate the capital account from the financial account. Revised historical estimates are available beginning in the fourth quarter of 1989.

As each of the BOP deficit measures described above indicate a large and sustained deficit, it is in CEA's opinion that the United States is experiencing a large BOP deficit within the for the purposes Section 122. Importantly, this conclusion is true regardless of the method used for calculating BOP deficit.

### G.    Is the Large Balance of Payments Deficit Serious?

45.    As mentioned above, Figure 2 charts the current account balance and the basic balance (a contemporaneous BOP measure reported by the BEA and commonly cited by

---

[18] June 1976 Survey of Current Business, Report of the Advisory Committee on the Presentation of Balance of Payments Statistics

19

economists at the time in the context of BOP deficits) as shares of GNP, given data estimates

contemporaneous with the Trade Act of 1974's passage. While the basic balance had been in

deficit for over a decade before the Trade Act of 1974 was introduced to Congress, between

1964 and 1972 the current account swung from a surplus of 0.9% of GNP to a deficit of -0.7% of

GNP. Administration documents suggest that the reversal of the current account surplus was

viewed as a primary indication of deterioration in the BOP and an impetus for President Nixon's

suspension of the gold standard in 1971. Indeed, the predicate for the passage of the Trade Act of

1974 was a declaration by President Nixon in August 1971 that the United States' BOP position

(including the trade deficit) was a national emergency and a corresponding imposition of a 10-

percent tariff on certain imports.[19] Facing legal challenges to his tariff authority, President Nixon

advocated for Congress to grant explicit statutory authorities. As explained in an *amicus brief*

filed with this Supreme Court:[20] "On April 10, 1973, the President transmitted the Trade Reform

Act of 1973 to Congress. To address the balance of payments crisis, President Nixon referenced

the country's 'international payments imbalances' and 'therefore request[ed] more flexible

authority to raise or lower import restrictions on a temporary basis to help correct deficits or

surpluses in our payments position.'"[21] This culminated in the passage of the Trade Act of 1974

into law.

46.     In his transmittal message to Congress accompanying the proposed Trade Reform

Act of 1973, President Nixon explicitly distinguished between the balance of trade and the

---

[19] See Proclamation No. 4074, 85 Stat. 926 (Aug. 15, 1971).

[20] Brief of Trade Scholars in Economics, Politics, and Law as *Amici Curiae*, Donald J. Trump vs. V.O.S. Selections Inc, et al. (Case Number 2025-1812, 2025-1813), https://www.supremecourt.gov/DocketPDF/25/25-250/380479/20251024111147691_25-250%20Amici%20Brief.pdf.

[21] President Richard Nixon, Special Message to the Congress Proposing Trade Reform Legislation (Apr. 10, 1973), in The American Presidency Project, https://perma.cc/F9MQ-487F.

20

- A141 -

"overall balance of payments", underscoring that contemporaneous understanding of a BOP

deficit was more expansive than a trade deficit. Because the current account is more expansive

than the trade balance and still excludes money-like payments, the CEA believes that the balance

on the current account is the most appropriate measure of BOP surplus/deficits for the purpose of

Section 122 of The Trade Act. However, as Figures 3 and 5 using the BOP accounting

framework illustrate, both narrower and broader candidate measures also reach the same

qualitative conclusions.

47.     Analysis by the IMF reinforces this conclusion. The IMF's 2024 External Sector

Report concluded that the U.S. current account deficit is between 0.7 and 2.0 percent of GDP too

large relative to the level that is consistent with the United States' economic fundamentals and

desirable policy mix.[22] As the IMF noted, "The globally sizable and excessively large increase in

[current account] balances in major economies, as estimated for 2024, can generate significant

negative cross-border spillovers… Globally sizable deficits can fuel financial crises with costly

global consequences." The IMF has noted that economies with fully-flexible exchange rates and

open capital accounts are vulnerable to capital-flow shocks and sudden stops; a floating currency

regime can mitigate those episodes relative to a fixed exchange rate regime, but it does not

eliminate external-crisis risk.[23]

48.     A sustained current account deficit by a country requires the accrual of additional

net foreign liabilities, and therefore a deterioration in this country's net international investment

---

[22] See the International Monetary Fund's External Sector Report: Global Imbalances In A Shifting World (2025) https://www.imf.org/en/publications/esr/issues/2025/07/22/external-sector-report-2025

[23] For example, see Antonio David, and Carlos Goncalves. "In Search of Lost Time: Examining the Duration of Sudden Stops in Capital Flows", IMF Working Papers 2019, 230 (2019), https://doi.org/10.5089/9781513516080.001

position, as the deficit country must finance this deficit by borrowing more, on net, from foreigners. The net international investment position of the United States, which reflects accrued liabilities from past current account deficits, has sharply deteriorated in the past decade as a share of GDP (Figure 6), falling from -39.9% in 2014 to -62% in 2022 and sharply again to -90.6% in 2024.

49.  The magnitude of this negative international investment position is a highly atypical position for a country like the United States and stands out among developed countries. In dollar terms, the United States' net negative international investment position is the largest in the world, and one of the most negative of any developed country as a share of GDP. The IMF has noted that deterioration in the net international investment position of a country can increase the susceptibility of the economy to fluctuations in exchange rates, market conditions, and foreign demand for domestic assets. The accrual of large foreign liabilities can also lead to a higher share of domestic cash flows accruing to foreigners, which can come at the expense of consumption loss for domestic households. [24,25] In some extreme cases, these problems can, among other things, endanger the ability of countries with very large net negative international investment positions to finance spending and can erode investor confidence in their economy.[26,27]

---

[24] Behar and Hassan (2022), IMF Working Paper, The Current Account Income Balance: External Adjustment Channel or Vulnerability Amplifier? https://doi.org/10.5089/9798400207488.001

[25] *See, infra*, Section III.

[26] Obstfeld (2012), Journal of International Money and Finance, Financial Flows, Financial Crises, and Global Imbalances. https://doi.org/10.1016/j.jimonfin.2011.10.003

[27] *See* Luis A.V. Catão & Gian Maria Milesi-Ferretti, *External Liabilities and Crises*, Journal of International Economics, Volume 94, Issue 1, 2014, Pages 18-32, ISSN 0022-1996 https://www.sciencedirect.com/science/article/pii/S0022199614000713?ref=pdf_download&fr=RR-2&rr=9ac78f895a25c5b3.

22

## Figure 6. United States Net International Investment Position % of GDP



Source: Bureau of Economic Analysis; CEA calculations

50.     All else equal, a larger current account deficit and deteriorating net international investment position could lead to larger primary income outflows in the future due to more payments abroad servicing those liabilities. To illustrate these dynamics stemming from BOP deficits, Figure 7 shows the primary income balance, which is a component of the current account. Historically the United States' primary income balance has been positive. Despite the United States accruing a deeply negative net international investment position, it has earned a higher return on its foreign assets than it pays on liabilities, a trend that economists have described as an "exorbitant privilege."[28] However, the primary income balance fell sharply in 2024, marking the only negative annual reading recorded by BEA going back to 1960 and the largest year-over-year drop on record.

---

[28] For example, see Stephanie E. Curcuru & Charles P. Thomas & Francis E. Warnock, 2013. "On returns differentials," International Finance Discussion Papers 1077, Board of Governors of the Federal Reserve System https://www.federalreserve.gov/pubs/ifdp/2013/1077/ifdp1077.htm

23

**Figure 7. Primary Income Balance as Share (%) of GDP**



Source: Bureau of Economic Analysis; CEA calculations

51.　　Cross-country research has found that current account deficits can become unsustainable if they are persistently between 2-5% of GDP.[29],[30] According to that research, large deficits eventually adjust through some combination of real exchange rate depreciation, reduced consumption, investment, and increased exports. The magnitude of the adjustment and the extent to which this adjustment is sudden or gradual can determine whether such an adjustment has large and adverse consequences for an economy. The more negative the net international investment position of a country, the greater the risk that an adjustment can result in large costs to the domestic economy.

---

[29] See, for example, Cline, William R. and John Williamson. *New Estimates of Fundamental Equilibrium Exchange Rates*. No. PB08-07 Peterson Institute for International Economics, 2008.

[30] See Mussa, Michael. "Sustaining Global Growth while Reducing External Imbalances." *The United States and The World Economy: Foreign Economic Policy for the Next Decade* (2005): pp. 175-207.

24

52. Based on these historical cross-country comparisons, the United States' current account deficit of 4% of GDP combined with its large negative net international invest position suggests that the BOP deficit is large and serious.

## IV.        Conclusion

53. On February 20, 2026, the United States had a large and serious BOP deficit.

54. As each considered measurement of the BOP deficit described in this declaration is currently in a much larger deficit than the corresponding deficits observed in the years immediately preceding and following the passage of the Trade Act of 1974; the BOP deficit is historically large; and the BOP deficit is serious based on historic cross-country research and since it is accompanied by a large deterioration in the net international investment position, it is in CEA's opinion that the United States' BOP deficit is both large and serious. Importantly, this conclusion is true regardless of any credible and reasonable method used for calculating BOP deficit.

55. Before Section 122's enactment, at the time of Section 122's enactment, and since Section 122's enactment, the United States has had a floating currency—not a fixed currency.

56. While trade deficits are conceptually distinct from BOP deficits, trade deficits are a key input into any credible or reasonable method to assess BOP deficits.

57. A large and serious BOP deficit can exist in both a floating exchange regime and a fixed exchange regime.

58. Plaintiffs' use of the accounting identity to assess BOP deficits is unreasonable. The accounting identity always equals zero, regardless of the exchange regime.

25

I declare, under penalty of perjury, that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 3rd day of April, 2026.

_____

Pierre Yared
Acting Chairman of the Council of Economic Advisers

26

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| THE STATE OF OREGON, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 26-01472 |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**<u>DECLARATION OF AMBASSADOR JAMIESON LEE GREER, UNITED STATES TRADE REPRESENTATIVE</u>**

I, Ambassador Jamieson Lee Greer, hereby state as follows:

1. I am the United States Trade Representative and the head of the Office of the United States Trade Representative, a component in the Executive Office of the President. *See* 19 U.S.C. § 2171(a). I have been the United States Trade Representative since February 26, 2025.

2. The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, component employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3. The purpose of this declaration is to explain, in my capacity as the principal advisor to the President on international trade policy and the chief representative for the United States in international trade negotiations, the basis for my recommending to the President that the temporary import surcharge imposed in Proclamation 11012 of February 20, 2026 (Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems) ("Section 122

1

Proclamation") not apply to certain products because of the needs of the United States economy. This declaration also addresses the harm to the Government should the Court issue an injunction.

4. On February 20, 2026, President Trump took decisive action to address fundamental international payment problems that the United States faces, in particular a large and serious balance-of-payments deficit, by signing the Section 122 Proclamation. President Trump invoked his authority under section 122 of the Trade Act of 1974 (19 U.S.C. § 2132) (Section 122), which empowers the President to address certain fundamental international payment problems through surcharges and other special import restrictions. The Section 122 Proclamation imposed, for a period of 150 days, a 10 percent *ad valorem* import surcharge on articles imported into the United States.

5. The Section 122 Proclamation exceptions are carefully scoped to ensure broad and uniform application of the Section 122 surcharge with respect to product coverage. As explained below, these specific exceptions reflect my recommendations to the President that certain articles should not be subject to the Section 122 surcharges because of the needs of the United States economy. These specific exceptions are limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, the need to avoid serious dislocations in the supply of imported goods, and other similar factors, as well as articles for which application of an import surcharge will be unnecessary or ineffective in carrying out the purposes of Section 122.

6. Specifically, I recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to metals used in currency and bullion. Metals used in currency and bullion, such as gold, play critical roles in domestic and international financial

2

- A149 -

markets.[1]  This specific exception would help avoid serious dislocations in the supply of imported goods that could cause unintended economy-wide disruptions, particularly because of the role such goods play in currency markets.[2]  Finally, imposing the temporary import surcharge on these metals would be unnecessary or ineffective in carrying out the purposes of Section 122.

7.      I also recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to energy and energy products.  These products, such as petroleum and natural gas,[3] sustain a wide range of economic activity and infrastructure, and are important to U.S. manufacturing, transportation, agriculture, and defense industries.[4]  As such, importation of certain energy-related raw materials is necessary for the functioning of the U.S. economy,[5] and it is critical to avoid serious dislocations in the supply of imported goods given economy-wide criticality.  Moreover, imposing the surcharge on these products would be unnecessary or ineffective in carrying out the purposes of Section 122.

8.      I also recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to natural resources and fertilizers that cannot be grown, mined, or otherwise produced in the United States or grown, mined, or otherwise produced in sufficient quantities to meet domestic demand.  For such goods, environmental, geographical, and other

---

[1] *See* Colin Weiss, "Official Reserve Revaluations: The International Experience," Board of Governors of Federal Reserve System (Aug. 1, 2025), https://www.federalreserve.gov/econres/notes/feds-notes/official-reserve-revaluations-the-international-experience-20250801.html.

[2] *See, e.g.*, Dean Belder, "Navigating Uncertainty: How Trump's Tariffs Are Affecting the Gold Market," Investing News Network (Aug. 27, 2025), https://investingnews.com/trump-gold-tariffs/ (explaining impacts of reciprocal tariffs on certain gold products prior to September modification of Annex II to Executive Order 14257 of April 2, 2025).

[3] *See* U.S. Energy Info. Admin., "U.S. Energy Facts Explained," https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php (explaining that the United States was a net importer in 2023 of crude oil).

[4] *See* Executive Order 14156 of January 20, 2025.

[5] *See, e.g.,* U.S. Energy Info. Admin., *supra* n. 3 (explaining importance of U.S. imports of energy products in meeting domestic demand).

3

natural factors often prevent the production of these goods in quantities commensurate with U.S. consumption. This category of goods includes: (1) coffee and tea, for which the U.S. climate is unsuitable for growing, in large part; for example, domestic production of coffee is minimal and accounts for less than one percent of domestic consumption;[6] (2) fertilizers, which are produced domestically, but for which the United States is still import-reliant, especially for specific types (*e.g.*, potash);[7] and (3) certain spices, which are mostly grown outside of the United States because they require tropical or subtropical climates in which to grow.[8] As such, I made this recommendation on grounds that the importation of these raw materials is necessary for the functioning of the U.S. economy and serious dislocations in the supply of these imported products should be avoided.

9. I also recommended that the surcharge imposed under Section 122 Proclamation not apply to certain agricultural products, such as beef, tomatoes, and oranges, on the grounds that there is unavailable domestic supply at reasonable prices, that the importation of these raw materials is necessary for the functioning of the U.S. economy, and that serious dislocations in the supply of these imported materials should be avoided. For example, the United States continues to experience domestic supply issues for lean beef trimmings due to widespread environmental issues and other factors.[9] In fact, given the impact of droughts and wildfires in the western United

---

[6] *See* U.S. Dep't of Agric. (USDA), "Production, Supply, and Distribution Online," https://apps.fas.usda.gov/psdonline/app/index.html#/app/home (last visited Apr. 3, 2026).

[7] *See, e.g.*, Jon Adamy, "Fertilizer Production Freefall: US Market Share Shrinks As Global Trade Surges," Michigan Farm News (Sept. 24, 2025), https://www.michiganfarmnews.com/fertilizer-production-freefall-us-market-share-shrinks-as-global-trade-surges#:~:text=Meanwhile%2C%20the%20U.S.%20relies%20on,for%20domestic%20use%20in%202022 ("[T]he U.S. relies on imports to meet demand for potash, with domestic production totaling less than 5% of that needed for domestic use in 2022."); *see* USDA, "Drivers of Fertilizer Markets: Supply, Demand, and Prices" (Sept. 2025), https://ers.usda.gov/sites/default/files/_laserfiche/publications/113324/ERR-354.pdf?v=89250.

[8] *See* American Spice Trade Ass'n, "Map Where Spices Grow: Impact on Global Trade," (Oct. 14, 2025), https://astaspice.org/resources/spice-map.

[9] *See* Proclamation No. 11010, 91. Fed. Reg. 7107 (Feb. 6, 2026).

4

States since 2022 on the domestic cattle industry and restrictions on the importation of live-animal commodities transiting through Mexico following detections of the New World Screwworm (NWS) in Mexico in May 2025,[10] the President recently invoked his authority under Section 404 of the Uruguay Round Agreements Act (URAA) (Public Law 103-465, 108 Stat. 4809, 4959-61 (19 U.S.C. § 3601)) to improve the domestic supply of beef at reasonable prices. Similarly, because of concerns about serious dislocations in the supply of tomatoes, oranges, and other foodstuffs, on November 14, 2025, the President issued Executive Order 14360 (Modifying the Scope of the Reciprocal Tariffs With Respect to Certain Agricultural Products). I advised the President that the imposition of the surcharge imposed under the Section 122 Proclamation could create similarly serious dislocations in the supply of those products and thus, that that surcharge should not apply to the same foodstuff products.

10. I recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to information materials, donations, and accompanied baggage on grounds that imposing the surcharge on these products would be unnecessary in carrying out the purposes of Section 122. In the case of information materials, imposing the surcharge on imported goods could raise constitutional concerns, as Congress has recognized in respect to other statutes relating to the regulation of importation, particularly section 203(b) of the International Emergency Economic Powers Act (IEEPA) (Pub. L. No. 100-418, § 2502, 102 Stat. 1107, 1371 (1988)) (codified at 50 U.S.C. app. § 5(b), 50 U.S.C. § 1702(b)). Moreover, in my judgment, imposing a surcharge on charitable donations and accompanied baggage is unnecessary to address the country's large and serious balance-of-payments problem because such items are not typically traded goods or services in the calculation of the U.S. current account.

---

[10] *See id.*

5

11.     I recommended that the temporary import surcharge imposed under Section 122 Proclamation not apply to goods of Canada or Mexico that qualify as duty free treatment under the *United States-Mexico-Canada Agreement* (USMCA).  I made this recommendation on grounds that there is unavailable domestic supply of some USMCA-compliant products at reasonable prices, that the importation of USMCA-compliant materials is necessary for the functioning of the supply chains of the U.S. economy, and that serious dislocations in the supply of imported USMCA-compliant goods of Canada and Mexico should be avoided.

12.     In his first term, President Trump and Congress brought about the USMCA as a replacement for the North American Free Trade Agreement (NAFTA), the failures of which were well known.  The USMCA, which entered into force on July 1, 2020, is a thirty-four-chapter trade agreement with Canada and Mexico that covers issues spanning the entirety of the three North American economies including: rules of origin for automobiles and automotive parts intended to create strong incentives to invest and manufacture in North America; improvements to the outdated NAFTA rules that benefit American farmers, ranchers, and agribusinesses; as well as commitments on digital trade, financial services, intellectual property rights, and investment.

13.     While the USMCA has many shortcomings, numerous U.S. manufacturers are currently dependent on the importation of raw materials and other inputs for their production processes, including inputs with high levels of regional content.[11]  In my assessment, potentially displacing these supply chains by imposing the surcharge on USMCA-compliant goods would create serious dislocations in the supply of imported goods in current circumstances.  Given that the USMCA Parties are currently conducting a Joint Review of that Agreement and the fact that

---

[11] *See, e.g.*, National Association of Manufacturers (NAM), "USTR-2025-0004-00121823-CAT-11738-Public Document" (Nov. 3, 2025) at pp. 6, 11, 14, 24, and 26, *available at* https://comments.ustr.gov/s/docket?docketNumber=USTR-2025-0004; NAM, "NAM Presses for Stronger, Smarter USMCA" (Nov. 12, 2025), https://nam.org/nam-presses-for-stronger-smarter-usmca-35156/.

6

these goods of Canada or Mexico were not subject to tariffs imposed under Executive Order 14257, as amended, I recommended that not applying the surcharge under Section 122 Proclamation on USMCA-compliant goods was essential to prevent serious dislocations in certain North American supply chains.

14.     Similarly, I recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to textile and apparel articles that qualify for duty free treatment under the *Dominican Republic-Central America Free Trade Agreement* (CAFTA-DR). Such goods include high levels of regional content.  I made this recommendation on grounds that there is unavailable domestic supply at reasonable prices and that serious dislocations in the supply of imported CAFTA-DR-compliant textile and apparel articles should be avoided.

15.     The CAFTA-DR, which entered into force on a rolling basis beginning on March 1, 2006, and concluding on January 1, 2009, is a twenty-two-chapter trade agreement with Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua.  Of particular importance is the trade in textile and apparel articles, which enter CAFTA-DR countries' markets duty free and quota free if the good meets the CAFTA-DR's rules of origin, providing a highly integrated supply chain for all CAFTA-DR parties, including the United States.

16.     In my assessment, potentially displacing the supply chain by subjecting CAFTA-DR compliant textile and apparel articles to the surcharge would limit the availability of the domestic supply of textile and apparel articles at reasonable prices and create serious dislocations in the supply of imported textile and apparel articles goods.

17.     The President's Section 122 action is necessary to address challenges associated with the U.S. balance of payments position.  In the International Monetary Fund's (IMF) 2026 Article IV consultation country report for the United States, the "[d]irectors expressed concern

7

- A154 -

about the size and persistence of the U.S. current account deficit," which remains significantly above the pre-pandemic baseline rate of 2 percent of gross domestic product (GDP) throughout 2026 and is projected to be above 3.6 percent through 2031.[12]  The IMF projects a deterioration of the current account deficit from 3.7 percent of GDP in 2025 to 3.8 percent in 2026,[13] which militates in favor of allowing the surcharge to remain in place throughout the pendency of any appeal.  Furthermore, the IMF projects a "continue[d] widening" of the U.S. negative net international investment position (NIIP) stressing that this "worsening of the NIIP . . . represents a potentially important source of vulnerability."[14]  These conditions represent a potential source of vulnerability that the President must continue to mitigate.

18.    Furthermore, as a result of the Section 122 and other trade actions, U.S. trading partners have been responsive and continue to engage in good-faith negotiations to rebalance their trade relationships with the United States.  Indeed, on March 13, 2026—just 21 days after the imposition of the Section 122 import surcharge—the United States and Ecuador concluded the U.S.-Ecuador Agreement on Reciprocal Trade, opening Ecuador's market of over 18 million consumers to U.S. agricultural and industrial exports.  By expanding U.S. exports while ensconcing U.S. tariffs on imported goods in each agreement, the Agreement on Reciprocal Trade program helps reduce the U.S. trade deficit, the single-largest driver of our current account deficit which causes our large and serious balance-of-payments deficit.  For this reason, the President expects to conclude more agreements in the coming months.

---

[12] IMF, *2026 Article IV Consultation – Press Release; Staff Report; and Statement by the Executive Director for the United States*, IMF Country Report 2026 (Apr. 2026), at 3, 46 (table 2).

[13] *Id.* at 4.

[14] *Id.* at 44, para. 67.

8

19.     Preserving the current trade environment is critical to ensuring trading partners' continued cooperation.  Notably, trading partners that signed reciprocal trade agreements with the United States prior to the imposition of the Section 122 surcharge continue to indicate willingness to honor and implement their commitments.

20.     Overturning or suspending the Section 122 action would risk undermining the conclusion of ongoing negotiations, slowing or stopping trading partners' implementation of their commitments, and undermining the President's effort to address fundamental international payments problems.  Such an action would also cause irreversible disruption to the Administration's efforts to rebalance the global trading system and potentially lead to unrecoverable economic and policy consequences.  Accordingly, it remains vital to the foreign policy, economy, and national security of the United States for the Court to permit the Section 122 surcharges to remain in effect.

9

21.     I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 3ʳᵈ day of April, 2026.


/s/ _____

Jamieson Greer
United States Trade Representative
Office of the United States Trade Representative

10

## UNITED STATES COURT OF INTERNATIONAL TRADE

THE STATE OF OREGON, et al.,

Plaintiffs,

v.

CASE NO. 26-01472

DONALD J. TRUMP, et al.,

Defendants.

## DECLARATION OF HOWARD W. LUTNICK, UNITED STATES SECRETARY OF COMMERCE

I, Howard W. Lutnick, hereby state and declare as follows:

1.   I am the Secretary of Commerce for the United States and the head of the Department of Commerce, an Executive Department of the United States.  *See* 5 U.S.C. § 101. The purpose of this declaration is to assert, in my official capacity and opinion, the critical role of the tariffs President Donald J. Trump has imposed under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132 ("Section 122") in redressing significant balance-of-payments issues that the United States faces, and the equal importance of maintaining the carefully designed scope of the Section 122 tariffs to most effectively redress these issues without impeding U.S. national security interests.  The statements made herein are based on my personal knowledge and on information provided to me in my official capacity as Secretary of Commerce.

2.   I have been tasked by President Trump to lead his tariff and trade agenda.[1]  As part of my duties as Secretary of Commerce, I have strategized with President Trump and

---

[1] *See* Statement by President-elect Donald J. Trump Announcing the Nomination of Howard Lutnick as Secretary of Commerce, The American Presidency Project, https://www.presidency.ucsb.edu/node/375586.

- A158 -

members of his cabinet on policies to conduct trade diplomacy and spur domestic investment, manufacturing, and export activity. Many of the fundamental problems the United States faces, ranging from the hollowing out of our defense-industrial and manufacturing base to balance-of-payment deficits and risk of significant currency depreciation, are caused by systemic trade imbalances with our foreign-trading partners.

3. The Department of Commerce has played a pivotal role in implementing the President's visionary trade policies. These policies have led to us securing historic trade deals and investment commitments from our trading partners, which are already yielding unprecedented returns that will contribute to redressing longstanding trade deficits and other economic issues. In the last month alone, there have been announcements on six different strategic investment projects that are directly tied to the U.S.-Japan trade deal, totaling over $100 billion of new investment in the United States and strengthening economic ties with one of our closest allies.[2]

4. While we continue to make great progress for the American people, certain adverse balance-of-payment conditions persist that require decisive action. On February 20, 2026, President Trump took such action by imposing a 10 percent tariff pursuant to Section 122. *See* Proclamation 11012 (Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems) ("Section 122 Proclamation"). The Section 122 Proclamation recognized that, based in part on data provided by the Bureau of Economic Analysis within the Department of Commerce,

---

[2] *See* Joint Announcement on the Japan-U.S. Strategic Investment, https://www.commerce.gov/news/press-releases/2026/03/joint-announcement-japan-us-strategic-investment.

2

the United States runs a substantial trade deficit, does not currently earn a net income from the capital and labor that it deploys abroad, and experiences significant net transfer payments flowing out of the country.

5. The Section 122 Proclamation exceptions are carefully scoped to ensure broad and uniform application of the Section 122 tariffs. These specific exceptions are designed to prevent the unnecessary or ineffective application of Section 122 tariffs, such as for articles that are subject to existing import restrictions in the form of tariff programs administered by my Department under Section 232 of the Trade Expansion Act of 1962, as amended ("Section 232"). Certain other exceptions are necessary and appropriate based on the specific needs of the U.S. economy, such as for certain articles that are encompassed by Section 232 investigations but are not yet covered by Presidential action under Section 232 imposing tariffs.

6. I have worked closely with the President as a member of his team of advisors evaluating the economic conditions and circumstances of the United States' current international payments disequilibrium. The current imbalance warrants the imposition of the Section 122 tariffs. I also worked closely with the President and his team to ensure that the Section 122 Proclamation exceptions were implemented in a manner fully consistent with the purposes and requirements of Section 122.

7. As Secretary of Commerce, my responsibilities include overseeing all of the work of the Department of Commerce, including its work under Section 232. I am personally familiar with the Section 232 tariffs currently in effect, as well as the Section 232

3

- A160 -

investigations conducted by the Department during my tenure as Secretary of Commerce.

8. Under Section 232, I am authorized to conduct investigations into the effect of imports of articles and their derivatives on the national security of the United States. If I determine that imports of an investigated article or its derivatives threaten to impair the national security of the United States and the President concurs, the President may take actions to adjust imports to remedy the threat. Such adjustments of imports may take the form of tariffs, quantitative restrictions such as quotas, or both.

9. The Section 122 Proclamation excepts all articles and parts of articles currently or that later become subject to additional import restrictions imposed pursuant to Section 232. Articles that are currently subject to Section 232 tariff programs include steel, aluminum, copper, automobiles, lumber and timber, medium- and heavy-duty trucks, and certain pharmaceuticals and pharmaceutical ingredients, as well as certain parts and derivatives of these articles. Each Section 232 program is unique, and is carefully calibrated to the particular circumstances of, among other things, the nature of the subject article and its parts and/or derivatives, the relevant industry, and the national security interests and requirements of the United States.

10. The Department of Commerce has also conducted Section 232 investigations into imports of other articles that have not yet culminated in Presidential action imposing tariffs. These investigations include the following products identified in Clause 14 of the Section 122 Proclamation that identifies appropriate exceptions: commercial

4

aircraft and commercial aircraft parts, semiconductors and certain electronics containing semiconductors, certain pharmaceuticals and pharmaceutical ingredients, and critical minerals. The President has also imposed tariffs on some semiconductor articles as he continues to direct negotiations with trading partners on other semiconductor articles.

11. Imposing a Section 122 tariff on imported articles that are already subject to a Section 232 program would be unnecessary and ineffective in carrying out the purposes of Section 122. These imports are already subject to a carefully designed import restriction architecture under Section 232 to address an identified national security threat. The tariff rates and procedures that apply to articles subject to Section 232 tariffs therefore vary based on the particulars of the subject articles, the industry, and U.S. national security interests. Section 232 rates can also be determined in part by negotiations with trading partners. Imposing an additional baseline tariff on top of these individually designed Section 232 programs risks significantly impeding U.S. national security interests.

12. Section 122 tariffs are broad based and therefore do not address with the same precision the actions already taken pursuant to Section 232. For example, there are instances, such as with the 50 percent tariff applicable to imports of certain steel, aluminum, and copper products, where the Section 232 tariffs are much higher than the 15 percent maximum tariff rate authorized by law under Section 122. And in the case of both automobiles and medium- and heavy-duty trucks, the President imposed tariffs coupled with a carefully crafted tariff offset program to encourage expansion

5

of domestic production and reduce dependence on imports. This offset program serves to spur domestic production activities and therefore avoid significant disruption to the domestic assembly operations of both automobiles and trucks, which effectively addresses both the national security threat and the balance of payments concerns.

13. Other products for which action imposing tariffs under Section 232 remain pending also merit a Section 122 exception because they are vital to the needs of the United States economy. Those exceptions cover certain commercial aircraft and commercial aircraft parts, semiconductors and certain electronics containing semiconductors, certain pharmaceuticals and pharmaceutical ingredients, and critical minerals. While the Trump Administration continues to make great strides in bolstering domestic manufacturing capabilities within these critical industries, at present these articles are largely only available domestically in limited supply or otherwise rely on intricate global supply chains. And, in the case of parts, some imported articles consist of raw materials or inputs that are not produced in the United States in sufficient quantity. Further, tariffing these articles under Section 122 could result in substantial dislocations in the supply of needed goods for which the United States presently relies upon imports.

14. For example, in the case of semiconductors, the U.S. share of global chip fabrication capacity has declined from 37 percent in 1990 to less than 10 percent in 2024.[3] And

---

[3] *See* Raj Varadarajan et al, "Emerging Resilience in the Semiconductor Supply Chain," Semiconductor Industry Association & Boston Consulting Group (May 2024) at 15, available at https://www.semiconductors.org/wp-content/uploads/2024/05/Report_Emerging-Resilience-in-the-Semiconductor-Supply-Chain.pdf.

6

in 2024, just nine percent of chips were fabricated in the United States.[4] A recent study conducted by the Bureau of Industry and Security within my Department also determined that less than two percent of all chips likely went through necessary assembly, testing, and packaging ("ATP") operations in the United States.[5] Current U.S. semiconductor demand is estimated at $130 billion for chips embedded in semiconductor-containing derivative products alone. Imposing the Section 122 tariff on semiconductors and semiconductor-containing electronics prior to implementation of the precise and calibrated 232 tariffs tailored to this industry would therefore invariably cause significant disruptions to U.S. supply chains and shortages due to the current lack of complete end-to-end production capacity to satisfy domestic demand. The President's existing Section 232 actions related to semiconductors recognized that current conditions warranted a targeted action regarding semiconductor tariffs at this time, but that future, additional and tailored actions may be taken after negotiations with trading partners. These economic conditions make clear that an exception for the Section 122 tariffs is warranted based on the needs of the U.S. economy due to lack of domestic supply. A broad Section 122 tariff untailored to this specific sector would risk hastening adverse consequences to the U.S. economy and national security that the President has wisely sought to avoid.

---

[4] *See* SEMI, "World Fab Forecast—1Q 2025" (June 5, 2025) (Estimate based on output capacity aggregated at the national level), available at https://www.semi.org/sites/semi.org/files/2025-05/SEMI_Capex_market_outlook_5.28.2025_shared.pdf.

[5] *See* Bureau of Industry and Security, "Assessment of the Status of the Microelectronics Industrial Base in the United States," at 33 (2023), available at https://www.bis.doc.gov/index.php/documents/technology-evaluation/3402-section-9904-report-final-20231221/file.

7

15. The same market conditions and rationale applies to the other Section 232-based product exceptions at issue. As another example, imports of finished dosage form pharmaceuticals rose from $10 billion in 2000 to $100 billion in 2024, leading to a more than $80 billion trade deficit in finished dosage form pharmaceuticals in 2024.[6] Recent data also suggests that China and India accounted for nearly two-thirds of all active pharmaceutical ingredients ("API") manufactured worldwide.[7] For critical minerals, the United States was completely import reliant for 12 critical minerals, with an additional 29 critical minerals exceeding 50 percent net import reliance in 2024.[8] Subjecting imports of these minerals to tariffs under Section 122 would harm industries dependent on these critical minerals and undermine the President's historic efforts that are securing new and sustainable alternative critical mineral sources. Like semiconductors, the pharmaceutical and critical minerals sectors require a calibrated tariff approach that accounts for sector-specific dynamics that a baseline tariff rate does not provide, and which would instead likely lead to undesirable impacts on global supply chains.

16. These examples demonstrate how these Section 232-based product exceptions plainly fall within product exceptions contemplated by Section 122(e). The President's Section 122 Proclamation rightly—and smartly—strikes a carefully measured

---

[6] *See* U.S. International Trade Commission DataWeb, https://dataweb.usitc.gov/.

[7] *See* Mercator Institute for China Studies (Merics), "Europe's increasing reliance on China for critical drugs + Foreign investment + China-Africa" (Sept. 12, 2024), available at https://merics.org/en/merics-briefs/europes-increasing-reliance-china-critical-drugs-foreign-investment-china-africa.; Statista, "Distribution of active pharmaceutical ingredient (API) production volume worldwide as of 2023, by region" (Oct. 10, 2024), available at https://www.statista.com/statistics/1498065/api-production-volume-by-region/.

[8] U.S. Department of the Interior, U.S. Geological Survey *Mineral Commodity Summaries 2025* (March 2025), available at https://pubs.usgs.gov/periodicals/mcs2025/mcs2025.pdf.

balance between a broad and uniform tariff aimed to redress significant balance-of-payment trends and overall disequilibrium, while at the same time recognizing product exceptions that will preserve the carefully crafted national security tariff programs that I am proud to oversee on behalf of the President and the citizens of the United States.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2 day of April, 2026, in the City of Washington, District of Columbia.

_____
Howard W. Lutnick
41st United States Secretary of Commerce

- A166 -

**U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

| | |
|---|---|
| THE STATE OF OREGON, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 26-01472 |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

## DECLARATION OF AMBASSADOR JAMIESON LEE GREER, UNITED STATES TRADE REPRESENTATIVE

I, Ambassador Jamieson Lee Greer, hereby state as follows:

1.      I am the United States Trade Representative and the head of the Office of the United States Trade Representative, a component in the Executive Office of the President. *See* 19 U.S.C. § 2171(a). I have been the United States Trade Representative since February 26, 2025.

2.      The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, component employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.      The purpose of this declaration is to explain, in my capacity as the principal advisor to the President on international trade policy and the chief representative for the United States in international trade negotiations, that the temporary import surcharge imposed in Proclamation 11012 of February 20, 2026 (Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems) ("Section 122 Proclamation") should be maintained during the

1

- A167 -

pendency of the United States Government appeal due to its continued importance in preserving our ongoing trade negotiations, bolstering our economic security, and reinforcing the Trump Administration's national security tariffs. If enforcement of the United States Court of International Trade's (CIT) judgments during the pendency of all appeals is not stayed, the United States Government will be required to pay refunds to the importer plaintiffs here—and any other importers who secure similar judgments in the coming days. This outcome will create uncertainty for both foreign trading partners and importers about the Trump Administration's ability to use trade policy to support domestic production and reduce reliance on imports generally, and in national-security-sensitive sectors in particular. It would also signal to financial markets that United States Government has fewer statutory tools than expected to confront long-standing problems in its balance-of-payments position at a time when its net international-investment position is sharply deteriorating.

4. First, maintaining the temporary import surcharge imposed in the Section 122 Proclamation is critical to ensuring trading partners' continued cooperation in ongoing trade negotiations. Since President Trump announced his global tariff program in April 2025, USTR has obtained significant commitments from trading partners to address structural problems underlying the substantial U.S. trade deficit, which as a subcomponent of the current account, contributes significantly to the large and serious balance of payments problems the United States is currently confronting. More specifically, due only to the leverage generated by President Trump's global tariff program, the United States has negotiated and finalized full Agreements on Reciprocal Trade ("ARTs") with Argentina, Bangladesh, Cambodia, Ecuador, El Salvador, Guatemala, Indonesia, Malaysia, and Taiwan and announced framework deals with the United Kingdom, the European Union, India, Japan, North Macedonia, South Korea, Switzerland, Thailand, and Vietnam. These

2

agreements have done more to eliminate certain persistent tariff and non-tariff barriers to U.S. exports, and thereby achieved more market access for American workers, producers, and service providers, than decades of traditional free trade agreements or multilateral negotiations at the World Trade Organization (WTO). Indeed, U.S. exports of goods and services exceeded $300 billion in each of the first three months of 2026, with each month breaking the record for the highest monthly export figure in American history.

5. After the Supreme Court issued its decision in *Learning Resources, Inc. et al. v. Trump*, 607 U.S. ___ (2026), which concluded only that the President lacked the authority under the International Emergency Economic Powers Act (IEEPA) to impose new additional tariffs on imports into the United States, and President Trump issued the Section 122 Proclamation, USTR has continued to work intensively with our ART partners to implement those agreements. The temporary import surcharge imposed in the Section 122 Proclamation has incentivized trading partners to continue implementation by underscoring President Trump's determination to address fundamental imbalances in the global trading system with increased tariffs.

6. Since President Trump issued the Section 122 Proclamation, USTR has also remained engaged in active negotiations with framework deal partners to finalize those agreements. In fact, USTR has scheduled additional negotiating rounds with numerous trading partners before the Section 122 surcharge is set to expire on July 24, 2026. A failure to stay enforcement of the CIT's judgments pending resolution of all appeals would inject uncertainty into those negotiations and significantly reduce trading partner incentives to eliminate barriers. Moreover, since the President announced the Section 122 surcharge, various other trading partners have approached the United States to engage in negotiations to eliminate their trade barriers as well. If

3

certain key trading partners walk away from the table now, these negotiations may never resume, even if higher courts conclude that the temporary import surcharge was lawful.

7. Second, the Section 122 surcharge enhances U.S. economic security. In line with Section 122 itself, the surcharge aims to address a large and serious U.S. balance-of-payments issue, as evidenced, in part, by the substantial U.S. trade deficit. Left unaddressed, this balance-of-payments issue endangers our ability to finance our spending, erodes investor confidence in our economy, and distresses financial markets.

8. President Trump's global tariffs program has spurred trading partners to commit hundreds of billions of dollars in greenfield U.S. investments across key sectors, including semiconductors, shipbuilding, energy, and critical minerals, while simultaneously securing increased market access for U.S. exports, as described above. Furthermore, the global tariffs program is designed to reinforce President Trump's domestic policies to increase domestic manufacturing capacity and production, which are already having an impact. In fact, since, the Section 122 tariff took effect on February 24, the manufacturing goods trade deficit decreased by 43.3 percent in March year-over-year, down from $151.4 billion in March 2025 to $85.4 billion in March 2026 (latest information available). In addition, from February 2026, the month the Section 122 surcharge took effect, through April 2026, overall manufacturing employment increased by one percent, as the Institute for Supply Management Manufacturing Purchasing Managers' Index and manufacturing productivity grew at some of the highest levels since January 2023. Thus, the President's tariff strategy, inclusive of the Section 122 surcharge, is having real, beneficial impacts on the U.S. economy.

9. Third, the Section 122 surcharge supports U.S. national security. The Section 122 action reinforces President Trump's national security tariff program by creating a demand signal for

domestic producers, spurring an increase in domestic production of critical manufactured goods and agricultural products, thereby reducing our vulnerability to economic coercion by adversaries and enhancing supply chain resilience in defense-critical sectors.

10.    In sum, if the CIT's decision is not stayed pending appeal, trading partners with whom we have concluded ARTs might abandon implementation of their commitments and ongoing negotiations of future such agreements may cease, while President Trump's policies to promote U.S. economic and national security by expanding domestic production capacity and production may be weakened.  Accordingly, it remains vital to the foreign policy, economy, and national security of the United States for the Court to permit the Section 122 temporary import surcharge to remain in effect.

11.    I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 11th day of May, 2026.

/s/ _____

Jamieson Lee Greer
United States Trade Representative
Office of the United States Trade Representative

5

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| THE STATE OF OREGON, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 26-01472 |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**DECLARATION OF HOWARD W. LUTNICK,
UNITED STATES SECRETARY OF COMMERCE**

I, Howard W. Lutnick, hereby state and declare as follows:

1.  I am the Secretary of Commerce for the United States and the head of the Department of Commerce, an Executive Department of the United States. *See* 5 U.S.C. § 101. The purpose of this declaration is to assert, in my official capacity and opinion, how the failure to issue a stay in this case will cause irreparable harm to the United States by negating the critical role of the tariffs President Donald J. Trump has imposed under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132 ("Section 122") in redressing significant balance-of-payments issues that the United States faces. The statements made herein are based on my personal knowledge and on information provided to me in my official capacity as Secretary of Commerce.

2.  Many of the fundamental problems the United States faces, ranging from the hollowing out of our defense-industrial and manufacturing base to balance-of-payment deficits and risk of significant currency depreciation, are caused by systemic trade imbalances with our foreign-trading partners.

- A172 -

3. The Department of Commerce has played a pivotal role in implementing the President's visionary trade policies. These policies have led to us securing historic trade deals and investment commitments from our trading partners, which are already yielding unprecedented returns that will contribute to redressing longstanding trade deficits and other economic issues.

4. Proclamation 11012 imposed a temporary 10 percent ad valorem surcharge on certain imports, subject to specified exceptions, effective February 24, 2026. The President imposed that surcharge after determining that fundamental international payments problems exist, that those problems significantly harm United States national interests, including economic and national-security interests, and that special measures to restrict imports are required to address those problems.

5. The Proclamation rests on the condition of the United States' international payments position and the President's judgment that those conditions impair United States national interests, including economic and national-security interests. The President found that the United States faces fundamental international payments problems; that special import measures such as surcharges and quotas are key tools to protect the economy and national security of the United States; and that large and serious balance-of-payments deficits can endanger the ability of the United States to finance its spending, erode investor confidence in the economy, and distress financial markets.

6. The President found in Proclamation 11012 that the United States runs a substantial trade deficit, that the annual balance on primary income turned negative in 2024 for

2

- A173 -

the first time since at least 1960, that the United States maintained a current-account deficit of 4.0 percent of GDP in 2024, that the United States' net international-investment position has deteriorated substantially, and that the balance on secondary income has been persistently in deficit since the 1960s.

7. The Section 122 surcharge is a temporary import restriction designed to help deal with those fundamental international payments problems. It is also part of a broader transition in United States trade policy following the Supreme Court's decision invalidating the prior IEEPA tariff program. The surcharge acts as a global baseline tariff that prevents the resurgence of conditions such as extremely high imports and trade deficits that contributed to the balance of payments problems found in Proclamation 11012. In my view, premature removal of the surcharge would usher in a flood of imports that characterized the pre-global tariff landscape, exacerbating the imbalances that Proclamation 11012 is designed to prevent.

8. The timing and full duration of the targeted Section 122 surcharge matters. Section 122 is, by design, temporary. The surcharge is scheduled to last only 150 days. If the surcharge is suspended or invalidated during the pendency of appeal, the harm cannot be repaired later. The United States cannot recover the lost import-restricting effect of a temporary measure after the statutory period has run. Nor can the United States reconstruct the negotiating leverage, market expectations, or trade flows that would be lost during that period.

9. Recent import data demonstrates why the temporary surcharge is necessary. In January, February, and March 2025—the three months immediately before President

3

- A174 -

Trump announced the global tariff program under the International Emergency Economic Powers Act—goods imports into the United States reached extraordinary levels. According to the Census Bureau's seasonally adjusted data for United States trade in goods with the world, imports totaled approximately $327 billion in January 2025, $325 billion in February 2025, and $344 billion in March 2025. Those were the three largest goods-import totals ever recorded.[1]

10. Those three months alone totaled just under $1 trillion in goods imports, for an average of $332 billion per month. That was an extraordinary import surge and reflected the scale and immediacy of the imbalance the Administration confronted.

11. After President Trump announced and implemented the global tariff program under IEEPA, imports immediately declined. Seasonally adjusted goods imports from the world fell from $344 billion in March 2025 to $275 billion in April 2025, a one-month decline of approximately 20% and totaling approximately $69 billion. Goods imports remained materially lower in the following months, including $275 billion in May 2025, $262 billion in June 2025, and $280 billion in July 2025.

12. When the President's broader global tariff regime was put in place for all countries in August 2025, the same pattern remained evident. Seasonally adjusted goods imports from the world fell from $280 billion in July 2025 to $262 billion in August 2025, a reduction of approximately $18 billion in one month. Compared with the January–March 2025 monthly average of $332 billion, August 2025 imports were approximately $70 billion lower.

---

[1] *See* U.S. Census Bureau, Trade in Goods with World, Seasonally Adjusted, available at https://www.census.gov/foreign-trade/balance/c0004.html.

4

13. These trends have contributed to an unprecedented, immediate, and sustained reduction in trade deficit levels, which directly address a key component of the balance of payment deficit identified in Proclamation 11012. In just one month following enactment of the IEEPA tariffs, the monthly trade deficit was almost cut in half from $161.5 million in March 2025 to $85.4 billion in April 2025. That deficit has consistently remained at reduced levels, including through the transition to the Section 122 proclamation. The most recent Census data available is for March 2026—the first full month following removal of the IEEPA tariff regime and transition to Section 122—reflects an increase in imports to almost $300 billion, but is still commensurate with the reduced and decreasing deficit levels that characterize the global tariff regime due in part to an increase to an all-time-high in exports.

14. These figures are important because they show that broad tariff measures affect import behavior. Importers respond to tariff expectations. Foreign producers respond to tariff expectations. Trading partners respond to tariff expectations. When the United States maintains a credible tariff baseline, it affects the timing, volume, and pricing of imports into the United States.

15. The inverse is also true. When a broad tariff baseline is removed or expected to be removed, import volumes can rise quickly. After the Supreme Court invalidated the IEEPA tariff program in February 2026, imports increased in the latest month for which Census seasonally adjusted world-goods data are available. Goods imports from the world surged to $299.95 billion in March 2026, the fourth highest single month in history.

5

16. That increase occurred even with the 10 percent Section 122 surcharge in effect for March 2026. In my judgment, that is significant. It indicates that the Section 122 surcharge is not excessive or unnecessary. It indicates the opposite: even with the surcharge, import pressures remain substantial. Removing the surcharge would remove the only global baseline currently restraining an unprecedented spike in import flows while the Administration continues to address the United States' balance of payments issues.

17. The Section 122 surcharge is therefore serving a critical stabilizing function. It is helping prevent a return to the extraordinary import levels that prevailed ahead of the President's imposition of global tariffs. It is helping restrain imports while the United States addresses fundamental payments problems. And it is helping preserve the effectiveness of the President's trade strategy during a short but important transition period.

18. If this Court's decision takes effect and the Section 122 surcharge is removed, I expect importers and foreign producers to respond immediately. They will have a strong incentive to accelerate shipments into the United States before other tariff measures are finalized or implemented. Based on the import patterns described above, I expect that goods imports in May 2026 and subsequent months would increase above the levels that would otherwise prevail with the surcharge in place.

19. That increase would directly undermine the objectives of Proclamation 11012. The Proclamation was designed to restrict imports temporarily in order to deal with large and serious United States balance-of-payments deficits and related fundamental

6

- A177 -

international payments problems. Removing the surcharge would do the opposite. It would invite additional imports during the very period in which the United States is attempting to stabilize its trade position and transition to more targeted measures.

20. If the surcharge is removed now, foreign producers and trading partners will have every incentive to increase shipments, preserve dependence on foreign supply, and entrench their position in the United States market before other actions such as tariff measures and investment commitments and plans can be finalized. The result would be a surge of imports during the precise period in which the United States is attempting to strengthen its position in the international payments system, protect its industrial base, and move from temporary balance-of-payments action to a robust domestic manufacturing environment supported by other targeted trade remedies. The surcharge reinforces the seriousness of the United States' position and demonstrates that the United States will not allow large and persistent payments imbalances to continue unchecked while negotiations and statutory investigations proceed.

21. Conversely, suspending or invalidating the surcharge now would send the opposite signal. It would tell trading partners that the United States cannot maintain even a temporary, globally applicable import measure during a period of serious payments stress. It would encourage delay. It would reduce incentives for foreign governments to address policies that undermine United States commerce and national security.

22. Failing to issue a stay also creates substantial uncertainty for importers, foreign producers, and trading partners. That uncertainty itself changes behavior. Importers

7

- A178 -

may accelerate shipments in anticipation of refunds, broader relief, or further litigation. Foreign producers may increase shipments to take advantage of perceived weakness in the United States' tariff posture.

23. These market effects are difficult to quantify precisely in advance, but they are real. Trade flows respond to tariff expectations. The early 2025 import surge, the decline following the IEEPA tariff announcements, the decline following full implementation in August 2025, and the March 2026 increase following the Supreme Court's February 2026 decision all demonstrate that import behavior changes rapidly when the tariff environment changes.

24. The United States cannot remedy these harms after the fact. Once goods enter the United States in higher volumes, the import-restricting effect of the temporary surcharge for that period is lost.

25. The Proclamation's exceptions further confirm that the measure is calibrated to national-security needs. The surcharge does not apply on top of tariffs imposed under Section 232, which are themselves designed to address national-security risks in specific sectors. That structure avoids disrupting carefully designed national-security tariff programs for steel, aluminum, autos, critical minerals, and other strategic sectors. It preserves the President's ability to use Section 232 and other authorities in a targeted manner while Section 122 addresses the broader balance-of-payments problem.

26. In other words, the Section 122 surcharge does not displace the Administration's national-security trade architecture. It supports it. It provides a temporary baseline

8

while sector-specific tools, including Section 232, operate or are developed. Removing that baseline would weaken the entire structure by creating a gap during which imports could surge, trading partners could delay, and foreign producers could deepen their position in the United States market.

27. The surcharge is also carefully limited. It is temporary. It is set at 10 percent, below the maximum 15 percent surcharge authorized by Section 122. Maintaining the surcharge during appeal would preserve the status quo established by the President's Proclamation. Suspending it would not preserve the status quo. It would change the tariff environment, invite import acceleration and flooding the market, thereby exacerbating the very balance of payments issues that Proclamation 11012 sought to address.

28. A stay is especially important because the Section 122 surcharge is temporary by law. The remaining period is short. If the Government ultimately prevails on appeal after the surcharge has been suspended for much or all of the remaining 150-day period, the practical benefit of the surcharge will have been lost.

29. In my judgment, allowing the Court's decision to take effect during appeal would cause serious and irreparable harm to the United States. It would impair the President's ability to address the fundamental international payments problems identified in Proclamation 11012. It would increase the likelihood of higher imports in the coming months, unwinding the serious progress the Administration has made in reducing the trade deficit that feeds directly into current balance of payment problems. It would simultaneously weaken the United States' national security and

9

economic security posture while also undermining our position with trading partners during ongoing negotiations.

30. For these reasons, I respectfully submit that a stay pending appeal is necessary to prevent irreparable harm to the United States and to preserve the effectiveness of the President's temporary Section 122 action while appellate review proceeds.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of May, 2026, in the City of Washington, District of Columbia.

_____

Howard W. Lutnick
41st United States Secretary of Commerce

10

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
              THE HONORABLE CLAIRE R. KELLY, JUDGE
              THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

_____

| | |
|---|---|
| THE STATE OF OREGON, *et al.*, | ) |
| | ) |
|    Plaintiffs, | ) |
| | ) |
|       v. | )     Court No. 26-01472-3JP |
| | ) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) |
| | ) |
|    Defendants. | ) |

_____

| | |
|---|---|
| BURLAP AND BARREL, INC.; BASIC FUN, INC., | ) |
| | ) |
|    Plaintiffs, | ) |
| | ) |
|       v. | )     Court No. 26-01606-3JP |
| | ) |
| DONALD J. TRUMP in his official capacity as President of the United States, *et al.*, | ) |
| | ) |
|    Defendants. | ) |

**DECLARATION OF BRANDON LORD**

I, Brandon Lord, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1. I am the Executive Director, Trade Programs Directorate, Office of Trade, U.S. Customs and Border Protection (CBP), a position I have held since July, 2022. In my role, I lead CBP's strategic efforts to enforce and protect the revenue, including the implementation of tariff measures under Section 232 of the Trade Expansion Act of 1962 and Section

- A182 -

122 of the Trade Act of 1974, 19 U.S.C. § 2312 ("Section 122"). I lead the administration of priority international trade issues, including Tariffs and Trade Remedies, Intellectual Property Rights, Free Trade Agreements, Import Safety, Textiles and Antidumping and Countervailing Duties. Previously, I served as the Acting Executive Director for Trade Policy and Programs, Office of Trade, from March 2021 until November 2021, and as the Deputy Executive Director for Trade Policy and Programs, Office of Trade, from November 2017 until July 2022.

2. On May 7, 2026, the Court declared Proclamation No. 11012, Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems, 91 Fed. Reg. 9,339 (Feb. 25, 2026) (the "Proclamation"), contrary to law, and permanently enjoined the collection of duties imposed by the Proclamation which invoked the President's authority under Section 122 (the "Section 122 duties"), with respect to three of the plaintiffs: The State of Washington (and its Instrumentalities), Burlap and Barrel, Inc., and Basic Fun, Inc. (the "affected importers"). The Court ordered Defendants to implement the permanent injunction within 5 days.

3. The Court's injunction poses immediate challenges to CBP, the agency tasked with collecting the Section 122 duties pursuant to the Proclamation and implementing the permanent injunction.

4. As of May 7, 2026, 170,885 importers have made over 13 million entries requiring deposits of Section 122 duties.

5. To implement the permanent injunction, CBP must first ascertain the importer of record (IOR) numbers for the affected importers, and will then need to reprogram the Automated Commercial Environment (ACE), CBP's official system of record for imported merchandise, to allow the affected importers to submit entry summaries

2

- A183 -

without declaring a provision of the Harmonized Tariff Schedule of the United States imposing Section 122 duties and depositing the associated Section 122 duties. CBP received confirmation of the IOR numbers for Burlap and Barrel, Inc. and Basic Fun, Inc., but it is currently waiting for confirmation of the IOR numbers for the State of Washington and its "instrumentalities."

6. Once ACE has been reprogrammed, CBP will need to manually extend liquidation for each of the affected importers' entries so that the Section 122 duties may be re-assessed if the permanent injunction is overturned on appeal. If liquidation is not extended, CBP will not be able to reliquidate the entries beyond the 90-day reliquidation period absent a court order. Extending liquidation is a manual and resource intensive process.

7. Should additional plaintiffs file actions and the Court's injunction be applied to their imports, CBP will need to ascertain all affected IOR numbers, continually modify the ACE programming as outlined above, and manually extend each importers' affected entries; a process that will become increasingly unworkable should additional IORs be covered, given that more than 13 million entry summaries have been filed with Section 122 duties to date.

8. If the permanent injunction is overturned on appeal, CBP may not be able to retroactively collect the outstanding Section 122 duties. For entries which CBP is enjoined from collecting Section 122 duties that it subsequently is able to liquidate or reliquidate with Section 122 duties, should a final decision in this matter uphold those tariffs, CBP would face significant risk that bills issued upon such liquidations or reliquidations would go unpaid. Although importers are required to maintain a continuous bond to cover unpaid bills, CBP's general continuous bonding formula is the greater of $50,000 or 10% of the duties, taxes, and fees paid by the importer in the

3

preceding 12 months, and thus would not likely cover the full amount of Section 122 duties subsequently assessed. Such bonding is intended for normal circumstances where estimated duties are usually deposited as required by 19 U.S.C. § 1505(a), and where the nonpayment of any estimated duties is a rare and/or unexpected occurrence.

9. Further, although CBP can extend liquidation of formal entries, the agency cannot do so for informal entries which liquidate immediately upon payment or release in accordance with 19 C.F.R. § 159.10(a). Thus, CBP may not be able to collect outstanding Section 122 duties on informal entries that are outside the 90-day reliquidation period if the permanent injunction is overturned.

10. This risk of unpaid bills and lost revenue would be exacerbated if the Court's injunction was applied to additional importers given the number of entries that have been filed with a deposit of Section 122 duties to date.

11. CBP's experience with processing refunds of tariffs imposed under the International Emergency Economic Powers Act (IEEPA) after the Supreme Court's decision holding that such tariffs were unlawfully imposed demonstrates that CBP can effectively and efficiently process refunds as needed if the affected plaintiffs prevail at the conclusion of litigation through all appeals. As further detailed in my declarations filed in *Euro-Notions Fla., Inc. v. United States*, Ct. No. 25-00595, CBP developed the necessary functionality and promptly began processing refunds after the Supreme Court issued its final decision.

12. Absent a stay of this Court's order pending appeal in this case, CBP will be required to divert resources from the IEEPA tariff refund processing effort to develop, test, monitor, and administer new functionality in ACE. Indeed, CBP is still engaged in the early stages of processing IEEPA tariff refunds through the new Consolidated Administration

4

and Processing of Entries (CAPE) functionality in ACE, and substantially all of its available resources are currently dedicated to maintaining and improving this functionality.  After the initial deployment of the new ACE programming to implement the injunction with respect to the affected importers, the agency's continued compliance would require it to constantly update the ACE programming to maintain a potentially expanding list of importers for whom estimated duty deposits for the contested Section 122 duties would not be due, pending appeal.

Executed this 11th day of May, 2026.

_____
Brandon Lord
Executive Director
Trade Programs
Office of Trade
U.S. Customs and Border Protection